IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VALERIA CORBIN,<br>    **Plaintiff,**<br><br>   v.<br><br>BUCKS COUNTY, et al.,<br>    **Defendants.** | CIVIL ACTION<br><br><br><br>NO. 23-2784 |

**OPINION**

  This is a wrongful-death action by Plaintiff Valeria Corbin against Bucks County, Pennsylvania and various guards and supervisors at the Bucks County Correctional Facility ("BCCF") (collectively, "Defendants").[1] Corbin serves as the administrator of the estate of Joshua Patterson, who died after overdosing on drugs he obtained while incarcerated at BCCF, and she alleges that Defendants failed in their duty to protect Patterson from this danger. Presently pending is Defendants' motion to dismiss all counts in the Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the motion will be granted in part and denied in part.

 I. **FACTUAL BACKGROUND**

  Corbin's Amended Complaint contains the following allegations, which are accepted as true in this posture. *See Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). In the summer of 2022, Allen Rhoades was arrested for narcotics-related offenses. Following his arraignment, Rhoades was sent to BCCF for pre-trial detention. Upon his arrival at the facility,

---

[1] Specifically, the individual defendants include seven BCCF corrections officers who are sued in their individual capacities, one who is sued in his individual and official capacities, and five BCCF supervisors who are sued in their individual and official capacities. While Corbin also names an unspecified number of "John Doe" and supervisors as defendants, her Amended Complaint includes no factual allegations against these unidentified individuals. Accordingly, her claims as to all "John Doe" defendants will be dismissed. *See, e.g., Reaves v. Betti*, 2022 WL 1122838, at *2 (M.D. Pa. April 14, 2022) (dismissing defendants from an action when "[t]he complaint is completely devoid of any allegations against these Defendants").

the intake officers only gave him "a cursory pat down," and as a result, failed to find "a substantial amount of illegal narcotics," including both fentanyl and methamphetamine, in Rhoades' pants area. After his in-processing was complete, he was taken to the housing module, where officers again failed to detect that he had drugs on his person. Once the officers departed, Rhoades began to sell his drugs to other inmates, including Joshua Patterson.

When Rhoades arrived at BCCF, Patterson was supposed to be housed in a "restrictive housing unit." However, he had instead been restricted to his cell on a normal housing block, where he could be visited by other inmates. One of those inmates, Mallet Clark, acted as a go-between for Patterson and Rhoades, facilitating an exchange of "pinks" (Sweet and Low coffee sweetener) for drugs. This transaction went unnoticed by the officers guarding Patterson's housing unit, who only discovered Rhoades' drugs later that day after receiving a tip from a confidential informant. The officers searched Rhoades' cell and found the drugs that were still in his possession, but they did not recover the drugs that had already been traded to other inmates. Patterson ingested the drugs he had purchased, and guards found him unresponsive in his cell early the next morning. He was taken to the hospital, where he was pronounced dead several days later "due to an overdose of narcotics."

## II.   LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Id.* When analyzing a motion to dismiss, the complaint must be construed "in the light most favorable to the plaintiff," with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Legal conclusions are disregarded, well-pleaded facts are taken as true, and a determination is made as to whether those facts state a "plausible claim for relief." *Id.* at 210-11.

### III. DISCUSSION

#### A. "Group Pleading"

At the outset, Defendants maintain that the Amended Complaint fails to state a claim against any of the individual defendants (*i.e.*, the BCCF guards and supervisors) because it relies on impermissible "group pleading." Pointing to several non-precedential decisions—principally *Angle v. Smith*, 2022 WL 2392822 (W.D. Pa. June 10, 2022), *R. & R. adopted* 2022 WL 2392438 (W.D. Pa. July 1, 2022)—they state that a complaint in a civil rights lawsuit "may not rely on vague references to a group of defendants," as doing so "fails to satisfy [the] minimum fair notice standard of FRCP 8." *Id.* at *4 (internal quotation marks and citations omitted). Thus, Defendants argue, because the Amended Complaint provides no details to distinguish the specific actions taken by any of the individual defendants, Corbin's claims against these defendants fail as a matter of law.

