**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VALERIA CORBIN, administrator of the ESTATE OF JOSHUA PATTERSON, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | Case No. 23-2784 |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| BUCKS COUNTY, et al., | : | |
| | : | |
| Defendants. | : | |

---

**DEFENDANTS JULIO ATILES AND STEPHANIE ULMER'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO SEAL NON-PUBLIC AND OPERATIONALLY SENSITIVE CORRECTIONS' MATERIALS**

Defendants Julio Atiles and Stephanie Ulmer, by and through their undersigned counsel, respectfully submit this Memorandum of Law in support of their Motion to Seal Non-Public and Operationally Sensitive Corrections' Materials.[1]

**INTRODUCTION**

In discovery, Defendants produced to Plaintiff a variety of non-public and operationally sensitive corrections materials, including: (i) surveillance video from the Bucks County Correctional Facility's ("BCCF") Reception Unit and Housing Modules; (ii) policies and procedures relating to BCCF's day-to-day operations including; and (iii) post-incident investigative reports authored by BCCF detectives. These materials were produced and designated as "confidential" in accordance with the Stipulated Protective Order the Court entered on October 26, 2023 (Dkt. No. 21).

---

[1] Plaintiff has no objection to the relief requested herein.

Department of Corrections Director David Kratz, a corrections professional with more than twenty years' experience in Bucks County, has reviewed each document belonging to foregoing categories.   Director Kratz has determined that these materials reveal non-public information regarding the procedures and measures BCCF takes to ensure the custody and control of detainees, and the safety of detainees, staff, third-party providers, volunteers, and the public.   In Director Kratz's professional opinion, public disclosure of these materials would result in a significant harm to the safety, security, and privacy of BCCF, its detainees, its staff, and the public.

Because these materials have been submitted in connection with Defendants' Motion for Summary Judgment, Defendants request the Court: (i) seal the video footage in its entirety; (ii) permit Defendants to redact operationally sensitive or safety-concerning information from the policies and post-investigative reports; and (iii) permit the parties to redact any direct quotes or references to such operationally sensitive materials in the parties' expert reports, briefing on Defendants' Motion for Summary Judgment, and the Statement of Undisputed Material Facts.

## ARGUMENT[2]

## I.     Standard of Review

### A.     Common Law Right of Access

The common law provides "a presumptive right of public access to pretrial motions of a nondiscovery nature … and the material filed in connection therewith." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (quotation marks omitted). This right of access seeks to promote "public health and safety"; encourage "integrity among counsel and their clients"; provide "information in cases with a 'public' character"; and educate the public

---

[2] To discuss each category of documents efficiently, Defendants have foregone including a background section and each category below along with the relevant legal analysis.

about "the judicial system" and the "legitimacy" of its decisions. *Aetna, Inc.,. v. Mednax, Inc.*, 2021 WL 5987205, at *3 (E.D. Pa. Dec. 17, 2021) (Beetlestone, J.) (quoting *Republic of the Phil. v. Westinghouse Elec. Corp.*, 949 F.2d 653, 664 (3d Cir. 1991)).

This right is not absolute, and may be overcome where "the moving party shows 'the interest in secrecy outweighs the presumption.'" *In re Avandia*, 924 at 672 (quoting *Bank of Am. Nat'l Tr. & Sav. Ass'n v. Hotel Rittenhouse Assocs*., 800 F.2d 339, 344 (3d Cir. 1986)).  To make this showing, the movant must demonstrate: (1) "that the material is the kind of information that courts will protect"; and (2) "that disclosure will work a clearly defined and serious injury to the party seeking closure." *Id.* (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994)).  In establishing the injury to be prevented, the movant must provide "specific examples" or "articulated reasoning" demonstrating "the harm of public disclosure." *Id.*

### B.    First Amendment Right of Access[3]

In addition to the common law right of access, the First Amendment provides a public right of access to civil trials. *In re Avandia Mktg.*, 924 F.3d at 673.  The First Amendment right of access seeks to enhance and safeguard the "integrity of the factfinding process"; foster an "appearance of fairness"; heighten "public respect for the judicial process"; and permit the public "to participate in and serve as a check upon the judicial process." *Aetna, Inc.*, 2021 WL 5987205, at *3 (quoting *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1070 (3d Cir. 1984)).

