# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VALERIA CORBIN, administrator of the ESTATE OF JOSHUA PATTERSON, | : : : | |
| Plaintiff, | : : | CIVIL ACTION |
| v. | : : | Case No. 23-2784 |
| BUCKS COUNTY, et al., | : : | JURY TRIAL DEMANDED |
| Defendants. | : : | |

## AFFIDAVIT OF DAVID KRATZ

I, David Kratz, hereby declare and state as follows pursuant to 28 U.S.C. § 1746:

1. I serve as the Director of the Bucks County Department of Corrections.

2. The Bucks County Correctional Facility ("BCCF") is a part of the Department of Corrections.

3. I have twenty years of experience with the Bucks County Department of Corrections and corrections in general.

4. I have knowledge of the facts set forth herein and, if called upon as a witness, I could testify to them competently under oath.

5. I respectfully submit this affidavit in support of Defendants Julio Atiles and Stephanie Ulmer's Motion to Seal Non-Public and Operationally Sensitive Corrections' Materials.

6. I am familiar with the above-listed lawsuit commenced by Plaintiff Valeria Corbin, and I have reviewed the materials counsel for Officers Atiles and Ulmer produced in discovery in this matter.

7. The materials produced comprise non-public and operationally sensitive corrections materials, including (i) surveillance video from BCCF's Reception Unit and Housing Modules; (ii) policies and procedures relating to BCCF's day-to-day operations including, the management of its Reception Unit, special confinement cases, guidance relating to various Officer duties; and (iii) post-incident investigative reports authored by BCCF detectives.

8. These materials reveal non-public and operationally sensitive measures (a) regarding the custody and control of detainees; (b) regarding the protection of prison staff, detainees, third-party providers, and the public; and (c) designed to maintain the security of BCCF and protect those within the facility.

9. After reviewing these materials, it is my opinion based on my twenty years of experience, that public disclosure of such materials would result in a significant harm to the privacy, safety, and security of BCCF, its detainees, and its staff and providers.

**A.  Surveillance Videos**

10. BCCF maintains a continuous video surveillance system that records various secure areas of the facility.

11. The purpose of the surveillance system is to monitor the day-to-day events that transpire in the facility, and to ensure the safety of BCCF, its detainees, and its staff and providers.

12. When an event occurs that implicates the safety and security of the facility, such as a fight or the attempted smuggling of contraband, the relevant video footage is maintained and catalogued by prison staff.

13. This video footage is preserved solely for the purpose of documenting the event, and is used only as an evidentiary record in conjunction with investigations whether they are noncriminal or criminal in nature.

14. This footage is not disclosed or provided to the public in any capacity.

15. I am familiar with the security footage produced here, which includes footage from the Reception Unit on the day that Allen Rhoades was processed in BCCF, footage of Allen Rhoades in his Holding Cell in the Reception Unit, and footage from the Housing Module on which Allen Rhoades and Joshua Patterson were housed on the day in question.

16. Like the footage itself, the areas shown in this video are not open to the public.

17. Beyond showing non-public areas of BCCF, the footage reveals non-public and operationally sensitive measures, including:

    a. Corrections Officers executing searches on new commitments;

    b. Protocols, procedures, and actions utilized in the initial commitment and screening of detainees;

    c. The layout of the Reception Unit, including the layout of holding cells and ingress and egress points;

    d. The movements, routines, and interactions of Reception Unit Officers;

    e. The layout of the Housing Module and recreational yard, including the layout of holding cells and the yard;

    f. The movements, routines, and interactions of Module Officers;

    g. The protocols and response of Officers to a "Code 99 – officer needs assistance" emergency code;

    h. The identity and conduct of third-party detainees and service providers that are not involved in this case in any capacity; and

    i. The number, location, and placement of wall, ceiling mounted, and concealed security cameras, and blind spots.

18. Knowledge of expected prison staff behavior in specific situations, standard protocol, and the layout of the facility would enable a detainee to develop countermeasures to subvert the objectives of prison staff regarding the custody and control of detainees, the security of the correctional facility, and the protection of the public, staff, third-party providers, and detainees.

19. BCCF, like all other prisons in the Commonwealth, works hard to keep contraband out of the facility. Surveillance cameras have specifically enabled the prison to minimize the amount of contraband coming into BCCF.

20. Should the surveillance footage here be publicly disclosed or published by the media or another public forum, it would allow detainees to facilitate security breaches, including transferring or hiding contraband, evading responsive measures by BCCF staff, planning attacks on other detainees, staff, providers, or the public, or propagating other dangerous misconduct.

21. The risk is particularly acute here as the footage shows Allen Rhoades opportunistically exploiting BCCF's procedures and routines to affect the introduction and transfer of contraband at BCCF.

22. For this very reason, surveillance footage from the interior of BCCF has been found exempt from public disclosure under Pennsylvania's Right-to-Know Law ("RTKL").

23. Based on the foregoing, it is my professional opinion that public disclosure of the surveillance videos would create an undue and improper risk to the personal safety of detainees, staff, and providers, and threaten the safety and security of BCCF.

**B.     Standard Operating Procedures and Guidelines**

24. The Department of Corrections maintains certain written policies that outline the duties to be performed and procedures to be followed in various situations at BCCF.

25. In this matter, the Department of Corrections' Standard Operating Procedures and Guidelines ("SOPs") pertaining to "Searches – Inmate and Staff"; "Module Officer"; "Special Assignment Officer"; "Reception Unit"; "Reception Unit Officer"; and "Special Confinement Cases" were produced.

