# EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VALERIA CORBIN, administrator of the ESTATE OF JOSHUA PATTERSON, | : : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | Case No. 23-2784 |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| BUCKS COUNTY, et al., | : | |
| | : | |
| Defendants. | : | |

---

## DEFENDANTS JULIO ATILES AND STEPHANIE ULMER'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants Julio Atiles and Stephanie Ulmer, by and through their undersigned counsel, respectfully submit this Memorandum of Law in support of their Motion for Summary Judgment.

### INTRODUCTION

Plaintiff Valeria Corbin, as administrator of the estate of Joshua Patterson, brings this civil rights action after Patterson ingested fentanyl while incarcerated at the Bucks County Correctional Facility ("BCCF") and passed away. This was the first inmate death involving the use of narcotics inside BCCF in the last ten years. The sole remaining Defendants are Julio Atiles and Stephanie Ulmer – the Reception Officers working the day prior to Patterson's death. Plaintiff asserts Officers Atiles and Ulmer failed to protect Patterson when Allen Rhoades, a new commitment to BCCF, exploited BCCF's intake procedures and an officer emergency to smuggle fentanyl onto Patterson's housing module. But there is no genuine dispute of material fact that Plaintiff's remaining failure-to-protect and derivative Pennsylvania law claims fail as a matter of law.

*First*, Plaintiff cannot establish any of the requisite failure-to-protect elements under the Third Circuit's suicide jurisprudence to which this Court previously analogized. Patterson did not

have a "particularized vulnerability" to drug abuse.  He never disclosed any history of drug abuse, never reported any detoxification symptoms, and was never referred to or participated in any opioid replacement therapy administered at BCCF.

Plaintiff also cannot show that Officers Atiles or Ulmer knew or should have known of any vulnerability and acted with reckless indifference to it.  Neither Officer ever interacted with or supervised Patterson.  In fact, there is no evidence that Officers Atiles or Ulmer even knew of Patterson before this litigation.  Even construing this element more broadly, neither Officer was aware that Rhoades possessed contraband during intake and failed to respond.  Nor would there have been any reason for them to believe any contraband was missed.  Prior to Rhoades' arrival, narcotics avoided contraband detection only twice out of 34,436 new commitment screenings in the last five years – less than .005% of new commitments.

*Second*, Plaintiff's claim fares no better under a traditional failure-to-protect analysis.  Patterson's confinement conditions did not pose a "substantial risk of harm."  Before Patterson, no inmate had died from using narcotics in their cell in the last ten years, and the Reception Unit's search procedures had been exceedingly effective.  There is likewise no evidence that inmates were "actively using" or "distributing" narcotics prior to Rhoades arrival.  Indeed, the criminal investigation into Patterson's death concluded the opposite.  Plaintiff further cannot establish deliberate indifference for the same reasons she fails to meet the "synonymous" reckless indifference standard.  There is simply no evidence, direct or circumstantial, from which Officer Atiles or Ulmer could have inferred any risk of harm to Patterson and willfully ignored it.

*Last*, because plaintiff's failure-to-protect claim fails as a matter of law, her derivative wrongful death and survivorship claims too fail.  Accordingly, Officers Atiles and Ulmer are entitled to summary judgment in their favor under Federal Rule of Civil Procedure 56.

## BACKGROUND[1]

### A.    BCCF's Reception Unit and Reception Officer Duties

The "Reception Unit" receives and processes new commitments to BCCF. SUMF ¶ 1.  This unit is staffed by "Reception Unit Officers." *Id.* ¶ 2.  Their duties include, among others, conducting "pat and unclothed, full body searches" and recording "demographic information" about the new inmate, including any "███████████████████████████████ ████████████████" *Id.* ¶¶ 3-8.  New commitments also undergo a "██████████████," *id.* ¶ 9, and an interview with a "██████████," *id.*  These also cover the commitment's "█████████" history, *id.* ¶ 10, and make "███████████████████████████," *id.*  A new commitment's responses and any referrals are logged in BCCF's "Offender Management System" during his or her commitment to the facility. *Id.* ¶ 11.

From 2017 through July 26, 2022, the Reception Unit processed 34,463 new commitments. *Id.* ¶ 12.  During this period, Reception Officers recovered narcotics and drug-related paraphernalia on 67 occasions.  *Id.* ¶ 13.  There were only two instances in which narcotics evaded BCCF's contraband detection measures and were recovered from an inmate's cell after commitment. *Id.* ¶ 14.  In both cases, the inmates ingested or "tucked" the drugs in a body cavity.  *Id.* ¶ 15.  Neither Officer Atiles nor Ulmer were involved in or aware of these incidents. *Id.* ¶ 16.

