# EXHIBIT F

EXPERT TESTIMONY AND/OR OPINION OF WILLIAM ADAMS
Correctional Counselor II, (Ret.)
California Department of Corrections and Rehabilitation

Regarding:

VALERIA CORBIN, Administrator of the ESTATE OF JOSHUA PATTERSON,
Plaintiff(s), vs. BUCKS COUNTY, et al., Defendant(s).

In the United States District Court for the Eastern District of Pennsylvania
Civil Action Number 23-0027

### CURRICULUM VITAE:

1. I am the owner and lead consultant of Correctional Litigation Solutions (CLS). CLS is a consulting firm that provides expert testimony and consulting services regarding policies, procedures, and general prison information regarding accepted standards, policies, and procedures related to correctional system, prison, and jail best practices and industry standards. The firm also provides services regarding general law enforcement use of force issues. My business address, contact information and fee schedule is as follows:

WILL ADAMS
Correctional Litigation Solutions
16692 Hallmark Trail
Monument, CO 81032
will.adams@corrlitsolutions.com

### FEE SCHEDULE

| | |
|---|---|
| Records Review/Consult/Report | $350 per hour |
| Deposition Testimony (4-hour Minimum) | $350 per hour |
| Travel (Excluding Trial Days) | $225.00 per hour |
| Mileage (Current Federal Rate) | 67¢ per mile |
| Trial Testimony | $2800.00 per day |

Corbin vs. Bates County, et al.
March 4, 2024
Page 2

## PROFESSIONAL HISTORY

2.  I began my employment with the California Department of Corrections (CDCR) on January 4, 1988. I attended the Basic Correctional Officer Academy shortly thereafter. On June 1, 1993, I was promoted to Correctional Sergeant. As a sergeant, I supervised Prison Facilities, Prison Yards, Prison Kitchen, Watch Office, Central Control, Receiving and Release, Inmate Transportation, Mental Health Unit, Outside Patrol Sergeant, and served two years as an In-Service Training Sergeant. During that period, I was one of the institution sergeants that assisted in the design and development of the current direct impact munitions and riot control procedures for which CDCR is now respected in the law enforcement community.

3.  On January 1, 2001, I was promoted to Correctional Lieutenant. As a lieutenant, I served as the second-line supervisor for all Correctional Officers and first-line supervisor for all sergeants. I routinely supervised facilities housing an average daily population of 1200 inmates, 20 correctional officers, and two sergeants, often cross covering a second facility. I served as watch Commander where I was in charge of the entire prison after business hours. I served as the escape commander and interim emergency commander as needed. While in that position, I was responsible for 4700 inmates and all staff members on institutional grounds. I served as Visiting Lieutenant and was a trainee member of the Special Emergency Response Team. I commanded the R. J. Donovan Correctional Facility Honor Guard as well.

4.  On November 26, 2006, I was promoted to Correctional Counselor II Specialist, Appeals Coordinator, at Kern Valley State Prison. I served in that position until accepting an assignment as Facility Captain in 2007. I served out of class as a captain for six months, and then accepted the position of Litigation Coordinator (returning to CCII Specialist as a lateral transfer) in late 2007.

5.  During my time as a Litigation Coordinator, I was utilized by the California Department of Corrections and Rehabilitation's Office of Legal Affairs, and the California Department of Justice, Office of the Attorney General, as a prison expert including prison administration, prison gangs, use of force, inmate politics and behaviors, inmate cultural norms, contraband and smuggling, and various other matters. I served as an expert in several trials and provided consulting services to the California DOJ and CDCR on multiple matters requiring my intimate knowledge of, and long-time experience with, matters of prison administration.

6.  On September 1, 2014, I retired from service with the CDCR, having served almost 27

Corbin vs. Bates County, et al.
March 4, 2024
Page 3

years in peace officer positions at three institutions of the department and having served in several special details away from the institution. The minority of my career was spent in administration, giving me a breadth of operational experience and constant inmate and staff contact over the years. Even during my time in administrative positions, I continued to remain qualified as a peace officer, and to train correctional officers, sergeants, lieutenants, and other prison staff as needed.

7.  Throughout my career, and continuing through this day, I have served as an expert witness in California state courts regarding general prison matters, prison and jail administration, interpretation of CDCR documents, CDCR policies and procedures, use of force, narcotic distribution and smuggling in the prison setting, prison gangs, prison disruptive (street gang) activities, and protection of confidential informants, documents, and information under the control of CDCR. Such testimony has taken place in the counties of San Diego, Los Angeles, Kern, Riverside, Kings, Tulare, Santa Cruz, Del Norte, and Monterey, among others.

8.  I have provided expert testimony and reports in Federal Court regarding prison and jail administration, confidential informant protection, confidential record protection, prison disciplinary process, general prison culture, inmate cultural norms, prison rules and policies, prison gang culture, emergency response, less lethal and deadly force with firearms and launchers, and use of force policy, procedure, applications, and options.

9.  Most often my expertise in use of force policy and procedure is provided in Federal Courts. I have testified in the U.S. Eastern, Central, and Southern District Courts of California. I have provided expert report and consulting services in the Northern District of California, District of New Mexico, District of Mississippi, District of Arizona, Western District of New York, Eastern District of Pennsylvania, and District of Michigan. My services have been provided for plaintiff and defense cases.

**TRAINING/ EXPERIENCE**

10.  I served as a master trainer in the following:
Use of Force Policy and Procedures
Tactical Alarm Response
Def. Tech. / Federal Arms Factory Certified Impact Munitions Instructor
Blood borne Pathogens
Electrified Fence Master Trainer
Electrified Fence Trainer for Master Trainers
Emergency Response Procedures

Corbin vs. Bates County, et al.
March 4, 2024
Page 4


Escape Procedures
Inmate    Staff    Relations
Litigation        Procedures
Range Safety Officer
I have been certified by CDCR in the following:
FEMA Emergency Response, National Incident
Management System (NIMS)
CDCR    Internal    Affairs    Investigation
(Investigator 40-hour Course)
Cardiopulmonary Resuscitation
Rules Violation Report Hearing Officer
Rules Violation Report Senior Hearing Officer
Basic    First    Aid
Basic Supervision
Advanced        Supervision
Sergeant's            Academy
Lieutenant's         Academy
Classroom Presentation Skills
CDCR Emergency Operations- Conflict Management

**CURRENT AND PRIOR PROFESSIONAL MEMBERSHIPS INCLUDE**

11.
- California Narcotic Officer's Association
- Fraternal Order of Police, San Diego Lodge# 10
- Former   Chapter   President,   California
  Correctional Supervisor's Organization
- California Correctional Peace Officers Association
- Former Chief Job Steward, California Correctional Peace Officers Association
- California Correctional Peace Officers Association, Retired Chapter
- Correctional Peace Officer's Foundation
- Lifetime Member, American Legion, Post #26, Bakersfield, CA
- Lifetime Member American Legion Post #109, Colorado Springs, CO
- Meudell Oildale Lodge #695, Free and Accepted Masons, Bakersfield, CA
- Centurian  Lodge  #  195,  Ancient  Free  and  Accepted  Masons,  Monument
  Colorado
- Kiwanis International, Golden Empire Club, Bakersfield, CA
- American Correctional Association
- Aircraft Owners and Pilots Association
- American Radio Relay League
- Committee Member, Citizens Bond Oversight Committee, Bakersfield City School

Corbin vs. Bates County, et al.
March 4, 2024
Page 5

      District, Bakersfield, CA
- Board Member, Jackson Creek Homeowner's Association, Monument, CO

12.    My presentations and list of cases in which I have provided consulting services or expert testimony are set forth in Exhibit "A" attached hereto.

