IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **VALERIA CORBIN, as Administrator of the Estate of Joshua Patterson,**<br>**Plaintiff,**<br><br>v.<br><br>**BUCKS COUNTY, et al.,**<br>**Defendants.** | **CIVIL ACTION**<br><br><br><br><br>**NO. 23-2784** |

## MEMORANDUM OPINION

This matter arises from the death of Joshua Patterson, who overdosed on drugs he obtained from another inmate while detained at the Bucks County Correctional Facility ("BCCF"). It is brought by Valeria Corbin, who serves as the administrator of Patterson's estate. Following discovery, the parties stipulated to the dismissal of claims against all defendants save Julio Atiles and Stephanie Ulmer—the BCCF correctional officers who were responsible for searching inmates for narcotics upon their arrival at the facility. Corbin presses three claims against these Defendants: 1) failure-to-protect, pursuant to 42 U.S.C. § 1983; 2) wrongful death, pursuant to 42 Pa. C.S. § 8301; and, 3) a survival action, pursuant to 42 Pa. C.S. § 8302.

Presently pending is Atiles and Ulmer's motion for summary judgment on all claims, made pursuant to Federal Rule of Civil Procedure 56(a), as well as their motion to seal various portions of the summary judgment record and briefing, pursuant to *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662 (3d Cir. 2019). For the reasons that follow, Defendants' motion for summary judgment will be granted, while their motion to seal will be granted in part and denied in part.

  I.  **FACTUAL BACKGROUND**

Unless otherwise noted, the following facts are undisputed. Following his arrest in late

2021, Patterson was detained at BCCF, where he was awaiting trial on felony retail theft charges. During booking, he disclosed no history of drug or alcohol use, displayed no detoxification or withdrawal symptoms, and was not referred to BCCF's treatment program for inmates suffering from opioid use disorder. This remained the case at the time of his death, when prison records contained no indication of any prior drug use.[1] Rather, the only "active alert" in that file was an indication that he had been removed from the general population and placed on "administrative lock" with an order to "keep separate" from other inmates following incidents of fighting.

About eight months after Patterson's arrival at BCCF, police arrested Allen Rhoads during a traffic stop when they found drugs in his car. During that traffic stop, Rhoads managed to hide some of those drugs (fentanyl and methamphetamine) in his pants, and these drugs went undiscovered as Rhoads was transported first to the Pennsylvania State Police barracks in Trevose, then to the Falls Township Police Department, and finally to BCCF following his arraignment.

New arrivals to BCCF are first taken to the Reception Unit, where they are searched for contraband and screened for medical issues prior to entering the main facility. When Rhoads arrived at the Reception Unit, Officers Julio Altiles and Stephanie Ulmer were on duty. Atiles conducted a clothed pat search of Rhoads before placing him in a holding cell and handing him a meal in a paper lunch bag. Surveillance footage from the holding cell shows that approximately two minutes later, Rhoads turned his back to the camera, removed something from the crotch of his pants, and placed it in the paper lunch bag. Though these actions when unnoticed at the time,

---

[1] Corbin disputes this, noting that Patterson had previously been arrested for possession of drug paraphernalia, and arguing that BCCF officials must have been aware of that fact. But the summary judgment record shows that Patterson's drug paraphernalia arrest was not noted anywhere in the prison's files. Rather, the arrest record Corbin points to was generated by the Chester County Court of Common Pleas, and there is nothing in the record to indicate that BCCF officials had access to that document.

2

Rhoads would later tell investigators that he was transferring the drugs that had been hidden in his pants since his arrest into the lunch bag.