But this argument both overstates what the Federal Rules require and understates what Corbin has actually alleged. First, Rule 8 requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The rule requires that a complaint contain enough factual allegations to permit the court to conclude that a defendant "is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. But there are not

special pleading rules for § 1983 claims, and the Third Circuit has repeatedly held that complaints in civil rights lawsuits are evaluated using the same standard as all other civil actions (with the exception of those identified in Rule 9).  *See, e.g.*, *Thomas v. Independence Twp.*, 463 F.3d 285, 295 (3d Cir. 2006).  Defendants point to no case in which the Third Circuit has ever recognized a categorical prohibition on what they term "group pleading"—*i.e.*, allegations that multiple defendants undertook the same action in tandem.  Rather, the cases they cite all indicate a claim leveled against multiple defendants is evaluated at the motion-to-dismiss stage as any other claim: surviving when the complaint pleads sufficient facts to show that the plaintiff is entitled to relief from a particular defendant, and failing when the complaint does not.

*Angle*—a report and recommendation that serves as Defendants' principal authority for their "group pleading" argument—is instructive on this point.  That case involved an excessive-force claim against a group of correctional officers, and the plaintiff's pro se complaint alleged that when returning him to his cell, "unspecified Defendants choked, slapped, punched, and kicked Angle several times."  2022 WL 2392822, at *1 (cleaned up).  This is exactly the sort of "the-defendant-unlawfully-harmed-me accusation" that the Supreme Court disapproved of in *Iqbal*.  *See* 556 U.S. at 678.  And so the magistrate judge correctly recommended dismissing the complaint, concluding that the plaintiff had failed to plead facts showing that any of the correctional officers named in the suit "played an 'affirmative part' in the complained-of misconduct."  *Angle*, 2022 WL 2392822, at *4.  It is true, as Defendants note, that elsewhere in this opinion, the court stated that a complaint "may not rely on vague references to a group of defendants."  *Id.* (quoting *Engel v. Buchan*, 710 F.3d 698, 710 (7th Cir. 2013)).  But the (also non-precedential) authority that was the source of this proposition in *Angle* makes clear that allegations levied against multiple defendants satisfy Rule 8 when "there is no genuine

4

uncertainty regarding who is responsible for what," such as when multiple defendants "are accused of acting jointly." *Engel*, 710 F.3d at 710.  And in that case, the court concluded that the complaint had adequately alleged various acts of investigative and prosecutorial misconduct against multiple defendants "without differentiating between them." *Id.*

So too here.  The Amended Complaint alleges four distinct failures by BCCF personnel, and it makes clear which of the defendants it seeks to hold responsible for each.  First, the Amended Complaint alleges that when Allen Rhoades was brought to the BCCF, the intake officers on duty that day failed to properly search him for narcotics, instead performing just "a cursory pat down."  Second, it alleges that after Rhoades brought these narcotics into the housing module and began selling them to other inmates (including Patterson, via an intermediary), the guards on duty that day failed to discover or deter these transactions.  Third, it alleges that after Patterson overdosed, the personnel guarding his housing module "failed to properly check on the decedent to make sure he was safe and alive."  And finally, it alleges each of these instances also represented a failure by Bucks County and BCCF leadership to properly train and supervise the facility's officers.  Irrespective of whether these allegations are sufficient to state a claim for which relief may be granted, they permit each defendant named in the Amended Complaint to understand the nature of the allegations levied against them.  Thus, they may not be categorically dismissed as "group pleading."

### B. Count I: Failure-to-Protect

Turning to the specific allegations in the Amendment Complaint, Corbin first alleges that the individual, non-supervisor Defendants (*i.e.*, Julio Atiles, Stephanie Ulmer, Thomas Fabiani, Tony Dowdy, Joshua Manning, Luis Ventureira, Kaitlyn McGinley, and Connor Wilcox), along with one BCCF supervisor (Zach Sherman), violated Patterson's Fourteenth and Eighth

5

Amendment rights by failing to protect him from dangerous illicit drugs, pursuant to 42 U.S.C. § 1983. "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citations omitted). As a part of its guarantee against cruel and unusual punishment, the Constitution imposes a duty on prison officials to "take reasonable measures to guarantee the safety of inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). A claim alleging a failure of this duty to prevent harm has two prongs: one objective, and one subjective. First, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. And second, he must allege that the prison officials had "a sufficiently culpable state of mind"—*i.e.*, "'deliberate indifference' to inmate health or safety." *Id.* (internal citation omitted).

Here, Defendants argue that Corbin's Amended Complaint pleads insufficient facts to establish either the objective or subjective element of her failure-to-protect claim. They are wrong on both counts.