But this right too is "not absolute." *Id.*  Like the common law right of access, the initial evidentiary showing is the same. *In re Avandia Mktg.*, 924 F.3d at 673 (movant must show "material is the kind of information that courts will protect" and "disclosure will work a clearly

---

[3] The Third Circuit has not determined whether the First Amendment applies to summary judgment records. *Aetna, Inc.*, 2021 WL 5987205, at *3 n.1. Consistent with the Court's prior decisions, however, Defendants apply this test as well. *Id.*

defined and serious injury"). *Id.*  The First Amendment test, however, requires a "much higher showing" that is akin to "strict scrutiny." *Id.*  In other words, access may be restricted only where there is an "overriding interest [in excluding the public] based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* (alteration in original) (quoting *Publicker Indus., Inc.*, 733 F.2d at 1071).  The surveillance videos, policies and procedures, and investigative reports qualify for protection under both standards.

## II.     The Surveillance Videos (Joint Exhibits 1-4) Must be Completely Sealed

BCCF, as a secure correctional institution, maintains a "continuous video surveillance system" that monitors "the day-to-day events that transpire in the facility." Kratz Aff. ¶¶ 10-11 (attached as **Exhibit A**).  The purpose of this system is "to ensure the safety of BCCF, its detainees, and its staff and providers." *Id.* ¶ 11.  If an event implicating the safety and security of BCCF occurs, the relevant video footage is preserved. *Id.*  ¶ 12.  The footage is preserved "solely for the purpose of documenting the event," and used only "in conjunction with investigations whether they are noncriminal or criminal in nature." *Id*. ¶ 12.  Video footage from BCCF is neither disclosed nor available to the public in any capacity. *Id.* ¶ 14.

The video footage produced in this matter captures the normal and routine operations of BCCF's Reception Unit and Housing Module. *Id.* ¶ 15.  Both areas are similarly not open to the public. *Id.* ¶ 16.  Among other operationally sensitive measures, the produced footage shows:

    a.  Protocols, procedures, and actions utilized in the initial commitment and screening of detainees;

    b.  The layout of the Reception Unit and Housing Module;

    c.  The movements, routines, and interactions of Reception Officers;

    d.  The protocols and response of Officers in connection with responding to a "Code 99 – officer needs assistance" emergency code; and

    e.  The number, location, and placement of wall, ceiling mounted, and concealed security cameras, and blind spots.

*Id.* ¶ 17(a)-(i).

### A.    Courts Protect Prison Surveillance Videos from Public Disclosure

At the outset, surveillance video from a secure correctional facility is precisely the kind of information that courts protect.  In fact, courts in this Circuit and throughout the country routinely seal correctional facility surveillance footage. *E.g.*, *Kearney v. Bayside State Prison Admin.*, 2023 WL 2207392, at \*2 (D.N.J. Feb. 23, 2023) (collecting cases and sealing prison videos; "[O]ther courts have concluded that releasing sensitive, security related information about the internal workings of a prison creates a risk of danger to correction officers and other inmates"); *Heffley v. Fed. Bureau of Prisons FCI Fort Dix*, 2023 WL 882745, at \*5-7 (D.N.J. Dec. 21, 2023) (same; "Defendants have articulated a strong, legitimate interest in protecting the security and operations of the prison which warrants the relief sought and outweighs the public interest in accessing the video"); *Curry v. Dich*, 2023 WL 4002476, at \*2 (E.D. Va. June 14, 2023) (same; *Chrisman v. Bd. of Cnty. Comm'rs of Okla. Cnty.*, 2020 WL 12948695, at \*2 (D. Okla. Oct. 9, 2020) (sealing prison video as "cameras are identified by number and location," it "shows dead spots in the video and surveillance," "entry and exit points are visible," and it shows "graphic" "medical care provided to decedent"); *Ortiz v. City & Cnty. of S.F.*, 2020 WL 2793615, at \*8 (N.D. Cal. May 29, 2020) (same); *see also Alexander v. Bucks Cnty.*, 2023 WL 5208506, at \*3 (E.D. Pa. Aug. 14, 2023) (granting protective order for "video footage" from BCCF).