26. The SOPs are non-public documents, and similarly have been found exempt from disclosure under the RTKL.

27. These SOPs divulge non-public and operationally sensitive measures such as:

    a. Protocols, procedures, and actions utilized in the initial intake and screening of new commitments, as well as the transfer and discharge of detainees;

    b. The specific responsibilities of Reception and Module Unit Officers, including the timing of daily activities, how and where equipment is stored and logged, cell inspection procedures, how Officers are guided to respond to certain situations, lockdown procedures, and directives for special housing units (such as the female housing module and mental health module);

    c. The types of searches and who is subject to search when entering BCCF;

    d. Guidance as to how searches should be conducted, including information regarding what steps an Officer can and cannot take; and

    e. Protocols, procedures, and actions utilized when a detainee is placed on a special confinement status for misconduct, mental health, or medical reasons.

28. Much like the surveillance footage, public dissemination of the SOPs in any manner would allow detainees to facilitate security breaches as the SOPs are the written corollaries of the surveillance video (i.e., explaining (instead of showing) the day-to-day responsibilities and procedures for each Officer assignment and unit of the facility).

29. Public disclosure of such materials, especially in written form, would allow detainees and the public to study them to determine areas within BCCF's procedures that are vulnerable to breaches.

30. If such vulnerabilities were found, it would provide detainees and staff the opportunity to perform illicit activities, such as concealing contraband during intake, planning and effecting transfers of contraband, planning and committing assaults on fellow inmates and staff, or committing escape attempts.

31. Even disclosure of the time of when an Officer is required to engage a certain function would create a profound risk of harm to the safety of those inside the facility as knowing when an Officer will be engaged in another task could provide a detainee with the opportunity to engage in dangerous misconduct, such as attacking another inmate, inflicting self-harm, attempting suicide, or attempting to escape.

32. Likewise, if a detainee is aware of the procedure used in locking down a module, he or she could use this information to interfere with or prohibit an Officer from gaining control of the module. Because lockdowns can occur for any number of reasons, this interference could result in an array of harm to inmates, detainees, and staff, such as the delayed provision of lifesaving medical services to a detainee experiencing a medical emergency.

33. Based on the foregoing, it is my professional opinion that public disclosure of the SOPs would create an undue and improper risk to the personal safety of inmates, staff, and providers, and threaten the safety and security of BCCF.

C.   **Post-Incident Investigative Materials**

   34.   The Department of Corrections encompasses a Special Investigations Unit ("SIU"), which is staffed by trained investigators who investigate various events and complaints reported at BCCF.

   35.   As part of their investigations, SIU investigators collect certain materials relating to the incident, such as surveillance footage, Officer reports drafted following the event, and log data relating to Officer rounds.

   36.   The investigative reports provide a complete overview of the event at the time of its occurrence, and the steps and information learned during post-incident investigation.

   37.   In this matter, four SIU investigative reports were produced. Two relating to the incident at issue in this litigation involving Allen Rhoades and Joshua Patterson, and two relating to drug investigations involving third-parties.

   38.   Beyond the factual narrative of the incident investigated, the investigative reports also reveal:

   a.   The post-incident investigative process, including what materials are reviewed, how post-incident interviews and searches are conducted, and where and how evidence is stored, transported, and reviewed within the facility;

   b.   Operationally sensitive corrections data, such as when Officers are completing their rounds or if unannounced checks are conducted;

   c.   Information provided by third-party law enforcement agencies;

   d.   If the event is founded, a discussion as to how the event transpired and the precise manner in which BCCF's security measures were evaded;

  e.  Personal information of those involved in the incident and third-party detainees, such as the individual's name, date of birth, inmate number, housing location, and urine test results;

  f.  Personal information of persons not in custody, including their name, date of birth, and contact information; and

  g.  The location, placement, and name of various surveillance cameras in the facility and what their footage shows.

  39.  Investigative reports (and their supporting materials) are non-public documents, and similarly have been found exempt from disclosure under the RTKL as investigative materials.

  40.  Public disclosure of the non-public, operationally sensitive information in the Investigative Reports would allow detainees and the public to study them to determine areas both within the post-investigative process and BCCF's procedures that are vulnerable to breaches.

  41.  Knowledge of such vulnerabilities would again allow detainees to exploit them to the detriment of the safety and security of the facility's detainees, staff, and providers. For example, knowing when and how post-incident searches are conducted and their scope would be reasonably likely to provide detainees with knowledge facilitating their ability to hide contraband, such as weapons or drugs, from detection. Not only would this create a safety risk for those within the institution, but it may also impede the SIU investigator's ability to investigate incidents and collect relevant evidence that is necessary to determine what happened and prosecute an individual involved in the event.

  42.  Public dissemination of the investigative reports would also unduly invade the privacy rights of third-parties, disclosing the individual's name, date of birth, and status as an inmate or relation to an inmate.

43. Much like the surveillance footage, public dissemination of the investigative reports would allow inmates to facilitate security breaches, including the concealment and transfer of contraband, evading responsive measures by BCCF staff, planning attacks on other inmates, staff, providers, or the public, or propagate other dangerous misconduct.

44. Based on the foregoing, it is my professional opinion that public disclosure of the investigative reports would create an undue and improper risk to the personal safety of inmates, staff, and providers, and threaten the safety and security of BCCF.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and understanding.

Date: April 9, 2024

David Kratz