### B.    Three Other Law Enforcement Agencies Do Not Find any Fentanyl or Methamphetamines on Rhoades' Person

On July 25, 2022, Rhoades was a passenger in a traffic stop conducted by the Pennsylvania State Police ("PSP"). *Id.* ¶ 17.  During the stop, Rhoades secreted fentanyl and methamphetamine in his pants. *Id.* ¶ 18.  After drugs were found throughout the vehicle, Rhoades was arrested and

---

[1] The factual recitation below is an abbreviated version of the Statement of Undisputed Facts ("SUMF").  Citations are provided to the corresponding SUMF paragraph.

taken to the local PSP barracks. *Id.* ¶ 19-20. While in the custody, PSP learned that Rhoades had an active arrest warrant issued by the Falls Township Police Department. *Id.* ¶ 21. Falls Township Police Department picked up Rhoades and transported him to their station. *Id.* ¶ 22. Rhoades was arraigned, issued bail, and transported to BCCF by two Pennsylvania State Constables. *Id.* ¶ 23. None of these law enforcement agencies detected any narcotics on Rhoades' person. *Id.* ¶ 24.

###    C.    Rhoades Thwarts BCCF's Search Procedure Using a Lunch Bag that he Opportunistically Retrieves During a BCCF Officer Emergency

Rhoades arrived at BCCF's Reception Unit at approximately 6:30 a.m. on July 26, 2022. *Id.* ¶ 25. Officers Julio Atiles, Stephanie Ulmer, and Thomas Fabiani were on duty. *Id.* ¶ 26. Upon Rhoades' entry with the two constables, Officer Atiles conducted a clothed pat search of Rhoades and placed him in Holding Cell #1. *Id.* ¶ 27. Rhoades received a brown lunch bag shortly thereafter. *Id.* ¶ 28. Two minutes after receiving the bag, Rhoades turns his back to the Holding Cell's camera, removes something from the crotch of his pants, and hides it in the lunch bag. *Id.* ¶ 29. The transfer takes less than a minute. *Id.* ¶ 30.

Rhoades then completes the intake process while in possession of his lunch bag. *Id.* ¶¶ 31-32. During this time, Rhoades answers booking questions from Officer Atiles, provides a urinary sample to Officer Fabiani, and meets with the intake nurse and case manager. *Id.* ¶ 33. After this, the case manager returns Rhoades to Holding Cell #1. *Id.* ¶ 34.

At 9:37 a.m., Officer Ulmer removes Rhoades from Holding Cell #1. *Id.* ¶ 35. Rhoades leaves the holding cell without the lunch bag. *Id.* ¶ 36. Although Officer Ulmer pushes the door closed, the door pushes back open after her back is turned and remains slightly ajar. *Id.* ¶ 37. There are no other inmates in the cell at this time. *Id.* ¶ 38. Officer Ulmer then proceeds to fingerprint Rhoades and provide him with a wristband. *Id.* ¶ 39. This is Officer Ulmer's only interaction with Rhoades. *Id.* ¶ 40.

Rhoades then proceeds to the Reception Unit's shower area with Officer Atiles where he receives an unclothed body search. *Id.* ¶ 41.  Officer Atiles thoroughly searched each piece of clothing Rhoades was wearing as well as his unclothed body. *Id.* ¶¶ 42-43.  Officer Atiles did not locate any contraband on Rhoades as he had left the lunch bag in Holding Cell #1. *Id.* ¶ 44.

While Officer Atiles conducted the unclothed body search, Officer Ulmer continued her duties in the main area of the Reception Unit. *Id.* ¶ 45.  Officer Fabiani was in the Reception Unit's backroom. *Id.* ¶ 46.  At approximately 9:50 a.m., however, an "emergency" "Code 99 – officer needs assistance" alarm was called on a nearby female housing module. *Id.* ¶ 47.  Officer Ulmer immediately responded to the emergent situation. *Id.* ¶ 48. Officer Ulmer attempted to notify the other Officers of her response before running out the Reception Unit door. *Id.* ¶ 49.  Officer Atiles, however, did not hear Officer Ulmer. *Id.* ¶ 50. But for responding to the Code 99, an emergency over which she had no control, Officer Ulmer would have remained in reception. *Id.* ¶ 51.

Believing Officer Ulmer was still present, Officer Atiles directed Rhoades to return to Holding Cell #6 in the main area while Officer Atiles remained in the back to "put[] away [Rhoades'] property." *Id.* ¶¶ 52-53.  Rhoades returned to the Reception Unit's main area with a laundry bag containing his BCCF-issued clothing. *Id.* ¶ 54.  Noticing that Officer Ulmer is not in the Reception Unit, Rhoades drops his laundry bag at Holding Cell #6. *Id.* ¶ 55.  He then proceeds to Holding Cell #1, retrieves his lunch bag, and stashes it in his laundry bag. *Id.* ¶ 56.  Rhoades completes these actions in less than 40 seconds. *Id.* ¶ 57.