**Valeria Corbin, Administrator of the Estate of Joshua Patterson, vs. Bucks County, et al. In the United States District Court for the Eastern District of Pennsylvania, Civil Action Number 23-2784**

13.    I have been asked to review the above titled case to provide an opinion as to whether the actions of, and the procedures used by the defendant(s), related to this lawsuit, were appropriate and consistent with the industry standards for correctional facilities, and how the actions of persons who had contact with Allen Rhoades, Bucks County Jail Number 128546[1] were appropriate or not based upon my training and experience in the correctional field.

14.    I have been asked to assess whether Defendant Bucks County Correctional Facility, through its employees, established, knew of, and acquiesced to policies, procedures, and customs that Defendants knew or should have known would lead to violations of citizens' constitutional rights. Related to the plaintiff, I have been asked to assess whether the defendants knew, or should have known that ineffective policies, rules, and procedures contributed to the incident described in the operative complaint in this case, and if the lack of training and supervision within the Bucks County Correctional Facility (BCCF) may have facilitated the introduction of narcotics into the jail which allowed Allen Rhoades to provide Fentanyl, to Joshua Patterson, which led to his death. I have been asked to assess whether the employees named in the operative complaint in this case failed in their duty to protect Mr. Patterson from harm.

15.    I have been asked to review BCCF policies in effect when Mr. Patterson was provided Fentanyl by Allen Rhoades while in the custody of the BCCF, located at 1730 Easton Road, Doylestown, PA 18901.

16.    I have been asked to determine if the procedures in effect at the time of the incident, or a lack of policies and procedures, met a generally recognized industry standard at the time Mr. Patterson was provided the Fentanyl that resulted in his death, while detained at the BCCF, as the events were described in the operative complaint.

---

[1] Bates # COB 000356

Corbin vs. Bates County, et al.
March 4, 2024
Page 6

17.   In forming my opinion, I have relied on my training and experience, as well as the policies and/or procedures of the BCCF.[2]

18.   My opinions are also based upon, and supported by, my review of various documents relative to this case including but not limited to:

- The Complaint with attachments filed by Plaintiff Estate of Jushua Patterson, Civil Action No. 23-2784.
- Defendant BCCF Policies as produced in discovery Bates COB 000149 through COB 000184.
- Documents provided to Plaintiffs' Counsel identified as Bates numbers COB 000001 through COB 000399.
- Deposition of Correctional Officer Julio Atiles taken remotely vis Zoom on February 13, 2024.
- Deposition of Correctional Officer Stefanie Ulmer taken remotely vis Zoom on February 13, 2024.

**OPINIONS**

19.   In this report, I am not opining about the defendants' intent or providing testimony as a fact witness. However, I have analyzed the facts, and have drawn the types of inferences that I typically made during my career based on my 26+ years of experience, education, and training, and information and research conducted during my time as the owner of Correctional Litigation Solutions since September 2014.

20.   This report is based on information currently available to me. I reserve the right to expand or modify my opinions as my analysis continues, as I received further discovery including documents and things, and to supplement my opinions in response to any additional information that becomes available to me, including any matters that Defendants raise in this case, opinions or testimony provided by Plaintiff's or Defendant's expert(s), and/or in light of any relevant orders from the Court.

21.   I also understand that I may be asked to give rebuttal testimony or provide a rebuttal expert report on any issues not covered in this report. I further reserve the right to respond in a rebuttal report to opinions put forth by any expert that Defendant(s) offers on prison policy and procedural issues and prison/jail administration. In addition, I may participate in creating materials (*e.g.*, animations, demonstratives, enlargements of

---

[2] BCCF Procedures reviewed are found in COB 000149 through COB 000183.

Corbin vs. Bates County, et al.
March 4, 2024
Page 7

exhibits, and other devices to illustrate my opinions) to aid the Court's and/or the jury's understanding of any of the subjects identified in this report.

22. This case involves allegations of improper, inappropriate, and negligent search procedures, and failure to protect the health and welfare of Joshua Patterson by the BCCF and its employees, failure to provide a safe housing area free from dangerous contraband for Mr. Patterson, as well as exercising prudence and reasonable care when conducting searches during the intake of arrestees at the BCCF, and indifference to Mr. Patterson's 4th, 8th, and 14th Amendment rights under the United States Constitution.

23. I am not a medical or mental health expert and give no medical or mental health opinions in this report. Likewise, I will offer no legal conclusions, as I am not an attorney. Remarks in this report referring to legal issues are based upon written reports of professionals in the legal field. I have not been asked to opine on medical procedures or response procedures at the BCCF. I may utilize common knowledge known to the lay person; however, such references are not intended to be taken as expert opinion on my part with regard to legal conclusions.

24. The plaintiff generally alleges that the BCCF, as well as the individual defendants in this case, acted in ways that contributed to the death of Joshua Patterson and violated his rights under the 4th, 8th, and 14th Amendments to the United States Constitution due to their ineffective training, ineffective application of written policies and procedures, failure to practice sound correctional facility practices, and disregard for Mr. Patterson's physical wellbeing.

25. It is alleged that the defendants showed deliberate indifference to the fact that the conditions in the BCCF were unsafe for inmates confined there, and that they knew, or should have known that their policies, procedures, training, and supervision of employees in the BCCF was substandard. It is alleged that those substandard policies and actions or inactions by employees of the BCCF led to the death of Joshua Patterson by Fentanyl overdose. Due to ineffective search of Allen Rhoades during his intake into the facility, he was allowed to bring a "baseball sized"[3] amount of Fentanyl and Methamphetamine into the BCCF by correctional officers assigned to the intake area of the BCCF on July 25, 2022.[4]

---

[3] COB 000372

[4] See: original Complaint for Deliberate Indifference, Civil Rights Violations, Negligent Hiring, Training, Supervision, and other claims, filed in the USDC, Eastern Dist. Of Pennsylvania, Civil Action No. 23-2784.

Corbin vs. Bates County, et al.
March 4, 2024
Page 8

26. The allegations in the operative complaint include a failure by the BCCF to protect from illicit drugs, municipal liability, wrongful death of Joshua Patterson, and survival action under Pennsylvania law.[5]

**DEFENDANTS**

27. In this report, I will refer to officers, policies, and procedures and may identify shortcomings of the same or point out deficiencies of officers. I may use activities to support my opinion that the risks from fentanyl in the facility were both well known, even to members of the public, but that Mr. Patterson was especially at risk due to his condition as a detainee.

28. I have been asked only to opine regarding the officers involved in the initial failure to stop the fentanyl that killed Mr. Patterson from entering the BCCF. It is my understanding that this case is proceeding only against Officers Ulmer and Atiles. Given that I will mention other officers or their supervisors, and generally the BCCF and its administration and administrative activities, these references are only intended to give context to issues raised in this report and are intended to be demonstrative that there were conditions at the BCCF that posed an unreasonable risk to Mr. Patterson's life.

29. References to officials, and activities other than Officers Atiles and Ulmer, are meant to be demonstrative that Mr. Patterson, as well as all inmates there suffered an unreasonable risk from the introduction of dangerous contraband and that a culture existed in the BCCF that presented an obvious risk to detainees. These risks were, or should have been, obvious to Officers Ulmer and Atiles.

30. The jail officers in general and Officers Atiles and Ulmer specifically were aware that preventive action was necessary but made no concerted or focused effort to do so, as a matter of course over a period of time before and after Mr. Patterson was killed by an accidental overdose of fentanyl that should have been prevented.

31. In mentioning officers and events other than Atiles and Ulmer, I am demonstrating that the lack of regard to the obvious risk of drugs, including dangers posed by fentanyl in the facility was pervasive throughout the facility and that officers throughout the facility lacked care for the vulnerability of Mr. Patterson and others as a matter of general practice and employee culture at the BCCF.