For the next several hours, Rhoads underwent the BCCF intake process, which included answering booking questions, providing a urine sample, meeting with the intake nurse, and undergoing an initial assessment by a case manager.  Towards the end of this process, Atiles took Rhoads out of his holding cell for fingerprinting and a strip search; the paper bag containing the drugs remained in the holding cell, the door of which was left ajar.  When the search was complete, Atiles directed Rhoads to return to the Reception Unit, which he believed was still under the supervision of Ulmer.  Ulmer, however, had been called away to respond to a "Code 99" alarm—*i.e.*, officer in need of assistance.  Thus, when Rhoads entered the Reception Unit, he was briefly unsupervised.  Surveillance footage shows that Rhoads used this opportunity to reenter the holding cell and retrieve his drugs from the lunch bag, which he transferred to the laundry bag he had been given to hold his BCCF-issued clothing.  Approximately 40 seconds later, Atiles returned to the Reception Unit, where he saw Rhoads standing in front of the holding cell as directed.  Detecting nothing amiss, Atiles escorted Rhoads to the main facility.  That was the last interaction between Rhoads and either Defendant.

Rhoads arrived at the main facility at approximately 10:00 a.m. and was taken to Alpha Module—the same module that housed Patterson.  Almost immediately, he set about selling the drugs he had smuggled in with him.  Patterson was one of the purchasers.  Over the course of the day, Rhoads and another inmate who served as a go-between stopped at Patterson's cell multiple times, and that afternoon, Rhoads delivered an item to Patterson by sliding it underneath his locked cell door.  Shortly thereafter, an informant reported that Rhoads had contraband in his possession, and he was moved out of Alpha Module pending investigation.  The drugs he had

delivered to Patterson, however, were not recovered.

About 12 hours after the item was slipped under Patterson's door, the on-duty module officer found him unresponsive in his cell. Patterson was transported to Doylestown Hospital, where he died several days later. An autopsy performed by the Bucks County Coroner's Office concluded that Patterson's death was caused by "complications from fentanyl intoxication." Following Patterson's death, Rhoads was criminally prosecuted for, among other things, drug delivery resulting in death.

## II. MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Inferences to be drawn from the underlying facts contained in the evidential sources must be viewed in the light most favorable to the party opposing the motion." *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34 (3d Cir. 1987).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52). "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead, he must show where in the

4

record there exists a genuine dispute over a material fact." *Id.* (citation omitted). A moving party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323.

## B. Failure-to-Protect Claim

Corbin's primary theory of liability under Section 1983 is that Ulmer and Atiles violated Patterson's Eighth and Fourteenth Amendment rights by failing to protect him from dangerous drugs.[2] "Prisoners retain the essence of human dignity inherent in all persons," *Brown v. Plata*, 563 U.S. 493, 510 (2011), and so the Constitution imposes a duty on prison officials to "take reasonable measures to guarantee the safety of inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). To succeed on a claim that prison officials breached this duty, a plaintiff must make out two elements. First, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). And second, he must show that the prison officials had "a sufficiently culpable state of mind"—*i.e.*, "deliberate indifference to inmate health or safety." *Id.* (internal citation omitted).

Corbin's Amended Complaint plausibly alleged both elements, describing "a persistent smuggling problem" at BCCF and averring that Defendants knew of this risk and chose to ignore it. *Corbin v. Bucks Cnty.*, --- F.Supp.3d ----, 2023 WL 8042560, at *5 (E.D. Pa. Nov. 21, 2023). But, now that discovery has been had, given the summary judgment record no reasonable juror would find in Plaintiff's favor on either point.

---

[2] Patterson, as a pre-trial detainee, was technically not covered by the Eighth Amendment's guarantee against cruel and unusual punishment, which only applies to convicted prisoners. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003). Nonetheless, the Fourteenth Amendment's Due Process Clause affords pre-trial detainees protections that are "at least as great as the Eighth Amendment protections available to convicted prisoners." *Id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). So, failure-to-protect claims brought by pre-trial detainees are evaluated using the Eighth Amendment standard. *Id.* at 582.