          **i.    The Objective Prong**

As discussed, to state an Eighth Amendment claim for failure to protect, a prison inmate must first plead facts sufficient to show that he was detained under conditions "posing a substantial risk of serious harm." *Farmer*, 511 U.S. 834. This is an objective standard, "requir[ing] a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original). "In other words, the prisoner must show that the risk of which he complains is not one that today's society

6

chooses to tolerate." *Id.*; *see also Farmer*, 511 U.S. at 834 ("[A] prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'") (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)).

Importantly, the unmitigated risk that can give rise to liability for prison officials need not be external to the prisoner (violence, disease, and the like); under some circumstances, a prisoner may state a § 1983 claim for failure to protect "when the acts causing the injury are those of the prisoner herself." *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 668 (3d Cir. 1988) ("*Colburn I*"), *abrogated on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993). In *Colburn I* and its progeny— principally *Colburn v. Upper Darby Twp.*, 946 F.2d 1017 (3d Cir. 1991) (*"Colburn II"*), *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314 (3d Cir. 2005), and *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017)—the Third Circuit held that if "officials know or should know of the particular vulnerability to suicide of an inmate, then the Fourteenth Amendment imposes on them an obligation not to act with reckless indifference to that vulnerability." *Colburn I*, 838 F.3d at 669. This duty has its limits: "custodial officials cannot be placed in the position of guaranteeing that inmates will not commit suicide," *id.*, and so the risk "must be so obvious that a lay person would easily recognize the necessity for preventative action." *Palakovic*, 854 F.3d at 222 (quoting *Colburn II*, 946 F.2d at 1025). But at base, these cases recognized that a strong propensity towards self-harm is the kind of "serious medical need" that prison officials may not knowingly disregard. *Id.* at 227.

Corbin argues that the same is true when an inmate dies from an overdose. Essentially, she reasons that illicit drugs—and in particular fentanyl—pose a severe danger to their users, and that this inherent risk of serious harm or death "is magnified within a prison." As a result, the

7

widespread availability of drugs in a prison, like the existence of a "particular vulnerability to suicide," is the sort of grave risk towards which prison officials may not be deliberately indifferent. In support of this analogy, Corbin relies primarily on *Zakora v. Chrisman*, 44 F.4th 452 (6th Cir. 2022), one of the few cases to have directly considered the viability of a failure-to-protect claim following a prisoner drug overdose. In its decision permitting this claim to move forward, the Sixth Circuit's reasoning tracked closely to the arguments now advanced by Corbin. First, the court stated that "[f]entanyl unquestionably poses a severe danger to anyone who comes in contact with it." *Id.* at 470. Second, the court determined that this inherent danger "is magnified when introduced to a controlled environment like a prison," *id.* at 470 (quoting *United States v. Colon*, 246 F. App'x 153, 156 (3d Cir. 2007)), taking judicial notice of various government reports warning of skyrocketing prisoner fatalities from drug overdoses in recent years. Third, the court determined that in light of "these unique vulnerabilities, the risk of injury from unfettered access to deadly drugs inside a prison 'is not one that today's society chooses to tolerate.'" *Id.* (quoting *Helling*, 509 U.S. at 36). And fourth, because the complaint alleged that drugs were "prevalent" inside the defendant's facility, and that prisoner access to these drugs was essentially "unfettered," the court concluded that the plaintiff had adequately plead the objective element of her failure-to-warn claim. *Id.* at 470-71.

While the Sixth Circuit's holding in *Zakora* is not binding in this litigation, its reasoning is persuasive. The dangers of fentanyl are indisputable. The drug can be deadly in even miniscule doses, and the National Institute of Health reports that it is the primary driver of the country's ongoing epidemic of overdose deaths.[2] And it is likewise undisputed that the risk of

---

[2] National Institute of Health, National Institute on Drug Abuse, *Drug Overdose Death Rates* (June 30, 2023), available at: https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates. *See United States v. Kindred Healthcare, Inc.*, 469 F.Supp.3d 431, 438 n.3 (E.D. Pa. 2020) (courts may take judicial notice of public records issued by government agencies).