Pennsylvania Courts have further determined that such video footage is exempt from public disclosure under Pennsylvania's Right-to-Know Law, 65 P.S. §§ 67.101, *et. seq.*  For example, in *County of Bucks v. Sholtis*, the Pennsylvania Commonwealth Court recently affirmed a trial court decision exempting interior video from public disclosure. 2023 WL 6887777, at \*4 (Pa. Commw.

Oct. 19, 2023).  In doing so, the Commonwealth Court found the videos exempt because inmates "could use information from the video to facilitate attacks on staff and inmates, 'evade responsive measures by prison staff,' conduct illicit activity in areas the Correctional Facility's cameras cannot observe, or create diversions to aid in escapes." *Id.* at *4.  The surveillance videos are thus the kind of information that courts will protect.

> **B.**     **Disclosure of BCCF's surveillance footage would work as clearly defined and serious injury, and BCCF's safety and security interests outweigh any public interest in access**

As Director Kratz notes, the non-public surveillance footage reveals a litany of operationally sensitive information. Kratz Aff. ¶ 17(a)-(i) (footage shows, among other measures, "how new commitments are searched," "the layout of the Reception Unit and Housing module," "ingress and egress" points, "the movements, routines, and interactions of Officers," how Officers respond to "emergency code[s]," and the "location, number, and placement" of its security cameras).  The public having access to this information creates a profound risk of harm and impedes BCCF's primary directives – "the security of the correctional facility, and the protection of the public, staff, third-party providers, and offenders." *Id.* ¶¶ 18-23.

The surveillance cameras have "specifically enabled" BCCF to further these directives and "minimize the amount of contraband coming into BCCF." *Id.* ¶ 19.  Disclosure of the video, however, directly undermines these directives as the video can be used to devise countermeasures, to exploit blind spots in the cameras monitoring system, or subvert officers' normal routines "to facilitate" a number of security breaches. *Id.* ¶ 20.  This includes transferring or hiding contraband; planning attacks on other detainees, staff, or providers; and engaging in self-harm. *Id.*  Director Kratz opines that the risk of harm here is "particularly acute" as it shows precisely how a new

commitment "opportunistically exploit[ed] BCCF's procedures and routines to affect the introduction and transfer of contraband." *Id.* ¶ 21.

The disclosure of BCCF's surveillance further does little, if anything, to advance the relevant public interests underpinning the common law right of access and First Amendment. Most pertinently, as explained by Director Kratz, public disclosure of the surveillance video here significantly weakens "public health and safety" by exposing the BCCF procedures that are designed to maintain the safety and security of the public at large. *Id.* ¶¶ 17-23; *see also Alexander*, 2023 WL 5208506, at *6 ("[P]ublic also has an interest in maintaining security and safety at BCCF, a fact which weighs against public unfettered disclosure of the videos."). Moreover, while the public no doubt has an interest in knowing about the events that transpire in a correctional facility, the public will be able to learn and evaluate all pertinent factual information from the other records comprising the summary judgment record. In particular, the factual narratives from the investigative reports and arrest warrant of Mr. Rhoades, and the relevant deposition testimony. As such, weighing the interests advanced under the relevant tests, BCCF's interest in maintaining the safety and security of detainees, staff, and providers, significantly outweighs any interest in public disclosure. *E.g.*, *Kearney*, 2023 WL 2207392, at *2 (collecting cases).

## C. Completely Sealing the Surveillance Footage is Narrowly Tailored Remedy

As noted, the First Amendment requires the movant to "narrowly tailor" its requested remedy to serve its secrecy interest. *Aetna, Inc.*, 2021 WL 5987205, at *6. The only option for the surveillance videos is to seal them in their entirely. There is simply "no less restrictive way" in which the surveillance videos could be sufficiently redacted or altered to allow for public disclosure. *Publicker Indus.*, 733 F.2d at 1070. As courts have recognized, no matter how correctional facility video is viewed or altered, information regarding the safety and security

policies and protocols can be gathered to the detriment of those in the facility. *Kearney*, 2023 WL 2207392, at *2 (sealing videos; "[A] less restrictive alternative to the relief sought is not available because there is no way to alter the videos to prevent sensitive information from being visible …"); *Sholtis*, 2023 WL 6887777, at *5 (rejecting argument that videos should be redacted; "Our *in camera* review demonstrates that a person could glean information about the Correctional Facility's policies and procedures from the entire video, not just the portion before corrections officers arrive at the inmate's cell.").