When Officer Atiles returns to the main area, Rhoades is standing in front of Holding Cell #6 as directed. *Id.* ¶ 58.  Officer Atiles then removes another inmate from Holding Cell #6 and escorts Rhoades to the main facility where he was housed alone in Housing Cell #1 on Alpha Module. *Id.* ¶ 59.  This is the last interaction Officer Atiles has with Rhoades. *Id.* ¶ 60.  During

Rhoades' time in reception, neither Officer Atiles nor Ulmer knew or had any indication that Mr.

Rhoades was in possession of methamphetamines and fentanyl. *Id.* ¶ 61.

> **D.      Patterson is Housed on Alpha Module and Not Known to Have Any History of Drug or Alcohol Use**

When Rhoades entered the facility, Patterson was already housed on Alpha Module in

Housing Cell #39. *Id.* ¶ 62.  Patterson had been committed to BCCF on November 26, 2021, and

was being held on two separate charges for Felony Retail Theft charges. *Id.* ¶¶ 62-64.  He was on

"administrative lock" with a "keep separate" order for fighting. *Id.* ¶ 65.  Patterson had no other

active alerts or special flags on his file, including relating to drug use. *Id.* ¶¶ 66-67.

In fact, Patterson's booking and commitment information logged in BCCF's "Offender

Management System" revealed that he: (i) never disclosed any history of drug or alcohol use; (ii)

never disclosed any detoxification or withdrawal symptoms; and (iii) was never referred to,

evaluated for, or participated in BCCF's "medically assisted treatment" ("MAT") program, which

offers inmates suffering from opioid use disorder the opportunity to participate in opioid

replacement therapy administered by BCCF's medical contractor.[2] *Id.* ¶ 67.  During the relevant

time frame, neither Officer Atiles nor Ulmer had any interaction with Mr. Patterson.  *Id.* ¶ 69.

> **E.      Rhoades Delivers Fentanyl to Patterson using an Intermediary**

Rhoades arrived on Alpha Module at approximately 10:00 a.m. *Id.* ¶ 70.  Between 2:00

p.m. and 3:38 p.m., Rhoades along with a "block worker" that served as a go-between for Rhoades

and Patterson, stopped at Patterson's housing cell "multiple times." *Id.* ¶ 71-73.  At approximately

3:33 p.m., Rhoades delivered an item to Patterson by sliding it underneath his locked cell door,

which is believed to be fentanyl. *Id.* ¶ 75.

---

[2] In the MAT program, medical staff provide inmates with Vivitrol (naltrexone) or Subutex (buprenorphine) to assist with opioid detoxification. *Id.* ¶ 68.

### F.    Rhoades' Contraband is Seized Mere Hours After his Arrival

After becoming suspicious of Rhoades' behavior and being informed by another inmate that Rhoades may have contraband in his cell, Officer Ventureira, one of two on-duty Module Officers, conducted a search of Housing Cell #1. *Id.* ¶ 75.  During the search, Officer Ventureira located a "coffee bag hidden in a brown paper bag, containing a plastic wrapped package consisting of numerous zip lock baggies with blue wax paper, and yellow and red zip lock baggies containing a white crystal powder." *Id.* ¶ 76. The "coffee bag" was a "yellow coffee packet" that the block worker had purchased for Rhoades. *Id*. ¶ 77.  The bag was immediately seized, and Rhoades was removed from Alpha Module. *Id.* ¶ 78-79.  The packages recovered later tested positive for 4-ANPP, acetyl fentanyl, fentanyl, and methamphetamine. *Id.* ¶¶ 80-81.

### G.    Patterson is Found Unresponsive in His Cell After Ingesting the Fentanyl he Received from Rhoades

At approximately 3:40 a.m. on July 27, 2022, Patterson was found unresponsive in his cell by Officer Connor Wilcox – the on-duty module officer. *Id.* ¶ 82. On his scheduled tour of the Module, Officer Wilcox noticed Patterson lying on the floor of his cell. *Id.* ¶ 83.  Prior to this, Patterson had been singing and dancing. *Id.* ¶ 84.  After several verbal attempts to wake Patterson were met with no response, Officer Wilcox pulled the pin on his body alarm, activating a Code 99 emergency (the same emergency code Officer Ulmer had responded to earlier). *Id.* ¶¶ 85-88.