---

[5] Operative Complaint.

Corbin vs. Bates County, et al.
March 4, 2024
Page 9

## INITIAL OPINION

32. It is my initial opinion that the failure of officers Ulmer and Atiles to detect fentanyl and methamphetamine in the possession of Allen Rhoades, during the in-processing of Mr. Rhoades into the Buicks County Correctional Facility, allow for a series of events that permitted Mr. Rhoades to smuggle the fentanyl that killed Joshua Patterson into the Alpha Module of the BCCF. Mr. Rhoades distributed the fentanyl to Mr. Patterson, who became a victim of an accidental overdose and died. Mr. Patterson would not have been provided with the fentanyl by Mr. Rhoades, had officers Ulmer and Atiles performed their duties in accordance with BCCF standard operating procedures and according to sound and commonly accepted correctional best practices.

## INCIDENT INVOLVING MR. JOSHUA PATTERSON

33. On July 27, 2023, at approximately 0344am, a correctional officer assigned to the housing unit named "Alpha Module" at BCCF found Mr. Patterson unresponsive in his assigned cell, cell thirty-nine, on the upper tier of Alpha Module.[6] The officer removed Mr. Patterson from the cell and started life-saving measures. Mr. Patterson was transported by EMS to Doylestown Hospital.[7] Mr. Patterson passed away at Doylestown Hospital from a death ruled as "accidental death" and a cause of death listed by the Buck's County Coroner's Office as "Complications of Fentanyl Intoxication."[8]

34. At or near the time Mr. Patterson was found unresponsive in cell 39, officers conducted a search of the cell and found a powdery substance consistent with fentanyl. The substance, a plastic bag found in the cell, and a rolled piece of white paper containing white residue, also found in the cell, were tested by NMS Labs. All three items of evidence were found to be positive for presence of fentanyl.[9] Through investigation, the BCCF found that Inmate Allen Rhoades, an inmate housed in Alpha Module, cell 2, provided the fentanyl to Mr. Patterson. The Bucks County Detectives, after completing an investigation at the BCCF concluded that Mr. Rhoades was responsible for violation of "A Drug Delivery Resulting in Death."[10]

## EVENTS REGARDING ALLEN RHOADES SMUGGLING FENTANYL INTO BCCF AND DELIVERING TO JOSHUA PATTERSON

35. On July 25, 2022, a Pennsylvania State Trooper arrested Mr. Rhoades for a warrant. During the arrest, the trooper found 19 bags of fentanyl in the car where Mr. Rhoades was stopped. The fentanyl was individually packaged in baggies marked "Ric Flair,"

---

[6] Report of Correctional Officer Wilcox, COB000026.
[7] Report of Sergeant Cruz, COB 000022.
[8] Coroner's Report, COB 000057.
[9] NMS Labs Report COB 000015 and 000016.
[10] Arrest Warrant of Allen Rhoades, COB 000255

Corbin vs. Bates County, et al.
March 4, 2024
Page 10

"Game Over," and "Avengers."[11] This packaging was consistent with fentanyl smuggled into the BCCF that day by Mr. Rhoades. According to the affidavit Mr. Rhoades was initially patted down (pat search) by correctional officers and placed into BCCF holding cell one.[12]

36. During the intake of Mr. Rhoades, correctional officers failed to find the baseball sized amount of fentanyl, which Mr. Rhoades eventually smuggled into Alpha Module.[13]

37. Reported reviews of the surveillance cameras in Alpha Module revealed that Mr. Rhoades immediately started distributing the contraband narcotics throughout the module, "within five minutes"[14] and continued to do so for several hours before an informant alerted a correctional officer of the criminal activity. The inmate advised an officer (Luis Venturiera) "that afternoon" that he should, "probably take a look at [cell] A1."[15] Cell A1 was occupied by Allen Rhoades. While it is unclear exactly when Officer Venturiera received this information, it is clear that he did not advise the lieutenant (shift supervisor) until 7:20pm.[16]

38. The BCCF Standard Operating Procedures and Guidelines (SOPs) indicate ███

███████████████████████████████████████████████████ [17] Officer Venturiera did not immediately report the suspected contraband to his shift supervisor and instead waited until 7:20pm to do so.

39. Mr. Rhoades admitted to investigators that he was handed "a large amount of fentanyl and methamphetamines during the traffic stop which he placed in his pants and later smuggled into the BCCF Alpha Module."[18] Joshua Patterson was among the several inmates provided fentanyl that day. There is no evidence correctional officers were monitoring the module sufficiently to detect the many transactions made by Mr. Rhoades and other inmates helping him distribute the dangerous contraband until a confidential informant informed a correctional officer of the activity.

40. There is no dispute among the parties that Mr. Rhoades distributed the narcotic that killed Mr. Patterson, or that Mr. Rhoades smuggled the narcotics into the module.

---

[11] Bucks CountyDistrict Attorney, Affidavit of Probable Cause, Case 99-22-0692, COB 000269.
[12] COB 000270
[13] A photograph of the baseball sized amount of contraband can be found in the affidavit. COB 000279.
[14] COB 000271.
[15] COB000379.
[16] BCCF Lieutenant's Shift Report dated 07/26/2022, COB000372.
[17] BCCF SOP Section B-3.11, "Module Officer" Emphasis added.
[18] COB000270.

Corbin vs. Bates County, et al.
March 4, 2024
Page 11

41. The affidavit of probable cause reports several transactions of suspected contraband narcotics including a screen capture of a video time stamped as early as 3:03pm.[19] The information received by the officer was relayed to the shift lieutenant on duty at 7:20pm.[20] Based upon this information, Mr. Rhoades was distributing narcotics unobserved by officers in the Alpha Module for a period in excess of four hours. In the deposition of Officer Julio Atiles, Officer Ulmer is seen on a video played by defense counsel placing an armband on Mr. Rhoades at 10:50am.[21] The BCCF investigative Unit placed Mr. Rhoades in the Alpha Module at 11:21am.

42. By his own admission, Mr. Rhoades was in possession or control of the baseball sized amount of narcotics upon arrival at the BCCF, throughout in-processing in the BCCF reception unit, smuggled the narcotic into, and then distributed fentanyl and methamphetamines in the module.

43. Based upon this information, Mr. Rhoades may have started distributing narcotics in the Alpha Module several hours before the 3:03 pm timestamp noted above. Mr. Rhoades admits that the fentanyl he brought into the module was delivered to Mr. Patterson, although he denies directly distributing the contraband to Mr. Patterson personally. In fact, the BCCF Special Investigation Unit report indicates that Mr. Rhoades is in the module at 11:21am, according to their documented review of surveillance cameras.[22] This means that Mr. Rhoades and others were distributing the narcotics for about eight hours unobserved and unhindered by BCCF officers.

44. Officers Ulmer and Atiles both indicated they knew inmates should be stopped from bringing narcotics into prison indicating they knew that drugs in prison are dangerous.

45. Officer Atiles indicated that preventing dangerous narcotics from entering the BCCF was why officers performed unclothed searches of inmates, but he made no mention of thorough and effective pat searches at intake.[23] Throughout his deposition, Officer Atiles repeatedly disregarded or downplayed the crucial value of the initial pat down search at initial reception of a detainee.

46. Officer Ulmer indicated an understanding that inmates should be searched upon entry to the jail but mentions the order of search operations as that the constables do it (pat search), then questions are asked of the incoming detainee, then an unclothed search is performed. She omits the obligation of BCCF to perform a pat search once receiving custody from the constable.[24]

---

[19] COB 000273.

[20] BCCF Lieutenant's Shift Report dated 07/26/2022, COB000372.