### i. *The Objective Element*

The first element of a failure to protect claim requires a plaintiff to show that he was detained under conditions objectively "posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The threshold for this element is high, as the risk to inmate health or safety must be "excessive." *Id.* at 837. "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993); *see also Farmer*, 511 U.S. at 834 ("[A] prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'") (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

One such unacceptable risk is the unchecked spread of "deadly narcotics such as fentanyl in proximity to detainees with the propensity to abuse them." *Corbin*, 2023 WL 8042560, at *4. As the Court previously explained, "[f]entanyl unquestionably poses a severe danger to anyone who comes in contact with it," and "this inherent danger is magnified when introduced to a controlled environment like a prison." *Id.* (quoting *Zakora v. Chrisman*, 44 F.4th 452, 470 (6th Cir. 2022). "[I]n light of 'these unique vulnerabilities, the risk of injury from unfettered access to deadly drugs inside a prison is not one that today's society chooses to tolerate.'" *Id.* (quoting *Zakora*, 44 F.4th at 470). Thus, while "[p]rison officials are not required to show that they have prevented all drugs from entering their facility in order to be protected from liability," *Zakora*, 44 F.4th at 470, there comes a point when a correctional facility becomes so awash in deadly narcotics that its inmates may be said to be "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

In this case, it is undisputed that fentanyl was present at BCCF during at least one point of Patterson's incarceration, and that he was able to obtain a lethal amount of the drug. But "[a]

pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents." *Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir. 1985) (citation omitted); *cf. Baze v. Rees*, 553 U.S. 35, 50 (2008) ("[A]n isolated mishap alone . . . while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a 'substantial risk of serious harm.'") (quoting *Farmer*, 511 U.S. at 842). Rather, "the objective prong of a failure-to-protect claim requires an analysis of the risk to the injured party before the alleged injury occurred"—*i.e.*, "the widespread presence of drugs at [BCCF]." *Zakora*, 44 F.4th at 470; *cf. Corbin*, 2023 WL 8042560, at *4 (holding that allegations of "unfettered access to drugs in a prison" were sufficient to satisfy the objective element of a failure-to-protect claim at the motion-to-dismiss stage).

Contra the Amended Complaint's allegations, the evidence adduced during discovery does not reveal a "substantial risk of serious harm" by illicit drugs at BCCF, and there is no genuine dispute of fact on this point. The summary judgment record shows that in the ten years leading up to Rhoads's arrival at the facility, during which BCCF processed 34,463 new commitments, reception officers recovered drugs and related paraphernalia on 67 occasions during their routine searches. During this same period, corrections officers recovered drugs from an inmate's cell on just two occasions.[3] Even assuming this second number is incomplete, and that additional inmates were able to sneak into the facility narcotics that were never recovered by correctional officers, these numbers paint a picture that is a far cry from the "persistent smuggling problem" described by the Amended Complaint. To the contrary, they encourage the conclusion that Atiles and Ulmer's failure to stop Rhoads from bringing fentanyl into BCCF was an unfortunate lapse in an otherwise robust contraband detection program.

---

[3] Both incidents involved inmates who ingested or "tucked" the drugs prior to arriving at the facility. They are therefore irrelevant to Corbin's claims against Atiles and Ulmer, as BCCF reception officers are not authorized to perform body cavity searches of inmates. Such searches are only performed by medical staff, typically after obtaining a search warrant.

Corbin does point to an incident—which occurred shortly after Patterson's death—in which another inmate, Octavious Davis, was also able to sneak narcotics into BCCF, where he subsequently "died in a similar fashion as the Plaintiff's decedent." But while Corbin describes this death as a "matter of public record," the only evidence of it in the summary judgment record is a single newspaper article which states that Davis "died as a result of an illegal drug overdose." This vague description, accompanied by no further details, is not enough to draw any parallels between Davis's death and Patterson's. And even if it was, four instances were BCCF inmates evaded contraband detection protocols across ten years remains well short of the "unfettered access to drugs" alleged by the Amended Complaint.