8

drugs is magnified in a prison environment. As the government reports cited in *Zakora* explain, "incarcerated individuals are about 12 times more likely to exhibit drug dependence or misuse than the general population," and "[i]solation and sheer boredom further complicate prisoners' efforts to resist drugs within prison walls." *Id.* at 470 (citations omitted). Like "a particular vulnerability to suicide," deadly narcotics such as fentanyl in proximity to detainees with the propensity to abuse them is the sort of risk "that today's society chooses not to tolerate" and that prison officials cannot knowingly disregard. *Helling*, 509 U.S. at 36. This duty is not absolute—as the *Zakora* court recognized, "[p]rison officials are not required to show that they have prevented all drugs from entering their facility in order to be protected from liability." 44 F.4th at 470. But as with inmate suicides, prison officials may not turn a blind eye "if such officials know or should know of the particular vulnerability . . . of an inmate." *Colburn I*, 838 F.2d at 669.

Defendants do not dispute the existence of this duty, Corbin's analogy between prisoner suicides and drug overdoses, or the viability of an Eighth Amendment failure-to-protect claim in at least some prison-overdose cases. Rather, their arguments all go to whether Corbin has pled sufficient facts to state such a claim. Essentially, Defendants argue that the Amended Complaint "alleges only a single instance of narcotics entering Patterson's block," and that this singular instance "fall[s] well short of paralleling the willful inaction in *Zakora* or establishing the objective element." But while it is true that "[a] pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents," *Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir. 1985) (citation omitted), Corbin alleges far more than a one-off event. The Amended Complaint states that "inmates were actively using and distributing narcotics on the block where the decedent was housed," and it describes "a persistent smuggling problem" at the Defendants'

9

facility. And it further states that in the months after Patterson's death, at least one other BCCF inmate overdosed on fentanyl that was also purchased while incarcerated.[3] Whether Corbin is ultimately able to substantiate these allegations remains to be seen. But at this stage of litigation, they plausibly describe the kind of "unfettered access to drugs in a prison" that the *Zakora* court determined was "sufficiently serious to satisfy the objective prong of an Eighth Amendment claim." 44 F.4th at 472.

### ii. The Subjective Prong

Turning to the subjective prong of Corbin's failure-to-protect claim, the Amended Complaint once again pleads sufficient facts to survive Defendants' motion to dismiss.

"In the Eighth Amendment context, 'deliberate indifference' is 'a subjective standard of liability consistent with recklessness as that term is defined in criminal law.'" *Parkell v. Dangerg*, 833 F.3d 313, 335 (3d Cir. 2016) (quoting *Nicini v. Morra*, 212 F.3d 798, 811 (3d Cir. 2000) (en banc)). Thus, prison officials are deliberately indifferent when they know "that inmates face a substantial risk of serious harm and disregard[] that risk by failing to take reasonable measures to abate it." *Id.* (quoting *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 229 (3d Cir. 2015)). "[S]ubjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001). But if a plaintiff seeks to demonstrate subjective knowledge by pleading facts "from which the inference

---

[3] Defendants argue that because this second overdose took place after Patterson's death, it has no bearing on his deliberate indifference claim. But that is only true insofar as it relates to the subjective prong of a failure-to-protect claim. With regards to the objective existence (or non-existence) of "conditions posing a substantial risk of serious harm," the existence of additional inmate deaths under "eerily similar circumstances"—as the Amended Complaint alleges—permits an inference that these dangerous conditions existed at the time of Patterson's death and remain unabated months after. *See Johnson v. United States*, 147 F.R.D. 91, 93 (E.D. Pa. 1993) ("In deciding a motion to dismiss under Rule 12(b)(6), all material allegations pleaded *and all reasonable inferences that can be drawn from them* must be accepted as true and construed in a light most favorable to the non-moving party.") (emphasis added).

could be drawn that a substantial risk of harm exists," they must also plausibly allege that prison officials in fact drew such an inference. *Parkell*, 833 F.3d at 335; *see also Farmer*, 511 U.S. at 843 n.8 ("It is not enough merely to find that a reasonable person would have known, or that the defendant should have known" of a particular condition.).

As with the objective prong, the allegations in Corbin's Amended Complaint meet this standard. First, she alleges that individual Defendants both "knew there was a pervasive drug smuggling problem at the Bucks County Prison" and "knew of the risks and harm associated with dangerous illegal drugs." Second, she alleges that they "ignored" this knowledge "and did not do anything to curb the introduction, spread, and usage of dangerous drugs in prison, despite their direct and prior knowledge from prisoners regarding drugs in the prison." Third, with regard to Patterson himself, Corbin alleges that the individual Defendants "knew the decedent was vulnerable to overdose or injury due to his previous narcotics usage," but housed him on a normal housing block and did not restrict other inmates from visiting his cell. Finally, to bolster the plausibility of these allegations, she describes multiple specific shortcomings in the performance of BCCF personnel, including that they performed just "a cursory pat down" of Rhoades during his intake, failed to discover narcotics on his person when he entered the housing module, and "failed to properly check on [Patterson] to make sure he was safe and alive." As in *Zakora*, these allegations do not describe "simply a run-of-the-mill drug-overdose case." 44 F.4th at 473. Rather, they describe an environment in which "relevant defendants allegedly knew that [the decedent] was at risk and ignored that risk," making this case "directly comparable to the suicide 'deliberate-indifference' cases where this court has allowed the claim to proceed beyond the pleading stage." *Id.* at 474.