Accordingly, the surveillance videos (Joint Exhibits 1-4) must be sealed. *Kearney*, 2023 WL 2207392, at *2; *Heffley*, 2023 WL 882745, at * 5-7; *Curry*, 2023 WL 4002476, at * 2 (same); *Chrisman*, 2020 WL 12948695, at *2; *Ortiz v*, 2020 WL 2793615, at *8 (same); *Leggon v. Wiley*, 2021 WL 11703054, at *2 (N.D. Fla. July 20, 2021) (reaffirming decision to seal surveillance video as it "show[s] the internal structure of prison facilities and its release would present a severe safety and security risk if individuals could study the video and find possible weak points in prison facilities and institutional security procedures").

## III. The Policies and Procedures (Joint Exhibits 5-9) Must be Redacted to Prevent Disclosure of Operationally Sensitive Information

The Department of Corrections maintains "certain written policies that outline the duties to be performed and procedures to be followed in various situations at BCCF." *Id.* ¶ 24.  These are known as BCCF's "Standard Operating Procedures and Guidelines" ("SOPs"). *Id.* ¶ 25.  Because the SOPs divulge the facility's routine operations, they are not publicly available. *Id.* ¶¶ 25-27.

The SOPs produced here pertain to "Searches – Inmate and Staff"; "Module Officer"; "Special Assignment Officer"; "Reception Unit"; "Reception Unit Officer"; and "Special Confinement Cases." *Id.* ¶ 26.  These SOPs reveal sensitive safety and security measures, such as:

a. Protocols, procedures, and actions utilized in the initial intake and screening of new commitments, as well as the transfer and discharge of detainees;

b. The specific responsibilities of Reception Unit and Housing Module Officers, including the timing of daily activities, how and where equipment is stored and logged, cell inspection procedures, how officers are to respond to certain situations, lockdown procedures, and directives for special housing units (such as the female housing module and mental health module);

c. Guidance as to how searches should be conducted, including information regarding what steps an Officer can and cannot take; and

d. Protocols, procedures, and actions utilized when a detainee is placed on a special confinement status for misconduct, mental health, or medical reasons.

*Id.* ¶ 27(a)-(e).

### A.     Courts Protect Prison Policies and Procedures from Public Disclosure

Like surveillance footage from correctional facilities, operationally sensitive prison policies are also the kind of information that courts protect. *E.g.*, *Bayete v. Dep't of Corr.*, 2023 WL 8827474, at *1 (D.N.J. Dec. 21, 2023) (sealing "prison procedures" because of "the nature of the records in question" and the "privacy interests involved"); *Melendez v. Steberger*, 2022 WL 2239959, at *2 (E.D. Pa. June 22, 2022) (sealing procedures relating to "inspections of cells and common areas" by redacting information that poses "security risk"); *Morris v. Bakos*, 2016 WL 6476998, at *2 (W.D. Pa. Nov. 1, 2016) (denying a motion *in limine* to introduce policies related to camera operations within a prison as evidence in trial due in part to security concerns); *Houser v. Pa. Dep't of Corr.*, 2015 WL 757552, at *4 (W.D. Pa. Feb. 23, 2015) (denying discovery request for a prison's internal procedures because such documents directly implicate security concerns); *McKenna v. City of Phila.*, 2000 WL 1521604, at *2 (E.D. Pa. Sept. 29, 2000) (declining to compel production of documents relating to "directives and correspondence regarding checkpoints and job descriptions of officers assigned to stationary posts" as they would "compromise the safety of police officer and the general public.").

9

The Pennsylvania Commonwealth Court has similarly determined that BCCF's SOPs are exempt from disclosure under the RTKL. *York Cnty. v. Coyle*, 2021 WL 3439685, at *7 (Pa. Commw. Aug. 6, 2021) (reversing trial court decision and finding prison policies exempt from public disclosure). Specifically, public disclosure of such policies present a "real and apparent" risk to the "safety of staff" as inmates could "learn the details of the policy" in an attempt to "defeat the[ir] effectiveness." *Id.*

### B. Disclosure of the SOPs would work as clearly defined and serious injury, and BCCF's safety and security interests outweigh any public interest in access