Officer Wilcox removed Patterson to the upper-tier balcony and administered CPR until he was relieved. *Id.* ¶ 89.  Patterson was transferred to Doylestown Hospital where he was placed in a medically induced coma. *Id.* ¶ 90.  He was kept medically alive until August 1, 2022, when the hospital discontinued medical efforts. *Id.* ¶ 91. The Bucks County Coroner's Office conducted an autopsy, concluding it was an "accidental" death caused by was "complications from fentanyl intoxication." *Id.* ¶ 92.  Following Patterson's death, Rhoades was criminally prosecuted for,

among other offenses, drug delivery resulting in death. *Id.* ¶ 93.  Patterson's death was "the first death involving the use of narcotics inside of [BCCF] in the last ten years." *Id.* ¶ 94.

### H.  Procedural Background

Plaintiff filed this action on July 21, 2023.  Defendants moved to dismiss for failure to state a claim on August 11, 2023.  On September 28, 2023, Plaintiffs filed an Amended Complaint. Defendants again moved to dismiss for failure to state a claim.  The Court entered an order granting the Motion in part on November 21, 2023, dismissing all parties except for the individual officers. On February 20 and March 4, 2024, the parties stipulated to the dismissal of all remaining parties except for Officers Atiles and Ulmer.  Officers Atiles and Ulmer now move for summary judgment pursuant to Rule 56.

### ARGUMENT

### A.  Standard of Review

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Rule 56 standard "by its very terms" provides that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986)).

While the Court must draw all reasonable inferences "in the light most favorable to the party opposing the motion," *Doe*, 480 F.3d at 256, the non-moving party "may not merely deny"

the moving-party's contentions, *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34 (3d Cir. 1987). Instead, the non-moving party "must show where in the record there exists a genuine dispute over a material fact." *Id.* A moving party is entitled to summary judgment where the non-moving party "fail[s] to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323.

### B.    Plaintiff Failed to Prove her Failure-to-Protect Claim

The Eighth Amendment's prohibition against cruel and unusual punishment imposes "a duty on prison officials to 'take reasonable measures to guarantee the safety of inmate.'" *Corbin v. Bucks Cnty.*, 2023 WL 8042560, at *3 (E.D. Pa. Nov. 21, 2023) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). To survive summary judgment on a traditional failure to protect claim, the plaintiff must show: "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm." *Muniz v. City of Phila.*, 2023 WL 6391691, at *4 (E.D. Pa. Sept. 29, 2023) (quoting *Travillion v. Wetzel*, 765 F. App'x 785, 790 (3d Cir. 2019)). This test encompasses both an objective and a subjective element. *Corbin*, 2023 WL 8042560, at *3.

In its November 21, 2023, Opinion in this matter, relying on the Sixth Circuit's decision in *Zakora v. Chrisma*, 44 F.4th 452 (6th Cir. 2022), the Court drew an analogy between failure-to-protect cases involving drug overdoses and inmate suicides. *Corbin*, 2023 WL 8042560, at *4. For failure-to-protect claims involving a suicide, the plaintiff to show: (i) the inmate had a "particular vulnerability" to suicide; (ii) the officers "knew or should have known of the vulnerability"; and (iii) the officers "acted with reckless indifference." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) ("*Colburn II*"); *Corbin*, 2023 WL 8042560, at *4 ("[P]rison officials may not

turn a blind eye 'if such officials know or should know the particular vulnerability …. of an inmate.'" (citation omitted).  Like the test for a traditional failure-to-protect claim, this too encompasses both objective and subjective elements. *Colburn*, 946 F.2d at 1023.

Tracking these elements, the Court noted that the duty to prevent the entry of drugs into a correctional facility is "not absolute," and prison officials "are not required to show that they have prevented all drugs from entering their facility in order to be protected from liability." *Corbin*, 2023 WL 8042560, at *4 (citing *Zakora*, 44 F.4th at  470).  Rather, prison officials cannot allow "narcotics such as fentanyl" to be "in proximity to detainees with the propensity to abuse them" if such officials "know or should know of the [inmate's] particular vulnerability." *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).  Plaintiff's claims fail under both standards.

### C.    Patterson's Failure-to-Protect Claim Fails under the Third Circuit's Suicide Jurisprudence

#### i.    *Patterson was not particularly vulnerable.*

Starting with the suicide jurisprudence to which the Court analogized, Plaintiff cannot show that Patterson had a "particular vulnerability" to drug abuse while incarcerated.  To withstand summary judgment on this element, the plaintiff must produce "affirmative evidence from which a reasonable jury could conclude there was a 'strong likelihood' that the inmate would inflict self-harm." *Carroll v. Lancaster Cnty.*, 301 F. Supp. 3d 486, 497 (E.D. Pa. Mar. 14, 2018) (citing *Colburn II*, 946 F.2d at 102).  A "mere possibility" is not enough. *Id.*  The evidence must reflect the decedent's "individual" vulnerability. *Wargo v. Schuylkill Cnty.*, 348 F. App'x 756, 759 (3d Cir. 2009).  The plaintiff cannot rely on "group characteristics" or assert the "demographic class to which the individual belongs" is vulnerable. *Id.*; *Est. of Thomas v. Fayette Cnty.*, 194 F. Supp. 3d 358, 376-77 (W.D. Pa. 2016) (same).