[21] Officer Atiles Depo., P41: L15-22.

[22] COB000379

[23] Atiles Dep.: P28, L14 – 22.

[24] Ulmer Dep.: P9, L2 - 11

Corbin vs. Bates County, et al.
March 4, 2024
Page 12

47. Officers Ulmer and Atiles, throughout this incident, exhibit an attitude that removes personal responsibility for the safety of Mr. Patterson and others, and places it on others. This shows that the attitude of expecting others to have effectively performed a function is a pervasive attitude in the BCCF that catastrophically decreases the safety and security of inmates like Mr. Patterson.

48. Officer Ulmer indicated she had been a correctional officer for three years, and Officer Atiles 19 years at the time they failed to prevent Mr. Rhoades from smuggling the fentanyl into the BCCF that killed Mr. Patterson.[25] Officer Atiles indicated that he had been working in the reception unit of the BCCF for "18 years off and on."[26]

49. Officer Atiles ignores all possible actions that could be made once a pat search fails, and places responsibility for the pat search on the constable.[27] It is only after being challenged by the deposing officer that Officer Atiles admits that the constable can't be blamed for the introduction of the fentanyl. Interestingly, even though challenged, Officer Atiles does not mention that it is an initial pat search that should have been performed. In fact, when he is asked if BCCF staff, in this case *he* should re-search incoming detainees, he makes no mention of a pat search and instead says, "we ask him questions about himself, yes."[28]

**ILLEGAL NARCOTICS TRANSACTIONS NOTED AND ALLEGED IN PROBABLE CAUSE AFFIDAVIT[29]**

50. Several inmates were interviewed by the detectives investigating the death of Mr. Patterson as it related to Mr. Rhoades having distributed narcotics in the Alpha Module at BCCF. In reviewing the affidavit of probable cause, I counted the number of times the detectives noted Mr. Rhoades or other inmates in the module apparently distributing the narcotics smuggled in by Mr. Rhoades. It is noted that several suspects later admitted to their involvement and more than one confidential informant described that there were narcotic distribution activities taking place in the module.

60. By my count there were at least eight different inmates who received the narcotics smuggled into the Alpha Module by Mr. Rhoades. None of these transactions were seen nor were any suspicious activities noted by correctional officers.

61. The distribution of fentanyl took place for around eight hours on Alpha Module, and although Officer Venturiera (Alpha Module Officer) indicated he noted Mr. Rhoades sniffing and "acting off," so he was suspicious of Mr. Rhoades, he took no action to investigate. It was not until later that afternoon that an inmate informed him that he might

---

[25] Atiles Dep.: P 16, L3-7, Ulmer Dep.: P 10, L16-17.

[26] Atiles Dep.: P17, L5-8.

[27] Atiles Dep. P9, L3 – 24.

[28] Ibid.

[29] COB 000268 through COB 000279

Corbin vs. Bates County, et al.
March 4, 2024
Page 13

want to search cell 1.[30] The officer indicated his suspicions were confirmed by an inmate. Still, he did not immediately act. He did not tell the shift commander until "sometime later in his shift" about his suspicions and the information he received from the inmate.[31]

62. Officer Venturiera's lack of action left Mr. Rhoades and others to distribute fentanyl throughout the module unfettered for several hours. His lack of taking immediate action is yet another example of a pervasive culture in the BCCF that "someone else should do it." In this specific case, Officer Venturiera left taking action to investigate and stop contraband activities in his assigned duty station to the lieutenant. The fact that he waited several hours to inform the lieutenant further illuminates the culture in the BCCF that while officers are aware that narcotics are extremely dangerous, someone else should, or should have, dealt with it.

**JOSHUA PATTERSON WAS ON RESTRICTIVE HOUSING STATUS BUT WAS APPROACHED SEVERAL TIMES BY INMATES INCLUDING MR. RHOADES.**

63. According to the BCCF Commitment Summary regarding Mr. Patterson, he had two "active alerts" listed including, "Keep Separate" (this was listed twice) and "ADM Lock."[32]

64. The Bucks County Special Investigation Unit Report indicates Mr. Patterson was "PATTERSON was on Administrative Lock for Fighting. As a result of this fight PATTERSON was sanctioned to 30 days in RHU (Restricted Housing)."[33] "He was the only detainee in Alpha Module housed in A-39 and was on administrative lock status."[34]

65. The Special Confinement Cases procedure at BCCF states, ["]      ██████████████████████████████████████
██████████████████████████████     ["][35]

66. Evidence of a culture of lack of concern or indifference to the wellbeing of inmates in the BCCF is found in the records of security checks made. It is my opinion that one officer being assigned to a housing unit must observe for the safety and security of the unit and act to interdict contraband and other rules violations in the unit. It is ca commonly understood correctional best practice that housing officers assume a duty post for which they must remain, stay alert, and take primary responsibility. At BCCF, a culture of expecting others to perform security functions based upon a shared duty led to multiple drug distributions in the Alpha Module without officers noticing. This shows a culture of indifference at the facility.

---

[30] COB 000378, COB 000379.
[31] Ibid.
[32] Commitment Summary, Joshua Patterson, COB 000020
[33] COB 000180
[34] COB 000377
[35] BCCF SOP B-4.48, "Special Confinement Cases," COB000180

Corbin vs. Bates County, et al.
March 4, 2024
Page 14

67. There were 39 recorded checks of the upper tier (where Mr. Patterson received the fentanyl) between 7am and midnight on July 26, 2022.

68. The 39 recorded checks were performed by 12 different officers.[36]

69. Of those 39 checks, the 12 different officers reported no unusual activity.[37]

70. During the time period of the 39 checks, Mr. Rhoades brought a baseball sized amount of fentanyl and methamphetamine into the Alpha Module and distributed it to several inmates, an officer was suspicious of him but took no action, several visits were made to Mr. Patterson by other inmates even though he was on RHU status, and Mr. Patterson was provided fentanyl, leading to his death.

71. Although officers were to check into Mr. Patterson ████████████████ of the 39 checks, 9 were late, representing about 1/3 of the total checks. Among the missed checks, 8 were more than 10 minutes past due. Of the 9 missed checks, 3 were around an hour between checks and 1 was 1.5 hours between checks. The late checks also represent missed checks due to the space between hours.

72. There were 5 missed checks, even though 12 officers conducted checks during the time that fentanyl was distributed in the BCCF Module.

**AN OFFICER SHOULD HAVE BEEN ASSIGNED ON THE UPPER TIER BUT WAS NOT**

73. There is no dispute between the parties that inmates were allowed to approach, communicate with, and trade items with Mr. Patterson at his cell front on July 26, 2022, unobserved and unhindered by correctional officers in the module. Even though he was supposed to have been kept separate from other inmates.

74. There were several officers making tours in the Alpha Module on July 26, 2022, even though Officer Venturiera was assigned to the unit. The officers touring there between 6:50 am and midnight, and ostensibly providing security coverage of Mr. Patterson, were not noting anything out of the ordinary, including Officer Venturiera who had suspicions about Mr. Rhoades.

75. According to the Restricted Housing Unit SOP section, ████████████████████████
████████████████████████████████████████ .[38] The second officer is primarily responsible

---

[36] COB000045 - 000049
[37] Ibid.
[38] SOP Section B-3.11 COB 000163.

Corbin vs. Bates County, et al.
March 4, 2024
Page 15

████████████████████████████████████████████████████
███.[39]

76. The ██████████████████████████████████████.[40]

77. The █████████████████████████████████.[41]

78. Even though there should have been a second officer assigned in the unit, there is no indication that a second officer was assigned. The assignment of a second officer to the upper tier in Alpha Module, if it took place, did not result in Mr. Patterson remaining separated from other inmates in the population, nor did it prevent him from receiving inmate visitors at his cell front, or being distributed fentanyl.