Corbin further notes that in the aftermath of Patterson's overdose, BCCF officials drug obtained urine samples from the other inmates in his housing module, eight of which tested positive. But as she concedes, six of these individuals had been booked just days before their urine sample was collected; it would thus be purely speculative to conclude that the drugs in their system were obtained while incarcerated at BCCF. *See Sullivan v. Warminster Twp.*, 765 F.Supp.2d 687, 697 (E.D. Pa. 2011) ("The nonmoving party may not avoid summary judgment by relying on speculation."). As for the remaining two individuals, both tested positive for the same drugs that Rhoads had brought into the facility (along with buprenorphine, a drug which BCCF medical personnel are authorized to administer to inmates diagnosed with opioid use disorder). Again, even when these facts are construed in the light most favorable to Corbin and considered alongside her other evidence of drug use at BCCF, they would not permit a jury to conclude that Patterson was "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

Throughout this litigation, Corbin has repeatedly analogized between this case and

*Zakora v. Chrisman*, a Sixth Circuit decision that is "one of the few cases to have directly considered the viability of a failure-to-protect claim following a prisoner drug overdose." *Corbin*, 2023 WL 8042560, at *4.  The summary judgment record, however, shows that the proper analogy is not to *Zakora* but to *Caraway v. CoreCivic of Tenn., LLC*, 98 F.4th 679 (6th Cir. 2024), a more recent decision that "highlight[s] the egregiousness of *Zakora*'s circumstances."  *Id.* at 684.  Not only did the complaint in *Zakora* allege that "drugs were everywhere" in the decedent's facility, it further alleged a string of other deaths in the same small cell block that "'evinced' an objectively serious risk of harm," as "back-to-back overdoses in a twelve-to-sixteen-person unit is a serious problem by any measure."  *Id.*  In *Caraway*, conversely, the plaintiff faced nothing close to "the kind of excessive, one-for-every-eight risk *Zakora* faced."  *Id.*  In *Zakora*, the complaint described a prison environment in which overdose deaths went uninvestigated, leaving the risk entirely unabated.  *Id.* at 685.  In *Caraway*, meanwhile, there were "no immediately prior overdoses at [the prison facility]," meaning that "prison officials couldn't have failed to investigate them."  *Id.*  Based on these distinctions, the *Caraway* court concluded that the plaintiff had failed to show an objectively serious risk of harm, and it affirmed the dismissal of the matter.  *Id.* at 688.

So too here.  Corbin's Amended Complaint survived Defendant's motion to dismiss because it alleged "the kind of 'unfettered access to drugs in a prison' that, like in *Zakora*, was 'sufficiently serious to satisfy the objective prong of an Eighth Amendment claim.'"  *Corbin*, 2023 WL 8042560, at *4 (quoting *Zakora*, 44 F.4th at 472).  But the summary judgment record paints a picture of a prison environment in which prisoner access to illicit drugs like fentanyl was the exception, not the dangerous norm.  Like in *Caraway*, there was not a string of close-in-time of inmate overdoses signaling an acute drug problem, nor is there evidence that BCCF officials

9

allowed dangerous conditions to persist by failing to investigate prior incidents. As a result, no reasonable factfinder could find in Corbin's favor on this element.

### ii. The Subjective Element

Because a plaintiff must make out both the objective and subjective elements to prevail on a failure-to-protect claim, Corbin's failure to demonstrate that Patterson was detained under conditions objectively "posing a substantial risk of serious harm" necessarily dooms her claim, entitling Defendants to judgment as a matter of law. *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997). But in addition to that defect, the summary judgment record would likewise not permit a reasonable juror to conclude that Defendants were deliberately indifferent to that unacceptable risk.