Disputing this, Defendants argue that the Amended Complaint fails to adequately plead

11

the subjective prong of Corbin's failure-to-protect claim because it "does not allege any prior incidents or deaths resulting from drug use or smuggling on Patterson's block." But while prior instances of prison overdoses would be strong circumstantial evidence that BCCF personnel were knowingly disregarding a grave risk to inmate safety (albeit likely insufficient without more, *see Parkell*, 833 F.3d at 335), Defendants are mistaken to suggest that such an allegation is necessary to survive a motion to dismiss. At this stage of litigation, Corbin's burden is to *plausibly allege* that prison officials knowingly ignored a substantial risk of serious harm—not to provide definitive evidence that they in fact did so. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) ("The Supreme Court's *Twombly* formulation of the pleading standard . . . simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.") (internal quotation marks and citation omitted). For the reasons previously discussed, she has satisfied this burden. Whether or not she can substantiate these allegations is a question that will be resolved in discovery.

However, Defendants' motion will be granted as to Zach Sherman—the officer in charge of the housing module where Rhoades was distributing narcotics and the sole supervisor named in Count I. As Defendants note, the Amended Complaint's only specific allegation regarding Sherman's conduct is that he restrained Rhoades during a search of his cell, an allegation which has no bearing on the claims she makes in this case. Corbin's only allegation against Sherman that concerns Patterson is that Sherman failed to properly train and supervise his subordinates, which is entirely duplicative of the allegations found in Count II of the Amended Complaint. Corbin does not argue otherwise. *See Cuvo v. De Biasi*, 169 F. App'x 688, 693 (3d Cir. 2006) (affirming the dismissal of "redundant" claims).

### C. Count II: Supervisor Liability

Corbin's Amended Complaint next alleges supervisory liability against the remaining individual defendants (*i.e.*, David Kratz, James Coyne, Carl Metellus, David Galione, Kelly Reed, Daniel Onisick, and Zach Sherman). In essence, she alleges that these individuals knew that drugs posed a serious danger to BCCF inmates and nonetheless failed to institute adequate policies, procedures, and oversight standards that might have rectified these conditions. Unlike her allegations against the non-supervisory defendants, however, this count fails to state a claim for which relief may be granted.

Because there is no vicarious liability under § 1983, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Thus, as relevant here, a prison supervisor is only personally liable for their subordinate's actions if he or she: (1) "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations," or, (2) "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.K.M. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (citations omitted). "'Failure to' claims—failure to train, failure to discipline, or, as is the case here, failure to supervise—are generally considered a subcategory of policy or practice liability." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *rev'd on other grounds sub nom. Taylor v. Barkes*, 575 U.S. 822 (2015). But under any theory, the plaintiff must allege facts showing that the supervisor defendant himself acted with "deliberate indifference." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

In this case, Corbin identifies a range of alleged shortcomings in the policies and

practices of the supervisor defendants, but none is pled with the degree of specificity necessary to survive a motion to dismiss. First, the Amended Complaint faults multiple BCCF policies, including that the facility "did not have sufficient procedure and policy" relating to in-processing new prisoners, searching new prisoners, monitoring housing modules, or ensuring that the prison remained drug-free. But the Amended Complaint provides no specifics regarding why these policies and procedures were insufficient, and indeed elsewhere faults the non-supervisor defendants for not complying with them. Such a conclusory allegation does not meet Corbin's burden under Rule 8(a). *See Phillips*, 515 F.3d at 232 ("[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests."). In a similar vein, Corbin faults the supervisor defendants for failing to "properly train and supervise correctional officers" on these (allegedly inadequate) policies and procedures, and she likewise alleges that "knew of the *de facto* custom" at BCCF that permitted an unacceptable level of drug trade in the facility. But again, these allegations are bereft of any further detail, and are little more than the sort of "formulaic recitation of the elements of cause of action" that is inadequate post-*Iqbal*. *Id.* at 231.