The SOPs are the "written corollaries of" the surveillance videos. While the video shows BCCF's procedures and routines in motion, the SOPs describe them in detail. Kratz Aff. ¶ 28. Allowing public disclosure of these materials, "especially in [their] written form," would facilitate security breaches by allowing the public to study them and look for areas that are vulnerable to breaches. For example, the SOPs here provide the timing of certain daily activities, such as making rounds to check on the detainee's safety. *Id.* ¶ 27(a)-(e). If a detainee knows the time that an officer will be "engaged in another task" or when a round is scheduled to take place, the detainee could use that knowledge "to engage in dangerous misconduct such attacking another inmate, inflicting self-harm, attempting suicide, or attempting to escape." *Id.* ¶¶ 29-31.

Similarly, the SOPs describe how officers are conduct a lockdown on the housing module. *Id.* ¶ 27(b). If this information is publicly available, detainees may be able to devise ways to interfere with or prevent the on-duty officers from locking down the module in an efficient or timely manner. *Id.* ¶ 32. Depending on the reason for the lockdown, this could result in "an array of harms." *Id.* For example, if an inmate is suffering from a medical emergency, it could delay the "provision of lifesaving medical services." *Id.*

Public disclosure of these materials similarly does not progress the relevant public interests.

Again, like the surveillance video, public disclosure here works to the detriment of public "health and safety" by exposing BCCF's safety and security procedures. *Id.* ¶¶ 29-32; *Alexander*, 2023 WL 5208506, at *6. Moreover, much of the SOPs have no relation to Officer Atiles and Ulmer's conduct in this case. Disclosure of this information does not advance or bear on the Court's "factfinding" or "appearance of fairness," or allow the public to act as "check upon the [Court's] judicial process" as to this case. *Aetna, Inc.*, 2021 WL 5987205, at *3. To the extent the procedures are relevant, the public can still be educated on the relevant provisions in a manner that does not disclose BCCF's operationally sensitive data. For example, explaining that Mr. Rhoades was subject to a pat search during his intake examination as opposed to divulging the specific process for conducting a pat search. Thus, weighing the interests advanced under the relevant tests, BCCF's interest in maintaining the safety and security of detainees, staff, and providers, significantly outweighs any interest in public disclosure. *Bayete*, 2023 WL 8827474, at *1; *see also McKenna*, 2000 WL 1521604, at *2 ("Public disclosure of such information would undermine the Police Department's peace-keeping abilities in the area, and could, in a worst case scenario, jeopardize the lives of other officers and the public.").

### C.    The Requested Redactions are Narrowly Tailored

The protection requested here – the redaction of operationally sensitive information – is narrowly tailored. Defendants are not seeking to shield the SOPs from public view in their entirety. Rather, Defendants only wish to prevent the operationally sensitive information that impacts its operations from becoming publicly available. As this Court has held, "narrowly tailored" redactions that serve movant's "interest in the secrecy of its" information and are "essential to the preservation of that interest" pass muster under the First Amendment standard. *Aetna, Inc.*, 2021 WL 5987205, at *6. Defendants' proposed redactions to the SOPs are attached as **Exhibit B**.

These redactions were made in consultation with Director Kratz to ensure redaction was limited to only information implicating the concerns raised in his affidavit.  While some SOPs contain significant redactions, they are as minimal as possible in light of the security and safety risks identified above.  For these reasons, the unredacted SOPs (Joint Exhibits 5-9) should be kept under seal while only redacted versions appear on the docket. *Bayete*, 2023 WL 8827474, at *1; *Melendez*, 2022 WL 2239959, at *2.

## IV.   The Investigative Reports (Joint Exhibits 11, 15, 27-28) Must be Redacted to Prevent Disclosure of Operationally Sensitive Information and Third-Party Information

BCCF maintains a Special Investigations Unit ("SIU"). Kratz Aff. ¶ 34.  The SIU is comprised of trained investigators who investigate various events and complaints reported at BCCF. *Id.*  If an event requiring investigation is reported, SIU investigators will collect and review materials relating to the incident (such as surveillance footage, officer reports, log data relating to Officer rounds). *Id.* ¶ 35.  Once their review is completed, the investigator prepares an "investigative report," providing a complete overview of the event at the time of its occurrence, and the steps taken and information learned during investigation. *Id.* ¶¶ 35-36.  If an event is founded, the investigative report will discuss "how the event transpired and the precises manner in which BCCF's detection measures were evaded." *Id.* ¶ 38.  Investigative reports (and their supporting materials) are not provided to the public. *Id.* ¶ 39.