The record is devoid of evidence showing a "strong likelihood" that Patterson would abuse drugs while incarcerated.  Patterson was not committed to BCCF on drug-related charges, never disclosed any history of drug use or withdrawal symptoms, and was never referred to or participated in the facility's MAT program. JA034-36 (committed for "Felony Retail Theft"); JA193-95 (Patterson's OMS data contains no "flags, notations, or information demonstrating that Mr. Patterson had: (i) disclosed a history of drug or alcohol use; disclosed that he was ever experiencing any detoxification or withdrawal symptoms; or (iii) had been referred to, evaluated for, or participated in the MAT program"); *see also* JA037 (no items recovered from Patterson's cell indicated that "the inmate was involved in drug activity …"); JA227 (requesting "All documents and communications supporting your contention that 'Defendants knew [D]ecdent was vulnerable to overdose or injury due to his previous narcotics usage'"); JA231 (responding "Plaintiff is not in possession of any documents in response to this request for documents").  There is also no evidence that Patterson engaged in any objective behavior showing he was a narcotics user.  The only incident involving Patterson prior to his death was his placement on administrative lock for "fighting." *Id.*

The only allegation to the contrary comes through Plaintiff's unverified interrogatory responses where she contends Patterson was "rehabilitating while in prison and was using suboxone." JA220.  But unverified responses are inadmissible and non-cognizable at summary judgment. JA219-21; *Guffey v. A.W. Chesterton Co.*, 2012 WL 5395035, at *1 n.1 (E.D. Pa. Aug. 28, 2012) (collecting authority; "[O]nly verified discovery responses may be considered as evidence in connection with a summary judgment brief …").  Yet, even taken as true, there remains nothing substantiating this vague assertion, and in light of the foregoing is no more than a "mere scintilla" that cannot raise a genuine issue of material fact. *E.g.*, *CITGO Petrol. Corp. v. U.S.*

*Lubes, LLC*, 2014 WL 3887773, at *4 (E.D. Pa. Aug. 8, 2014) ("[S]ingle declaration stating only that [Defendant's] prices increased making it hard for [Plaintiff] to compete is the very definition of a 'mere scintilla.'"); *Lamberti v. Postiano Ristorante, Inc.*, 2005 WL 627975, at *6 (E.D. Pa. Mar. 16, 2006) (deposition testimony providing "little, if any information" and lacking "any actual evidence" to support it "amounts to a mere 'scintilla'").

Plaintiff may nevertheless attempt to argue that Patterson's status as an inmate rendered him "particularly vulnerable." JA259-260 (expert report; contending Officers Atiles and Ulmer "knew of the particular vulnerability of danger [sic] narcotics introduced into the BCCF imposed upon the inmates of the facility"; "It is my opinion that the risk of overdose from fentanyl in correctional facilities is greater than the general public …"). Courts in this Circuit, however, have repeatedly foreclosed the "demographic vulnerability" argument. *Wargo*, 348 F. App'x at 759-60 (rejecting argument that decedent "fell into categories of persons more likely to commit suicide"); *Joine v. Twp of Ridley*, 229 F. App'x 161, 162-63 (3d Cir. 2007) (no objective element where "heightened risk" was based on demographic factors); *Ponzini v. Monroe Cnty.*, 897 F. Supp. 2d 282, 293 (M.D. Pa. Sept. 19, 2012) ("Although Decedent may belong to a 'category of persons more likely to commit suicide, that is not enough to establish an individual risk.'").

Plaintiff thus cannot show that Patterson was "particularly vulnerable to drug use." *Diorio v. Harry*, 2022 WL 3025479, at *4 (3d Cir. 2022) (affirming summary judgment; decedent "reported a single risk" factor and "denied current suicidal ideations"); *Wargo*, 348 F. App'x at 759-60 (same; decedent engaged in "odd" behavior, but nothing showing a "strong likelihood" of suicide); *Barker–Puza v. Carbon Cnty.*, 304 F. App'x 47, 49 (3d Cir. 2008) (same; "[E]rratic mood swings, his intoxication, and the circumstances that resulted in his arrest … – while prophetic in

hindsight – suggest only the 'mere possibility' that [decedent] posed a suicide risk"); *Caroll*, 301 F. Supp. 3d at 497 (granting summary judgment; inmate not placed on "suicide watch").