79. It is my opinion that the assignment of a second officer could have prevented the distribution of narcotics around the module by Mr. Rhoades and prevented Mr. Patterson from receiving any, thereby preventing his death.

80. It is my opinion that even though a primary concern in correctional facilities is enforcement of laws and rules pertaining to the unit, including interdicting, controlling, locating, and removing fentanyl and other dangerous drugs, the culture in the BCCF allowed for officers to ignore a duty to protect inmates from a substantial risk posed by drugs in the housing unit, by first sharing the duty among 12 officers to patrol, observe, and act upon violations, but then exhibiting a mutual expectation that one of 12 different officers would gather sufficient information based upon proactive observation and policing to do so.

**ALLEN RHOADES WAS ABLE TO SMUGGLE A LARGE AMOUNT OF NARCOTICS INTO THE BCCF DUE TO FAILURES BY OFFICERS TO PERFORM PROPER CELL DOOR SECURITY, PAT DOWN PROCEDURES, ENGAGE IN CONSISTENT OBSERVATION OF MR. RHOADES, COMMUNICATE EFFECTIVELY, AND TAKE PERSONAL RESPONSIBILITY FOR THE SAFETY AND SECURITY OF INMATES IN THE RECEPTION UNIT**

81. It is my opinion that Mr. Patterson would not have been the recipient of fentanyl on July 26, 2022, had officers in the Reception Unit of BCCF followed written BCCF procedures and exercised reasonable prudence regarding detection of contraband in their duty area, and prevention of introduction of the same into the facility.

82. Allen Rhoades, as stated earlier in this report, was arrested, and brought to the BCCF by Pennsylvania State Troopers on July 26, 2022.

---

[39] Emphasis added.
[40] BCCF Activity Log, COB 000010.
[41] Ibid.

Corbin vs. Bates County, et al.
March 4, 2024
Page 16

83. According to the SOP for the Reception Unit, ███████████████████████████
████████████████████████████████████████████████████████████ "[42]

84. Officers Julio Atiles and Stefanie Ulmer were assigned to the Reception Unit when Mr. Rhoades arrived.

85. According to Officer Ulmer, she booked Mr. Rhoades into the facility but did not immediately pat search Mr. Rhoades because she is a female officer and therefore not allowed to pat search male inmates. In her deposition, she stated regarding Mr. Rhoades, "He gets pat searched when he comes into the jail with the constables."[43]

86. According to Officer Atiles, he conducted the pat search of Mr. Rhoades.[44] When asked if he took responsibility for not properly searching Mr. Rhoades, Officer Atiles stated, "No"[45]

87. Officer Atiles indicated that, "They're [detainees] given a pat down before they are placed in a holding cell, they're given a pat down."[46]

88. The SOP regarding pat down searches indicates the following procedure is to be followed:

89. "Pat search procedures will be executed in the following manner:



a. ████████████████████████████████████
b. ████████████████████████████████████
c. ██████████████████████████████████
d. ████████████████████████████████████
e. ████████████████████████████████████
f. ██████████████████████████████████████
g. ████████████████████████████████████

---

[42] BCCF SOP Section B-4.40, "Reception Unit – Admissions and Discharge Procedures, Revised 9/16/2020, Section 2a. COB 0000172
[43] Ulmer Dep.: P9, L2-7.
[44] Atiles Dep.: P8, L24-6.
[45] Atiles Dep.: P8, L19 through P9, L6.
[46] Atiles Dep.: P14, L3 – 5.

Corbin vs. Bates County, et al.
March 4, 2024
Page 17



90. Items in bold and italicized are due to my emphasis and do not appear like that in the policy. I emphasize these sections because it is my opinion that they highlight the failures on the part of Officer Atiles to properly pat search Mr. Rhoades.

91. The existence of the search procedures and Reception Unit SOP indicate that the BCCF was aware of the risks posed by allowing fentanyl and other dangerous contraband into the facility. This was not sufficient to ensure proper training of the officers or monitoring of the reception unit.

92. As noted earlier in this report, Mr. Rhoades indicated he received a large amount of methamphetamine and fentanyl at the scene of his arrest from another person. He admits having the drugs in his pants upon arrival at the BCCF.

93. According to the BCCF Special Investigation Unit (SIU), Mr. Rhoades is seen on surveillance video in the holding cell, after being pat searched by Officer Atiles, producing something from inside his pants, "At 0646 hours, RHOADES is provided a lunch bag by an officer. At 0648 hours, RHOADES turns his back to the camera and appears to remove the plastic wrap from a sandwich. RHOADES places his right hand down the front of his pants and appears to remove something. RHOADES is observed clearly manipulating something in the front of his pants that he eventually hides inside the lunch bag."[48]

94. Mr. Rhoades corroborates the observations of the SIU Officer. "During an interview with Allen RHOADES, he provided details that during the traffic stop he was handed a large amount of Fentanyl and methamphetamine by another occupant in the vehicle that he secreted in his pants. Once he was arrested, he kept the Fentanyl and methamphetamine in his pants until arriving to the Bucks County Correctional Facility.

95. While inside of holding cell 1 in the intake area of the Bucks County Correctional Facility, Allen RHOADES stated, he had ingested bags Fentanyl and was feeling high from the effects. Allen RHOADES admitted that he smuggled the Fentanyl and

---

[47] BCCF SOP A-4.20, "Searches – Inmate and Staff – Pat Searches and Unclothed Searches. COB 000150 – COB 000151.
[48] SIU Incident Report COB 000376

Corbin vs. Bates County, et al.
March 4, 2024
Page 18

96. methamphetamine (contraband) into the correctional facility by removing it from his pants and wrapping the Fentanyl and methamphetaminc (sic.) in the sandwich wrapper, then placed the drugs inside of the brown food bag. Allen RHOADES stated that he had smuggled those drugs from the intake holding cell into A Module housing cell 1."[49]

97. Based upon the admission of Mr. Rhoades and the observations of the Bucks County SIU investigator, it is clear that Mr. Rhoades was placed in the holding cell after he had been pat searched by Officer Atiles. Officer Atiles failed to conduct a pat search thorough enough to detect a "large amount" of narcotics in his pants. The amount was described and photographed later as being the size of a baseball.

98. The BCCF search procedure indicates ███████████████████████████
███████████████████████████████████████████████████████

99. Officer Atiles did not properly check this area during the pat search, because he should have easily found the baseball sized amount of narcotics had he performed the pat search of the waistline and legs properly.

100. The procedure ████████████████████. Had Officer Atiles █████████████
██████████████, he would have easily found a large amount of narcotics hidden there.

101. The procedure instructs officers about pat searching inside the waistline of the detainee's pants, abdomen, and crotch area. It reads, ████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████

102. Given that Mr. Rhoades admitted hiding the drugs in his pants and the SIU Officer reported observing him reaching into his pants while in the holding cell and removing something he placed in a bag, it is my opinion that Officer Atiles failed to properly search the waist, leg, and crotch area of Mr. Rhoades, thereby allowing Mr. Rhoades to introduce the contraband into the BCCF.

103. It is my opinion that the failure of properly pat searching Mr. Rhoades upon his arrival at the BCCF was a catastrophic failure, in that it provided an opportunity for Mr. Rhoades to introduce the fentanyl into the jail that ended the life of Mr. Patterson. Had officer Atiles properly pat searched Mr. Rhoades, it is my opinion that Mr. Patterson would not have received the fentanyl that killed him.

---

[49] Probable Cause Affidavit, COB 000270.