"In the Eighth Amendment context, 'deliberate indifference' is 'a subjective standard of liability consistent with recklessness as that term is defined in criminal law.'" *Parkell v. Danberg*, 833 F.3d 313, 335 (3d Cir. 2016) (quoting *Nicini v. Morra*, 212 F.3d 798, 811 (3d Cir. 2000) (en banc)). Thus, prison officials are deliberately indifferent when they know "that inmates face a substantial risk of serious harm and disregard[] that risk by failing to take reasonable measures to abate it." *Id.* (quoting *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 229 (3d Cir. 2015)). As the Sixth Circuit aptly summarized it, this standard requires a plaintiff to establish that the correctional officers: "(1) had notice of the risk that inmates would overdose based on their unfettered access to drugs and (2) failed to reasonably respond to that risk." *Caraway*, 98 F.4th at 686; *accord Farmer*, 511 U.S. at 844. Even when the summary judgment record is viewed in the light most favorable to Corbin, it would not permit a reasonable jury to find in her favor on this element.[4]

---

[4] In its Opinion denying Defendants' motion to dismiss, the Court analogized between Corbin's claim and the Third Circuit's cases dealing with failure-to-protect claims following prisoner suicides. *See, e.g., Palakovic v. Wetzel*, 854

10

To begin, the summary judgment record contains no direct evidence that either Atiles or Ulmer were aware that drugs were entering BCCF on their watch. Both testified otherwise at their depositions, and Corbin points to no other evidence to establish a genuine dispute of fact on this point. This is not, by itself, fatal to her claim; the subjective element of a failure-to-protect claim may also be proven through "circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 131 (3d Cir. 2001). Such is the case when, for example, "the risk of harm was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past such that the defendants must have known about the risk." *Parkell*, 833 F.3d at 388 (3d Cir. 2016). But as explained *supra*, the summary judgment record does not reveal such an obvious and longstanding risk. Rather, it shows that in the past decade, inmates were able to smuggle drugs into BCCF on just a handful of occasions. And as Corbin concedes, both Atiles and Ulmer testified at their depositions that they were unaware of these incidents. From these facts, no reasonable jury could conclude that Defendants knew or should have known of an unacceptable risk of drugs flowing through the Reception Unit and into the BCCF housing modules, and that they deliberately chose to ignore this risk.

Corbin counters that Atiles and Ulmer's culpability is evident from their failure "to discover a baseball-sized container of deadly narcotics" as it was smuggled into the facility. And she argues that this failure was the result of both Defendants' failure to adhere to BCCF procedures, resulting in, among other things, the 40 second gap when Rhoads was left entirely

---

F.3d 209 (3d Cir. 2017). In their motion for summary judgment, Defendants note that plaintiffs in that context carry the additional burden of demonstrating that the decedent had a "particular vulnerability to suicide," and that prison officials were deliberately indifferent to that "particular vulnerability." *Id.* at 222. The same should be true of drug overdose cases, they argue, and they offer a litany of reasons why Patterson did not have a "particular vulnerability" to drug abuse. Because Corbin's claims fail even under the traditional failure-to-protect standard, the Court declines to decide whether Corbin was also required to demonstrate that Patterson had a "particular vulnerability" to drug abuse, or that prison officials were aware of that fact.

11

unsupervised. As Corbin's export opined in his report, "Mr. Patterson would not have been provided with the fentanyl by Mr. Rhoads, had Ulmer and Atiles performed their duties in accordance with BCCF standard operating procedures and according to sound and commonly accepted correctional best practices."[5] But this argument fundamentally misunderstands the deliberate indifference standard. Even construed in the light most favorable to Corbin, this evidence would at most permit a jury to conclude that Atiles and Ulmer were negligent in the performance of their duties—*i.e.*, they displayed a "lack of due care for the prisoner's interests or safety." *Farmer*, 511 U.S. at 825. And negligence is not enough to make out a claim of deliberate indifference. *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001); *cf. Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986) ("[A] lack of care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent."). The record contains no evidence from which a jury could conclude that the Defendants had the mental state that is necessary for liability: deliberate indifference to Patterson's health and safety.