      Corbin's response to Defendants' motion addresses none of these shortcomings. The bulk of her brief is spent defending the viability of supervisory liability in general—a point that the Defendants do not contest—rather than explaining how the barebones allegations in her Amended Complaint state such a claim in this case. To the extent she addresses Defendants' arguments, she merely restates her conclusory allegation that "the Bucks County Prison had deficient policies and procedures" with no further elaboration. Absent further details, Count II of her Amended Complaint will be dismissed without prejudice.

### D. Count III: Municipal Liability

In addition to pressing her claims against the individual defendants, Corbin's Amended Complaint also seeks to hold Bucks County liable for Patterson's death, pursuant to *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978). Local governments can sometimes be liable for the constitutional violations of their employees, but only when "the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell*, 436 U.S. at 658). In all instances, "the Plaintiffs have the burden of showing that a government policymaker is responsible by action or acquiescence for the policy or custom." *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 250 (3d Cir. 2007).

In this case, the allegations levied against Bucks County are virtually identical to the allegations levied against the supervisory defendants—*i.e.*, that Bucks County knew of rampant drug use at BCCF yet failed to promulgate, enforce, and train personnel on adequate policies to thwart this behavior. For the reasons set forth above, these allegations are too conclusory to survive Defendants' motion to dismiss, even assuming that the supervisor defendants identified in the Amended Complaint are the sorts of policymakers whose decisions can give rise to *Monell* liability. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 135 (3d Cir. 2010) ("[T]he plaintiff must first allege that a defendant is a final policymaker. Only then can a court proceed to the next question of whether the single act or single decision of that defendant constituted municipal policy.") (quoting *McGreal v. Ostrov*, 368 F.3d 657, 685 (7th Cir. 2004)). Thus, Defendants' motion to dismiss Count III of the Amended Complaint will be granted, and Count III will be dismissed without prejudice.

### E. Counts IV & V: Wrongful Death and Survival Action

The final counts of Corbin's Amended Complaint seek damages pursuant to Pennsylvania's Wrongful Death Act, 42 Pa. C.S. § 8301, and Survival Act, 42 Pa. C.S. § 8302. That former statute compensates "the decedent's survivors for the pecuniary losses they have sustained as a result of the decedent's death." *Linebaugh v. Lehr*, 505 A.2d 303, 304 (Pa. Super. 1986) (quoting *Slaseman v. Myers*, 455 A.2d 1213, 1218 (Pa. Super. 1983)). The latter abrogates the common law rule that an action for personal injury did not survive death, ensuring that "the action survives and simply continues in the decedent's personal representative." *Salvadia v. Ashbrook*, 923 A.2d 436, 439-40 (Pa. Super. 2007). While neither statute creates "a substantive cause of action," they provide the "vehicle through which plaintiffs can recover for unlawful conduct that results in death." *Johnson v. City of Phila.*, 105 F.Supp.3d 474, 483 (E.D. Pa. 2015). This is because "'the survival of civil rights of actions under § 1983 upon the death of either the plaintiff or defendant' [is] an area not covered by federal law." *Giles v. Campbell*, 698 F.3d 153, 156 (3d Cir. 2012) (quoting *Robertson v. Wegmann*, 436 U.S. 584, 587 n.3 (1978)). And so federal courts must consult the law of survivorship of the forum state to determine the viability and scope of a deceased plaintiff's civil rights claim. *Id.*; *see* 42 U.S.C. § 1988(a) ("[I]n all cases where [the laws of the United States] are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause . . . .").

Here, Defendants argue that Corbin's Wrongful Death and Survival Act claims should be

dismissed because her Amended Complaint fails to state an underlying constitutional tort claim—a requirement for recovery under these state statutes.  *See Bright v. Westmoreland Cnty.*, 380 F3d 729, 741 (3d Cir. 2004) ("[I]f the underlying tort theory [fails], then the wrongful death or survival claim will fail.").  But, as discussed above, the Amended Complaint successfully pleads a § 1983 claim against the individual, non-supervisor defendants.  Because Defendants offer no other explanation for why Counts IV or V are improper, their motion to dismiss these counts will be denied.

An appropriate order follows.

**BY THE COURT:**

/s/Wendy Beetlestone, J.

_____
**WENDY BEETLESTONE, J.**