Four SIU investigative reports were produced here.  Two relating to Mr. Rhoades and Mr. Patterson, and two relating to earlier investigations involving third-party inmates. *Id.* ¶ 37.  These investigative reports discuss and reveal insights into, *inter alia*:

  a. The post-incident investigative process, including what materials are reviewed, how post-incident interviews and searches are conducted, and where and how evidence is stored, transported, and reviewed within the facility;

b. Operationally sensitive corrections data, such as when Officers are completing their rounds;

c. Personal information of those involved in the incident and third-party detainees, such as the individual's name, date of birth, inmate number, housing location, and urine test results;

d. Personal information of persons not in custody, including their name, date of birth, and contact information; and

e. The location, placement, and name of various surveillance cameras in the facility and what their footage shows.

*Id.* ¶ 38(a)-(g).

### A.      Courts Protect Post-Incident Investigation Materials

For reasons similar to those discussed above, courts also protect post-incident investigative reports that provide insights into an investigatory process. *Milhouse v. Heath*, 2022 WL 18046706, at *2 (M.D. Pa. May 6, 2022) (finding "good cause to seal" prison investigative reports because the reports "contain information that raises significant privacy and security concerns regarding the Bureau of Prison's investigatory processes, the operation of federal prisons, and the inmates' safety"); *Richardson v. City of Newark*, 2019 WL 1795542, at *1 (D.N.J. Apr. 24, 2019) (sealing internal affairs investigative report as they disclose "confidential investigative techniques"); *Doe v. Richland Cnty. Sch. Dist. Two*, 2020 WL 1184051, at *4 (E.D. Cal. Mar 12, 2020) (sealing "Sheriff's Department Incident and Investigative Report"); *Carr v. Miller*, 2021 WL 2635841, at *1 (D. Idaho June 25, 2021) ("Weighing the security and safety concerns presented by the investigative report …, the Court concludes that Defendant's Motion to Seal will be granted."); *see also McKenna*, 2000 WL 1521604, at *2 ("[P]ublic has a 'wide-reaching interest in maintaining the confidentiality of these documents that involves protecting people who provide information to investigators and protecting the investigative process, itself.'").

The Bucks County Court of Common Pleas has similarly determined that investigative

reports are exempt from public disclosure under the RTKL. Decision (Dkt No. 46), *Cnty. of Bucks v. Ciavaglia*, No. 2021-04177 (investigative reports exempt from disclosure); Decision (Dkt No. 10), *Ciavaglia v. Cnty. of Bucks*, No. 2022-01693 (same); Decision (D.I. 6), *Ciavaglia v. Cnty. of Bucks*, No. 2022-02156 (same).

**B.** **Disclosure of the Investigative Reports would work as clearly defined and serious injury, and BCCF's safety and security interests outweigh any public interest in access**

Beyond the factual narrative of the incident investigated, the investigative reports provide insights into the "post-incident investigative process." Kratz Aff. ¶ 38(a). This involves how the post-incident investigation unfolds, when interviews and searches are conducted, the location of certain cameras within the facility, and how evidence is stored, transported, and reviewed within BCCF (including the precise location of evidence storage units). *Id.* ¶ 38(b). If the incident is founded, the report also discusses how BCCF's "security measures" were evaded. *Id.* ¶ 38(d). The internal investigation reports also include a variety of personal non-public information relating to third-party detainees and persons not in custody. *Id.* ¶ 38(e)-(f) (reports include these individuals' names, dates of birth, inmate numbers, housing locations, urine test results, and more).

Public disclosure of this information would result in two distinct harms. First, like the surveillance video and SOPs, disclosure of information relating to the post-investigative process and BCCF's procedures would allow the public to study them for vulnerabilities. *Id.* ¶¶ 40-41, 43 As Director Kratz explains, "knowing when, where, and how post-incident searches are conducted and their scope would be reasonably likely to provide detainees with the ability to hide contraband, such as weapons or drugs, from detection." *Id.* This would both create an undue risk of safety to those within an institution, and impede an SIU investigator's ability to collect relevant evidence to that is necessary to complete the investigation and, if necessary, prosecute the involved individual.