> ii.   *Neither Officer Atiles nor Ulmer knew or should have known of any alleged vulnerability.*

There is no evidence demonstrating that Officers Atiles or Ulmer "knew or should have known of" Patterson's alleged vulnerability to drug abuse. *Colburn II*, 946 F.2d at 1023.  Meeting this element in the suicide context requires officers to have "actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities." *Carroll*, 301 F. Supp. 3d at 496 (citing *Colburn II*, 946 F.2d at 1023).  The likelihood of harm must also be "so obvious" that it would be "easily recognized" by a layperson. *Baez v. Lancaster Cnty.*, 487 F. App'x 30, 31 (3d Cir. 2012).

Even if Plaintiff had shown Patterson's alleged vulnerability, Officer Atiles and Ulmer both worked in the Reception Unit. JA206-08.  They had no responsibilities to supervise or observe inmates on Alpha Module where Patterson was housed. JA011-13.  And neither had any contact with Patterson. JA209 ("Please describe the contact you had with the inmate [Patterson]"; "Officer Ulmer – None."; "Officer Atiles – None").  In fact, there is nothing indicating Officer Atiles or Ulmer even knew who Patterson was before Plaintiff filed this case.

The only contention to the contrary comes in Plaintiff's expert report.[3]  Plaintiff's expert contends "Officers Ulmer and Atiles testified that they knew of the particular vulnerability of danger [sic] narcotics introduced into the BCCF imposed upon the inmates of the facility." JA260.  Curiously, Adams provides no citation for this alleged testimony. *Id.*  The failure is telling as even

---

[3] Courts are prohibited from considering "an unsworn expert report" at summary judgment. *FCS Cap. LLC v. Thomas*, 579 F. Supp. 3d 635, 650 n.10 (E.D. Pa. 2022) (collecting cases).  Defendants nevertheless address it given the contention that they "testified" to this point.

a cursory review of Officer Atiles and Ulmer's deposition transcripts shows that neither Officer ever testified regarding any particular harm or vulnerability relating to Patterson – let alone BCCF or narcotics in general. JA084-112 (Ulmer); JA113-74 (Atiles).  Notwithstanding, this opinion, even if true, does not show that either Officer had "affirmative knowledge about a strong likelihood" of harm that would befall Patterson. *Diorio*, 2022 WL 3025479, at *5.

Plaintiff thus cannot show that Officer Atiles or Ulmer knew or should have known of any particular vulnerability. *Id.* (affirming summary judgment; decedent did not have an "array of mental health issues" and "denied to staff past acts of self-harm and experiencing suicidal ideations"); *Carroll*, 301 F. Supp. at 497-99 (granting summary judgment; officers had no "meaningful interactions with" decedent); *Foster v. City of Phila.*, 2004 WL 225041, at *5 (E.D. Pa. Jan. 30, 2004) (same; Plaintiff "adduced no evidence … that [defendant] knew or should have known that [decedent] had a particular vulnerability.").

### iii. Officer Atiles and Ulmer did not act with reckless indifference.

"Reckless indifference" is "synonymous[] with 'deliberate indifference.'" *Baez*, 487 F. App'x at 31 (citing *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005)).  Deliberate indifference requires a showing that the officer both "kn[e]w[] of and disregard[ed] an excessive risk to inmate health or safety." *Beers–Capitol v. Whetzel*, 256 F.3d 120, 131 (3d Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)).  This can be established through "circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk." *Id.*  This may be done by "showing that the risk of harm was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past such that the defendants must have known about the risk." *Parkell v. Danberg*, 833 F.3d 313, 335 (3d Cir. 2016). The officer, however, must "both be aware of facts from which the inference could be drawn that

a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).  Deliberate indifference is "a high bar," and the defendant's behavior must be more than a "mere 'negligent failure to recognize the high risk of [harm].'" *Diorio*, 2022 WL 3025479, at *6 (quoting *Colburn II*, 946 F.2d at 1023).

As explained above, there is no evidence showing that Officer Atiles or Ulmer knew (or should have known) about any particular vulnerability or harm to Patterson. *Supra* § C.ii.  Plaintiff must therefore rely on circumstantial evidence.  This endeavor too lacks evidentiary support as there is nothing showing that any risk of harm to Patterson was "longstanding, pervasive, well-documented, or expressly noted" or otherwise "obvious." *Parkell*, 833 F.3d at 335.  No one at BCCF – let alone Officer Atiles or Ulmer who had no interaction with Patterson – knew that Patterson had a history of drug use. *Supra* § C.ii; *Blackstone v. Thompson*, 568 F. App'x 82, 84 (3d Cir. 2014) (no evidence showing "longstanding, pervasive, well-documented, or previously noted tensions between [inmate] and [assailant]").