Corbin vs. Bates County, et al.
March 4, 2024
Page 19

104. It is my opinion that the procedure of having an initial pat search of incoming inmates, followed by an unclothed search is a sound procedure; however, if officers involved in the in-processing of detainees perform complacent and ineffective pat searches assuming that anything they miss will be found in the unclothed search, the two search procedure fails, and contraband is likely to be introduced into the facility.

**OFFICER ATILES DID NOT RECEIVE EFFECTIVE TRAINING IN SEARCH PROCEDURES AND WAS NOT AWARE OF WRITTEN BCCF SOPS REGARDING SEARCHES**

105. In his deposition, Officer Atiles indicated, as noted above, that he did not believe he bore any responsibility for failing to pat search Mr. Rhoades properly. Even so, Officer Atiles admitted being unfamiliar with the policies of BCCF regarding search procedures. He described the pat search procedure as, "The initial pat-down search is we're checking from the neck down and, again, like I said, the primary search is we're looking for anything out of the ordinary, like a weapon, a bulge in a sock area, a bulge in the waistline."[50]

106. It is noted that Officer Atiles did not describe checking an area which my 26+ years of training and experience in the correctional field informs me is a primary place inmates, arrestees, and detainees hide contraband. That place is in the crotch area, between the legs, in the area of the penis and testicles. Inmates often hide contraband in that area because officers are often too embarrassed to search them there or are intimidated by the protestations of the person being searched in that area of the body. It is clear, however, that ███████████████████████████████████████████████.

107. During his deposition, Officer Atiles was shown SOP Section A-4.20 regarding search procedures as noted above. Officer Atiles repeatedly stated he was not familiar with the policy. At one point he stated, "I don't know the policy, sir, offhand."[51]

108. Officer Atiles indicated in his deposition that he cannot recall the search procedures being a part of his quarterly online training.[52]

109. Officer Atiles was shown, during his deposition, BCCF SOP B-3.13, "Reception Unit Officer." He indicated he was not familiar with the policy.[53]

110. It is my opinion that the BCCF had a responsibility to ensure that officers in the reception area were properly trained in how to search inmates, beginning with a proper and effective pat search of newly arriving commitments, such as Mr. Rhoades. Proper searches were

---

[50] Atiles Dep.: P16, L19 – 24.
[51] Atiles Dep.: P24, L3 – 21.
[52] Atiles Dep.: P25, L1 – 8.
[53] Atiles Dep.: P25, L13 trough P26, L 22.

Corbin vs. Bates County, et al.
March 4, 2024
Page 20

crucial in preventing dangerous contraband from being introduced into the jail. The officer regularly assigned in the reception unit, Officer Atiles, by his own testimony, was not aware of the BCCF SOPS regarding search procedures or Reception Unit procedures. Officer Atiles did not recall having received training in pat searches, unclothed body searches, or Reception Unit standard operating procedures/policies.

111. Because the BCCF was responsible for the training of their officers, and provided training quarterly as testified to by Officer Atiles, they reasonably should have known that officers were not receiving training in search procedures.

112. It is my experience and opinion that a failure to provide meaningful training to officers results in substandard performance by the officers. In this case, the failure of BCCF to provide training in the SOPs regarding search procedures and Reception Unit procedures contributed to the catastrophic failure of BCCF officers to prevent the introduction fentanyl into the facility. This failure resulted in the death of Mr. Patterson.

**FAILURE TO PROPERLY SECURE AN EMPTY CELL GAVE MR. RHOADES AN OPPORTUNITY TO GAIN ACCESS TO THE NARCOTICS HE SMUGGLED INTO ALPHA MODULE**

113. After Officer Atiles failed to find the narcotics Mr. Rhoades had hidden in his pants during the initial pat search, Mr. Rhoades was placed in holding cell 1. While there, he was provided a lunch. He took the plastic wrap form the sandwich and used it to package the large amount of fentanyl and methamphetamine he removed from his pants. He placed the drugs into the lunch bag and at one point placed the drugs near the officer's station.

114. When Officer Ulmer removed Mr. Rhoades from the holding cell 1 for processing, she left the door to the cell "slightly ajar."[54] Mr. Rhoades did not have the lunch bag with him when he left holding cell 1.[55] It is apparent Mr. Rhoades left the lunch bag containing the drugs in holding cell 1, which should have been locked once empty of detainees.

115. After Mr. Rhoads had been processed by Officer Ulmer, Officer Atiles took him directly to have the unclothed search. It is verified during his deposition that Mr. Rhoades did not have the lunch sack when he went with Officer Atiles for the unclothed search.[56]

116. When Officer Ulmer failed to close and lock the holding cell after removing Mr. Rhoades for further processing, she created an opportunity for Mr. Rhoades to re-enter the cell.

117. It is my experience and training, and a common correctional safety and security practice, to never leave an empty cell open. There are several reasons for this. Among them, open

---

[54] COB 000376.
[55] Ibid.
[56] Atiles Dep.: P42, L17 – 24.

Corbin vs. Bates County, et al.
March 4, 2024
Page 21

cells can be used for detainees to hide while conducting illegal activities, stage attacks on staff or inmates, force staff members into the cell then lock them in for the purpose of assault (either sexual or physical), force staff members of visitors into the cell for the purpose of hostage taking, and several other purposes that threaten the safety of staff and inmates. Specific to this case, the cell was considered a "dirty cell" because an inmate had left items of clothing and things there that may have contained contraband, and the inmate should not be allowed back in. The concept of dirty and clean cells was a "custom" at the BCCF.[57]

118. In this specific case, Officer Ulmer would have stopped Mr. Rhoades from re-entering the cell to retrieve the narcotics had she simply closed and secured (locked) the empty holding cell door. Had she done so, it is my opinion that Mr. Rhoades would not have been able to re-enter the cell and retrieve the fentanyl that was eventually distributed to Mr. Patterson, resulting in Mr. Patterson's death.

119. It was the account of Officer Ulmer, during her deposition, that while Officer Atiles was performing the strip search of Mr. Rhoades, she was required to respond to a Code 99, which she described as an emergency incident in an area away from the Reception Unit.[58] This called her away from her post. She indicated that she called out to her partners to inform them she was leaving, and then ran out of the Reception Unit.[59]

120. When Officer Ulmer left the unit, it was unclear to Officer Atiles she was gone.[60] In the deposition of Officer Atiles, he indicated that he was in the back of the reception unit and was not aware of Ulmer's absence from the front of the unit until reviewing the surveillance video.

121. Regardless of the location of Officer Ulmer, Officer Atiles had custodial control of Mr. Rhoades, and bore the responsibility of maintaining direct observation of him until properly relieved of that duty by another officer who affirmatively assumed custodial control. Officer Atiles had the responsibility to maintain direct observation and control of Mr. Rhoades by escorting him to the "clean cell" after performing an unclothed search of the detainee.

122. Officer Atiles admitted he did not escort Mr. Rhoades from the area where he was given an unclothed search to holding cell 6, which afforded Mr. Rhoades the opportunity to go instead from the shower area to the unsecured holding cell 1, retrieve the contraband he left there, and then go to holding cell 6 once again in possession of the dangerous contraband.

---

[57] Atiles Dep.: P46, L13 – 21.
[58] Ulmer Dep.: P10, L7 – 14.
[59] Ibid, and P19, L11 – 19.
[60] Atiles Dep.: P20, L8-24.