### C. Remaining Claims

In addition to her failure-to-protect claim, Corbin also seeks damages pursuant to Pennsylvania's Wrongful Death Act, 42 Pa. C.S. § 8301, and Survival Act, 42 Pa. C.S. § 8302. But, as the Court previously explained, neither statute creates "a substantive cause of action." *Corbin*, 2023 WL 8042560, at *7 (quoting *Johnson v. City of Phila.*, 105 F.Supp.3d 474, 483 (E.D. Pa. 2015)). Rather, by allowing a § 1983 claim to be pressed by the victim's estate, they merely provide the "vehicle through which plaintiffs can recover for unlawful conduct that

---

[5] Defendants have moved to strike this report, offering various explanations for why its contents are inadmissible. Because they are entitled to summary judgment regardless of whether the report is considered that motion will be denied as moot.

results in death." *Id.*; *accord Cappel v. Aston Twp. Fire Dep't*, --- F.Supp.3d ----, 2023 WL 6133173, at *22 (E.D. Pa. Sept. 19, 2023) ("Causes of action 'under the Pennsylvania Wrongful Death Act and the Pennsylvania Survivor act . . . are strictly derivative.'") (quoting *Duvall v. Hustler*, 447 F.Supp.3d 311, 338 (E.D. Pa. 2020)).

Here, because Corbin's sole substantive claim against Atiles and Ulmer—failure to protect, pursuant to 42 U.S.C. § 1983—fails as a matter of law, her derivative survivorship and wrongful death claims necessarily fail as well. *Bright v. Westmorland Cty.*, 380 F.3d 729, 741 (3d Cir. 2004). Corbin does not argue otherwise.

### III. MOTION TO SEAL

In addition to their motion for summary judgment, Atiles and Ulmer have moved to seal portions of the parties' briefing and the summary judgment record. In both civil and criminal contexts, "the common law presumes that the public has a right of access to judicial materials." *In re Avandia Mktg., Sales, Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019). Once this presumption attaches, it may only be rebutted by a showing that the parties' "interest in secrecy outweighs the presumption." *Id.* Specifically, "[t]he movant must show 'that the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure.'" *Id.*

Atiles and Ulmer's motion makes three requests. First, they seek to seal several surveillance videos that are a part of the summary judgment record, arguing that this footage reveals a litany of operationally sensitive information, including: ingress and egress points; possible blind spots in the monitoring system; the movements, routines, and interactions of BCCF officers; and how procedures like new commit searches are performed. Were the public to have unfettered access to this information, they argue, it would create a profound risk of harm

13

to BCCF staff and impede the facility's ability to ensure a secure environment.

The Court agrees that sealing these videos in their entirety is appropriate. It is well-settled in this circuit that correctional facilities have a compelling privacy and security interest in maintaining the confidentiality of video surveillance footage. *See, e.g.*, *Alexander v. Bucks Cnty.*, 2023 WL 5208506, at *3 (E.D. Pa. Aug. 14, 2023); *Kearney v. Bayside State Prison Admin.*, 2023 WL 2207392, at *2 (D.N.J. Feb. 23, 2023); *Palmer v. York Cnty.*, 2022 WL 4120261, at *4 (M.D. Pa. 2022). And particularly here, that interest substantially outweighs any public interest in accessing them. There is no material dispute as to what the videos depict. Their contents are accurately summarized in the parties' statements of undisputed material fact. And "the public also has an interest in maintaining security and safety at BCCF, a fact which weighs against public unfettered disclosure of the videos." *Alexander*, 2023 WL 5208506, at *3. Taken together, these considerations are sufficient to satisfy Atiles and Ulmer's burden under *Avandia*.