*Id.* ¶ 41. Second, public dissemination would also "unduly invade the privacy" of third-parties who may have been involved in the investigation, but otherwise have no connection to the parties or events involved in this case. *Id.* ¶ 42.

Public disclosure of the investigative reports also does not advance the relevant public interests. For the reasons explained, public disclosure here works to the detriment of public "health and safety" by exposing BCCF's investigative process and safety and security procedures. *Id.* ¶¶ 40-44; *see also McKenna*, 2000 WL 1521604, at *1. Disclosure also does not advance or bear on the Court's "factfinding" or "appearance of fairness," or allow the public to act as "check upon the [Court's] judicial process." *Aetna, Inc.*, 2021 WL 5987205, at *3. As explained below, Defendants do not seek to redact any factual narrative relating to this case. *See infra* § IV.C. Furthermore, a majority of the post-incident investigative reports are not relevant to the remaining issues. Specifically, the reports relating to Patterson and Rhoades primarily focus on what occurred on Alpha Module, but the issues here involve Officer Atiles and Ulmer's conduct in the Reception Unit. Thus, weighing the interests advanced under the relevant tests, BCCF's interest in maintaining its safety and security significantly outweighs any interest in public disclosure.

## C.     The Requested Redactions are Narrowly Tailored

Lastly, the requested redactions are narrowly tailored. Defendants again only wish to redact the sensitive information that implicates BCCF's safety and security as well as the third party's privacy interests. Defendants' proposed redactions to the SOPs are attached as **Exhibit C**. These redactions are exceedingly minor, leaving the factual narrative intact while removing certain investigative details that reveal insights into the SIU's process and third-party inmate information. These redactions were also made in consultation with Director Kratz to ensure that only operationally sensitive information was redacted.

The redactions also remove personal identifying information and are in line with Local Rule of Civil Procedure 5.1.3, which requires personal identifiers to be removed from all documents filed with the Court. Local R. Civ. P. 5.1.3 ("Personal identifiers … must be modified or partially redacted in all documents filed."). Accordingly, these redactions are narrowly tailored to preserved Defendants' secrecy interest in the least restrictive way possible. *Brown v. Smith*, 2023 WL 120458, at *12 (D.N.J. Jan. 5, 2023) (redacting "other inmate names," "housing locations," "disciplinary charges," "birthdate," and "phone number[s]" from jail reports).

## V.      Materials Quoting the Foregoing

In accord with the foregoing, Defendants respectfully request the Court also permit any direct quotes or references to redacted information from the foregoing materials to be redacted in the parties' expert reports, briefing on Defendants' Motion for Summary Judgment, and the Statement of Undisputed Material Facts. If the underlying material is protected from disclosure under the common law right of access and the First Amendment, it follows that any reproduction of such material in the parties' filings or expert reports should also be redacted. *AstraZeneca LP v. Breath Ltd.*, 2008 WL 11383792, at *2 (D.N.J. Dec. 1, 2008) (finding "briefs should be sealed to the extent they quote from or refer to such confidential materials" and requiring "redacted versions" to be filed on the public docket). Proposed redactions as to the Statement of Undisputed Material Facts, Memorandum of Law in Support of Motion for Summary Judgment, and Plaintiff's expert report are attached as **Exhibits D, E, & F**.[4]

## CONCLUSION

For these reasons, Defendants respectfully request the Court enter an order: (i) sealing the video footage in its entirety; (ii) permitting the SOPs and post-investigative reports to be redacted

---

[4] Defendants have not submitted their expert report for purposes of summary judgment.

to remove operationally sensitive information; and (iii) permitting any direct quotes or references to redacted information from the foregoing materials to be redacted in the parties' expert reports, briefing on Defendants' Motion for Summary Judgment, and the Statement of Undisputed Material Facts.

Date: April 10, 2023

BUCKS COUNTY LAW DEPARTMENT

*/s/ Jaclyn C. Grieser*
Jaclyn C. Grieser (No. 93358)
Deputy County Solicitor

*/s/ Tyler B. Burns*
Tyler B. Burns (No. 325660)
Assistant County Solicitor

*Attorneys for Julio Atiles and Stephanie Ulmer*