Even considering this inquiry more broadly, there is no support.  Patterson was the first inmate to pass away from using narcotics in his cell in the last ten years. JA197.  Prior to Rhoades' arrival, the search and contraband prevention procedures were exceedingly effective. *Id.*  Out of 34,436 inmates processed, narcotics avoided contraband detection protocols in the Reception Unit only *twice* – less than .005% of commitments. *Id.*  Both incidents also involved smuggling via body cavity, which does not implicate any of Officer Atiles or Ulmer's conduct. JA044-45 (Rhoades' using lunch and laundry bag to hide narcotics); JA198-99 (contraband concealed via rectum); JA201 (contraband concealed "by 'tucking' it"); *Misero v. Christine*, 2014 WL 2915888, at *4 (E.D. Pa. June 25, 2014) (granting summary judgment; no evidence that defendants "were aware of a 'longstanding, pervasive, well-documented or expressly noted' problem of inmate

abuse of razor blades …"); *Baker v. Lehman*, 932 F. Supp. 666, 671 (E.D. Pa. 1996) (finding "one other such incident" of "violence in [prison] clothing shop" insufficient).

      Even if the foregoing could be sufficient to establish an inference of an obvious risk of harm, there is no evidence that Officers Atiles or Ulmer drew any such inference. Officer Atiles and Ulmer were not aware of or involved in the body cavity smuggling incidents. JA198; JA201-203; JA149 (Officer Atiles testifying he has no such knowledge of these incidents). Also, at no point during their interactions with Rhoades, did Officer Atiles or Ulmer learn or have reason to believe that he had contraband with him. JA132-33; JA097; JA141. In fact, both officers did not learn that he had secreted contraband until days later. *Id.*; *Bingham v. Lancaster Cnty*, 2024 WL 23139, at *6-7 (E.D. Pa. Jan. 2, 2024) (granting summary judgment; officers "did not know of [plaintiff's] mental health diagnosis or have information about his previous suicide attempts" and "did not observe anything in [his] cell or on his person indicating that he had the intent and ability to commit self-harm"); *Mertz v. Harmon*, 2017 WL 930303, at *4 (E.D. Pa. Mar. 9, 2017) (no evidence that "Defendants were aware of any animus [assailant] had toward plaintiff"); *see also Hickey v. Merritt-Scully*, 2022 WL 883851, at *13 (M.D. Pa. Mar. 24, 2022) ("[G]iven that [defendant] did not know about [plaintiff's] underlying seizure disorder, it was not possible for her to be deliberately indifferent ….").

      Accordingly, there is no evidence of deliberate indifference and the failure-to-protect claim fails. *E.g.*, *Bingham*, 2024 WL 23139, at *6-7; *Blackstone*, 568 F. App'x at 84 (affirming summary judgment; violent inmate "status and one report of unspecified tensions between the cellmates does not support an inference of deliberate indifference"); *Despaigne v. Crolew*, 89 F. Supp. 2d 582, 586 (E.D. Pa. 2000) (granting summary judgment; despite assertion that defendant "knew of first incident," there was no evidence showing defendant "actually drew an inference" from it).

**D.** **There is no Evidence Supporting Patterson's Failure-to-Protect Claim under the Traditional Framework**

    *i.*   *The conditions at BCCF did not pose a substantial risk of harm.*

Insofar as Plaintiff's claim is analyzed under the traditional "failure-to-protect" framework, it fares no better. Plaintiff first was not "incarcerated under conditions posing a substantial risk of harm." *Muniz*, 2023 WL 6391691, at *4 (E.D. Pa. Sept. 29, 2023). This objective element "may not ordinarily be shown by pointing to a single incident or isolated incidents." *Corbin*, 2023 WL 8042560, at *4 (citing *Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir. 1985)). Plaintiff alleged in the Amended Complaint that BCCF had a "persistent smuggling problem" and that "inmates were actively using and distributing narcotics" at BCCF. *Id.* Neither claim finds evidentiary support.

As discussed, there were only two instances in which narcotics avoided contraband detection protocols in the Reception Unit out of 34,436 new commitment cases. JA196. These occurrences happened more than a year apart, involved body cavity smuggling, and had no connection to Patterson or Rhoades. JA198-99; JA201. It is a far cry to say that two unrelated instances of narcotics making it past the Reception Unit establishes a "persistent smuggling problem" at BCCF. Nor should they as this Court previously recognized that prison officials are "not required … [to] prevent[] all drugs from entering their facility." *Corbin*, 2023 WL 8042560, at *4; *Bracey v. Pa. Dep't of Corr.*, 571 F. App'x 75, 78 (3d Cir. 2014) (affirming summary judgment; "nine incidents" of "yard attacks" insufficient considering "numerous … visits that occurred during the two-year period").