Corbin vs. Bates County, et al.
March 4, 2024
Page 22

123. Instead of escorting Mr. Rhoades, Officer Atiles ordered Mr. Rhoades to go from the unclothed search area to holding cell 6, but gave no indication that he informed Officer Ulmer, or ensured that at a minimum Mr. Rhoades was under visual surveillance at all times between locations.[61]

124. Officer Atiles simply gave a detainee an order to go somewhere and believed the inmate would feel obliged to follow it. Instead of identifying the failure to escort or ensure safe and secure movement of a detainee, Officer Atiles instead identified the failure in following BCCF policies and ineffective performance of accepted correctional practices as the fault of Mr. Rhoades alone, because Mr. Rhoades did not follow orders. Officer Atiles testified, "Well, we searched him. The search was good. He didn't follow the direct order when I told him to go back holding cell 6."[62]

125. Officer Atiles indicated that it was not his habit to escort inmates to the "clean cell" after the search, but in fact he only ordered them to go there. He stated, "…after an unclothed body search, I usually give them instructions to go to what we called holding cell number 6, which is the clean cell, where once they've been searched and they've been processed, they go inside the cell. I gave them instructions to go to holding cell 6, I normally put away their property and then I come and I lock him in the cell.[63]

126. This statement indicates to me that Officer Atiles was in the habit of trusting people recently arrested and booked into a correctional facility to comply at all times with his instructions. Based upon my training and experience in officer safety tactics and correctional awareness, as well as safety and security measures in the correctional environment, this is naïve on the part of Officer Atiles to expect arrestees undergoing in-processing to always follow instructions or orders. Such an expectation on the part of Officer Atiles shows a lack of regard for the safety and security of inmates and staff members, and a lack of understanding that maintaining proper custody and control of inmates whose intentions are unknown to the officer is essential to his own safety, the safety of the in-processing detainee, and others in the correctional environment.

127. In the deposition of Officer Atiles, defense counsel asked if it was possible for Officer Atiles to find the contraband in the lunch bag during the unclothed search given the fact that Mr. Rhoades did not have it with him during that search. Officer Atiles said it would not be possible.[64]

126. It is my opinion that Officer Atiles was correct that it was not possible to find the fentanyl and methamphetamines Mr. Rhoades smuggled into the BCCF during the unclothed body

---

[61] Atiles Dep.: P19, L 7 – 23.
[62] Atiles Dep.: P31, L1 – 6.
[63] Atiles Dep.: P19, L8-16.
[64] Atiles Dep.: P43, L7-12.

Corbin vs. Bates County, et al.
March 4, 2024
Page 23

search because the contraband was not in his possession at that time, it was in holding
cell 1, which should have been locked.

128. It is my opinion that the contraband narcotics should have been found during the initial
pat search officer Atiles performed at intake. Had the pat search been performed properly,
the drugs could not have been smuggled into the Alpha Module and distributed for over
eight hours before being reported to officers. The same drugs could not have resulted in
the death of Mr. Patterson.

129. It is my opinion that there was a section of the Reception Unit SOP that called for video
surveillance in the Reception Unit. The video surveillance was not monitored when Mr.
Rhoades entered the area of cell1 after having been given an unclothed body search but
not under escort or direct visual observation.

130. SOP Section B-4.40 § Remaining Holding Cells, (c.), reads, "███████████████████
████████████████████████████████████████████████████████████████████
██████████████████████[65] The evidence I have reviewed thus far does not include any
report from Main Center staff regarding their visual supervision, if any, of the reception
unit via video.

131. It is my opinion that if a reception unit officer must respond to a Code 99, the Main Center
staff should begin monitoring the video closely to ensure the security of the remaining
holding cell that may be left unattended. Had this taken place, it is possible the Main
Center staff would have seen Mr. Rhoades re-enter the unsecured holding cell 1, retrieve
something, and then enter the "clean cell" holding cell 6.

**SUMMARY OF EXPERT OPINIONS**

132. It is my opinion that the death of Joshua Patterson could have been prevented. Had
Officer Atiles performed an effective search in accordance with BCCF SOP regarding
searches, Mr. Patterson's death would have been prevented.

133. Likewise, if Officer Ulmer locked holding cell 1 after taking Mr. Rhoades out prior to the
unclothed search, the death would have been prevented.

134. If Officer Atiles had escorted Mr. Rhoades directly to holding cell 6 after the unclothed
search and locked him in instead of trusting him to go there on his own, Mr. Patterson's
death would have been prevented.

---

[65] Emphasis added.

Corbin vs. Bates County, et al.
March 4, 2024
Page 24

135. If officers in the Alpha Module proactively monitored the module and kept inmates away from Mr. Patterson's door (he was on RHU "keep separate" status), the death would have been prevented.

136. If a second officer was assigned to the upper tier in Alpha Module due to the high population in the unit, the death would have been less likely to happen as the officer would stop contraband from being passed into the cell or take immediate action if it happened.

137. If Officer Venturiera had informed the shift supervisor of suspected contraband in the afternoon when he received the tip from an informant about Cell 1, instead of waiting until after 7pm to make the report, search operations could have started immediately and either stopped inmates from distributing the fentanyl to Mr. Patterson, or they might have found Mr. Patterson in possession of the fentanyl and prevented his death.

138. It is my opinion that the BCCF had policy and training responsibility for the officers staffing the facility and should have reasonably known that training was lacking, and officers were unaware of the policies governing their activities and duty assignments. Had officers been effectively trained and aware of BCCF's written SOPs, errors leading to the death of Mr. Patterson would have been less likely to occur.

139. The failures of the defendants in this case were related to, and causative of, the death of Mr. Patterson. This assessment applies to the actions and decisions related to the correctional environment alone and does not extend to any other issue involved in this case such as medical care.

140. In the hours leading to the time Mr. Patterson died, the officers of the BCCF exhibited a "someone else will do it, someone else should have done it" culture repeatedly. The officers showed a repeated pattern of disregard to stopping contraband, by their shared institutional culture. For instance:

141. Officer Atiles expected the constable to have performed a pat down on Mr. Rhoades but did not perform an effective pat down himself.

142. Officer Ulmer expected the constable to have conducted an effective pat down of Mr. Rhoades and assumed Officer Atiles did one too.

143. Officer Atiles assumed Officer Ulmer secured the door to Cell 1 in the reception Unit after removing Mr. Rhoades.

144. Officer Ulmer assumed there was no reason to ensure the security of the reception unit when she failed to secure the cell 1 door.

Corbin vs. Bates County, et al.
March 4, 2024
Page 25

145. Officer Atiles assumed that Mr. Rhoades would go directly to cell 6 after the unclothed search. But did not take affirmative steps to ensure he did.

146. Officer Atiles did not ensure Mr. Rhoades could not obtain fentanyl from the "dirty cell" but assumed Officer Ulmer would do so. Because he assumed Officer Ulmer would do it, he assumed Officer Ulmer was in her post even though she was not.

147. Officer Ulmer left her post for a legitimate reason (responding to a code 99 in the female section of the facility) but assumed Officer Atiles was aware she was gone.

148. Officer Ulmer took no affirmative steps to ensure Officer Atiles knew she was absent from her post and assumed he knew she was gone.

149. Officer Venturiera was assigned to the housing unit where Mr. Rhoades distributed the contraband and extremely dangerous fentanyl but shared the duty of touring the unit with several other officers.

150. Officer Venturiera suspected Mr. Rhoades, but instead of taking affirmative steps to investigate, assumed another officer would.

151. Officer Venturiera failed to immediately notify the lieutenant about his suspicions, even after a detainee in the unit warned him about Mr. Rhoades and confirmed his suspicions. Instead, he waited until the lieutenant arrived for a shift tour to share his confirmed suspicions.

152. Officer Venturiera apparently assumed his suspicions about Mr. Rhoades and possible narcotics in the unit could wait until someone else decided to act.

153. Lieutenant Sherman, the shift commander, did act and the contraband in Mr. Rhoades' possession and cell were confiscated. He wrote in his shift log that based upon the incident, **"In lieu of this finding; Cell searches will be conducted on Alpha module as precautionary measures taken."**[66] Even so, he apparently assumed someone else would do it because there is no indication in the log after that entry (at 7:45pm) that any searches took place.