Second, Atiles and Ulmer seek to redact several BCCF policies and procedures that were produced during discovery and included in the summary judgment record. This, too, is appropriate. Like correctional facility surveillance footage, operationally sensitive prison policies are the kind of information that courts in this circuit typically protect. *See, e.g.*, *Melendez v. Steberger*, 2022 WL 2239959, at *2 (E.D. Pa. June 22, 2023) (sealing portions of prison policies which "deal[]with inspections of common areas," reasoning that "[i]nmates who know how often and where [prison] authorities will search each shift might be more able to evade those searches and pose a risk to prison security as a result"); *cf. Easley v. Tritt*, 2020 WL 836695, at *9 (M.D. Pa. Feb. 20, 2020) (denying a motion to compel a prison's use of force policy on the grounds that "such policies should remain confidential in the interests of prison

14

safety and security"). And that is the case here. The BCCF policies included in the summary judgment record contain extensive discussions of, among other things: specific procedures for performing pat and strip searches; admission and discharge procedures; and restrictive confinement criteria. Indeed, as Defendants argue, these procedures are just "the 'written corollaries of' the surveillance videos." The facility's interest in ensuring the confidentiality of this information outweighs the public's interest in unfettered access to these records. Further, the proposed redactions are "narrowly tailored to serve that interest." *Avandia*, 924 F.3d at 673 (quoting *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1061 (3d Cir. 1984)).

Third, in the aftermath of Patterson's death, BCCF officials prepared several investigative reports that are now a part of the summary judgment record. Atiles and Ulmer seek to redact four categories of information from these reports. First and most straight forwardly, the reports contain various identifying information, including dates of birth, inmate numbers, contact information, and the like. Such information is sealed as a matter of course. *Cf.* E.D. Pa. Loc. R. Civ. P. 5.1.3 (requiring parties to redact "personal identifiers" in all documents filed with the court). Next, the reports contain sensitive operational information, such as when guards complete their rounds and the placement of security cameras. For the reasons discussed above, this too is appropriate to seal. Third, the reports include discussions of the precise manner in which inmates were able to evade BCCF's security measures. In an affidavit accompanying the motion, BCCF's director, David Kratz, explained that "knowledge of such vulnerabilities would [] allow detainees to exploit them to the detriment of the safety and security of the facility's detainees, staff, and providers." The Court agrees with this assessment, and further agrees that Defendants' interest in preventing this outcome outweighs the public's interest in accessing these portions of the investigative reports.

15

Lastly, the investigative reports include discussions of the post-incident investigative process itself, including what materials were reviewed, how post-incident interviews and searches were conducted, and where and how evidence was stored, transported, and reviewed within the facility.  In his affidavit, Director Kratz stated that public dissemination of these processes will likewise harm operational security, since "knowing when and how post-incident searches are conducted and their scope would be reasonably likely to provide detainees with knowledge facilitating their ability to hide contraband, such as weapons or drugs, from detection."  But unlike the facility's operational procedures, it is not obvious why information about how BCCF investigates incidents will hurt prison security.  And so, Director Kratz's brief, conclusory assertion that this is so is not enough to permit the Court to evaluate the strength of this interest.  Moreover, while Defendants claim the public has little interest in this material, "[t]he public has a strong interest in the safe, efficient, and orderly operation of its prison system."  *Bacon v. Taylor*, 419 F.Supp.2d 635, 638 (D. Del. 2006).  This interest would be directly advanced by allowing the access to information from which the public could assess the adequacy of BCCF's post-incident investigation process, and Defendant's motion fails to explain why it is outweighed by their interest in keeping the information confidential.  Accordingly, this portion of Defendants' motion to seal will be denied.

### IV.   CONCLUSION

Patterson's death was a tragedy.  "But not every tragedy leads to legal liability."  *Wartluft v. Milton Hershey Sch. & Sch. Tr.*, 844 F. App'x 499, 501 (3d Cir. 2021).  Because the record would not permit a jury to conclude that either Altiles or Ulmer was deliberately indifferent towards a serious risk of harm, their motion for summary judgment will be granted, and Corbin's remaining claims will be dismissed.

An appropriate order follows.

                **BY THE COURT:**

                **/s/Wendy Beetlestone, J.**

                _____

                **WENDY BEETLESTONE, J.**