As to Plaintiff's allegations regarding "active drug use" and "distribution" at BCCF, the record is again bereft of evidence. Aside from the Fentanyl and methamphetamines that Rhoades smuggled , no other drugs were recovered from cell and inmate searches on Alpha Module, JA044-47. Furthermore, the criminal investigation concluded that "Module A did not have any drugs

available other than Subutex [which is therapeutically administered inside BCCF by its medical contractor] until Allen RHOADES arrival." JA083; JA182; JA194. Plaintiff's expert nevertheless opines that "drugs were prevalent inside the BCCF" because eight inmates from Alpha Module took urine tests following Patterson's death and tested positive for drugs Rhoades did not smuggle, including "BZO (Benzodiazepine)," "THC (Tetrahydrocannabinol)," "BUP (Buprenorphine)," "COC (Cocaine)," and "AMP (Amphetamines)." JA195-96.

Putting aside that this opinion is non-cognizable at summary judgment, *supra* § C.i, the evidence tells a different story: (i) no such drugs were recovered from Alpha Module, JA044-47; (ii) six of the eight inmates tested were booked either the same day or within three days of Rhoades entering BCCF, JA046; (iii) the remaining two inmates tested positive for the drugs Rhoades smuggled, *id.*; and (iv) inmates enrolled in the MAT program receive maintenance doses of certain opioids from medical personnel, JA182; JA194. In the absence of any corroborating evidence (e.g., admissions of use within BCCF, the inmates were not MAT participants, or the test results exceeded therapeutic dosages), this assertion is "mere speculation." *Butler v. Kauffman*, 2023 WL 2601918, at *3 (M.D. Pa. Mar. 22, 2023) (stating "mere speculation" "is not sufficient to survive summary judgment") (citing *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015)).

Accordingly, Plaintiff cannot establish that Patterson was incarcerated under conditions posing a "substantial risk of harm." *E.g.*, *Bracey*, 571 F. App'x at 78; *Culver v. Specter*, 2016 WL 1274136, at *16 (M.D. Pa. Mar. 31, 2016) (granting summary judgment; No evidence of "any other instances when [assailant] assaulted a fellow inmate"); *Franqui-Pagan v. Jackson*, 2017 WL 4922031, at *4-5 (M.D. Pa. Sept. 28, 2007) (same; "assault was an 'isolated incident.'").

ii.    *Officers Atiles and Ulmer were not deliberately indifferent.*

Finally, because reckless indifference and deliberate indifference are "synonymous,"

Plaintiff cannot establish the subjective element for the same reasons articulated above. *Supra* § C.iii ((i) neither Officer worked on Alpha Module; (ii) neither interacted with Patterson; (iii) neither knew Rhoades possessed contraband and ignored it; (iv) the search procedures at the time were exceedingly effective; and (v) there were no other reports or complaints regarding inmates actively using or distributing narcotics prior to Rhoades' arrival).  Accordingly, even under the traditional failure-to-train analysis, Plaintiff's claim fails. *E.g.*, *Diorio*, 2022 WL 3025479, at *6-7; *Bingham*, 2024 WL 23139, at *6-7; *Blackstone*, 568 F. App'x at 84.

### E.   Plaintiff's Derivative Survivorship and Wrongful Death Claims Fail

Finally, as the Court previously found, there are no survivorship or wrongful death act claims if the underlying "constitutional tort claim" fails. *Corbin*, 2023 WL 8042560, at *7 (noting "neither statute creates a 'substantive cause of action' …." (citation omitted).  Because Plaintiff's failure-to-protect claims fail as a matter of law, her derivative survivorship and wrongful death claims necessarily fail. *Id.* (("[I]f the underlying tort theory [fails], then the wrongful death or survival claim will fail." (quoting *Bright v. Westmoreland Cnty.*, 380 F.3d 729, 741 (3d Cir. 2004)).

### CONCLUSION

For these reasons, Officer Atiles and Ulmer respectfully request the Court enter an order granting summary judgment in their favor.

Date: April 10, 2024

BUCKS COUNTY LAW DEPARTMENT

*/s/ Jaclyn C. Grieser*
Jaclyn C. Grieser (No. 93358)
Deputy County Solicitor

*/s/ Tyler B. Burns*
Tyler B. Burns (No. 325660)
Assistant County Solicitor

*Attorneys for Julio Atiles and Stephanie Ulmer*