154. It is my opinion that most persons in the United States are aware of a fentanyl epidemic. Most people are aware that fentanyl is extremely dangerous and poses a severe danger to anyone who comes in contact with it. Officers Ulmer and Atiles were aware of the

---

[66] COB 000372.

Corbin vs. Bates County, et al.
March 4, 2024
Page 26

dangers yet did not take personal responsibility for maintaining security in their duty area, each acting upon the "someone else" culture in the BCCF.

155. It is my opinion that dangers of fentanyl overdose are greatly magnified in correctional facilities because inmates are left out of the view of others and are therefore subject to more infrequent observation of their health and welfare. Inmates are wholly dependent upon correctional officers and staff members to observe them and their health, safety, and wellbeing.

156. Because a culture existed at the BCCF and Officers Ulmer and Atiles failed in their duties to stop the introduction of fentanyl and other dangerous contraband into the facility, Mr. Patterson was detained under conditions that posed a substantial risk of serious harm.

157. This risk was extended to the Alpha module when 12 officers performed ineffective checks and failed to notice or stop the distribution of fentanyl in the Alpha Module. It is clear that these officers failures would not have been at issue had Officers Atiles and Ulmer performed their duty to protect the inmate population from the introduction of fentanyl.

158. It is also my opinion in this case that lesser amounts of contraband, including fentanyl and methamphetamine can be missed during in-processing of detainees. This is common and I believe that an amount of fentanyl, sufficiently small, could be hidden in a body cavity and be easily missed by officers during both pat and unclothed searches. This is not; however, the case here. In this case, a baseball sized amount of fentanyl and methamphetamines was in Mr. Rhoades' pants when Officer Atiles alleges, he performed a pat search.

159. The failures and indifference to adherence with BCCF SOPs exhibited by Officers Ulmer and Atiles posed a substantial risk of harm to Mr. Patterson and to the inmates in the facility in general. The risk was so great that it violated the contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the "someone else culture" and specific and identifiable catastrophic failures of Officers Ulmer and Atiles were not a "one off," but were failures borne of habit, of a long history of indifference to safety that the officers admitted to as noted above.

160. Officers Ulmer and Atiles testified that they knew of the particular vulnerability of danger narcotics introduced into the BCCF imposed upon the inmates of the facility, even so, their catastrophic failures to act upon that knowledge by performing their duties in accordance with written (and available) SOPs showed a reckless indifference to that vulnerability.

161. The risk of failing to prevent the introduction of fentanyl into the BCCF was so obvious that even a lay person would recognize the necessity of conducting effective searches

Corbin vs. Bates County, et al.
March 4, 2024
Page 27

and exercising security procedures in a manner effective to prevent fentanyl from entering the facility.

162. Fentanyl poses a severe danger to anyone who comes in contact with it. As noted by the Bucks County District Attorney Affidavit of Probable Cause in the case against Allen Rhoades, No. 99-22-0692, *"Fentanyl: a scheduled II substance is a synthetic opioid that is 50-100 times stronger than morphine. Because of its powerful opioid properties, Fentanyl is also diverted for abuse. Fentanyl is often labeled as highly potent heroin. Many users believe that they are purchasing heroin and actually don't know that they are purchasing fentanyl - which often results in overdose deaths."*[67]

163. It is my opinion that the risk of overdose from fentanyl in correctional facilities is greater than the general public because the drug is highly dangerous, and inmates are not under consistent observation. Mr. Patterson, as noted above, was in his cell by himself, and was subjected to periods of nearly an hour, on one instance an hour and a half, without any observation from officers. During such periods, inmates may easily overdose from fentanyl and not be observed after the overdose for prolonged periods of time. Therefore, the risk of death by fentanyl overdose to Mr. Patterson was magnified by his status as an incarcerated person.

164. It is my opinion that drugs were prevalent inside the BCCF as noted by the SIU Incident Report. Inmates were noted as testing positive for:

- BZO (Benzodiazepine) based upon my training and experience found in urine after cocaine usage.

- THC (Tetrahydrocannabinol) based upon my training and experience is found in the urine and blood stream after use of cannabis.

- BUP (Buprenorphine) Used to relieve symptoms of heroin withdrawal. According to the Drug Enforcement Administration (DEA), "Like other opioids commonly abused, buprenorphine is capable of producing significant euphoria. Data from the United States and other countries indicate that buprenorphine has been abused by various routes of administration (sublingual, intranasal, and injection) and has gained popularity as a heroin substitute and as a primary drug of abuse."[68]

- COC (Cocaine)

---

[67] COB000198

[68] https://www.deadiversion.usdoj.gov/drug_chem_info/buprenorphine.pdf

Corbin vs. Bates County, et al.
March 4, 2024
Page 28

- AMP (Amphetamines)

165. As per the evidence in this case, Mr. Rhoades only introduced Methamphetamine and fentanyl into the BCCF on 7/26/22. Even so, inmates tested after the incident had illegal narcotics in their systems not smuggled in by Mr. Rhoades. For instance, an inmate with positive urinalysis test results for amphetamines, buprenorphine, and methamphetamine was booked into the BCCF on 6/7/22, around 6 weeks prior to Mr. Rhoades.[69]

166. Such information supports the conclusion, and my opinion, that narcotics were prevalent in the BCCF and unfettered access to those drugs existed prior to Mr. Rhoades being allowed to introduce the fentanyl that killed Mr. Patterson by the failures of officers Atiles and Ulmer. The prevalence and unfettered access to dangerous drugs did not stop when Mr. Patterson died, as evidenced by the death of detainee Octavious Davis at BCCF on January 16, 2023, from a drug overdose suffered in custody there.[70]

167. I have relied on my professional experience while preparing my report. Based on my 26 years of experience at the CDCR, and 9 years as a prison expert and consultant, I have direct knowledge and administrative experience in the development of corrections policies and procedures, including correctional awareness, safety and security protocols, search and escort procedures, as well as supervising correctional officers, sergeants, and lieutenants conducting prison operations in maximum and medium custody facilities such as level four and three (maximum and medium security) prisons, facilities, housing units, administrative segregation units, and specialized units to include supervision of correctional officers in psychiatric services units and administrative segregation.

168. I have served in officer, supervisory, management, and administrative levels in medium and maximum-security institutions, and am aware of the policies and procedures essential to maintaining and enhancing safety and security in the correctional facility setting, as well as, assisting in the delivery of medical care in the correctional setting, supervising correctional staff, and assisting with security and inmate protection in the prison environment.

169. I have performed and supervised the reception, intake, and release of inmates in the correctional environment with a primary focus on preventing the introduction of controlled substances and dangerous contraband. I have engaged during my career in the CDCR in the training of employees regarding inmate intake and release procedures,

---

[69] COB00378

[70] Complaint, Pages 11 – 12.

Corbin vs. Bates County, et al.
March 4, 2024
Page 29

search and escort procedures, housing unit and cell security, officer safety tactics, and responsibility of staff members to exercise situational awareness, also known as correctional awareness, in the custodial environment.

170. This opinion is based solely upon the facts available at the time of this writing. I am competent and willing to testify regarding the above, if asked to do so. All opinions expressed here are my own, having been based upon my extensive training and experience from the beginning of my career with the CDCR until the present. I reserve the right to amend this opinion should additional facts become available that are not available at the time of this writing.

171. I reserve the right to submit supplemental opinions as requested by the parties or court, or as additional information or discovery is received.

Respectfully,

William Adams
Correctional Counselor II, CDCR (Ret.)
Owner/Consultant
Correctional Litigation Solutions