# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| VALERIA CORBIN, administrator of the ESTATE OF JOSHUA PATTERSON, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | Case No. 23-2784 |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| BUCKS COUNTY, et al., | : | |
| | : | |
| Defendants. | : | |

---

## PUBLIC JOINT APPENDIX FOR SUMMARY JUDGMENT

Brian J. Zeiger, Esquire
Levin & Zeiger LLP
1500 John F. Kennedy Blvd
Suite 620A
Philadelphia, PA 19102
Tel: (215) 546-0340
E-mail: zeiger@levinzeiger.com

*Attorney for Plaintiff*

Jaclyn C. Grieser (No. 93358)
*Deputy County Solicitor*

Tyler B. Burns (No. 325660)
*Assistant County Solicitor*

Bucks County Law Department
55 E. Court Street, 5th Floor
Doylestown, PA 18901
Tel: (215) 348-6464
E-mail: Jgrieser@buckscounty.org
        Tbburns@buckscounty.org

*Attorneys for Julio Atiles and Stephanie Ulmer*

# <u>TABLE OF CONTENTS</u>

**Page**

**<u>Joint Exhibit No.</u>**

1. #1 – 7.26.22 Rhoades Clothed Body Search.wmv ................................................... N/A

2. #3 – 7.26.22 Rhoades Holding Cell #1.wmv ....................................................... N/A

3. #6 – 7.26.22 – Rhoades Booking Process.wmv ..................................................... N/A

4. #15 – 7.26.22 Rhoades Retrieves Bag.wmv ......................................................... N/A

5. Bucks County Department of Corrections Standard Operating Procedures and Guidelines § B-3.11 ..............................................................................................JA001

6. Bucks County Department of Corrections Standard Operating Procedures and Guidelines § B-3.13 ..............................................................................................JA011

7. Bucks County Department of Corrections Standard Operating Procedures and Guidelines § A-4.20 ..............................................................................................JA014

8. Bucks County Department of Corrections Standard Operating Procedures and Guidelines § B-4.40 ..............................................................................................JA023

9. Bucks County Department of Corrections Standard Operating Procedures and Guidelines § B-4.48 ..............................................................................................JA032

10. PATTERSON, JOSHUA CALEB – Bucks County Department of Corrections Commitment Summary ........................................................................................JA034

11. 22-406-18 IM Patterson, J. #132072 IR ...........................................................JA036

12. July 27, 2022 Incident Report from Ofc Wilcox to Sgt. Cruz...............................JA040

13. Office of the Coroner – Cause of Death .............................................................JA041

14. RHOADES, ALLEN JR. – Bucks County Department of Corrections Commitment Summary ........................................................................................JA042

15. #22-407-18 IM Rhoades, A. #128546 – Incident Report .......................................JA044

16. July 26, 2022 Incident Report from Lieutenant Sherman to Captain Nottingham.JA054

17. July 26, 2022 Incident Report from Ofc Ventureira to Sgt Hordijenko ................JA055

18. July 26, 2022 Incident Report from Officer Ulmer to Sgt Cruz............................JA056

19.     NMS Labs Report – RHOADES 10.13.22 ............................................................JA057

20.     Misconduct Report for Incident Number 22-0726-901 ......................................JA060

21.     Criminal Complaint for Allen Rhoades with Attachments ...................................JA061

22.     Deposition Transcript of Stephanie Ulmer .........................................................JA084

23.     Deposition Transcript of Julio Atiles ..................................................................JA113

24.     Affidavit of A. Dayoub re: Prison Oversight Board - July 2022 ..........................JA172

25.     Affidavit of Lt. Z. Sherman re: Offender Management Data for IM Patterson J. ...JA193

26.     February 12, 2024 Email - County's Response to Plaintiff's Interrogatory No. 6 .JA196

27.     21-024-18 IM Quinn – Initial Report ...................................................................JA198

28.     22-225-18 IM Sullivan – Incident Report ............................................................JA200

29.     Officer Defendants' Responses to Plaintiff's Interrogatories ...............................JA204

30.     Plaintiff's Answers to Interrogatories of Officer Defendants ...............................JA219

31.     Officer Defendants' Request for Production of Documents to Plaintiff ................JA222

32.     Plaintiff's Answers to Defendants' Request for Production of Documents ...........JA230

33.     Expert Testimony and/or Opinion of William Adams[1] .........................................JA234

---

[1] As discussed in Defendants' Motion to Exclude Plaintiff's Expert William Adams, this version of Adams' report has been modified to number each paragraph as the original report contained no numerical identifiers for any headings or paragraphs.

| | **BUCKS COUNTY DEPARTMENT OF CORRECTIONS STANDARD OPERATING PROCEDURES AND GUIDELINES** | | |
|---|---|---|---|
| **Title:** | **Module Officer** | | |
| **Section:** | **B-3.11** | **Applicability:** | **Correctional Facility** |
| **Policy/Document Cross Reference:** | **A-4.10, A-4.24, B-4.13, B-4.48, B-4.60** | | |
| **Promulgating Department:** | **Correctional Facility – Operations** | | |
| **Effective Date:** | **1/1/2003** | **Review Date:** | **3/20/2017** |
| | | **Revision Date:** | **11/28//2004 6/20/2004 11/20/2013 1/8/2018 11/28/2018 1/31/2020 3/6/2020 9/2/2020** |
| **Authority:** | **Director** | | |
| **Related Statutes and/or Standards:** | **PA Title 37:** | **N/A** | |
| | **ACA:** | **N/A** | |

Efficient operation and supervision of Module activities, routines and time schedules will be the responsibility of all Module Officers.

 **Module Officers are responsible for:**

1. Security, safety, and cleanliness of the Module.

2. ███████████████████████████████████████████
   ███████████████████████████████████████████
   ███████████████████████████████████████████
   ███████████████████████████████████████████
   ███████████████████████████████████.

3. Reporting any problems – including problems between inmates – ███████████████████.

4. Dissemination of information to staff and inmates, including maintaining accurate records in the OMS logbook.

5. Accounting for and knowing the condition of all security equipment on the Module – including keys – and reporting any emergent issues immediately to a Shift Supervisor; non-

emergent issues will be reported in writing to the Shift Supervisor.

6.  Knowing the cell assignments for all inmates and ensuring that inmates are not in the cells of others.

7.  Knowing the location of all inmates assigned to the Module as well as the inmates' whereabouts when off the Module.

8.  Ensuring only authorized workers or inmates assigned to the Module are present on the Module.

9.  Ensuring that all inmates who are transferred off the unit, or who are permanently released:
    a.  clean their cell or bunk area
    b.  return linen(s)
    c.  return library books and tablets
    d.  remove all personal property, including televisions and radios.

10. Ensuring there are adequate supplies on the Module for cleaning and proper hygiene.

11. Maintaining and documenting accurate inventory of all cleaning equipment.

12. █████████████████████████████████████████████████
    ████████████████████████████████████.

13. █████████████████████████████████████████████████.

14. ████████████████████████████████████████████
    ████.

15. █████████████████████████████████████████████████
    ███████████████████████████████████████.

16. Notifying the Shift Supervisor of suspected contraband on the Module.

17. Taking counts ███████████████.

18. Monitoring the dayroom and regulating the general noise level in the Module.

19. Following emergency fire procedures in case of an emergency (**SOP § B- 4.13**).

20. Being attentive to duties at all times.

21. Ensuring that no unauthorized items are brought on post by staff.

22. Ensuring that the officers' station is off limits to all inmates, unless the officer is present.

23. Supervising Module workers.

24. Ensuring that on general cleaning days, all areas are clean, neat and orderly.

25. Patting down inmates before leaving and returning to the Module at the discretion of the officer.

26. Ensuring all inmates follow Inmate Handbook regulations.

27. ███████████████████████████████████████████
███████████████████████████.

28. ███████████████████████████████████████████
████.

29. ███████████████████████████████████.

30. Ensuring all outgoing mail is properly addressed with inmate BCCF number and BCCF return address. ████████████████████████████████
████████████████.

31. ███████████████████████████.

32. Ensuring all ████████████████████████████████
████████████.

33. Restricting personal phone calls. ████████████████████
████████████████████████.

34.  In addition to the general module post orders, the following procedures will be performed in specified areas:

**J-Module**

1. ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████.

2. ███████████████████████████████████████████
████████████████████████████████  ██████████
██████████████████████████.

3. ███████████████████████████████████████████
████████████████████████████  ██████████████
████████████████████████████.

4. ███████████████████████████████████████████
███████████████████████████████████████████
████████████████.

5. ███████████████████████████████████  ████████
████████████████████.

6. ███████████████████████████████████████████████
   ████████████████████ .

7. ███████████████████████████████████████████████
   ██████████████████████ .

8. ███████████████████████████████████████████████
   ████████████████████████ .

9. ████████████████████████████████ .

**Restricted Housing Unit (RHU), Mental Health Unit (MHU), and Administrative Custody Unit-Female (ACU-F)**

1. Observe the distribution and consumption of meals and supervise the cleanup after meals.

2. Have a knowledge of special confinement policies and procedures (**SOP §B-4.48).**

3. Collect and forward all inmate request forms appropriately.

4. Supervise and document showers ████████████ .

5. Assist and document the movement of inmates to recreation.

6. ███████████████████████████████████████████████
   ██████████████████████████ .

7. ███████████████████████████████████████████████
   █████████████████ .

8. Ensure that all cells are in operable condition and noting any maintenance issues or graffiti present.  Cell windows are to be kept clear at all times.

9. ████████████████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████████████
   █████████████████████ .

10. ██████████████████████████████████████████
    ████████████████████████████████████████████ .

**RHU Regulations Including Women in RHU Status**

1. ███████████████████████████████████████████████
   ████████████████████████ ███████████████████████

███████████████████████████████████████████████████
████████████████████████████.

2. Personal care products will be provided to those inmates on RHU status.

3.   Personal property is limited to:
    a. ███████████████████████████████
    b. ███████████████████████████
    c. █████████
    d. ████████████████

4. Inmates are not permitted to attend any programs such as A.A. meetings, educational classes, or treatment programs.

5. Inmates are not permitted to attend religious activities. ███████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████.

6. █████████████████████████████.

7. ███████████████████████.

8. ████████████████████████████████████████████████████
████████████████████████████████████████████.

9. ████████████████████████████████████████████████████
████████████████.


**RHU Property for Males:**

Upon inmate admission to RHU the officer will:

- ████████████████████████████████████████████████████
████████████████
- ████████████████████████████████████████████████████
██████████████████████
- ████████████████████████████████████████████████████
██████████████
- ████████████████████████████████████████████████████
██████████████

Upon inmate release from RHU, ████████████████████████████
████████████████████████

**Second Module Officer**

The following procedures have been established for a second Module Officer assigned to this post to provide additional security ███████████████████████████████ ███████████████████████████████████████████ .

The second officer's ████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████ .

The █████████████ Officer will:

1. ███████████████████████████████████████████ ███████████████████████████ .

2. ███████████████████████████████████████████ ██████████████████████████████ .

3. Assist in supervising inmates on any watch status and ensure that proper documentation is maintained ██████████████████████ .

4. Collect the property belonging to inmate(s) who will not be returning to the Module ██ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████████ .

5. ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████   █████████████████████████ ██████████ .

6. ███████████████████████████████████████████ .

7. Supervise ██████████████ .

8. Assist ████████████████ .

9. Assist ████████████████████████████████ .

10. Assist ███████████████████████████████████ ██████████████████████ .

11. Assist ████████████████████████████████ .

12. Supervise inmates █████████████████████████ ██████████████████████████ .

13. Assist  in  supervising  ███████████████████████████ ,

███████████████████████████ .

14. Assist in completing any paperwork and/or duties as necessary.

15. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████ .

**Second F Module Officer**

The second Module Officer assigned to provide additional security in F-Module will be responsible for performing the duties and responsibilities outlined above, as well as those listed below.

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
█████████████ .

The second F-Module Officer will:

1. Assist in supervision of all inmates on locked status during shower, phone call, and recreation periods and ensure that proper documentation is maintained for the inmates participating in these activities.

2. ████████████████████████████████
███████ .

3. ████████████████████████████████
████████████████████████████████
████████████████████████████████
██████████████████████████████ .

**T Module**

Efficient operation and supervision of Module activities, routines and time schedules will be the responsibility of all Module Officers. ████████████████████████████
█████████████████ .

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████ .

T Module Officers will be responsible for:

1. ██████████████████████████████████████████████.

2. Ensure that all kitchen workers shower and receive a clean set of kitchen whites before reporting to work each day.

3. Ensure that all kitchen workers are ready for work at scheduled hours. ████████████
████████████████████████████████████████████████

4. Ensure that kitchen workers' bunks are cleaned and ready for inspection, prior to leaving the module.

**Urban Yard Responsibilities:**

It is the responsibility of each Module officer to ensure that the Module Urban Yard activity is conducted in a safe and secure environment.

The Module officer will be responsible for:

1. ████████████████████████████████████████████████
████████.

2. ████████████████████████████████████████████████
██████████████████.

3. ████████████████████████████████████████████████
██████████████████████.

4. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████.

5. ████████████████████████████████████████████████
██████████████████.

6. Immediately report any and all security or safety concerns ████████████████ as they occur.

**Physical Altercations in Housing Units:**

████████████████████████

████████████████████████████████████:

1. ██████████████████████.

2. ████████████████████████████████████████████████
██████████████████████.

3. ████████████████████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████.

4. ███████████████████████████████████████████
███████████████████████████.

5. ██████████████████████████████████████████████.

6. <u>Factors to consider</u> ████████████████████:
   - █████████████████████████████
   - █████████████████████
   - ████████████████████
   - █████████████████████
   - ████████████████████████████████
   - ██████████████████████
   - ███████████████████n
   - ████████████████████████

7. <u>The second module officer</u> █████████████████:
   a. ████████████████████████████████
      ████████████████
   b. █████████████████████
   c. ███████████████████████████
   d. ███████████████████████████████████

████████████████████

████████████████████████████████████

1. ████████████████████████████████.

2. ██████████████████████████████████████████

3. <u>The second module officer will:</u>

   a. ██████████████████████████████████████
      ██████████████████████████████████████
      ██████████████████████████████████████
      ██████████████.

   b. ██████████████████████████████████████
      ████████████████████████

   c. ████████████████████████████████

   d. ██████████████████████████████████████
      ████████████████:



| | BUCKS COUNTY DEPARTMENT OF CORRECTIONS<br>STANDARD OPERATING PROCEDURES AND GUIDELINES | | |
|---|---|---|---|
| **Title:** | **Reception Unit Officer** | | |
| **Section:** | **B-3.13** | **Applicability:** | **Correctional Facility** |
| **Policy/Document Cross Reference:** | | **B-4.6, A-4.16** | |
| **Promulgating Department:** | | **Correctional Facility – Operations** | |
| **Effective Date:** | **1/1/2003** | **Review Date:** | **3/10/2017**<br>**1/26/2018** |
| | | **Revision Date:** | **4/01/2007**<br>**5/19/2009**<br>**3/18/2015**<br>**12/20/2017** |
| **Authority:** | **Director** | | |
| **Related Statutes and/or Standards:** | | **PA Title 37:** | **N/A** |
| | | **ACA:** | **N/A** |

The Reception Unit Officer is responsible for processing new commitments, discharges, institutional transfers and court returns without unnecessary delay, ensuring that all steps of these processes are completed.

**Reception Unit Officers will:**

1. Have a working knowledge of, comply with all existing post orders, policies, procedures and directives, especially all emergency procedures, and assist the Reception Unit Supervisor as directed.

2. Be responsible for the security, safety and cleanliness of this post.

3. Ensure the Reception Unit remains free of contraband.

4. Ensure that no unauthorized inmates are present in the Reception Unit at any time.

5. Be responsible for the correct handling and storage of all inmate personal property and clothing stored in the property storage area.

6. Be responsible for ensuring that all inmates leaving the institution are the actual owners of any radio, television or book(s) they may have had in their possession.

7. Be knowledgeable of and follow the procedures for youthful offender commitments **(SOP Sec. A-4.16).**

**Admissions and Discharges**

For admissions, the Reception Unit Officer will:

1. ███████████████████

2. ████████████████████████████████████████████
███████████████████

3. ████████████████████████████████████████████
██████████████

4. ████████████████████████████████████████████
████████████████████████████████████████████
████████████

5. ███████████████████████████████████

    a. ████████████████████████████████████████
███████████████

    b. ███████████████████████████

    c. ████████████████████

    d. ████████████

    e. ████████████

    f. ██████████████████

    g. ██████████████████

    h. ███████████████

    i. █████████████████████████████

    j. ████████████████████████████████████████
████████

6. Ensure that inmates returning from court are processed ████████████ through the Reception Unit and returned to housing units as quickly as possible.

7. For discharges, Reception Unit Officers will:

    a. ████████████████████████████████

    b. ████████████████████████████████████████████
███████████

c. ██████████████████████████████████
   ████████████████

d. ██████████████████████████████████
   █████████████████

8.  When handling foul, dirty and grossly unsanitary clothing, do the following:

a. ████████████████████████████

b. ██████████████████████████████████
   ████████████

9.  ██████████████████████████████████
    ██████████████████████████████████
    ██████████████████████████████████
    █████████████████████████

**Note:  Reception Unit Officers will familiarize themselves with directions and instructions found in the *Reception Unit Manual* as well.** ████████████████████████████
████.

| | **BUCKS COUNTY DEPARTMENT OF CORRECTIONS**<br>**STANDARD OPERATING PROCEDURES AND GUIDELINES** | | |
|---|---|---|---|
| **Title:** | **Searches – Inmate and Staff -**<br>**Pat Searches and Unclothed Searches** | | |
| **Section:** | **A-4.20** | **Applicability:** | **Divisional** |
| **Policy/Document Cross Reference:** | **A-4.2, A-4.10,  B-3.8,  B-4.10, C-4.5** | | |
| **Promulgating Department:** | **Administration** | | |
| **Effective Date:** | **1/1/2003** | **Review Date:** | **2/3/2017** |
| | | **Revision Date:** | **6/23/2006**<br>**9/18/2007**<br>**1/30/2009**<br>**1/10/2010**<br>**4/19/2012**<br>**3/31/2015**<br>**1/26/2018**<br>**8/29/2019** |
| **Authority:** | **Director** | | |
| **Related Statutes and/or Standards:** | | **PA Title 37:** | **95.241.5** |
| | | **ACA:** | **ACRS-4- 2C-04, 2C-05, 2C-06** |

**Policy**

Searches will be conducted for the purpose of controlling contraband **(SOP §B-4.10, C-4.5)**, recovering stolen or missing property, and to ensure safety and security of the facility and of inmates, employees, contractor staff, and volunteers. ████████████

████████████████████████████████████████

████████████████  ████████████████████████

████████████████████████████████████████

Searches will not be conducted as a punitive action or form of harassment, and will be conducted in a manner which minimizes embarrassment and indignity to any person.

Security staff will be trained to conduct all types of searches and completion of training will be documented in the DOC training file. Search training will also incorporate Prison Rape Elimination Act (PREA) protocol as it relates to all inmate searches, including <u>lesbian, gay, bisexual, transgender, intersex, and other gender non-conforming offenders.</u> **(SOP §A-4.2)**

<u>**Types of Searches**</u>

A.  Pat Searches

1. *Pat searches are conducted with individuals wearing their clothes.* *(95.241.5.ii).*

2. Officers may wear approved protective gloves to maintain good hygiene while conducting pat searches.

3. ███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████ ███████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
████████████████

4. Visitors, contractors, volunteers and staff members entering the Community Corrections Centers ██████████████████████████████████
█████████

5. *Inmates* ██████████████████████████████████
███████████████████████

6. ███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
██████████

7. ███████████████████████████████████
███████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
█████████████████████████████████

Pat search procedures will be executed in the following manner:

a. ███████████████████████████████████
██████████████████████

b. ███████████████████████████████████
██████████████████████



c. ███████████████████████████████████
███████████████████

d. ███████████████████████████████████
█████████████

e. ███████████████████████████████████
███████████████████████████████████████

f. ███████████████████████████████████
████████████

g. ███████████████████████████████████
███████████████

h. ███████████████████████████████████
████████████████████

i. ███████████████████████████████████
████████████████████████

j. ███████████████████████████████████
███████

k. ███████████████████████████████████
██████████████

B.  Unclothed, Full Body Searches

1.  *An unclothed body search will be conducted on an inmate* ███████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████

2.  ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████

3.  ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████

4.  Searches or physical examinations of transgender, intersex, or other gender non-conforming offenders solely to determine an individual's genital status are not

permitted. 

5. *This search procedure will be conducted expeditiously and efficiently in the following manner:* *(95.241.5ii)*

a.

b.

c.

d.

e.

f.

g.

h.

i.

j.

k.

l.

m.

n. ██████████████████████████████████

o. ██████████████████████████████████
██████████████████████████████████
████████████████████████████

p. ██████████████████████████████████
██████████████████████

q. ██████████████████████████████████
██████████████████████████████████
████████████████████ █████████████████
██████████████████████████████████
██████████████████████████████████
███████████████████████████

r. ██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
█████████

6. This Department ████████████████████
██████████████████████████████████

C. ████████████████████████████

1. Sentenced Inmates:

██████████████████████████████ ████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████

2. Pre Trial Detainees:

a. ██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████



8.



Reception Unit Staff  _____

Date : _____

| | **BUCKS COUNTY DEPARTMENT OF CORRECTIONS**<br>**STANDARD OPERATING PROCEDURES AND GUIDELINES** | | |
|---|---|---|---|
| **Title:** | Reception Unit – Admission and Discharge Procedures | | |
| **Section:** | **B-4.40** | **Applicability:** | **Correctional Facility** |
| **Policy/Document Cross Reference:** | | **B-4.6, B-4.10,  B-4.27, B-4.45, A-4.16** | |
| **Promulgating Department:** | | **Correctional Facility – Operations** | |
| **Effective Date:** | **1/1/2003** | **Review Date:** | |
| | | **Revision Date:** | **4/19/2007**<br>**3/6/2008**<br>**3/20/2009**<br>**4/1/2015**<br>**1/25/2017**<br>**12/20/2017**<br>**5/29/2018**<br>**9/16/2020** |
| **Authority:** | **Director** | | |
| **Related Statutes and/or Standards:** | | **PA Title 37:** | **95.222.1 & 95.222.2** |
| | | **ACA:** | **N/A** |

**Policy and Procedure for Admissions**

A.  **Delivery of Commitments**

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████

████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████

1. **Receiving Inmates**

   a. *The Records Department will ensure that commitment documents are complete, under proper legal authority, and represent an appropriate admission to the facility.* *(95.222.1.i)* ███████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ███████████ █████████████████████████████
      ████████████████████████████████████████
      █████████████████

   b. ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      █████████████ *(95222.1.ii)*

   c. ████████████████████████████████████████
      ████████████████████████████████████████
      ██████████████

2. **Personal Property**

   *Property secured from new commitments will be categorized as personal property and money.  An itemized inventory of property collected from inmates upon admission will be completed by the Reception Officer(s).*

   a. ████████████████████████████████████████
      ████████████████████████████████████████



b. *Personal Property will be inventoried and bagged and tagged with a property receipt* ████████████████████████████ .*(95.222.1.iii)*

Only the following items will be accepted:

1. ████████████████
2. ██████████████████████
3. ██████████████
4. ████████████████████████
   ███
5. ██████████████
6. ████████████████
7. ████████████████
8. ██████████████████
9. ██████████████████

<u>Tobacco products of any kind are not permitted</u>.

c. Institutional checks from other prisons will be entered on the inmate account at booking ██████████████████████████ ██████████████████ Institutional checks/money orders are placed on an inmate's account.

d. ████████████████████████████
   ████████████████████████████
   ██████████████

   ████████████████████████████
   ██████████████

**3.  *Intake Process***
   The intake process will include the following

   *a.* ████████████
   b. ████████████
   *c.* ████████████████████
   d. ██████████████████
   e. ████████████████████████
   ██████████
   *f.* ████████████████████████
   g. ████████████████████

4. **Securing and Searching Property**



    *a.* ████████████████████████████████
████████████████████████████████
████████████████████

    *b.* ████████████████████████████████
████████████████████████████████
████████████████

    c. ████████████████████████████████
████████████████████████████████
████████████████████████████████
█████████ Perishable items will not be accepted by the facility ████████
██████████████████████. Prescribed medications will be
turned over to the dispensary.

5. **Booking and Processing**

    a. The Records Department Staff will verify admission documents. ████████
████████████████████████████ ██████████████
████████████████████████████████
██████████████████████

    b. Bookings will be completed in the order received ████████████
████████████████████████████████
██████████.

    *c. In order to provide positive identification of a new commitment, the following
information will be obtained:*

- ████████████
- ██████████████
- ██████████
- ████████████
- ████████████████
- ████████████████████████
- ████████████
- ██████████████
- ████████████
- ██████████████████
- ████████████



Additional Information to include when available:



6. **Role of Classification Personnel**

Case Managers will be responsible for interviewing all new admissions and assisting commitments with any immediate problems.  Case Managers will:



a. ████████████████████████
b. ████████████
c. ██████████
d. █████████████████
e. ███████████
f. █████████
g. ███████████████
h. █████████████████
i. ███████████████████████████████ *(95.222.1.vi)*
j. ███████████████████████████████████ *(95.222.1.vii)*
k. ██████████
l. ████████████████

7. **Consular Notification and Access** *(95.222.1.viii)*

*The United States Department of State requires consular notification and access for all federal, state, or local officials who may, in the performance of their official duties, have contact with a foreign national(s).  This includes County Corrections employees.*



*The federal government has a publication titled* <u>Consular Notification and Access</u>*.  This 70 page document published by the State Department provides an overview and instructions for those required to communicate with international consulates.   This publication includes specific instructions for contacting consulate officials, provides a list of country's who mandate notification, offers prepared statements for  nationals, provides a variety of translated languages, and lists all foreign consulate offices having signed treaties with the USA, with  addresses and contact numbers.*

*Three (3)* <u>Consular Notification and Access</u> *publications have been ordered for the Department of Corrections.* ████████████████████████

████████████████████ *Case Management staff will utilize these manuals if and when the need arises to work with a foreign national (s).*

***Summary of Requirements Pertaining to Foreign Nationals***

*1)* ████████████████████████████

████████████████

2) ███████████████████████████████████████
███████████████████████████

3) ███████████████████████████████████████
███████████████████

4) ███████████████████████████████████████
████████████████████

5) ███████████████████████████████████████
███████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
████████████████████

8. **Attorney Representation**

*All new commitments/Mittimus* ███████████████████████
███████████. (95.222.1.W)

9. **Designated Holding Cells**

<u>Safety Cell</u> ██████████████████

The safety cell, ████████████████████████████████ will be utilized to
contain a person who is uncontrollably violent or self-destructive, ████████████
███████████████████████████████████████████
██████████████████████████

a. ███████████████████████████████████████
███████████████████████

b. ███████████████████████████████████████
███████████████████████████████████████████
███████████████████

c. ███████████████████████████████████████

<u>Holding Cell</u> ███

a. ███████████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████

<u>Remaining Holding Cells</u>

a. ███████████████████ cells ████████████████████████

███ will be used as a temporary holding areas for commitments pending processing.

b. ████████████████████████████
████████████████████████████
█████████████████

c. ████████████████████████████
████████████████████████████
████████████████████████████

**10.  Initial Clothing Issue – See SOP B-4.60 for Initial Clothing Issue**

**11. Initial bedding Issue – See SOP B-4.40 for Initial Bedding Issue**

**Policy and Procedures for Discharging Inmates**

**Discussion:** ████████████████████████████
████████████████████████████
████████████████

**Procedures:**

A.  **Staff from departments identified below will complete the following**:

*1. Records Officers will verify all release paperwork is complete and under the Proper legal authority*. <span style="color:red">(95.222.2.i)</span> ████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████

2.  ██████████████████████████
████████████████

3.  ████████████████████

*4.* ██████████████████████████
████████████████████

*5.* ████████████████████████

*6.* ████████████████████████ :

a.  ████████████████████ ████████
████████████████

b. ████████████████████████████████████████████
████████████████

c. ████████████████████████████████████████████
███████████████████████

7. ████████████████████████████████████████████
████████████████████████████████████████████
██████████████

8. █████████████████████████████████  ████████████
███████████████

9. ████████████████████████████████████████████
████████████████████████████████

10. *Inmate's Personal Property will be returned.* *(95.222.2.ii.C)*

*11.* ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

12. ████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████

13. ████████████████████████████████████████████
████████████████████████████████████████████
██████████████████

| | **BUCKS COUNTY DEPARTMENT OF CORRECTIONS**<br>**STANDARD OPERATING PROCEDURES AND GUIDELINES** | | |
|---|---|---|---|
| **Title:** | **Special Confinement Cases** | | |
| **Section:** | **B-4.48** | **Applicability:** | **Correctional Facility** |
| **Policy/Document Cross Reference:** | | | |
| **Promulgating Department:** | **Correctional Facility - Operations** | | |
| **Effective Date:** | **1/1/2003** | **Review Date:** | **3/21/2017**<br>**1/26/2018** |
| | | **Revision Date:** | **3/10/2005** |
| **Authority:** | **Director/Warden** | | |
| **Related Statutes and/or Standards:** | | **PA Title 37:** | |
| | | **ACA:** | |

## Policy

Special confinement, i.e. restrictive confinement, will be imposed only for the duration and to the degree necessary to ensure the safety of inmates and staff, and the security of the institution. Special confinement may include loss of privileges, movement, and/or exclusive cell confinement.

Cell confinement will be ██████████████████████████████████████████████████████████████████████████████.

Inmates in special confinement status will be afforded basic living provisions and conditions of inmates in general population where applicable.

## Procedures

The following provisions will be observed when special confinement is employed to both male and female inmates.

A.   ████████████████████████████████████████████████████████████████████████████████

B.   Inmates in special confinement will receive the same meals as those served to the general population unless special dietary needs are required.

C.   Special Confinement inmates will ████████████████████████████████████████████████████████████████.

D.   Inmates in special confinement will be afforded the same opportunity for clothing, linen, and laundry exchange, as inmates in general population, where and when possible.

E. Special Confinement status canteen items ███████████████████████ ██████████████████████ .

F. Inmates in special confinement will be provided the same opportunities for writing and receiving letters as those inmates in general population.

G. Inmates in special confinement ███████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████ .

H. Inmates in special confinement will ████████████████████████ ████████████████████████████████████████ .

I. Inmates in special confinement will be provided access to reading and legal materials.


<u>Disciplinary Detention</u> - An inmate may be placed in disciplinary detention (lock) for any of the following reasons:

A. ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████ .

B. ████████████████████████████████████████████

C. ████████████████████████████████████ .

D. ████████████████████████████████████████████ ███████████████████████████ .

E. ████████████████████████████████████████████ ████████████████████ .

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER



# BUCKS COUNTY DEPARTMENT OF CORRECTIONS
## COMMITMENT SUMMARY

AS OF: 7/27/22    4:50AM



**COMMITMENT SUMMARY**

| | |
|---|---|
| Name: | PATTERSON, JOSHUA CALEB |
| Inmate Address | |
| DOB: | 22 y/o. |
| SSN: | |
| Sex: | MALE |
| Race: | BLACK |
| Marital: | SINGLE |
| Height: | 511 |
| Weight: | 150 |
| Eyes: | BROWN |
| Hair Length: | BRAIDED |
| Hair Color: | BLACK |
| Citizenship: | UNITED STATES OF AMERICA |
| Gang: | NONE ADMITTED |
| Driver's Lic.: | PA |
| License #: | |
| SID: | |
| BCP#: | |
| Booking #: | |
| Class code: | |
| CCC Admit Date: | 11/26/2021 |
| Release Date: | 07/27/2022 |



Active Alerts:
| KEEP SEPARATE |
| KEEP SEPARATE |
| ADM LOCK |

**ALIAS**

| Last Name, First Name, Middle | Social Security # | Birthdate | Source |
|---|---|---|---|
| | | | |

**EMPLOYMENT**

| Employer | Job Title | Address | Start Date | End Date |
|---|---|---|---|---|
| | | | | |

**WORK RELEASE EMPLOYMENT**

| Employer Name | Address | Phone | Start Date | End Date |
|---|---|---|---|---|
| | | | | |

**EMERGENCY CONTACT**

| Name | Family Address | Phone Number | |
|---|---|---|---|
| | | | This person is an emergency contact. |

*Handwritten notes:*

ADMIN LOCK — K/S — (c/s 7/26/22)
RT — 25∿ Bail — TR-8/2 + RSP No Bail
7 — m/c.
DELCO DETAINER

3 ACUTE WATCHES
1 — c/o - Wilcox.

Inmate Commitment Summary Report                    Page 1 of 2

**CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER**

## SENTENCE INFORMATION

**Charge #:** 1   **Link To:**   **Statute #:** 183929A1    **Description:** RETAIL THEFT-TAKE MDSE

**Sentence Linking:**

**Sentencing Condition:**

| | Years | Months | Days | Release Date |
|---|---|---|---|---|
| **Minimum** | | | | |
| **Maximum** | | | | |
| **Probation** | | | | |

**Projected Charge Release Date:**

**Effective Date:**     **Sentence Date:**

**Include Effective Date:**

**Bond Amount:** $25,000.00    **Fine:**

     **Costs:**

**Calculate Extra Time From Fines:**    **Restitution:**

     **Case #**

**Discharge Date:**     **Judge:**

**Discharge Type:**

---

**Charge #:** 1   **Link To:**   **Statute #:** 183925    **Description:** RECEIVING STOLEN PROPERTY

**Sentence Linking:**

**Sentencing Condition:**

| | Years | Months | Days | Release Date |
|---|---|---|---|---|
| **Minimum** | | | | |
| **Maximum** | | | | |
| **Probation** | | | | |

**Projected Charge Release Date:**

**Effective Date:**     **Sentence Date:**

**Include Effective Date:**

**Bond Amount:** $0.00    **Fine:**

     **Costs:**

**Calculate Extra Time From Fines:**    **Restitution:**

     **Case #** CP-09-CR-0000149-2022

**Discharge Date:**     **Judge:** Diane E. Gibbons

**Discharge Type:**

## CHARGE NOTES

bail revoked 

## DETAINERS

| Complaint Date Detainer Number | Recieved | Charges | Detainer Type | Complaint Date | Detainer Bond | Issuing Agency | Complaint Released | Release Date |
|---|---|---|---|---|---|---|---|---|
| CR-0000409-2021 | 11/26/21 16:56 r/t | | OTHER COUNTY | 11/26/21 16:56 | | OTHER CO DELCO | | |

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report

| Date of Report:<br>07/28/2022 | Day:<br>Thursday | Investigator:<br>Mcleod, R⬛⬛⬛ | | ORI#: | | Incident #:<br>⬛⬛⬛ | UCR:<br>⬛⬛⬛ |
|---|---|---|---|---|---|---|---|
| **Source of Call:**<br>Referred | | **Date and Time of Incident:**<br>07/27/2022 at 0340 hrs. | | | **Case Status:**<br>Open / Investigation | | |
| **Crime or Incident:**<br>Drugs/Death Investigation | | **Location of Incident – Address/Module:**<br>Alpha 39 cell | | | | | |

| Involved: | | | DOB | BCP# | Telephone |
|---|---|---|---|---|---|
| Inmate | PATTERSON, Joshua Caleb | | ⬛⬛ | ⬛⬛ | ⬛⬛⬛ |
| **Involved:**<br>Staff | Ofc. C. Wilcox | | **DOB** | **BCP** | **Telephone** |
| **Involved:** | | | **DOB** | **BCP** | **Telephone** |
| **Involved:** | | | **DOB** | **BCP** | **Telephone** |

**Summary:**
Ofc. Wilcox discovered IM PATTERSON unresponsive while conducting his rounds.

**Assisting Staff:**
Inv. D⬛⬛ Onisick, Ofc.Wilcox

**Narrative:**

*PATTERSON, Joshua⬛⬛*
*Booking ⬛⬛⬛*
*Date of Birth: ⬛⬛⬛; 22 years of age*
*Admitted: 11/26/2021 @ 1637 hrs.*
*Pronounced on August 01, 2022*

**Background:**
Former inmate PATTERSON, Joshua Caleb #⬛⬛⬛ arrived at Bucks County Correctional Facility on November 26, 2021 at 1637 hrs. after being arrested on an outstanding Felony Retail Theft charge from Warrington Township Police Department.  Patterson was arraigned in front of District Justice Snow and given a $25,000 10% bail which he was unable to post. PATTERSON was also being held on Felony Retail Theft charges from Brookhaven Police in Delaware County, Pa.  At the time this medical emergency was called PATTERSON was on Administrative Lock for Fighting.  As a result of this fight PATTERSON was sanctioned to 30 days in RHU (Restricted Housing).

**Initial Report:**
On Wednesday July 27, 2022 at approximately 0455 hrs. I was contacted by Chief Investigator DiSandro regarding a medical emergency on Alpha 39 involving inmate PATTERSON, J.⬛⬛⬛.  Chief DiSandro related that it appears as though this medical emergency was a possible drug overdose.

I arrived at the Bucks County Correctional Facility at approximately 0530 hours and met with Warden Metellus and Deputy Warden Galione who briefed me on the circumstances of this medical emergency.  I was made aware that the patient, IM PATTERSON, J. was still alive and in a medically induced coma at Doylestown Hospital.  I was told that doctors reported no brain activity from the patient and there would be medical efforts to restore brain activity by adjusting the patient's body temperature. I was advised that the patient was in Alpha 39 cell at the time he was discovered unresponsive by Officer Wilcox at approximately 0340 hrs.  Ofc. Wilcox was making his acute watch tours on this date and time when he investigated 39 cell and saw IM PATTERSON's feet from the cell door window.  Ofc.

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report

**22-406-18: Page 2**

Wilcox knocked on the door to determine if the inmate was simply sleeping but received no response. IM PATTERSON was the only person in the cell at the time and was on RHU (Restricted Housing) status. Officer Wilcox immediately activated his body alarm to illicit an immediate response from other officers. Officer Wilcox then opened the cell door where he observed Inmate Patterson seated on the floor with his back against the wall. Ofc. Wilcox tapped his chest and made efforts to have him react but was unable to obtain any response. Ofc. Wilcox drug the inmate out of the cell and onto the second-floor tier and initiated CPR. Other officers and medical personnel from Prime Care soon arrived to assist as needed.

**Statements and Interviews:**

██████████████████████████████████████████I was able to speak with Ofc. Wilcox in the SIU Office and I asked about IM PATTERSON's activity prior to discovering him unresponsive. Ofc. Wilcox advised me that earlier in the morning, around 0200-0230 hrs. PATTERSON was dancing and singing in his cell. Wilcox related that while conducting a tour on the upper tier of the module he activated his body alarm at approximately 0340 hrs. when he realized that PATTERSON was unresponsive. Wilcox related that after receiving no response from the inmate he entered the cell, again checked for a response, and when he received none he drug the patient from the cell onto the second floor tier and began administering CPR. Ofc. Wilcox related that he never reentered the cell after the inmate was taken by medical personnel and never saw any signs of drugs or a struggle before removing the inmate from his cell.

On this date I also spoke with Sgt. N████ Cruz regarding this medical emergency. Sgt. Cruz related that she responded to this call and stood by to supervise while medical personnel from Prime Care and Warrington Ambulance arrived to provide emergency medical care on the patient. While medical personnel were working on the patient on the floor of the second tier Sgt. N. Cruz and Ofc. Black searched 39 cell. As a result of this search numerous items of interest were located on the top bunk in this cell. Sgt. N. Cruz and Officer Black secured a handmade straw, a small glassine baggy, a white powder substance on top of a piece of cardboard and a white container with a yellow lid. Sgt. N. Cruz related that she secured all items and placed the white powder that was found on the cardboard inside the white container with the yellow lid. ██████████████████████████████████
██████████████████████████████████

**SIU Response and Investigation:**

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████ None of the personal documents secured by SIU indicated that the inmate was involved in drug activity, was sad or depressed or in any way wanted to harm or kill himself.

I was made aware later in the day that contact was made with the inmate's mother advising her of her son's condition and current location. I was also made aware that the family was interested in harvesting the patient's organs through the Gift of Life program. The patient was kept alive medically until the afternoon of Monday August 01, 2022. On this date the hospital discontinued medical efforts and the patient soon passed.

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report

**22-406-18: Page 3**

On August 27, 2022 I retrieved the evidence from this case ███████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████ I prepared this evidence for subsequent submittal to NMS Labs. ██████████
████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
This evidence was ████████████████████████████████████████████████ turned over to Bucks
County Detectives Gorman and Eisenhauer.

**Autopsy:**
On Tuesday, August 02, 2022 at 0825 hours I attended the autopsy for this case at the Bucks County Coroner's Office located at 850 Eagle Blvd. Warminster, Pa. 18974. Dr. E███ Williams performed the autopsy while Tech L████████ Guzman assisted. At the conclusion of this autopsy at 0910 hrs. Dr. Williams advised me and Det. T██████ Johnson of the Bucks County District Attorney's Office that there were no obvious signs of abuse or a struggle on the decedent's body. There were indications of cardiac arrest and signs that CPR was administered. Dr. Williams stated that blood results from Doylestown Hospital indicated the presence of Fentanyl in the decedent's body at the time he arrived at Doylestown Hospital on 07/27/2022. It was discovered that the blood that was secured from PATTERSON by Doylestown Hospital on the day of his arrival to the ER was later turned over to the Bucks County Coroner's Office.

I requested a copy of the autopsy report when completed and a drug screen of the decedent's blood to determine what, if any, drugs were present.

**MISCELLANEOUS:**

████████████████████████████████████████████████████████████████████████████
██████████████████. Later that day I received medical records from Prime Care that included Doylestown Hospital on the date that PATTERSON was admitted on July 27, 2022.

On 08/09/2022 I received a discharge summary from Prime Care which shows that Dr. Sheu of Doylestown Hospital indicates that the date of discharge is listed as August 01, 2022. This summary also indicates that PATTERSON suffered cardiac arrest and tested positive for fentanyl. This summary also states, "Coroners office was made aware of the suspected fentanyl overdose that occurred in correctional facility to which the coroner's office reported that they would take the body for autopsy and file death certificate".

On August 01, 2022 it was decided that this case would be investigated jointly with the Bucks County Detectives and Bucks County District Attorney's Office. Det. Lt. Gorman and Det. Eisenhauer of the County Drug Strike Force were assigned to this case. Deputy District Attorney T█████ Gannon was also assigned to this case.

# Bucks County Department of Corrections
# Special Investigation Unit
# Incident Report

**22-406-18: Page 4**

**Staff / Prime Care / EMS:**
Corrections Officers on scene:
- Officer Wilcox
- Lt. Kovach
- Sgt. N. Cruz
- Ofc. McFadden
- Ofc. Suplicky
- Sgt. Lynn
- Ofc. R. Keefe
- Ofc. Fabiani
- Ofc. Clark
- Ofc. Harrison
- Ofc. Black
- Ofc. Knoneborg

Prime Care Medical Staff on scene:

- M█████ Oke

- J. Link, RN

- ████ Pahasenko, RN

Emergency Medical Service:

- Warrington Ambulance Squad 170

**Bucks County Coroner's Report on Cause and Manner of Death**

On 09/20/2022 I received a Cause and Manner of Death Report from the Bucks County Coroner's Office indicating the following:

***Cause of Death: Complications of Fentanyl Intoxication***

***Manner of Death: Accident***

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER



**To** : SGT. Cruz
Fro m : Ofc Wilcox
Date : 7-27-22
Subject : Mutual Aid



# County of Bucks

**OFFICE OF THE CORONER**
**Bucks County, Pennsylvania**
850 Eagle Boulevard Warminster, PA 18974
Phone: (267) 880-5040      Fax (267) 880-5656
**Meredith J. Buck, Coroner**

To:
Date:

## CAUSE OF DEATH

Name of Deceased: Joshua Patterson

Case Number: 2022-0496

Date of Death: 8/1/2022

Date of Birth:

Residence of Deceased:

Municipality of Deceased: Philadelphia

Place of Death: Doylestown Hospital

Municipality of Death: Doylestown Twp

Cause of Death: Complications of Fentanyl Intoxication

Manner of Death:  ☐ Natural   **X** Accident  ☐ Suicide

☐ Homicide   ☐ Undetermined   ☐ Pending

Scott Croop,
First Deputy Coroner
Bucks County Coroner's Office

*************************************************************************************

# CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER



## BUCKS COUNTY DEPARTMENT OF CORRECTIONS
## COMMITMENT SUMMARY

AS OF:  7/27/22   10:21AM

## COMMITMENT SUMMARY

| | |
|---|---|
| **Name:** | RHOADES, ALLEN JR |
| **Inmate Address** | ████████████  () - |
| **Inmate Address** | ████████  ████████ |
| **DOB:** | ████ |
| **SSN:** | ████ |
| **Sex:** | MALE |
| **Race:** | BLACK |
| **Marital:** | SINGLE |
| **Height:** | 507 |
| **Weight:** | 150 |
| **Eyes:** | BROWN |
| **Hair Length:** | SHORT |
| **Hair Color:** | BLACK |
| **Citizenship:** | UNITED STATES OF AMERICA |
| **Gang:** | NONE ADMITTED |
| **Driver's Lic.:** | PA |
| **License #:** | |
| **SID:** | ████ |
| **BCP#:** | ████ |
| **Booking #:** | ████ |
| **Class code:** | 07/26/2022 |
| **CCC Admit Date:** | |
| **Release Date:** | |

**Active Alerts:**
LEVEL 3 - MEDICAL
LEVEL 2 - MEDICAL
BOTTOM BUNK STATUS
DNA ON FILE
RHU STATUS

## ALIAS

| Last Name, First Name, Middle | Social Security # | Birthdate | Source |
|---|---|---|---|

## EMPLOYMENT

| Employer | Job Title | Address | Start Date | End Date |
|---|---|---|---|---|

## WORK RELEASE EMPLOYMENT

| Employer Name | Address | Phone | Start Date | End Date |
|---|---|---|---|---|

## EMERGENCY CONTACT

| Name | Family Address | Phone Number | |
|---|---|---|---|
| ████ | ████ | ████ | This person is an emergency contact. |

**CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER**

**SENTENCE INFORMATION**

| | | | | | | |
|---|---|---|---|---|---|---|
| Charge #: 1 | Link To: | Statute #: 35780-113A16 | | **Description:** INT POSS CONTR SUBST BY PER NOT REG | | |

| | | | | | |
|---|---|---|---|---|---|
| Sentence Linking: | | | **Effective Date:** | | **Sentence Date:** |
| Sentencing Condition: | | | **Include Effective Date:** | | |
| | | | **Bond Amount:** $10,000.00 | | **Fine:** |

| | Years | Months | Days | Release Date | | |
|---|---|---|---|---|---|---|
| | | | | | **Calculate Extra Time From Fines:** | **Costs:** |
| Minimum | | | | | | **Restitution:** |
| Maximum | | | | | **Case #** | |
| Probation | | | | | **Discharge Date:** | **Judge:** |
| Projected Charge Release Date: | | | | | **Discharge Type:** | |

**CHARGE NOTES**

**DETAINERS**

| Complaint Number | Date Detainer Recieved | Charges | Detainer Type | Complaint Date | Detainer Bond | Issuing Agency | Complaint Released | Release Date |
|---|---|---|---|---|---|---|---|---|
| 3095/22 | 07/26/22 12:35 | RECEIVING STOLEN PROPERTY | OTHER COUNTY | 07/26/22 12:36 | | OTHER COUNTY PHIL | | |

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report

JA044

| Date of Report:<br>07/28/2022 | Day:<br>Thursday | Investigator:<br>Onisick, D | | ORI#: | | Incident #: | UCR: |
|---|---|---|---|---|---|---|---|

| Source of Call:<br>Staff Initiated | Date and Time of Incident:<br>07/26/2022 @ 0630 Hours | Case Status:<br>Open / Investigation |
|---|---|---|

| Crime or Incident:<br>Contraband | Location of Incident – Address/Module:<br>BCCF - A Module, A1 |
|---|---|

| Involved:<br>Inmate | Allen RHOADES JR | DOB | BCP# | Telephone |
|---|---|---|---|---|
| Involved:<br>Inmate | Mallet CLARK | DOB | BCP | Telephone |
| Involved:<br>Inmate | Juan TORRES | DOB | | Telephone |
| Involved:<br>Inmate | Janusz DOBROWOLSKI | DOB | BCP | Telephone |

**Summary:**
Inmate Allen RHOADES was found to have a large amount of narcotics in cell A1 on A Module.

**Assisting Staff:**
Investigator Robert MCLEOD

**Narrative:**

On 07/26/2022 at approximately 0630 hours, Inmate Allen RHOADES was transported to BCCF by Pa State Constables K___ WHITE and B___ ZAVODNICK. A clothed body search was conducted by Ofc. Julio ATILES and RHOADES was placed into Holding Cell #1 in Reception at 0633 hours. There was an inmate already in HC#1 identified as T___ SANTIAGO. RHOADES speaks with SANTIAGO then at 0637 hours, moves towards the front of the cell and hides beneath the camera. RHOADES appears to be manipulating something for several minutes then at 0644 hours, RHOADES stands over the toilet and was observed opening a bag/s of suspected heroin/fentanyl. RHOADES empties the contents from the baggies and snorts them from his left arm. RHOADES disposes the baggies in the toilet and flushes it. At 0646 hours, RHOADES is provided a lunch bag by an officer. At 0648 hours, RHOADES turns his back to the camera and appears to remove the plastic wrap from a sandwich. RHOADES places his right hand down the front of his pants and appears to remove something. RHOADES is observed clearly manipulating something in the front of his pants that he eventually hides inside the lunch bag.

RHOADES is subsequently removed from HC1 at 0744 hours to begin intake processing. RHOADES takes the lunch bag with him. RHOADES returns to HC1 at 0755 hours with the lunch bag and proceeds to the bench. RHOADES turns his back to the camera and again, appears to be using something that he had removed from the lunch bag. RHOADES is removed from HC1 at 0804 hours by Ofc. ATILES. RHOADES places the lunch bag on the floor by the officer's podium during this process. At 0815 hours RHOADES retrieves the lunch bag is temporarily placed into HC3 by Ofc. FABIANI to provide a UT. At 0817 hours RHOADES is taken for screening by the nurse and case manager. At 0931 hours CM BROOKINS returns RHOADES to HC1 who is still in possession of the lunch bag. RHOADES stands beneath the camera by the front of the cell and appears to be manipulating something again. RHOADES is removed from HC1 at 0937 by Ofc. ULMER and does not have the lunch bag with him. Ofc. ULMER leaves HC1 cell door slightly ajar.

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report

**22-407-18: Page 2**

Ofc. ULMER fingerprints RHOADES and at 0947 hours RHOADES is given an unclothed body search and provided a jumper in preparation for housing by Ofc. Julio ATILES. RHOADES is observed returning to Holding Cell #1 at 0951 hours and retrieves the brown lunch bag where he had hidden the contraband. RHOADES places this brown bag into his prison issued clothing bag and is subsequently escorted to A Module at 0954 hours and housed in cell A1. No one was observed to have entered HC1 while RHOADES was being processed, and there were no officers present in Reception when RHOADES retrieved the lunch bag.

On 07/26/2022 at approximately 1918 hours, Lt. Zach SHERMAN arrived on A Module ████████ and was notified by Ofc. Louis VENTUREIRA that he received information that Inmate Allen RHOADES may have contraband/drugs in his cell. Lt. SHERMAN immediately responded to A1 and escorted Inmate RHOADES off the block for an unclothed body search. Ofc. VENTUREIRA proceeded to A1 where Inmate RHOADES was the sole occupant to conduct a search of the cell. During the search, Ofc. VENTUREIRA located a coffee bag hidden in a brown paper bag, containing a plastic wrapped package consisting of numerous zip lock baggies with blue wax paper, and yellow and red zip lock baggies containing a white crystal powder. Lt. SHERMAN returned to A1 and photographed the evidence before placing it into the Admin Corridor safe for SIU.

I spoke with KEEFE personnel on 08/02/2022 and was advised yellow coffee packets are available for inmates in the vending machines in various flavors.

On 07/27/2022 at 0344 hours a code 99 emergency was activated on A Module by Ofc. ██████ WILCOX who observed Inmate Joshua Patterson, ██████████ leaning against the wall, unresponsive in cell A-39. Ofc. WILCOX removed PATTERSON from the cell and immediately began chest compressions until medical staff arrived on the unit. While awaiting EMS, Sgt. N████ CRUZ conducted a search of PATTERSON'S cell and located a white powdered substance on the top bunk, a small glassine baggie, and a straw.  Inmate Patterson is the only inmate housed in A-39 and he has been on administrative lock status. At 0405 hours EMS arrived and continued with lifesaving measures. At 0423 hours Inmate PATTERSON was transported to Doylestown Hospital and is currently in the ICU and not expected to survive. Preliminary toxicology results obtained from Doylestown Hospital staff by PrimeCare indicated the presence of Fentanyl in PATTERSON'S system. Inmate PATTERSON has been incarcerated at BCCF since 11/26/2021 for Theft and RSP.

████████ the contraband was collected ████████████████████ and photographed. Upon removing the plastic wrapping from the package recovered from Inmate RHOADES' cell, it was determined to contain (8) bundles of suspected Heroin/Fentanyl, totaling (123) individual zip-lock bags with blue wax paper stamped with "Avengers", and (9) yellow and red zip-lock bags containing suspected Methamphetamine.

████████████ I spoke with Constable K██ White ████████ regarding Inmate Allen RHOADES. WHITE advised that he and his partner, B███ ZAVODNICK picked Inmate RHOADES up from Falls Twp Police Department on the morning of 07/26/2022 and transported him to the Bucks County Correctional Facility (BCCF). Investigators determined that RHOADES was initially arrested by Falls PD on 07/01/2022 for RSP and Possession of a Controlled Substance.

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report

**22-407-18: Page 3**

The arresting Officer D███ MATKOWSKI filed charges in District Court 07-1-10 on 07/07/2022 by summons. ███
████████████████ Investigator MCLEOD learned that certified mail for RHOADES came back undeliverable and a warrant was issued.

████████████ I spoke with Tpr. D███ BAIR from the PSP Trevose Crime Room who advised that Allen RHOADES was the back seat passenger in a traffic stop that was conducted by Tpr. B███ NEIFELD on the morning of 07/26/2022.

All (3) subjects in the vehicle were transported to PSP Trevose where it was determined that RHOADES had an active warrant from Falls Twp PD. RHOADES was subsequently picked up by Falls Twp PD and transported to their station.

Ofc. J███ SMITH reported ████████████████████████ after he finished his tours on A Module, Inmate Janusz DOBROWOLSKI ████████ asked to speak with him. DOBROWOLSKI complained about the UT'S he was provided ████████████. During the conversation Ofc. SMITH advised that DOBROWOLSKI admitted to using Fentanyl twice in the past 24 hours. Ofc. SMITH reported that DOBROWOLSKI appeared exhausted, sweaty, and unable to maintain his balance. DOBROWOLSKI said he was still "coming down" from his last use.

████████████ cell and inmate searches were conducted on A Module ████████████████████ ████████ (3) Inmates tested positive for Fentanyl, and (3) for Amphetamines. Listed below are the positive UT's from A Module.

1. MASTROMATTO, J███ #███████ – BZO, **Fentanyl** ████████████
2. HILLIARD, V███ #███████ – METH, **Fentanyl** ████████████
3. ROSSMANN, S███ #███████ – THC ████████
4. DOBROWOLWSKI, J███ #███████ – **Fentanyl**
5. BENHAM, B███ #███████ – BUP, METH
6. SANTIAGO, T██ #███████ – BZO, THC, COC ████████
7. QUINN, M███ #███████ – THC
8. LOMAS, M███ #███████ – AMP, BUP, METH ████████

████████████████████████████████

1. CHIAZZA, B██████████
2. OGLESBY, J████████
3. MOORE, T█████████
4. BLACKBURN, T█████████
5. MATKOVSKIY, G████████

████████████████ Investigator R███ MCLEOD and I conducted an interview with Ofc. Louis VENTUREIRA regarding the contraband he recovered from Inmate Allen RHOADES' cell on 07/26/2022. Ofc. VENTUREIRA advised that he had worked a 6AM – 2PM OT shift on 07/26/2022, and then continued working a 2PM – 10PM shift on A Module which is his regularly assigned post. While he was working his normal post on A Module, Ofc. VENTUREIRA stated that he noticed Inmate RHOADES sniffling and acting off.

# Bucks County Department of Corrections
# Special Investigation Unit
# Incident Report

**22-407-18: Page 4**

Ofc. VENTUREIRA was suspicious of RHOADES' behavior. Later that afternoon, an inmate worker in the module ████████████████████████████ advised Ofc. VENTUREIRA that he should probably take a look at A1 cell. Ofc. VENTUREIRA advised that this confirmed his suspicion that something was going on with Inmate RHOADES.

Sometime later during his shift, Ofc. VENTUREIRA advised that Lt. Zach SHERMAN arrived on the module and he approached the lieutenant and advised him that he believed RHOADES in A1 was possibly holding contraband.

Lt. SHERMAN immediately removed RHOADES from the module and instructed Ofc. VENTUREIRA to conduct a search of the cell. VENTUREIRA advised that he observed a coffee bag on the lower bunk assigned to RHOADES. The bag felt fuller than normal and upon searching the coffee bag, VENTUREIRA located a plastic bag containing what he believed to be narcotics.

**Video Review – Inmate Mallet CLARK:**

- CLARK meets/speaks with RHOADES and another inmate by Phone Room at 11:21:37 ████████████

- CLARK and RHOADES enter A1 at 11:27:25 ████████

- CLARK and RHODES exit A1 at 11:29:32 and proceed to the vending machine. ████████

- CLARK purchases soda for RHOADES and proceeds to A25 on 2nd tier at 11:30:50. ████████

- RHOADES proceeds to A1 with soda at 11:31:42. ████████ Returns to dayroom to clean up spilled soda shortly thereafter.

- CLARK on 2nd Tier at A39 & A40 at 13:57:13 ████████

- CLARK leaves A39 & A40 and goes to 1st Tier – Walks directly to A1 where Rhoades is located. Out of view at 13:58:33 ████

- CLARK exits A1 13:59:02 Walks towards center of dayroom, backtracks to phone room momentarily (verbal exchange w/inmate). Walks to officer podium. Ofc MCGINLEY opens supply closet. CLARK inside closet. ████████████

- CLARK leaves supply closet 14:00:27 – Up Stairs to 2nd Tier ████████

- CLARK at A39 & A40 14:00:38 – Takes tablets that are slid under doors of both cells and travels back to 1st tier ████

- CLARK enters supply closet 14:01:02. Exits Closet at 14:01:24 and walks up stairs to 2nd tier with (2 -3) tablets and what appears to be a yellow bag in left hand. ████████

- CLARK Gives tablet to Inmate J██████ WESSELS at top of stairs by A35 at 14:01:32 the proceeds to slide tablets under A39 & A40 cell doors. Speaks w/PATTERSON then departs at 14:01:50 ████████

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report



- CLARK walks around 2nd Tier out of view and appears to have items in both hands. ▇▇▇▇▇▇▇

- CLARK walks to A25 and quickly departs with items no longer in his hands. Travels down stairs to 1st Tier goes directly to A1 at 14:02:17 – Leaves A1 14:02:24 walks towards vending machines – looks towards A39 & A40 and motions with his right hand. ▇▇▇▇▇▇▇

- CLARK at Vending machine 14:02:33- Motions towards A39 & A40 while at machine. Walks towards center of dayroom, stops at 14:03:30 – Items in hands (yellow packet in left hand) – interacts with A39 or A40.

- CLARK runs upstairs to A40. Speaks with A40 (MOORE or OGELSBY), then places something under A39 for PATTERSON AT 14:04:00. Spends several seconds at bottom of cell door, then departs at 14:04:13. Drops something at the open door of A36 and goes downstairs to 1st Tier. Yellow packet still visible in left hand and unknown item in right hand at 14:04:22 ▇▇▇▇▇▇▇

- CLARK goes directly to A1 at 14:04:29 – Departs A1 at 14:04:45 – Yellow Packet in left hand. Travels upstairs to 2nd Tier – Looks back at officer podium. ▇▇▇▇▇▇▇

- CLARK quickly places items under cell doors of A39 & A40 at 14:05:04 – Speaks with occupants of both cells, departs at 14:05:36 and goes to A36. Leaves A36 at 14:06:09 ▇▇▇▇▇▇▇

- Cell A36 occupied by Inmate Janusz DOBROWOLSKI – ▇▇▇▇▇▇▇▇▇▇▇▇▇
  ▇▇▇▇▇

- CLARK walks to his cell, A25 at 14:06:24. Departs several seconds later and goes to the supply closet on the 1st Tier ▇▇▇▇▇▇▇

- As CLARK is entering A25, RHOADES departs A1 at 14:06:12 and walks towards the supply closet where the tablets are distributed. CLARK meets RHOADES at the closet at gets him a tablet. CLARK takes the tablet from RHOADES and they proceed to A1 ▇▇▇▇▇▇▇.

- CLARK departs A1 at 14:10:31 without the tablet. RHOADES presumably has the tablet. CLARK climbs stairs to the 2nd Tier ▇▇▇▇▇▇▇.

- CLARK enters A36 at 14:10:52 – Speaks with DOBROWOLSKI outside of cell. Walks with DOBROWOLSKI. Stops to speak with A40 at 14:11:22 then continues on with DOBROWOLSKI. Both proceed to area of A25 ▇▇▇▇▇▇▇

- DOBROWOLSKI leaves A25 at 14:12:53 goes into A41 which is occupied by Inmate James MASSINO. CLARK also leaves but returns to A25 then departs again @ 14:13:34. CLARK stops at A39 & A40 at 14:13:48. Retrieves brown bag from bottom of cell door A40 and hands it to A36 Inmate Cody ATKINSON who is standing outside the cell door.

- ATKINSON takes bag to 1st Tier water fountain at 14:15:35 ▇▇▇▇▇

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report

- WESSELS places item under A35 (RHU Status - Inmate A███ JOHNSON) at 14:15:28 – Goes to A39 speaks with Patterson then returns to A35 ████.

- Atkinson returns to A40 with bag/Item places under A40 while WESSELS speaks with PATTERSON in A39 again at 14:16:40. WESSELS enters A37 with bag. ATKINSON retrieves a tablet and unknown item from A40. And continues speaking with occupants of both cells. WESSELS exits A37 without bag. CLARK approaches A39 & A40 at 14:18:078 and speaks with PATTERSON in 39 then departs. ████.

- ATKINSON still at A40 places tablet under the cell door of A40 at 14:18:48 then departs ████.

- WESSELS retrieves item from under cell door of A35 and places it under cell door of A39 at 14:19:45. Speaks with PATTERSON then enters A37.

- ATKINSON returns at 14:20:12 and is clearly looking for the module officers as he walks by A39 & A40, then quickly returns and slips something under the door of A40 or A39 (Hard to determine which cell). Atkinson continues to the stairway and bends, overlooking to see if the officers can see him.

- The reverse view ██████ shows DOBROWOLSKI depart A41 at 14:18:36 (He has been in A41 a little less than 6 minutes). DOBROWOLSKI and Inmate M███ LOMAS enter A25 with CLARK.

- ATKINSON leaves A39 & A40 and enters A41 (MASSINO'S Cell) at 14:19:03

- CLARK leaves A25 at 14:19:56 and stands in the middle of the stairway, speaking with another inmate. Goes back up then stops and comes down to 1st Tier. ████.

- ATKINSON exits A41 at 14:20:19 clearly hiding something in his hands, looking over the railing to see the officer's locations ██████████.

- At 14:50:45 W/N – Inmate D███ SMITH goes to A39 and speaks with PATTERSON. He walks to A28, then returns to A39 and slides something under the door to PATTERSON. They speak momentarily and subject bends down again and appears to retrieve something. Subject departs at 14:52:26 and returns to A28. Subject returns to Dayroom. ████.

- At 14:54:16 ATKINSON back at A40. Inmate Juan TORRES on first floor speaking with MOORE or OGELSBY in A40. Throws something to 2nd Tier and ATKINSON places item under cell door of A40. ATKINSON then speaks with PATTERSON in A39. Leaves at 14:55:01 ████.

- At 16:01:24 CLARK travels upstairs to 2nd Tier. Passes by 34 & 35 cell, clearly looking for officers, then returns to A39. Speaks with both 39 and 40 cells. Places and or retrieves something from under door of 39 cell. (Possibly Commissary in CLARK's hand). Departs and places item under 35 cell door. At 16:03:07. ████.

**VIDEO REVIEW – Inmate Allen RHOADES:**

- **Meets with Mallet CLARK. See CLARK video review**

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report

- Meets with Inmate J█████ KEHLER after deal with CLARK at 11:34:10. After short discussion, RHODES proceeds to A1.

- KEHLER enters A1 at 11:36:42

- KEHLER exits A1 at 11:46:08

- KEHLER enters A28 at 11:48:22

- 13:48: 50 – RHOADES opens cell door to A1. Departs cell and closes door. Proceeds to Dayroom and sits at table in middle of the module at 13:49:33. RHOADES clearly intoxicated and "dips" out continuously ████████ ███████.

- At 13:51:33 looks towards A39 / A40 and turns around in chair at table. Continues to "dip" out until he is approached by Inmate J██████ WESSELS at 13:54:12 ████████████████.

- WESSELS motions towards A39/A40 and RHOADES looks towards the cells. RHOADES gets up from table and proceeds upstairs to the 2nd Tier ████████████.

- Reverse view from Camera 2Fl In shows WESSELS at the top of the stairs speaking with A39 or presumably A40 before coming down to the 1st Tier to speak with RHOADES.

- RHOADES climbs the stairs and begins to speak with A40 occupants (MOORE & OGELSBY) at 13:54:37 ████████████.

- RHOADES departs at 13:56:37 and returns to A1. No exchanges were observed during this first interaction ████████████.

- RHOADES returns to corner where his cell, A1 is located and speaks with some inmates before entering cell at 13:57:39 ████████████.

- Inmate Mallet CLARK enters A1 shortly thereafter at 13:58:35 directly after speaking with A39 & A40 (*See CLARK Video Review).*

- RHOADES exits A1 at 14:55:42 and walks into Dayroom and speaks with Inmate he was in Reception HC1 with earlier that morning identified as T███ SANTIAGO #██████. Provides him a piece of candy or food. Proceeds to 2nd Tier at 15:03:10 ████████.

- ████████████ RHOADES enters Dayroom at 15:00:58, stands at bottom of stairs then walks away. RHOADES returns to bottom of stairs, then walks to the vending machine and water fountain. Throws something in trash can the proceeds up the stairs directly to A39 and speaks with PATTERSON, then speaks with A40. ████████.

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report

- While RHOADES is at A40, Inmate B██ RABATIN #086261 speaks with PATTERSON and retrieves brown bag from under A39 cell door. Subject fills with water and returns to A39 and slides bag back under A39 cell door at 15:08:26 then departs. RABATIN enters 36 cell shortly thereafter (DOBROWOLSKI'S cell) ██████

- RHOADES leaves A40 and proceeds to the 1st Tier at 15:08:47.

- RHOADES enters A Module yard area at 15:09:21 ██████████████

- TORRES enters the yard at 15:10:09 and meets with RHOADES. There is a discussion between them and they both depart the Yard at 15:11:00. ██████████████

- TORRES waits at bottom of stairs for RHOADES and both proceed to the 2nd Tier and go to A46. TORRES opens the cell door, but they don't go inside. They appear to have a discussion outside A45 then enter A46 at 15:12:49. (TORRES' cellmate departs before they enter).

- RHOADES proceeds back up to 2nd Tier with Inmate Juan TORRES at 15:11:25. Both inmates pass A39 & A40 ██████████████

- TORRES' cellmate returns at 15:14:05. Opens door, gets paperwork from TORRES and departs, while TORRES closes the door with RHOADES still inside. ██████████

- RHOADES departs A46 at 15:14:37 and they both proceed to area of A1.

- TORRES enters A Mod Yard area at 15:17:40 and meets with Mallet CLARK. ██████████████████████████████████████

- CLARK back in view playing basketball at 15:19:20

- LOMAS, SANTIAGO, and TORRES exit Yard at 15:21:10. ██████████████ TORRES & LOMAS proceeds to A18. LOMAS is housed there. (LOMAS tested positive for Meth). ██████████

- DOBROWOLSKI enters yard at 15:23:20 stands by door. LOMAS enters shortly thereafter, speaks with DOBROWOLSKI and they depart Yard at 15:25:42

- TORRES departs A18 at 15:24:29 and proceeds to the 2nd Tier ██████████

- DOBROWOLSKI and LOMAS depart A1 at 15:25:50 (Both UT Pos for Meth and Fentanyl) ██████████

- DOBROWOLSKI enters Yard at 15:33:00. Makes contact with CLARK.

- ATKINSON enters Yard at 15:34:37 makes contact with CLARK and DOBROWOLSKI

- CLARK departs Yard at 15:38:44

- LOMAS & DOBROWOLSKI depart Yard at 15:39:30

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report

- RHOADES enters Yard at 15:42:46

- TORRES enters Yard at 15:45:10

- TORRES and RHOADES Out of view at 15:47:35 (Playing basketball)

- TORRES ███ with tablet at 36 Cell 16:44:30. No Exchange visible ███

- Torres ███ at 1655 ███ Speaks with Patterson at 39 Cell and departs.

**Inmate James Massino #133188**

On 07/26/2022 at 1427 hours, MASSINO calls C███ A███ at ███████. At 3:40 of call – MASSINO asks A███ to out money on someone's books. A███ advises MASSINO she cannot hear him and to call her back.

On 07/26/2022 at 1431 hours, MASSINO calls C███ A███ at ███████. At 1:55 of call MASSINO asks T A███ to put $25 on someone's account for him. At 4:05 of call – MASSINO states that "the only reason I do the (sun?) Is because of my anxiety. If I Go 18 hours without doing anything I can tell, because my mind goes back to all the things I don't want it to". At 6:40 of call – MASSINO provides name of Mallet CLARK and his inmate number ███ to A███.

On 07/26/2022 at 2030 hours, MASSINO calls A███ from C Module. MASSINO advises A███ that he was moved from A Module and currently on C Module. At 6:47 of call – MASSINO stated to A███ that "A Module is intake and that's where a lot of the drugs come in". MASSINO advises A███ that they raided #1 cell.

On 07/27/2022 at 2021 hours, MASSINO calls A███ from C Module. At 3:01 of call – MASSINO advises A███ that an inmate died on A Module and they drug tested the entire block.

MASSINO states that he died from Fentanyl. "Somebody on the block had it". He advises A███ that he got moved last night so he was not drug tested. She states to MASSINO, "You don't take Fentanyl". MASSINO states, "Well no, but it would have come back for the other thing". A███ replies, "Oh yeah, thank god, you got lucky then". MASSINO states, "Yeah I got real fucking lucky". At the end of the call MASSINO states, "I got so lucky yesterday. So lucky. And it scares the shit out of me".

C███ A███, AKA T███, ███████ deposited $25 into account of Mallet CLARK on 07/26/22 at 1444 hours. A███ is listed as the ███ to James MASSINO #███.

On 11/07/2022 I attended the preliminary hearing for the defendant, Inmate Allen RHOADES at District Court   07-2-02. RHOADES waived his right to a preliminary hearing.

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report

*Investigator Daniel Onisick*

**CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER**



# County of Bucks
## DEPARTMENT OF CORRECTIONS
## INCIDENT REPORT



**TO**      : CAPTAIN NOTTINGHAM

**FROM**    : LIEUTENANT SHERMAN

**DATE**    : JULY 26, 2022

**INCIDENT: I/M RHOADES, ALLEN #** ▮▮▮▮ **CONTRABAND FOUND**

On July 26, 2022 at approximately 1915 Hrs I (LT. Sherman) entered Alpha module to conduct unannounced rounds. I was notified by Officer Ventureira that I/M Rhoades, Allen ▮▮▮▮ might have possible contraband/drugs on his person or in his cell. I, immediately escorted this inmate off the module and into the dispensary restroom where an unclothed body search was conducted resulting in nothing found. I entered Alpha module a second time and approached A-01 cell where I observed a baseball sized package containing multiple baggies (red, blue, yellow, clear in color) which appeared to be 100+ count. Immediately I directed Sgt. Hordijenko to report to Alpha module with a evidence bag to secure the possible contraband. I documented the evidence via pictures before the contraband was removed from the scene; once secured by Sgt. Hordijenko it was sealed into an evidence bag attached with a chain of custody form; this was placed in the evidence drop box. I directed Officer Ventureira to continue the cell search as precautionary steps if any other possible contraband was unfounded at this time. This inmate was observed and cleared for housing by medical staff and was issued a misconduct. Investigations has been notified via Email of these findings. Nothing further to report.

**Respectfully Submitted,**
Lieutenant Sherman

**JA055**

**CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER**



# County of Bucks
## DEPARTMENT OF CORRECTIONS
# INCIDENT REPORT



TO      : SGT HORDIJENKO

FROM    : OFC VENTUREIRA

DATE    : 7/26/22

INCIDENT: I/M RHOADES, ALLEN # ███████

---

On Tuesday July 26, 2022 approx. 1910hrs, I, Officer Ventureira searched I/M Rhoades, Allen # ███████ cell #1 and found contraband in his coffee bag that was located next to I /M Rhoades on the bed. I informed Lt. Sherman what was found, which was concealed and removed by Sgt Hordijenko off the module. End of report.

Respectfully Submitted,

_Ofc Ventureira ____

CONFIDENTIAL




# County of Bucks

### DEPARTMENT OF CORRECTIONS

## INCIDENT REPORT

**TO** : **SGT CRUZ**

**FROM** : **OFFICER ULMER**

**DATE** : **07/26/2022**

**INCIDENT:** **CODE 99 FOXTROT**

---

On 07/26/2022 @ approximately 0756, I Officer Ulmer was posted in reception when a code 99 was called on Foxtrot module. I officer Ulmer, responded to Foxtrot with the emergency set of keys from main control. Sgt Cruz opened Foxtrot outer door with the emergency set. I officer Ulmer removed I/M Sutton, A████ #██████ from foxtrot sally port where she was secured in handcuffs by Officer Forman. I/M Sutton was escorted to the dispensary for medical evaluation. Once medically cleared, I/M Sutton was placed in holding cell 1.

**End of Report**

**Respectfully Submitted,**

_____Officer Ulmer_____

DOC/231-08

**CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER**



**NMS Labs**                                                    CONFIDENTIAL
Integrated Forensic Services
850 Eagle Boulevard, Warminster, PA  18974
e-mail: BUX@nmslabs.com  Phone: (844) 276-1182 Fax: (215) 366-1501
Barry K. Logan, Ph.D. F-ABFT, Laboratory Director

**Drug Chemistry Final Report**
**Report Issued    10/13/2022 14:55**

To:  **40200**                                    **Case ID Number**    ▮▮▮▮▮▮▮
     Bucks County District Attorney's Office      **Agency Number**     ▮▮▮▮▮▮
     Attn: Bucks County DA's Representative
     100 N. Main St, 2nd Floor
     Doylestown, PA 18901

**Name(s)/(DOB):**
  RHOADES, ALLEN

**Item(s) Received:**

| Lab Item # | Agency Item # | Description |
|---|---|---|
| 1 | (5) | Twenty-two blue paper bags stamped "Avengers" in red containing white solid material |
| 2 | (5) | Five blue paper bags stamped "Avengers" in black containing white solid material |
| 3 | (5) | One blue paper bag containing white solid material |
| 4 | (6) | Seventy-eight blue paper bags stamped "Avengers" in red containing white solid material |
| 5 | (6) | Two blue paper bags stamped "Avengers" in black containing white solid material |
| 6 | (7) | Six zipper-sealed red plastic bags containing white solid material |
| 7 | (7) | Three zipper-sealed yellow plastic bags containing white solid material |
| 8 | (8) | One blue paper bag containing white solid material |

| Received Date | Delivery Method Description | Name/Airbill |
|---|---|---|
| 9/15/2022 | Hand Delivery | J. REILLY |

**Results and Conclusions:**

| Lab Item # | Compound/Comment | Result |
|---|---|---|
| 1 | 4-ANPP, Acetylfentanyl, Fentanyl* | Confirmed |
|   | Weight | 1.04 g (+/- 0.12 g) (net) |
|   | 4 sample(s) tested | 0.18 g (+/- 0.03 g) (net) |
| 2 | 4-ANPP, Acetylfentanyl, Fentanyl* | Confirmed |
|   | Weight | 0.22 g (+/- 0.04 g) (net) |
|   | 3 sample(s) tested | 0.14 g (+/- 0.03 g) (net) |
| 3 | 4-ANPP, Acetylfentanyl, Fentanyl | Confirmed |
|   | Weight | 0.05 g (+/- 0.02 g) (net) |
|   | 1 sample(s) tested | |

**CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER**

**NMS Labs**                                                        CONFIDENTIAL

Integrated Forensic Services
850 Eagle Boulevard, Warminster, PA  18974
e-mail: BUX@nmslabs.com  Phone: (844) 276-1182 Fax: (215) 366-1501
Barry K. Logan, Ph.D. F-ABFT, Laboratory Director

| | | |
|---|---|---|
| 4 | 4-ANPP, Acetylfentanyl, Fentanyl* | Confirmed |
| | Weight | 4.12 g (+/- 0.32 g) (net) |
| | 5 sample(s) tested | 0.25 g (+/- 0.03 g) (net) |
| 5 | 4-ANPP, Acetylfentanyl, Fentanyl* | Confirmed |
| | Weight | 0.10 g (+/- 0.03 g) (net) |
| | 1 sample(s) tested | 0.04 g (+/- 0.02 g) (net) |
| 6 | Methamphetamine* | Confirmed |
| | Weight | 1.05 g (+/- 0.05 g) (net) |
| | 3 sample(s) tested | 0.51 g (+/- 0.03 g) (net) |
| 7 | Methamphetamine* | Confirmed |
| | Weight | 0.52 g (+/- 0.04 g) (net) |
| | 2 sample(s) tested | 0.29 g (+/- 0.03 g) (net) |
| 8 | 4-ANPP, Acetylfentanyl, Fentanyl | Confirmed |
| | Weight | Less than 0.01 g |
| | 1 sample(s) tested | |

**Method of Analysis:**

| Lab Item # | Analysis Reported Name |
|---|---|
| 1 | Gas Chromatography/Mass Spectrometry (GC/MS), Weight/Volume Determination |
| 2 | Gas Chromatography/Mass Spectrometry (GC/MS), Weight/Volume Determination |
| 3 | Gas Chromatography/Mass Spectrometry (GC/MS), Weight/Volume Determination |
| 4 | Gas Chromatography/Mass Spectrometry (GC/MS), Weight/Volume Determination |
| 5 | Gas Chromatography/Mass Spectrometry (GC/MS), Weight/Volume Determination |
| 6 | Color Test, Gas Chromatography/Mass Spectrometry (GC/MS), Weight/Volume Determination |
| 7 | Color Test, Gas Chromatography/Mass Spectrometry (GC/MS), Weight/Volume Determination |
| 8 | Gas Chromatography/Mass Spectrometry (GC/MS), Weight/Volume Determination |

**Reference Comment(s):**

4-ANPP (4-Anilino-N-phenethylpiperidine) is not listed by name in the Pennsylvania Schedules of Controlled Substances. It is a DEA Schedule II substance.
Acetyl fentanyl is a Pennsylvania Schedule I substance.
Fentanyl is a Pennsylvania Schedule II substance.
Methamphetamine is a Pennsylvania Schedule II substance.

*This item was hypergeometrically sampled allowing a conclusion to be drawn at the 95% confidence level that 50% or more of the samples had the results stated above.

JA059

**CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER**



**NMS Labs**                                                    CONFIDENTIAL

Integrated Forensic Services
850 Eagle Boulevard, Warminster, PA  18974
e-mail: BUX@nmslabs.com  Phone: (844) 276-1182 Fax: (215) 366-1501
Barry K. Logan, Ph.D. F-ABFT, Laboratory Director

The remainder of the submitted evidence should be picked up within thirty (30) days after receipt of the laboratory report unless alternate arrangements are made by you prior thereto.

The weight of evidentiary item(s) expressed as a decimal represents the truncated value. This report indicates the analytically determined weight of the evidentiary item(s) with an expanded uncertainty (k=2.576) corresponding to 99.00% confidence. Any weight ± expanded uncertainty which encompasses 0.00 g shall be considered to be not significantly different than 0.00 g.

I affirm that I have reviewed all data used to produce this report.

    Case 22-BUX-013122 was electronically signed on
    10/13/2022 14:55

Jordan R. Gardner, B.S., Forensic Chemist

CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER

## MISCONDUCT REPORT
## DEPARTMENT OF CORRECTIONS
## BUCKS COUNTY

Incident Number: 22-0726-901

Inmates BCCF Number ▮

Inmates D.O.B ▮

### OFFICER'S REPORT

| Inmate's Name | Place of Misconduct | Date | Time |
|---|---|---|---|
| Rhoades, Allen | Alpha | 7/26/2022 | 1710pm |

| Other Inmates Involved | Cell | Name | Witnesses | Cell | Name |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| Class & No. | Misconduct | Class & No. | Misconduct |
|---|---|---|---|
| 1-6 | Contraband | | |
| | | | |

### Officer's Version

On Tuesday, July 26th, 2022 approx 1710 pm, I, Officer Ventureira conduct a cell search on cell #1 I/M Rhoades, Allen ▮ While searching the cell I, Officer Ventureira found what seemed to be possible contraband in his coffee bag which was on the bunk where I/M Rhoades was sleeping on. I informed Lt Sherman of my findings. The possible contraband was removed off the module by Sgt Hordijenko. End of report.

### Immediate Action Taken

RHU Pending CEB

| Copy Given To Inmate By: | N GARCIA | Date: 7/26/22 | Time: 2125 |
|---|---|---|---|
| Date of Report 7/26/2022 | Signature and Title of Reporting Officer Ofc Ventureira | | Institution BCCF |

Reviewed By
Shift Supervisor Sgt. Hordijenko

Reviewed By
Shift Commander LT. Sherman

Date Reviewed 7/26/22

| COMMONWEALTH OF PENNSYLVANIA COUNTY OF BUCKS | | **POLICE CRIMINAL COMPLAINT** **COMMONWEALTH OF PENNSYLVANIA** **VS.** |
|---|---|---|

Magisterial District Number: **07-2-02**

**MDJ: Hon.** MARK D. DOUPLE
1277 ALMSHOUSE ROAD
**Address:** WARRINGTON, PA 18976

**Telephone:** 215-343-7961

DEFENDANT: *(NAME and ADDRESS):*

| ALLEN | | RHOADES | |
|---|---|---|---|
| First Name | Middle Name | Last Name | Gen |

1730  S EASTON RD
DOYLESTOWN  PA  18901

### NCIC Extradition Code Type

| ☒ 1-Felony Full | ☐ 5-Felony Pend. | ☐ C-Misdemeanor Surrounding States | ☐ Distance: |
|---|---|---|---|
| ☐ 2-Felony Ltd. | ☐ 6-Felony Pend. Extradition Determ. | ☐ D-Misdemeanor No Extradition | |
| ☐ 3-Felony Surrounding States | ☐ A-Misdemeanor Full | ☐ E-Misdemeanor Pending | |
| ☐ 4-Felony No Ext | ☐ B-Misdemeanor Limited | ☐ F-Misdemeanor Pending Extradition Determ. | |

### DEFENDANT IDENTIFICATION INFORMATION

| Docket Number | Date Filed | OTN/LiveScan Number | | Complaint | Incident Number | | Request Lab Services? |
|---|---|---|---|---|---|---|---|
| CR-77-23 | 04/11/23 | R461207-5 | | 173 | 99-22-0692 | | ☒ YES ☐ NO |

| GENDER | DOB | | POB | | | Add'l DOB | | Co-Defendant(s) | | ☐ |
|---|---|---|---|---|---|---|---|---|---|---|
| ☒ Male | AKA | First Name | | Middle Name | | Last Name | | | Gen. | |
| ☐ Female | | | | | | | | | | |

| RACE | ☐ White | ☐ Asian | ☒ Black | ☐ Native American | ☐ Unknown |
|---|---|---|---|---|---|

| ETHNICITY | ☐ Hispanic | | ☒ Non-Hispanic | | ☐ Unknown | |
|---|---|---|---|---|---|---|

| HAIR COLOR | ☐ GRY (Gray) | ☐ RED (Red/Aubn.) | ☐ SDY (Sandy) | ☐ BLU (Blue) | ☐ PLE (Purple) | ☐ BRO (Brown) |
|---|---|---|---|---|---|---|
| | ☒ BLK (Black) | ☐ ONG (Orange) | ☐ WHI (White) | ☐ XXX (Unk/Bald) | ☐ GRN (Green) | ☐ PNK (Pink) |
| | ☐ BLN (Blonde / Strawberry) | | | | | |

| EYE COLOR | ☐ BLK (Black) | ☐ BLU (Blue) | ☒ BRO (Brown) | ☐ GRN (Green) | ☐ GRY (Gray) |
|---|---|---|---|---|---|
| | ☐ HAZ (Hazel) | ☐ MAR (Maroon) | ☐ PNK (Pink) | ☐ MUL (Multicolored) | ☐ XXX (Unknown) |

| DNA | ☐ YES ☒ NO | DNA Location | | WEIGHT (lbs.) |
|---|---|---|---|---|

| FBI Number | | MNU Number | | | | | 150 |
|---|---|---|---|---|---|---|---|

| Defendant Fingerprinted: | ☐ YES ☐ NO | | | FL HEIGHT In. |
|---|---|---|---|---|
| Fingerprint Classification: | | | | 5   7 |

### DEFENDANT VEHICLE INFORMATION

| Plate # | State | Hazmat ☐ | Registration Sticker (MM/YY) | Comm'l Veh. Ind. ☐ | School Veh. ☐ | Oth. NCIC Veh. Code | Reg. same |
|---|---|---|---|---|---|---|---|
| VIN | | Year | Make | Model | Style | Color | as Def. ☐ |

Office of the attorney for the Commonwealth ☐ Approved  ☐ Disapproved Because: _____

(The attorney for the Commonwealth may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth Prior to filing. See Pa.R.Crim.P. 507).

**THOMAS GANNON**

| (Name of the attorney for the Commonwealth) | (Signature of the attorney for the Commonwealth) | 03/13/2023 4-11-2023 (Date) |
|---|---|---|

I, **JARROD EISENHAUER** / ROBERT GORMAN / DANIEL ONISICK 35170 9931
(Name of the Affiant) PSP/MPOETC -Assigned Affiant ID Number and Badge #

of **Bucks County Detectives** / BUCKS COUNTY CORRECTIONAL FACILITY PA0094800
(Identify Department or Agency Represented and Political Subdivision) (Police Agency ORI Number)

do hereby state: (check appropriate box)

1.  ☒ I accuse the above named defendant who lives at the address set forth above
    ☐ I accuse the defendant whose name is unknown to me but who is described as

    ☐ I accuse the defendant whose name and popular designation or nickname are unknown to me and whom I have therefore designated as John Doe or Jane Doe

    with violating the penal laws of the Commonwealth of Pennsylvania at [205] Doylestown Township
    (Subdivision Code)  (Place-Political Subdivision)

    1730  S EASTON RD  DOYLESTOWN, PA 18901

in _____**BUCKS**_____ County [ 09 ] on or about Between 07/26/2022 0000 and 08/02/2022 2359
(County Code)  (Offense Date)

---

AOPC 412A - Rev. 12/21  Page ___ of ___

 POLICE CRIMINAL COMPLAINT

| Docket Number:<br>CR-77-23 | Date Filed:<br>04/11/2023 | OTN/LiveScan Number | | Complaint<br>173 | Incident Number<br>99-22-0692 |
|---|---|---|---|---|---|
| **Defendant Name** | First:<br>ALLEN | | Middle: | Last:<br>RHOADES | |

2. I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have made.

3. I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 Pa.C.S. § 4904) relating to unsworn falsification to authorities.

4. This complaint consists of the preceding page(s) numbered _____ through _____.

5. I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

The acts committed by the accused, as listed and hereafter, were against the peace and dignity of the Commonwealth of Pennsylvania and were contrary to the Act(s) of the Assembly, or in violation of the statutes cited.
**(Before a warrant of arrest can be issued, an affidavit of probable cause must be completed, sworn to before the issuing authority, and attached.)**

JARROD EISENHAUER / RoBerT GormAN /
                      DANIEL ONESICK

04/11/2023
(Date)

(Signature of Affiant)

AND NOW, on this date _____4/11/23_____ I certify that the complaint has been properly completed and verified.

An affidavit of probable cause must be completed before a warrant can be issued.

07-2-02
(Magisterial District Court Number)

(Issuing Authority)

 **POLICE CRIMINAL COMPLAINT**

| Docket Number: | Date Filed: | OTN/LiveScan Number | | Complaint | Incident Number |
|---|---|---|---|---|---|
| CR-77-23 | 04/11/2023 | | | 173 | 99-22-0692 |

| Defendant Name | First: ALLEN | Middle: | Last: RHOADES |
|---|---|---|---|

The acts committed by the accused are described below with each Act of Assembly or statute allegedly violated, if appropriate. When there is more than one offense, each offense should be numbered chronologically.

(Set forth a *brief* summary of the facts sufficient to advise the defendant of the nature of the offense(s) charged. A citation to the statute(s) allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section(s) and subsection(s) of the statute(s) or ordinance(s) allegedly violated.)

| Inchoate Offense | ☐ | Attempt 18 901 A | ☐ | Solicitation 18 902 A | ☐ | Conspiracy 18 903 | | Number of Victims Age 60 or Older |
|---|---|---|---|---|---|---|---|---|

| ☒ | 1 | 2506 | A | of the | 18 | 1 | F1 | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense # | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Code | UCR/NIBRS Code |

| PennDOT Data (If Applicable) | Accident Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (Include the name of the statute or ordinance):
**Drug Delivery Resulting In Death**

Acts of the accused associated with this Offense:

**The actor administered, dispensed, delivered, gave, prescribed, sold or distributed a controlled substance or counterfeit controlled substance, in violation of Section 13(a)14 or 13(a)30 of the act of April 14, 1972 known as The Controlled Substance, Drug, Device and Cosmetic Act, and Joshua Patterwon died as a result of using the substance, in violation of Section 2506 of the Pennsylvania Crimes Code, Act of December 6, 1972, 18 Pa. C.S. -2506, as amended.**

 **POLICE CRIMINAL COMPLAINT**

| Docket Number: CR-77-23 | Date Filed: 04/11/2023 | OTN/LiveScan Number | | | Complaint 173 | Incident Number 99-22-0692 |
|---|---|---|---|---|---|---|
| Defendant Name | First: ALLEN | | Middle: | | Last: RHOADES | |

The acts committed by the accused are described below with each Act of Assembly or statute allegedly violated, if appropriate. When there is more than one offense, each offense should be numbered chronologically.

(Set forth a *brief* summary of the facts sufficient to advise the defendant of the nature of the offense(s) charged. A citation to the statute(s) allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section(s) and subsection(s) of the statute(s) or ordinance(s) allegedly violated.

| Inchoate Offense | ☐ | Attempt 18 901 A | ☐ | Solicitation 18 902 A | ☐ | Conspiracy 18 903 | | Number of Victims Age 60 or Older |  |
|---|---|---|---|---|---|---|---|---|---|

| ☐ | 2 | 780-113 | A30 | of the | 35 | 2 | F | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense # | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Code | UCR/NIBRS Code |

| PennDOT Data (If Applicable) | Accident Number | | | ☐ Interstate | | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|---|---|

Statute Description (Include the name of the statute or ordinance):

**Manufacture, Delivery, or Possession With Intent to Manufact**

Acts of the accused associated with this Offense:

**The actor, not being registered under the Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, nor a practitioner registered or licensed by the appropriate State Board, possessed with intent to deliver a controlled substance namely, Fentanyl and Methamphetamine both Schedule II substances, and said actor was previously convicted of an offense under clause (30) of subsection (a) of Section 13 of the Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, or of a similar offense under any statute of the United States or of any state, in violation of Sections 13(a) (30) and (15)(a) of the Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, 35 P.S. -780-113(a) (30) and - 780-115 (a), as amended. The actor, not being registered under the Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, nor a practitioner registered or licensed by the appropriate State Board, delivered, Fentanyl and Methamphetamine both Schedule II substances, a controlled substance, in violation of Section 13(a) (30) of the Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, 35 P.S. -780-113(a) (30), as amended. The actor, not being registered under the Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, nor a practitioner registered or licensed by the appropriate State Board, delivered, Fentanyl and Methamphetamine both Schedule II substances, a controlled substance, and said actor was previously convicted of an offense under clause (30) of subsection (a) of Section 13 of the Controlled Substance, Drug, Devise and Cosmetic Act, Act of April 14, 1972, or a similar offense under any statute of the United States or of any state, in violation of Section 13(a) (30) and 15(a) of the Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, 35 P.S. -780-113(a) (30) and -780-115(a), as amended. The actor, not being registered under the Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, no**

 **POLICE CRIMINAL COMPLAINT**

| Docket Number: CR-77-23 | Date Filed: 04/11/2023 | OTN/LiveScan Number | | Complaint 173 | Incident Number 99-22-0692 |
|---|---|---|---|---|---|
| Defendant Name | First: ALLEN | Middle: | | Last: RHOADES | |

The acts committed by the accused are described below with each Act of Assembly or statute allegedly violated, if appropriate. When there is more than one offense, each offense should be numbered chronologically.

(Set forth a *brief* summary of the facts sufficient to advise the defendant of the nature of the offense(s) charged. A citation to the statute(s) allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section(s) and subsection(s) of the statute(s) or ordinance(s) allegedly violated.)

| Inchoate Offense | ☐ Attempt 18 901 A | | ☐ Solicitation 18 902 A | | ☒ Conspiracy 18 903 | | Number of Victims Age 60 or Older _____ | | |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | 3 | 780-113 | A30 | of the | 35 | 2 | F | | |
| Lead? | Offense # | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Code | UCR/NIBRS Code |

| PennDOT Data (if Applicable) | Accident Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (Include the name of the statute or ordinance):

Criminal Conspiracy to Manufacture, Delivery, or Possession With Intent to Manufacture or Deliver

Acts of the accused associated with this Offense:

? 903. Criminal conspiracy.
(a) Definition of conspiracy.--A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

The actor, not being registered under the Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, nor a practitioner registered or licensed by the appropriate State Board, possessed with intent to deliver a controlled substance namely, Fentanyl and Methamphetamine both Schedule II substances, and said actor was previously convicted of an offense under clause (30) of subsection (a) of Section 13 of the Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, or of a similar offense under any statute of the United States or of any state, in violation of Sections 13(a) (30) and (15)(a) of the Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, 35 P.S. -780-113(a) (30) and - 780-115 (a), as amended. The actor, not being registered under the Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, nor a practitioner registered or licensed by the appropriate State Board, delivered, Fentanyl and Methamphetamine both Schedule II substances, a controlled substance, in violation of Section 13(a) (30) of the Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, 35 P.S. -780-113(a) (30), as amended. The actor, not being registered under the Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, nor a practitioner registered or licensed by the appropriate State Board, delivered, Fentanyl and Methamphetamine both Schedule II substances, a controlled substance, and said actor was previously convicted of an offense under clause (30) of subsection (a) of Section 13 of the Controlled Substance, Drug, Devise and Cosmetic Act, Act of April 14, 1972, or of a similar offense under any statute of the United States or of any state, in violation of Section 13(a) (30) and 15(a) of the Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, 35 P.S. -780-113(a) (30) and -780-115(a), as amended. The actor, not being registered under the Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972,

 **POLICE CRIMINAL COMPLAINT**

| Docket Number: CR-77-23 | Date Filed: 04/11/2023 | OTN/LiveScan Number | | Complaint 173 | Incident Number 99-22-0692 |
|---|---|---|---|---|---|
| Defendant Name | First: ALLEN | Middle: | | Last: RHOADES | |

The acts committed by the accused are described below with each Act of Assembly or statute allegedly violated, if appropriate. When there is more than one offense, each offense should be numbered chronologically.

(Set forth a *brief* summary of the facts sufficient to advise the defendant of the nature of the offenses(s) charged. A citation to the statute(s) allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section(s) and subsection(s) of the statute(s) or ordinance(s) allegedly violated.)

| Inchoate Offense | ☐ | Attempt 18 901 A | ☐ | Solicitation 18 902 A | ☐ | Conspiracy 18 903 | | Number of Victims Age 60 or Older _____ | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | 4 | 5123 | A | of the | 18 | 2 | F2 | | | | |
| Lead? | Offense # | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Code | | UCR/NIBRS Code | |

| PennDOT Data (if Applicable) | Accident Number | | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|---|

Statute Description (Include the name of the statute or ordinance):
**Contraband/Controlled Substance**

Acts of the accused associated with this Offense:

**The actor, a prisoner or inmate of any prison or mental hospital namely, Bucks County Correctional Facility in violation of Section 13 (a) (16) of The Controlled Substance, Drug, Device and Cosmetic Act, possessed or had under his control a controlled substance namely, Fentanyl and Methamphetamine both Schedule II substances in violation of Section 5123 (a.2) of the Pennsylvania Crimes Code, Act of December 6, 1972, 18 Pa.C.S. -5123 (a.2), as amended. The actor sold, gave, transmitted or furnished to a convict in a prison or inmate in a mental hospital, or gave away in or brought into a prison, mental hospital, or a building appurtenant thereto, or on the land granted to or owned or leased by the Commonwealth or county for the use and benefit of the prisoners or inmates, or put in a place where it may be secured by a convict of a prison, inmate of a mental hospital, or employee thereof, a controlled substance included in Schedules I through V of the act of April 14, 1972 (P.L. 223, No. 64), known as the Controlled Substance, Drug, Device and Cosmetic Act, namely, Fentanyl and Methamphetamine both Schedule II substances in violation of Section 5123 (a) of the Pennsylvania Crimes Code, Act of December 6, 1972, 18 Pa. C.S. -5123 (a), as amended.**

| Inchoate Offense | ☐ | Attempt 18 901 A | ☐ | Solicitation 18 902 A | ☐ | Conspiracy 18 903 | | Number of Victims Age 60 or Older _____ | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | 5 | 2705 | | of the | 18 | 1 | M2 | | | | |
| Lead? | Offense # | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Code | | UCR/NIBRS Code | |

| PennDOT Data (if Applicable) | Accident Number | | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|---|

Statute Description (Include the name of the statute or ordinance):
**Recklessly Endangering Another Person**

Acts of the accused associated with this Offense:
**A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury.**

*CONFIDENTIAL*



Confidential Information Form
Criminal Complaint

**Complete the defendant's SSN Information if known. If this form is submitted as part of a Police Criminal Complaint, the NCIC Cautions/Medical Conditions and Scars/Marks/Tattoos should also be completed if known.**

| Docket Number:<br>CR-77-23 | Date Filed:<br>04/11/2023 | OTN/LiveScan Number | | Complaint<br>173 | Incident Number<br>99-22-0692 |
|---|---|---|---|---|---|
| Defendant Name | First:<br>ALLEN | Middle: | | Last:<br>RHOADES | |

| NCIC Cautions and Medical Conditions (Check up to 9) | | | | |
|---|---|---|---|---|
| ☐ 00 | ☐ 20 | ☐ 50 | ☐ 70 | ☐ 01 |
| ☐ 05 | ☐ 25 | ☐ 55 | ☐ 80 | |
| ☐ 10 | ☐ 30 | ☐ 60 | ☐ 85 | |
| ☐ 15 | ☐ 40 | ☐ 65 | ☐ 90 | |

| Scars, Marks, Tattoos<br>NCIC Codes | |
|---|---|
| | |

Pursuant to the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania*, the Confidential Information Form shall accompany a filing where confidential information is required by law, ordered by the court, or otherwise necessary to effect the disposition of a matter. This form, and any additional pages, shall remain confidential, except that it shall be available to the parties, counsel of record, the court, and the custodian. This form, and any additional pages, must be served on all unrepresented parties and counsel of record.

| This Information Pertains To: | Confidential Information: | Reference in Filing: |
|---|---|---|
| **ALLEN RHOADES**<br>(full name of adult)<br>OR<br>This information pertains to a minor with the Initials of _____ and the full name of<br><br>(full name of minor)<br>and date of birth of: _____ | Social Security Number (SSN):<br><br>Financial Account Number (FAN):<br><br>Driver's License Number (DLN):<br><br>State of Issuance (DLN):<br><br>Expires (DLN):<br><br>State Identification Number (SID): | Alternative Reference:<br>SSN1   SSN1A<br>Alternative Reference:<br>FAN1<br>Alternative Reference:<br>DLN1<br><br><br>Alternative Reference:<br>SID1 |

Additional page(s) attached. _____ total pages are attached to this filing.

I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

Signature of Attorney or Affiant _____   Date 4/11/2023

Name: **JARROD EISENHAUER**   Attorney Number: (if applicable) _____

Address: **Bucks County Detectives** _____   Telephone: _____

_____   Email: _____

*CONFIDENTIAL*

*Please provide the following information for each co-defendant*  **Co-Defendant Data Sheet**

| Docket Number:<br>CR-77-23 | Date Filed:<br>04/11/2023 | OTN/LiveScan Number<br>R461207-5 | | Complaint<br>173 | Incident Number<br>99-22-0692 |
|---|---|---|---|---|---|
| **Defendant Name** | First:<br>ALLEN | Middle: | | Last:<br>RHOADES | |

---

**Complaint/Incident Number**
173

Co-Defendant # _____ **1**

**MALLET CALEB CLARK**
(Name)

(Home Street Address)

(City, State & ZIP Code)                                           (Telephone #)

---

**Complaint/Incident Number**
173

Co-Defendant # _____ **2**

**JANUSZ WOJCIECH DOBROWOLSKI**
(Name)
**0**
(Home Street Address)

(City, State & ZIP Code)                                           (Telephone #)

---

**Complaint/Incident Number**
173

Co-Defendant # _____ **3**

**JUAN RAMON TORRES**
(Name)
**0**
(Home Street Address)
,
(City, State & ZIP Code)                                           (Telephone #)

---

**Complaint/Incident Number**
173

Co-Defendant # _____ **4**

**JAMES  MASSINO**
(Name)
**0**
(Home Street Address)
,
(City, State & ZIP Code)                                           (Telephone #)

---

 POLICE CRIMINAL COMPLAINT

| Docket Number: CR-77-23 | Date Filed: 04/11/2023 | OTN/ | | Complaint 173 | Incident Number 99-22-0692 |
|---|---|---|---|---|---|
| Defendant Name | First: ALLEN | Middle: | Last: RHOADES | | |

## AFFIDAVIT OF PROBABLE CAUSE

Please see Attachement A

DANIEL ONISICK
ROBERT CORMAN

I, **JARROD EISENHAUER**, BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

I CERTIFY THAT THIS FILING COMPLIES WITH THE PROVISIONS OF THE CASE RECORDS PUBLIC ACCESS POLICY OF THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA THAT REQUIRE FILING CONFIDENTIAL INFORMATION AND DOCUMENTS DIFFERENTLY THAN NON-CONFIDENTIAL INFORMATION AND DOCUMENTS.

_____
Signature of Affiant

Sworn to me and subscribed before me this ___11___ day of ___April___ , 2023 .

___4/11/23___ Date _____
Magisterial District Judge

My commission expires first Monday of January, 2026

# Bucks County Detectives / Bucks County Correctional Facility

•

## Office of the Bucks County District Attorney
### 99-22-0692
### Affidavit of Probable Cause
### Attachment A

**Probable Cause belief is based u on the followin facts and circumstances:**

Your Honor, your Affiants are Bucks County Detective Lieutenant Robert Gorman, badge 9903 Bucks County Detective Jarrod Eisenhauer, badge 9931, and Bucks County Correctional Facility Investigator Daniel Onisick.

Whereas this affidavit provides the probable cause for the defendant involved in the drug dealing resulting in the death of Joshua Patterson, the distribution, storage, delivery, and use of Fentanyl and methamphetamine in Bucks County, Pennsylvania, while incarcerated in the Bucks County Correctional Facility.

## INTRODUCTION

Throughout this affidavit the drug being ingested causing the death of Joshua Patterson is identified as Fentanyl. The additional drugs being distributed, stored, delivered, and smuggling into the Bucks County Correctional Facility is Methamphetamine.

Fentanyl: a scheduled II substance is a synthetic opioid that is 50-100 times stronger than morphine. Because of its powerful opioid properties, Fentanyl is also diverted for abuse. Fentanyl is often labeled as highly potent heroin. Many users believe that they are purchasing heroin and actually don't know that they are purchasing fentanyl – which often results in overdose deaths.

Methamphetamine: a schedule II substance is a potent central nervous system stimulant that is mainly used as a recreational drug.

This affidavit of probable cause lists persons who will not be identified by their name. These persons did act in the role of a confidential informant. These persons will be identified as CS and an assigned number (Example CS-00). This is done for their safety, as persons named within this affidavit of probable cause have been identified as violent.

Some of the persons listed as confidential informant within this affidavit of probable cause are currently inmates serving sentences within different correctional facilities. Your affiants know through training and experience that if a person who may or may not be involved within this

Page 1 of 14

investigation finds out the identity of a person who is cooperating with law enforcement that the cooperating individual can be labeled as a "snitch" or "rat" which could also be harmful to the cooperating individual by being harassed or physically harmed while incarcerated within any correctional facility.

Throughout this affidavit of probable cause portions of interviews recapping the events that took place leading to and following the death of Joshua Patterson will be referenced. One of the interviews being referenced will include the interviews of Allen RHOADES. During his interviews Allen RHOADES often provided false details that were corroborated in being false. When confronted with confirmation of the false information Allen RHOADES at times changed his statements providing the truth about the events and his involvement.

### DEFENDANT

Based upon the details provided by the underwritten facts of this probable cause affidavit the defendant, Allen RHOADES did participate in facilitating the delivery resulting in the death of Joshua Patterson, the distribution, storage, delivery, and smuggling of drugs in the Bucks County Correctional Facility. Allen RHOADES has a date of birth of ▮

### PROBABLE CAUSE

#### Allen RHOADES Arrest

On July 25, 2022, Pennsylvania State Trooper B. Neifield conducted a traffic stop on a vehicle where Allen RHOADES was a passenger seated in the rear of the vehicle. After finding that Allen RHOADES had a warrant issued in his name out of the Falls Township Police Department he was taken into custody. During a search of the vehicle Trooper Neifield located a total of 19 bags of Fentanyl, a bag of cocaine, a bag of marijuana, and prescription medication throughout the vehicle. Of the bags of Fentanyl located inside of the vehicle there were white in color wax bags with the stamp "Ric Flair", white in color wax bags stamped "Game Over", and blue in color wax bags stamped "Avengers" all packaged with Fentanyl.

  

#### Allen RHOADES Bucks County Correctional Facility Holding Cell

On July 26, 2022, following his arrest Allen RHOADES was eventually arraigned and issued a bail. He was then transported to the Bucks County Correctional Facility and released to the

custody of Bucks County Correctional Facility Officers. Allen RHOADES was initially patted down by Corrections Officers and placed into holding cell 1.

While in holding cell 1 Allen RHOADES on two different occasions reached in the area of his pants to retrieve wax bags containing Fentanyl. After removing the Fentanyl each time Allen snorted the Fentanyl. Immediately after snorting the substance Allen RHOADES disposed the empty wax bags into the holding cell toilet and flushed the toilet. Allen RHOADES then showed clear signs of being under the influence of Fentanyl, by nodding out and having an unsteady gait.

While still inside of holding cell 1 Allen RHOADES received a brown bag containing food from a Corrections Officer. The bag of food supplied to Allen RHOADES had a drink, and a sandwich packaged inside. The sandwich packaged within the brown food bag is wrapped inside of a clear wrapping. Allen RHOADES removed a large amount of individual packaged wax bags of Fentanyl and individually packaged small zip lock bags of methamphetamine from his pants that were wrapped in the shape of a ball. The Fentanyl and methamphetamine removed from his pants was then wrapped in the sandwich wrapper and placed into his brown food bag.

When entering the Bucks County Correctional Facility, it is a normal procedure for inmates to meet with the nurse at the facility and to provide a urine sample. The consented urine sample provided by Allen RHOADES to the nurse yielded positive, that Allen RHOADES had Cocaine, Amphetamines, Opiates, Methamphetamine, and Fentanyl in his urine when arriving.

Once Allen RHOADES was done with the intake and registration at the Bucks County Correctional Facility, he was given a yellow jump suit and a bag of additional Correctional Facility clothing. After being provided this bag of prison clothing Allen RHOADES retrieved the brown food bag with the Fentanyl and methamphetamine within and place it into his prison issued prison clothing bag. Allen RHOADES was then escorted to A module housing cell 1. Allen RHOADES was housed in housing cell 1 alone.

### Allen RHOADES Interview

During an interview with Allen RHOADES, he provided details that during the traffic stop he was handed a large amount of Fentanyl and methamphetamine by another occupant in the vehicle that he secreted in his pants. Once he was arrested, he kept the Fentanyl and methamphetamine in his pants until arriving to the Bucks County Correctional Facility. While inside of holding cell 1 in the intake area of the Bucks County Correctional Facility, Allen RHOADES stated, he had ingested bags Fentanyl and was feeling high from the effects. Allen RHOADES admitted that he smuggled the Fentanyl and methamphetamine (contraband) into the correctional facility by removing it from his pants and wrapping the Fentanyl and methamphetamine in the sandwich wrapper, then placed the drugs inside of the brown food bag. Allen RHOADES stated that he had smuggled those drugs from the intake holding cell into A Module housing cell 1.

Allen RHOADES Bucks Coun    Correctional Facili    A Module Housin    Cell 1

On July 26, 2022, approximately 5 minutes after being escorted onto Module A housing cell 1, Allen RHOADES met with inmate Mallet CLARK. This was the first of many meetings that took place between Allen RHOADES and Mallet CLARK inside of housing cell 1 and within the general population area of module A. During the multiple interactions Mallet CLARK gave Allen RHOADES headphones for his tablet, a tablet, and commissary items to include a soda

RHOADES and Mallet CLARK returned into housing cell 1 for a short period of time. The two then together walk over to the vending machine where Mallet CLARK purchased Allen RHOADES a soda. Immediately after getting Allen RHOADES the soda, Mallet CLARK quickly walked to his housing cell 25 and entered.



While in the general population portion of Module A Allen RHOADES started to again show signs of using Fentanyl by nodding out and having a hard time keeping his head in the upright position.

### Allen RHOADES Interview Continued

During an interview with Allen RHOADES, he provided details that when entering Module, A housing cell 1 he, was the sole inmate housed within that cell. He further provided details that he utilized housing cell 1 to store and deliver his inventory of Fentanyl and methamphetamine that he smuggled into the correctional facility to other inmates. When entering A Module Allen RHOADES stated that he was approached by Mallet CLARK who asked Allen RHOADES for drugs. Allen RHOADES stated that he delivered Mallet CLARK bags of Fentanyl stamped Avengers and methamphetamine. Allen RHOADES denied ever getting a soda from Mallet CLARK. Allen RHOADES reported that he was intimidated by Mallet CLARK who was said to be part of the 215 Prison Gang*.

*Your affiant viewed hours of video surveillance and at no time did Mallet CLARK appear to physically threaten or harm Allen RHOADES. Each of the meetings viewed in the video surveillance showed Mallet CLARK delivering soda, coffee, headphones, and a tablet to Allen RHOADES. These interactions are believed to be Mallet CLARK making payments for the Fentanyl and methamphetamine deliveries by Allen RHOADES.

### Allen RHOADES and Mallet CLARK Interaction with Joshua Patterson

On July 26, 2022, while working within the correctional facility as a block worker Mallet CLARK was seen as he stopped at the victim Joshua Patterson's housing cell 39 multiple times.

During the meetings some of which were just verbal, Mallet CLARK would stop and talk to Joshua Patterson, would retrieve what was believed to be notes, deliver and retrieve tablets, and assist with hot water for food for Joshua Patterson.

Allen RHOADES while out of housing cell 1 in the general population portion of Module A was d continued to show clear signs of being under the influence of Fentan .
Allen RHOADES was awoken by an inmate who pointed in the direction of the victim Joshua Patterson's housing cell 39 and Jamel OGLESBY's housing cell 40.

Allen RHOADES after walking to housing cells 39 and 40 had verbal communication with Joshua Patterson and Jamel OGLESBY. After a brief conversation at housing cell 40, Allen RHOADES walked directly back to his housing cell 1. A short time later Mallet CLARK walked into housing cell 1 and only stayed for a short period of time before walking out.

While walking in the general population area of Module A Mallet CLARK was verbally called by Joshua Patterson. With frustration Mallet CLARK began to tell Joshua Patterson to wait. Mallet CLARK, who was still frustrated walked to Joshua Patterson's housing cell 39 and placed an unknown item under Joshua Patterson's housing cell door and in return was given an unknown item from Joshua Patterson. Immediately after receiving the item from Joshua Patterson, Mallet CLARK walked directly to Allen RHOADES housing cell 1, where Allen RHOADES was still within and walked inside. After a short amount of time Mallet CLARK walked out of Allen RHOADES housing cell 1, walked directly to housing cells 39 and 40 and placed unknown items quickly under the cell doors of housing cell 39 for Joshua Patterson and housing cell 40 for the inmates inside of housing cell 40. After this delivery of unknown items was completed Allen RHOADES exited his housing cell and again met with Mallet CLARK who gave Allen RHOADES a tablet and the two walked back into housing cell 1 together.

After these interactions Allen RHOADES returned to Joshua Patterson's housing cell and had a conversation with Joshua Patterson individually and also with the inmates inside of housing cell 40. This interaction occurred multiple times where Allen RHOADES would walk back to housing cell 39 and housing cell 40 and talk with Joshua Patterson and the inmates inside of housing cell 40.

During one of the meetings at housing cell 39 and housing cell 40 Allen RHOADES with a cup of coffee in his hand reached down in the area of under the cell doors twice. The first time it appears that Allen RHOADES is placing an item under the door where the second time it appears that Allen RHOADES is receiving an item. The item received is believed to be a sugar substance (pinks) that Allen RHOADES pours into his coffee. Allen RHOADES then walks away and returns to housing cell 39 and housing cell 40 a short time later.

While at the cell doors Allen RHOADES talked directly to Joshua Patterson and again leaned down delivering an item under Joshua Patterson housing cell 39 door and immediately walked away.

Allen RHOADES in addition to the unknown delivered item also later delivers Joshua Patterson a bag of rice that he poured hot water into before deliverin  it to Joshua Patterson.

Allen RHOADES Interview Continued

During his interview Allen RHOADES stated that he had delivered Fentanyl and methamphetamine (ice) to Mallet CLARK. Allen RHOADES during his interview believed that

the Fentanyl delivered to Joshua Patterson was the blue wax bags Fentanyl marked "Avengers" he smuggled into the correctional facility. Allen RHOADES said he knew Mallet CLARK gave the Fentanyl to Joshua Patterson that killed him. Allen RHOADES stated that he delivered bags of Fentanyl packaged in blue wax bags stamped Avengers and in clear zip lock baggies originally to Mallet CLARK. Those blue wax bags of Fentanyl were said to have been later

Mallet CLARK told him by a letter that he (Mallet CLARK) gave the Fentanyl delivered to him by Allen RHOADES to Joshua Patterson and for Allen RHOADES to not tell anyone about the Fentanyl delivery to him. *

*That letter was not recovered as Allen RHOADES stated that he flushed the letter while in RHU. In addition to making this statement Allen RHOADES denied ever talking to Joshua Patterson or ever giving him anything directly. Allen RHOADES confirmed that the drugs that he was saying were from Mallet CLARK ultimately were originally delivered by him.

Allen RHOADES initially stated that he had only delivered 2 bags Fentanyl and a bag or two of methamphetamine solely to Mallet CLARK for coffee and protection. He later admitting that he lied giving false information about who he had all delivered the drugs to and how much Fentanyl and methamphetamine was delivered. Allen RHOADES later confirmed that he delivered Fentanyl and methamphetamine to multiple inmates within the Correctional Facility to include Jamel OGELSBY in housing cell 40 under his housing cell door. Allen RHOADES said that Jamel OGELSBY yelled into the general public area "yo bring some of that up for me". After yelling this Juan "JR" TORRES then asked Allen RHOADES to come talk to him about giving him drugs for "pinks" (Sweet and Low sugars).

In addition to Mallet CLARK and Jamel OGELSBY Allen RHOADES said he gave methamphetamine to Juan "JR" TORRES and Justin KEHLER for "pinks (Sweet and low sugars).

During his interview Allen RHOADES denied talking with Joshua Patterson. He also stated that he did not give Joshua Patterson anything under his cell door. When confronted with a photograph of him (Allen RHOADES) sliding an item under Joshua Patterson's cell door he continued to provide false information and state that he did not talk to Joshua Patterson or slide anything under Module A cell 39 door.

Mallet CLARK Metham hetamine Delive

After meeting Allen RHOADES Mallet CLARK met with many different people including Cody ATKINSON and Janusz DOBROWLSKI. After the short meeting between Janusz DOBROWLSKI and Mallet CLARK, Janusz DOBROWLSKI walked directly into housing cell 41 and met with James MASSINO. After a very short time Janusz DOBROWOLSKI walked out of James MASSINO's housing cell and walked back to Mallet CLARK's housing cell 25 and walked inside with Mallet CLARK. Mallet CLARK walked out of his housing cell 25 and into housing cell 18. He later walked out of housing cell 18 with commissary items believed to be food and walked directly to Allen RHOADES housing cell 1 with the items. Shortly after walking into Allen RHOADES housing cell 1 Mallet CLARK walked out directly back to his

Page 7 of 14

housing cell 25 where a group of inmates met Mallet CLARK in his housing cell 25. Mallet CLARK then stood outside of the housing cell in a manner of being a look out.

After meeting with Janusz DOBROWOLSKI, James MASSINO called Christina ALTIERI. During the intercepted call James MASSINO asked Christina ALTIERI to put $25.00 on Mallet

account. After the money was deposited, Janusz DOBROWOLSKI again met with Mallet CLARK inside of Mallet CLARK's housing cell 25. Janusz DOBROWOLSKI then returned back to James MASSINO's housing cell 41 and walked inside of the housing cell.

### CS-03 Interview

During this investigation an interview was conducted with a person who will be listed throughout this affidavit of probable cause as CS-03. He / She does have a crimin falsi conviction, was incarcerated, and housed on Module A prior to and after the death of Joshua Patterson. CS-03 provided details and information about his / her involvement in the delivery and use of methamphetamine while incarcerated in the Bucks County Correctional Facility. CS-03 has been found to provide truthful information that has been corroborated.

CS-03 has personal knowledge of the events and was present on July 26, 2022, when James MASSINO was offered and delivered methamphetamine from Janusz "Hollywood" DOBROWOLSKI. CS-03 said that when Janusz "Hollywood" DOBROWOLSKI first offered methamphetamine to James MASSINO that he (Janusz "Hollywood" DOBROWOLSKI) told James MASSINO that Mallet CLARK had methamphetamine for sale and could also get Fentanyl if James MASSINO wanted it. CS-03 stated that during the arrangements for the methamphetamine transaction James MASSINO was told to give the payment for the methamphetamine to Mallet CLARK on his "books" in the amount of $25.00. After the $25.00 was deposited on Mallet CLARK's account CS-03 stated Janusz "Hollywood" DOBROWOLSKI gave the methamphetamine to James MASSINO.

CS-03 confirmed that prior to and after receiving methamphetamine on July 26, 2022, that he has never seen or been offered methamphetamine while inside of the Bucks County Correctional Facility.

### Mallet CLARK Interview

During an interview with Mallet CLARK, he provided details and information about Allen RHOADES delivering and offering drugs while on Module A of the Correctional Facility, and the surrounding events that took place prior to and following the death of Joshua Patterson. During his interview Mallet CLARK provided some false statements in an attempt to separate himself from his involvement in the possession and distribution of methamphetamine. Mallet CLARK stated that he uses the drug methamphetamine and last saw the drug within the Bucks County Correctional Facility from Allen RHOADES who showed it to him. The bags of methamphetamine shown were described as being packaged inside of small red bags. Mallet CLARK stated that Allen RHOADES was willing to sell the methamphetamine for food and coffee. Allen RHOADES also offered "Dope" Heroin / Fentanyl to other inmates, and he knew

that "Hollywood" (Janusz DOBROWOLSKI) was given Fentanyl that came from Allen RHOADES.

Mallet CLARK confirmed that he was delivered methamphetamine on July 26, 2022, from Allen RHOADES for a bag of coffee but denied receiving any Fentanyl from Allen RHOADES. Mallet using the methamphetamine that was delivered to him.

Mallet CLARK initially denied talking to the victim Joshua Patterson but after showing him a picture of him meeting with Joshua Patterson Mallet CLARK changed his story and said that he talks to all of the inmates and helps them out especially when they are locked in their housing cells. Mallet CLARK remembered he delivered candy to Joshua Patterson.

Mallet CLARK stated that he did not have proof but was a thousand percent sure that the Fentanyl brought into the correctional facility by Allen RHOADES was the drugs "Smoke" (Joshua Patterson) took that killed him. Mallet CLARK additionally told that he would have known if there were any drugs on A Module prior to Allen RHOADES arrival and that there were no drugs other than Subutex (Spit backs) until Allen RHOADES brought the methamphetamine and Fentanyl onto the block. Mallet CLARK further stated that the only people on A Module that he knew had drugs at the time of Joshua Patterson's death was Allen RHOADES and "Hollywood" (Janusz DOBROWOLSKI).

## CS-02 Interview

During this investigation an interview was conducted with a person who will be listed throughout this affidavit of probable cause as CS-02. He / She does have a crimin falsi conviction and was incarcerated and housed on Module A prior to and after the death of Joshua Patterson. CS-02 provided details and information about his / her involvement in the delivery and use of Fentanyl and methamphetamine while incarcerated in the Bucks County Correctional Facility. Initially during their interview CS-02 stated that he / she was delivered Fentanyl while inside of the correctional facility from Joshua Patterson who was inside of housing cell 39. CS-02 later told that he / she was being untruthful about who delivered the Fentanyl and methamphetamine to him / her because they did not want to get anyone else in trouble for having or delivering drugs inside of the correctional facility. CS-02 during his / her interview provided many statements that were truthful and corroborated.

CS-02 stated that on July 26, 2022, he / she was present when Mallet CLARK delivered methamphetamine to Janusz "Hollywood" DOBROWOLSKI while on Module A. CS-02 was also present when James MASSINO was delivered methamphetamine by Janusz "Hollywood" DOBROWOLSKI. CS-02 confirmed that the methamphetamine delivered to James MASSINO was sourced from Mallet CLARK, where the methamphetamine was paid for by James MASSINO putting the payment on Mallet CLARK's account through his girlfriend. CS-02 confirmed that Janusz "Hollywood" DOBROWOLSKI received "a line" of methamphetamine for delivering the methamphetamine to James MASSINO from Mallet CLARK as his payment.

CS-02 did not ever see methamphetamine or Fentanyl on Module A before July 26, 2022, and described that the only drug that was previously available and seen on Module A was Subutex (Spit back).

### Juan "JR" TORRES Fentan 1 Delive

While outside Allen RHOADES and Juan "JR" TORRES met and eventually walked inside of Module A together going to the second floor. Juan TORRES and Allen RHOADES walked into housing cell 46 together. After a very short conversation the two walked out of housing cell 46 to Allen RHOADES housing cell 1 and walked inside. Juan "JR" TORRES walked out of Allen RHOADES housing cell 1 directly to the outside yard and immediately met with Mallet CLARK. After a brief conversation Juan "JR" TORRES returned into Module A and met with Janusz "Hollywood" DOBROWOLSKI.



After meeting Janusz "Hollywood" DOBROWOLSKI, Juan "JR" TORRES walked into Janusz "Hollywood" DOBROWOLSKI's housing cell 36 together. Juan "JR" TORRES later walked out of Janusz "Hollywood" DOBROWOLSKI's housing cell with both hands full of commissary items. While walking Juan "JR" TORRES again met with Allen RHOADES who followed Juan "JR" TORRES into housing cell 46. Allen RHOADES is later seen walking away from Juan "JR" TORRES with a bag of rice.

Janusz "Hollywood" DOBROWOLSKI again met with Juan "JR" TORRES and the two walk to the commissary machine. Janusz "Hollywood" DOBROWOLSKI clearly puts his code into the commissary machine for Juan "JR" TORRES who gathers the items of commissary that he picked and walks away from Janusz "Hollywood" DOBROWOLSKI.

### CS-01 Interview

During this investigation an interview was conducted with a person who will be listed throughout this affidavit of probable cause as CS-01. He / She does have a crimin falsi conviction, was incarcerated, and housed on Module A prior to and after the death of Joshua Patterson. CS-01 provided details and information about his / her involvement in the delivery of Fentanyl while incarcerated in the Bucks County Correctional Facility. Initially during their interview CS-01 provided false statements about them being in possession of Fentanyl while in the correctional

facility. CS-01 later told that he / she was being untruthful in an attempt to not admit their involvement in possessing and delivering the Fentanyl inside of the correctional facility. CS-02 during his / her interview provided many statements that were truthful and corroborated.

CS-01 said that Juan "JR" TORRES first saw Allen RHOADES talking to and possibly

inmates housed in housing cell 40. CS-01 was later present when Juan "JR" TORRES was delivered white bags of Fentanyl stamped "Game Over" while on Module A for "Pinks" (Sweet and Low Sugars) from Allen RHOADES. After being offered and delivered the Fentanyl from Allen RHOADES, CS-01 was present when Juan "JR" TORRES asked other inmates to include Janusz "Hollywood" DOBROWOLSKI if he was interested in buying bags of Fentanyl for commissary food items. CS-01 reported that Juan "JR" TORRES then went with Allen RHOADES into housing cell 1, and while inside of Allen RHOADES housing cell 1, CS-01 saw that Allen RHOADES had a sandwich bag with a large amount of white and blue Fentanyl bags inside of the sandwich bag. During the transaction Juan "JR" TORRES was shown and given white wax bags stamped "Game Over", while being handed the Fentanyl, Allen RHOADES discussed the strength of the white Fentanyl bags describing the white Fentanyl bags stamped "Game Over" as being very powerful. CS-01 stated that Allen RHOADES also had a larger number of blue bags inside the sandwich bag but only delivered the white wax bags of Fentanyl stamped "Game Over" to Juan "JR" TORRES.

CS-01 stated that Juan "JR" TORRES with the white Fentanyl bags on him, walked to Janusz "Hollywood" DOBROWOLSKI and delivered the Fentanyl to him. As a payment for the Fentanyl CS-01 stated that Janusz "Hollywood" DOBROWOLSKI gave multiple commissary items to Juan "JR" TORRES from Janusz "Hollywood" DOBROWOLSKI's housing cell and the vending machine.

CS-01 later talked to inmates housed in housing cell 40 and learned from Jameel OGELSBY that he and his cellmate were given methamphetamine and Fentanyl from Allen RHOADES. Both inmates later discussed to CS-01 that they flushed the drugs before they were found by corrections Officers following Joshua Patterson's death.

CS-01 was familiar with the victim Joshua Patterson and knew that Joshua Patterson was known to have Subutex (Spit Backs) for sale. He / she further stated that they knew Joshua Patterson as a person who doesn't use drugs.

CS-01 stated that before Allen RHOADES got to A Module on July 26, 2022, that heroin and Fentanyl was not on Module A. CS-01 stated that he would have known if any drugs were on Module A before and after Allen RHOADES arrival to the module.

## CS-02 Interview Continued

CS-02 corroborated that they were also present when Janusz "Hollywood" DOBROWOLSKI was delivered bags of Fentanyl stamped "Game Over". These bags of Fentanyl were said to have been delivered directly to Janusz "Hollywood" DOBROWOLSKI by Juan "JR" TORRES. CS-02 stated that four white bags of Fentanyl stamped "Game Over" were delivered to Janusz

"Hollywood" DOBROWOLSKI for a payment of food from commissary. CS-02 stated that Janusz "Hollywood" DOBROWOLSKI first gave Juan "JR" TORRES commissary food from housing cell 36 then finished the payment for the Fentanyl bags by getting additional commissary food from the vending machine in Module A.

that the
DOBROWOLSKI's housing cell were the same bags they seen delivered by Juan "JR" TORRES to Janusz "Hollywood" DOBROWOLSKI on July 26, 2022.

### Allen RHOADES Housin  Cell 1 Search

While working on July 26, 2022, Corrections Officer Louis Ventureira was notified by CS-01, that Allen RHOADES inside of Module A housing cell 1 had a bag of drugs inside of the housing cell. Corrections Officer Louis Ventureira provided this information to Lieutenant Zach SHERMAN. Lieutenant Zach SHERMAN immediately removed Allen RHOADES from housing cell 1. Corrections Officer Louis Ventureira conducted a search of housing cell 1. During the search Corrections Officer Louis Ventureira located a brown paper bag identical to the bag Allen RHOADES was given in intake containing food. Inside of the bag was a yellow and black coffee bag identical to the bag of coffee given to Allen RHOADES from Mallet CLARK. Inside of the bag of coffee was a sandwich bag with a large amount of multiple blue Fentanyl bags and methamphetamine.



### Joshua Patterson Death

On July 27, 2022, at 3:44 a.m., while conducting a check on the inmates housed on Module A, Corrections Officer Wilcox looked inside of housing cell 39 and finds inmate Joshua Patterson leaning against the wall and no longer breathing. After opening the cell, life-saving efforts were administered in an attempt to save the life of Joshua Patterson. Joshua Patterson was transported to the Doylestown Health Doylestown Hospital.

Prison investigators searched the housing cell of Joshua Patterson (39) and located a white substance, plastic bag similar to the bags used to secure the wax bags of Fentanyl, and a homemade straw. The powder, although only a residue was tested and found to be positive for Fentanyl.

On August 1, 2022, Joshua Patterson was pronounced dead. Doctor Erica Williams of the Bucks County Coroner's Office reported the death was a result of complications from Fentanyl Intoxication.

### Janusz DOBROWOLSKI Cell Search

On July 28, 2022, Janusz DOBROWOLSKI's housing cell was searched. During the search Corrections Officers located 4 white wax bags with Fentanyl stamped "Game Over" inside of the housing cell. Janusz "Hollywood" DOBROWOLSKI confirmed that the bags of Fentanyl were his and that he received 4 bags of Fentanyl from another inmate while on Module A of the correctional Facility.



### CS-04 Interview

A person who will be listed as CS-04 was interviewed during this investigation. He / She does have a crimin falsi conviction and was incarcerated and in the area of the Restricted Housing Unit or the "Hole" after the death of Joshua Patterson with Allen RHOADES. CS-04 has been found to provide truthful information in not only this investigation but also in additional investigations that have been corroborated. During his / her interview CS-04 stated that he / she knew Joshua Patterson and identified him as "SMOKE". CS-04 told that when talking to Allen RHOADES, he had told him / her the he (Allen RHOADES) gave Joshua Patterson the "dope" that killed him. While talking to Allen RHOADES CS-04 said Allen RHOADES made the statement "RIP SMOKE, that nigga wanted dope, so I gave him dope, it aint my fault he died". Allen RHOADES further told CS-04 "They going to have to do an investigation, I am going to tell them that it wasn't my dope".

### Allen RHOADES Interview Continued

During his initial interview Allen RHOADES stated although he was not sure he believed that the Fentanyl he smuggled into the Bucks County Correctional Facility and eventually delivered to the inmates on A Module was delivered to Joshua Patterson and ingested by him eventually causing his death.

### CONCLUSION

Your Honor based on the information provided throughout this affidavit of probable cause your affiants believe that Allen RHOADES smuggled Fentanyl and methamphetamine into the Bucks County Correctional Facility namely onto Module A within the facility. Allen RHOADES as a result to having no money delivered the drugs to inmates housed on Module A for food, soda, coffee, Pinks (Sweet and Low sugars), and other commissary items. Inmates to include Mallet , "JR" TORRES, and Janusz "Hollywood" DOBROWOLSKI after receiving delivery of the drugs then delivered the drugs to inmates such as James MASSINO. In addition to the people mentioned throughout this affidavit of probable cause other inmates and witnesses were interviewed who also confirmed that Module A did not have any drugs available other then Subutex until Allen RHOADES arrival. Furthermore, the Fentanyl recovered from Module A following Allen RHOADES arrival and days after the death of Joshua Patterson was the identical white bags stamped "Game Over" and blue bags stamped "Avengers" that were located in the vehicle Allen RHOADES was arrested within just before his arrival to the Bucks County Correctional Facility. Allen RHOADES although changing his story multiple times and provided false statements throughout his interview did admit to having the Fentanyl and methamphetamine on him and delivering the drugs to the inmates. Allen RHOADES even when shown pictures of him delivering items to Joshua PATTERSON he continued to deny any contact with the victim. In conclusion Allen RHOADES had personal knowledge and identified during his interview that the Fentanyl Joshua Patterson used that caused his death was delivered to him inside of a clear zip lock bag containing a blue wax fentanyl bag with the stamp "Avengers".

Based on this information your affiants respectfully request that a warrant be issued in the name of the defendant Allen RHOADES for his involvement in the Death of Joshua Patterson and the delivery of drugs to not only Joshua Patterson but to the other inmate within he Bucks County Correctional Facility.

Affiant Signature   Date        Affiant Signature   Date        Affiant Signature   Date

1   A thority Signature        Date

Page 14 of 14

800.211.DEPO (3376)
EsquireSolutions.com

```
1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3    --------------------------------x
     VALERIA CORBIN, Administrator  : CIVIL ACTION
4    of the ESTATE OF JOSHUA          :
     PATTERSON,                       :
5          Plaintiff(s),              :
                                      :
6          v.                         :
                                      :
7    BUCKS COUNTY, et al.,            :
           Defendant(s).             : NO. 23-2784
8    --------------------------------x

9                     - - -
               February 13, 2024
10                    - - -

11         Videoteleconferenced Deposition of

12   STEFANIE ULMER, held remotely via Zoom, by

13   agreement of all parties, beginning at 12:48

14   p.m., on the above date, before Denise D.

15   Bach, a Registered Professional Reporter,

16   Certified Court Reporter, License No.

17   XI0003990, and Notary Public.

18

19

20

21
               ESQUIRE DEPOSITION SOLUTIONS
22                1835 Market Street
                      Suite 555
23          Philadelphia, Pennsylvania 19103
                   (215) 988-9191
24
```



STEFANIE ULMER                                    February 13, 2024
CORBIN V. BUCKS COUNTY

```
 1   APPEARANCES:

 2          LEVIN & ZEIGER, LLP
            BY: BRIAN J. ZEIGER, ESQUIRE
 3          Suite 620
            1500 J.F.K. Boulevard
 4          Philadelphia, PA 19102
            215.825.5183
 5          zeiger@levinzeiger.com
            --Representing the Plaintiff(s)
 6
            BUCKS COUNTY LAW DEPARTMENT
 7          BY: TYLER B. BURNS,
            ASSISTANT COUNTY SOLICITOR
 8          and JACLYN GRIESER,
            DEPUTY COUNTY SOLICITOR
 9          5th Floor
            55 East Court Street
10          Doylestown, PA 18901
            215.348.6464
11          tbburns@buckscounty.org
            jgrieser@buckscounty.org
12          --Representing the Defendant(s)

13   ALSO PRESENT:

14          ASHLEY DAYOUB, Litigation Paralegal,
            Bucks County
15

16

17

18

19

20

21

22

23

24
```



STEFANIE ULMER                                    February 13, 2024
CORBIN V. BUCKS COUNTY

1                        I  N  D  E  X

2   WITNESS                                    PAGE
      STEFANIE ULMER
3         Mr. Zeiger                           5, 20
          Mr. Burns                            17
4

5                 E  X  H  I  B  I  T  S

6   MARKED              DESCRIPTION              PAGE

7            (NO EXHIBITS WERE MARKED.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



STEFANIE ULMER
CORBIN V. BUCKS COUNTY

February 13, 2024

```
 1                DEPOSITION SUPPORT INDEX

 2

 3        DIRECTION TO WITNESS NOT TO ANSWER

 4    Page   Line        Page   Line      Page   Line

 5      (NONE)

 6

 7

 8        REQUEST FOR PRODUCTION OF DOCUMENTS

 9    Page   Line        Page   Line      Page   Line

10      (NONE)

11

12

13                   STIPULATIONS

14    Page   Line        Page   Line      Page   Line

15       5      7

16

17

18                 QUESTIONS MARKED

19    Page   Line        Page   Line      Page   Line

20      (NONE)

21

22

23

24
```



```
 1                    STEFANIE ULMER, having been first
 2     duly sworn or affirmed, was examined and
 3     testified as follows:
 4                    MR. ZEIGER:  Usual stipulations?
 5                    MR. BURNS:  Yes.
 6                            -   -   -
 7                    (It is hereby stipulated and
 8     agreed by and among counsel that signing,
 9     sealing, filing and certification are waived;
10     and that all objections, except as to the form
11     of questions, are reserved until the time of
12     trial.)
13                            -   -   -
14                       EXAMINATION
15                            -   -   -
16     BY MR. ZEIGER:
17          Q.    Good afternoon, Officer.
18          A.    Good afternoon.
19          Q.    Thank you for being here today.
20     I see you're wearing a uniform.  Are you
21     currently a correction officer at the Bucks
22     County prison?
23          A.    Yes.
24          Q.    In July of 2022, were you also a
```



STEFANIE ULMER                                February 13, 2024
CORBIN V. BUCKS COUNTY

1  correction officer at the Bucks County prison?

2         A.    Yes.

3         Q.    And at that time, in July of

4  2022, what was your assignment at the Bucks

5  County prison?

6         A.    I'm not sure.

7         Q.    Okay.  On July 26th of 2022, if I

8  told you you were -- July 25th or 26th of

9  2022, you were working in reception or

10 receiving, would that refresh your memory?

11        A.    Yes.

12        Q.    Okay.  And do you recall working

13 with Officer Atiles at that time?

14        A.    Yes.

15        Q.    And was he your partner that day

16 or it doesn't really work that way in

17 reception?

18        A.    Yes, he was my partner.

19        Q.    And was there another Officer

20 Fabiani working at that time?

21        A.    That's what they're saying.  But

22 I don't remember seeing him.

23        Q.    Okay.  No problem.

24              And so, you know, Officer



 1 | Fabiani, I believe, I'm not going to have the
 2 | opportunity to depose him, and I understand
 3 | that, so can you -- I normally wouldn't ask
 4 | you this, but can you give a greater
 5 | explanation as to why, if the paperwork's
 6 | saying he was there and you're saying "I don't
 7 | remember it," like what's going on in your
 8 | mind?
 9 |        A.     He could have been in the back
10 | room.  Like there's three different positions
11 | he could have been in in reception.  He could
12 | have been in the back room.  I'm just really
13 | not sure.
14 |        Q.     And at that time period in
15 | history, what was his role at the Bucks County
16 | prison?
17 |        A.     Corrections officer.
18 |        Q.     But, I mean, did he work in
19 | reception with you and Officer Atiles at that
20 | time, from your memory?
21 |        A.     I'm not sure.
22 |        Q.     Okay.  Do you know at all what
23 | his role and responsibility would have been at
24 | that time period?



STEFANIE ULMER                              February 13, 2024
CORBIN V. BUCKS COUNTY

1          A.      No.

2          Q.      Okay.  Is there some officer

3    called like a special, they have like special

4    assignment?  Have you ever heard that phrase?

5          A.      Yeah, he's an officer that can be

6    put anywhere.

7          Q.      And that's all it means?

8          A.      Yeah.

9          Q.      They can just be put anywhere.

10   It's nothing more than that?

11         A.      No.  It's just like an officer on

12   the floor.

13         Q.      They don't have a higher rank or

14   more say or anything like that?

15         A.      No.

16         Q.      And the day of the incident we're

17   here for today, do you remember having an

18   interaction with Inmate Rhoades?

19         A.      Yes.  I booked him.

20         Q.      Okay.  What does that mean that

21   you booked him?

22         A.      I put him through our intake

23   process.  Was a part of it at least.

24         Q.      And then at some point after



STEFANIE ULMER                                    February 13, 2024
CORBIN V. BUCKS COUNTY

1    that, was he to be searched?

2          A.    He gets pat-searched when he

3    comes into the jail with the constables.  Then

4    we'll put him through the booking process,

5    which is asking questions.  And then he'll be

6    eventually be stripped out with an unclothed

7    body search and put into a jumper.

8          Q.    After he's done the strip search,

9    where does he go next?

10         A.    Either back to the block or back

11   into one of the holding cells.

12         Q.    And the holding cell would have

13   been a different holding cell or the same

14   holding cell he originally came from?

15         A.    It depends; if reception is busy,

16   if it's empty.  It's all based on that.

17         Q.    Okay.  And do you recall if

18   when -- if when -- do you recall who searched

19   Inmate Rhoades?

20         A.    With the unclothed body search?

21         Q.    Yes.

22         A.    It would have to be Officer

23   Atiles.  I'm a female.  I can't do anything

24   with a male inmate.



STEFANIE ULMER                                February 13, 2024
CORBIN V. BUCKS COUNTY

1          Q.     Officer Ulmer, I understand all

2     these answers.  I have to make a record with

3     the court reporter.  I know that's your answer

4     before I ask the question.  I mean that very

5     respectfully.

6          A.     Fine.

7          Q.     So, when Mr. Rhoades was being

8     searched by Officer Atiles, where were you?

9          A.     Responding to a code 99 on a

10    different block.

11         Q.     Can you explain, what's a code

12    99?

13         A.     It's an emergency, either officer

14    down, there's a fight between two inmates, an

15    officer needs assistance.

16         Q.     Okay.  And how many years have

17    you been a corrections officer?

18         A.     Three.

19         Q.     Okay.  And during that time, how

20    many code 99s would you say come up in your

21    shifts?

22         A.     Maybe once a week.  It depends.

23    Depends on the time.

24         Q.     So, once a week.  So, if you've



STEFANIE ULMER                                    February 13, 2024
CORBIN V. BUCKS COUNTY

```
 1   been a correction officer for three years,
 2   maybe like 150 have come up?
 3           A.     Sure.
 4           Q.     And so it's somewhat routine
 5   then?
 6           A.     Yes.
 7           Q.     Okay.  And so do you know, is
 8   there any policy or procedure for when that
 9   comes up to make sure there's additional
10   coverage at reception?
11           A.     No.  So, if there was three of us
12   up there -- there always has to be at least
13   two of us.  If the code is closer to
14   reception, which we have two blocks that are
15   close to reception, which is foxtrot and
16   hotel, one of us would respond.
17                  But, at that time, foxtrot was a
18   female block, so being -- me being the female,
19   I responded to the code.
20           Q.     And so then there was only one
21   correction officer left in reception?
22           A.     Yes.  Should have been.  Or
23   possibly two.
24           Q.     You only recall Officer Atiles
```



STEFANIE ULMER                                February 13, 2024
CORBIN V. BUCKS COUNTY

 1   being there, right?
 2          A.     Yes.
 3          Q.     I beg your pardon.  This working
 4   from home thing's terrible.
 5                 And you -- now I've lost my train
 6   of thought.  I'm sorry, Officer Ulmer.
 7          A.     You're fine.
 8          Q.     You testified a couple questions
 9   ago that there's always supposed to be two
10   officers in the reception area.
11                 Right?
12          A.     Yes, unless there's an emergency.
13          Q.     Right.  Is that a written policy
14   or just a custom?
15          A.     I'm not really sure.
16          Q.     Okay.  And you also testified
17   that you don't recall seeing Officer Fabiani
18   working during this time period, correct?
19          A.     I do not, yeah.
20          Q.     Okay.  There was an emergency in
21   either foxtrot or hotel modules and that
22   emergency was a female block.  Obviously
23   you're female, so you responded to that as the
24   emergency officer.



STEFANIE ULMER                              February 13, 2024
CORBIN V. BUCKS COUNTY

```
 1                    Correct?
 2          A.      Yes.
 3          Q.      Okay.  Now, I remember my train
 4   of thought.
 5                    So, now that left Officer Atiles
 6   alone in reception, correct?
 7          A.      Yes.
 8          Q.      I didn't hear you.
 9          A.      Yes.
10          Q.      Okay.  And so would you say that
11   was in violation of the policy or not?
12          A.      No.
13          Q.      Okay.  Did you -- did you later
14   learn that Inmate Rhoades was able to bring
15   narcotics into the prison during that shift?
16          A.      Not that day.  I learned about it
17   maybe a day after, two days after.
18          Q.      Okay.  And were you able to read
19   the investigation report?
20          A.      No.
21          Q.      But you do have some knowledge of
22   it happening, right?
23          A.      Yeah, I heard about what
24   happened, yes.
```



STEFANIE ULMER                                    February 13, 2024
CORBIN V. BUCKS COUNTY

1        Q.      Do you think he did not bring
2   narcotics into the prison during the shift
3   when you were working that day?
4        A.      I'm not sure.  I don't recall
5   seeing it.
6        Q.      Okay.  Do you think in your role
7   and responsibility on that day that you did
8   anything wrong?
9        A.      No.
10       Q.      Do you think you violated any of
11  the policies?
12       A.      No.
13       Q.      Okay.  Do you think Officer
14  Atiles did anything wrong?
15       A.      I couldn't say.  I'm not sure.
16       Q.      Why not?
17       A.      I don't know how he did his
18  unclothed body search.  I don't know any of
19  that.  I'm not back there, so --
20       Q.      Okay.  To your knowledge, do you
21  know if Officer Atiles violated any of the
22  policies --
23       A.      No.
24       Q.      -- in regard to the search of Mr.



STEFANIE ULMER                                February 13, 2024
CORBIN V. BUCKS COUNTY

1   Rhoades?

2          A.     No.

3          Q.     Have you ever heard the phrase

4   "clean cell"?

5          A.     Yes.  It's a reception term.

6          Q.     What does that mean?

7          A.     When the inmates come in, they'll

8   get put into a cell in their street clothes

9   still.  That's considered a dirty cell.  When

10  they come out, it gets checked and then that's

11  considered a clean cell.

12              But the inmate that you're just

13  stripping out doesn't usually go back into it.

14         Q.     Where would they go?

15         A.     They would go into a different

16  one, or they would go back immediately to the

17  block that they're housed on.

18         Q.     And why would they not go back

19  into that dirty cell?

20         A.     Because if we didn't check it,

21  then we don't know if anything was in there.

22         Q.     Right.  And if an inmate were to

23  go back to the dirty cell, would that be some

24  kind of violation of the policy or the custom?



1      A.      Yeah, I mean, we typically
2   wouldn't allow that, yes.
3      Q.      And if it happens, that would be
4   a mistake?
5      A.      Yes.
6      Q.      And if you found out later that
7   that's how narcotics were smuggled into the
8   prison, would you agree that the mistake
9   caused the narcotics to come into the prison?
10      A.      No, not necessarily.
11      Q.      Why not?  Explain your answer.
12      A.      I mean, I don't know what
13   happened.  I wasn't in there for it.
14      Q.      I wasn't talking about this case,
15   per se, I'm talking about in general.
16      A.      Yeah.
17      Q.      If you learn -- sorry, I don't
18   mean to interrupt you.
19      A.      No, you're fine.
20              Yes, technically, it would be
21   considered a mistake, a breakdown of something
22   happening.
23      Q.      Okay.
24              MR. ZEIGER:  I have nothing



STEFANIE ULMER                                    February 13, 2024
CORBIN V. BUCKS COUNTY

```
 1   further.
 2                   -   -   -
 3                EXAMINATION
 4                   -   -   -
 5   BY MR. BURNS:
 6        Q.    Officer Ulmer, just real quick
 7   here, I'm going to share my screen for you.
 8             Before, before we do that, are
 9   you familiar with what Officer Fabiani looks
10   like?
11        A.    Yes.
12             MR. BURNS:  And, Brian, for your
13   reference, what I'm about to show Officer
14   Ulmer is Video Number 8, 7/26/22.
15   BY MR. BURNS:
16        Q.    So, this is a video from the
17   reception, this is approximately 8:04 in the
18   morning on July 26th as it says here in the
19   corner.
20             Do you recognize this officer
21   here?
22        A.    Yes, that's Officer Fabiani.
23        Q.    Okay.  So, Officer Fabiani is
24   indeed working in the reception at this time?
```



STEFANIE ULMER                                February 13, 2024
CORBIN V. BUCKS COUNTY

```
1           A.      Yes.
2           Q.      Okay.  And then hold on one
3    second, I'm going to show you a different
4    video.
5                   MR. BURNS:  Brian, again, this --
6                   MR. ZEIGER:  I'm sorry, I'm
7    sorry, Tyler, it was the gentleman with the
8    white beard?
9                   MR. BURNS:  Yeah, with the
10   handlebar mustache.
11                  This is the same video as last
12   time, Brian.  This is Number 15.
13                  MR. ZEIGER:  Okay.
14   BY MR. BURNS:
15          Q.      Hold on one second.  I apologize
16   for the delay here.  I've just got to queue us
17   up to the right time here.
18                  All right.  I'm going to share my
19   screen again for you as well.  Okay.  Now, you
20   can't see you right now, but I'm going to
21   advance this shortly.  This is -- is this you
22   working in reception, Officer Ulmer, the
23   female opening the door?
24          A.      Yes.
```



```
 1              Q.     Okay.  And then this individual

 2     back here, this male officer, is he a

 3     reception officer?

 4              A.     He's a records officer.

 5              Q.     So, he doesn't work in reception?

 6              A.     No.

 7              Q.     Okay.  So, I just want you to pay

 8     attention to yourself and sort of your body

 9     language here in the next probably 20 seconds.

10              A.     Okay.

11              Q.     So, if you look there, you'll

12     kind of notice that you were peeking out,

13     looked back again, and then looks like you ran

14     off camera.

15                     Would that be you responding to

16     the code 99 that you referenced earlier?

17              A.     Yes.  I probably popped my head

18     out and popped my head back in to tell them I

19     was going, just so they knew.

20              Q.     Okay.  But for responding to that

21     code 99, you would have been in reception,

22     correct?

23              A.     Yes.

24              Q.     Okay.  So, it's fair to say that
```



1  an emergency, an exigent circumstance caused

2  you to be away from your post at that time?

3          A.    Yes.

4                MR. ZEIGER:  Objection.

5  BY MR. BURNS:

6          Q.    And you cannot control when

7  emergencies happen in the prison, correct?

8          A.    Cannot, no.

9                MR. BURNS:  Nothing further.

10                    -  -  -

11                FURTHER EXAMINATION

12                    -  -  -

13  BY MR. ZEIGER:

14          Q.    Do you agree on that last part of

15  the video that when you do that thing where

16  you sort of peek your head to let them know,

17  that the reception area is empty at that time,

18  right?

19          A.    With officers or inmates?

20          Q.    Officers.

21          A.    There's someone in there.

22  They're just in the back.

23          Q.    Understood.  But there's no one

24  sitting in that central --



STEFANIE ULMER
CORBIN V. BUCKS COUNTY

February 13, 2024

1      A.      No.

2      Q.      -- little area?

3      A.      Yes.

4      Q.      And now that you saw Officer

5   Fabiani, you agree he was there?

6      A.      Yes.

7      Q.      What was his role that day?

8      A.      He was probably in the back, the

9   back room, which is dealing with property and

10  everything else.  Me and Atiles were up front,

11  which would mean we would be booking people.

12     Q.      Okay.

13     A.      And then he helps out by dealing

14  with property and anything else.

15     Q.      So, Officer Fabiani had no

16  responsibility regarding search of inmates?

17     A.      I'm not sure.  It was either one

18  of them.  It could either be Atiles or

19  Fabiani.  I'm not sure which one handled it in

20  that situation.  There's always two males up

21  there.  Either one of them can deal with it.

22              MR. ZEIGER:  All right.  I have

23  nothing further.

24              MR. BURNS:  Nothing further from



STEFANIE ULMER                                    February 13, 2024
CORBIN V. BUCKS COUNTY

1    us as well.  Thank you very much for your

2    time, Officer.  You can leave and go back to

3    your regular shift.  We greatly appreciate

4    your time.

5                    THE WITNESS:  Thank you.

6                    (Videoteleconferenced Deposition

7    is concluded at 1:02 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



STEFANIE ULMER                                    February 13, 2024
CORBIN V. BUCKS COUNTY

```
1              C E R T I F I C A T E

2              I hereby certify that the

3   proceedings and evidence noted are contained

4   fully and accurately in the notes taken by me

5   on the deposition of the above matter, and

6   that this is a correct transcript of the same.

7

8

9

10              Denise D. Bach

11              DENISE D. BACH,
                Registered Professional
12              Reporter
                Certified Court Reporter
13              Notary Public - Expires
                March 2026
14
                DATE OUT:  February 23, 2024
15

16

17

18

19              (The foregoing certification of

20  this transcript does not apply to any

21  reproduction of the same by any means, unless

22  under the direct control and/or supervision of

23  the certifying reporter.)

24
```







STEFANIE ULMER
CORBIN V. BUCKS COUNTY

February 13, 2024



STEFANIE ULMER
CORBIN V. BUCKS COUNTY

February 13, 2024



STEFANIE ULMER
CORBIN V. BUCKS COUNTY

February 13, 2024



STEFANIE ULMER
CORBIN V. BUCKS COUNTY

February 13, 2024





800.211.DEPO (3376)
*EsquireSolutions.com*

1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3    -------------------------------x
     VALERIA CORBIN, Administrator  : CIVIL ACTION
4    of the ESTATE OF JOSHUA        :
     PATTERSON,                     :
5          Plaintiff(s),            :
                                    :
6          v.                       :
                                    :
7    BUCKS COUNTY, et al.,          :
           Defendant(s).           : NO. 23-2784
8    -------------------------------x

9                    - - -
                February 13, 2024
10                   - - -

11        Videoteleconferenced Deposition of

12   JULIO ATILES, held remotely via Zoom, by

13   agreement of all parties, beginning at 12:07

14   p.m., on the above date, before Denise D.

15   Bach, a Registered Professional Reporter,

16   Certified Court Reporter, License No.

17   XI0003990, and Notary Public.

18

19

20

21
              ESQUIRE DEPOSITION SOLUTIONS
22                 1835 Market Street
                      Suite 555
23           Philadelphia, Pennsylvania 19103
                    (215) 988-9191

24



JULIO ATILES                                    February 13, 2024
CORBIN V. BUCKS COUNTY

```
 1    APPEARANCES:

 2            LEVIN & ZEIGER, LLP
              BY: BRIAN J. ZEIGER, ESQUIRE
 3            Suite 620
              1500 J.F.K. Boulevard
 4            Philadelphia, PA 19102
              215.825.5183
 5            zeiger@levinzeiger.com
              --Representing the Plaintiff(s)
 6
              BUCKS COUNTY LAW DEPARTMENT
 7            BY: TYLER B. BURNS,
              ASSISTANT COUNTY SOLICITOR
 8            and JACLYN GRIESER,
              DEPUTY COUNTY SOLICITOR
 9            5th Floor
              55 East Court Street
10            Doylestown, PA 18901
              215.348.6464
11            tbburns@buckscounty.org
              jgrieser@buckscounty.org
12            --Representing the Defendant(s)

13    ALSO PRESENT:

14            ASHLEY DAYOUB, Litigation Paralegal,
              Bucks County
15

16

17

18

19

20

21

22

23

24
```



```
 1                    I   N   D   E   X

 2   WITNESS                                  PAGE
      JULIO ATILES
 3        Mr. Zeiger                          5, 44
          Mr. Burns                           37
 4

 5                  E   X   H   I   B   I   T   S

 6   MARKED                 DESCRIPTION            PAGE

 7                 (NO EXHIBITS WERE MARKED.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```



JULIO ATILES
CORBIN V. BUCKS COUNTY

February 13, 2024

```
1              DEPOSITION SUPPORT INDEX
2

3        DIRECTION TO WITNESS NOT TO ANSWER
4    Page   Line        Page   Line        Page   Line
5      (NONE)
6

7

8       REQUEST FOR PRODUCTION OF DOCUMENTS
9    Page   Line        Page   Line        Page   Line
10     (NONE)
11

12

13                  STIPULATIONS
14   Page   Line        Page   Line        Page   Line
15      5      7
16

17

18                QUESTIONS MARKED
19   Page   Line        Page   Line        Page   Line
20     (NONE)
21

22

23

24
```



```
 1                  JULIO ATILES, having been first
 2    duly sworn or affirmed, was examined and
 3    testified as follows:
 4                  MR. ZEIGER:  Usual stipulations?
 5                  MR. BURNS:  Yes.
 6                       -  -  -
 7                  (It is hereby stipulated and
 8    agreed by and among counsel that signing,
 9    sealing, filing and certification are waived;
10    and that all objections, except as to the form
11    of questions, are reserved until the time of
12    trial.)
13                       -  -  -
14                  EXAMINATION
15                       -  -  -
16    BY MR. ZEIGER:
17         Q.     Good morning, Officer.
18         A.     Good morning, sir.
19         Q.     Are you currently working as a
20    correction officer at the Bucks County prison?
21         A.     Yes, sir.
22         Q.     And in regard to the incident
23    that we're here for today, July of 2022, were
24    you working as a guard at the Bucks County
```



1  prison at that time period?

2          A.     Yes, sir.

3          Q.     Okay.  And are you familiar with

4  the incident we're here for today?

5          A.     Yes, sir.

6          Q.     Okay.  And there was -- at that

7  time, correct me if I am wrong, you were

8  working in the capacity of like reception,

9  like when someone first came into the jail, is

10 that right?

11         A.     Yes, sir, intake, yes.

12         Q.     Okay.  And did you later learn

13 that there was an inmate named Allen Rhoades

14 that you searched?

15         A.     Yes, sir.

16         Q.     In regard to that incident, do

17 you think you did anything wrong?

18         A.     No, sir.

19         Q.     Okay.  If I told you that it

20 turns out that Allen Rhoades smuggles

21 narcotics into the prison, do you accept

22 responsibility for not properly searching him

23 for that incident?

24         A.     I searched him, sir.  I



1   pat-searched him and I give him unclothed body

2   search.

3        Q.    So, if he still managed to bring

4   narcotics into the facility, do you accept

5   responsibility for that?

6        A.    No, sir.

7        Q.    Okay.  So, did you learn later

8   that he, in fact, did bring narcotics into the

9   facility?

10        A.    I did hear about the incident,

11   yes.  I was kind of wondering how he did that

12   when I searched him, and then I later found

13   out.

14        Q.    Okay.  And based -- and how many

15   years have you been a corrections officer?

16        A.    It will be 19 years this summer.

17        Q.    Okay.  That's a long time.

18             And so, based on what you found

19   out later and based on what you know your own

20   actions are, do you think anyone did anything

21   wrong in regard to him being able to bring

22   narcotics into the Bucks County prison?

23        A.    Not in terms of the intake area,

24   sir, no.



JULIO ATILES                                  February 13, 2024
CORBIN V. BUCKS COUNTY

1        Q.     Okay.  In terms of where?  I

2   mean, someone had to have done something

3   wrong, right, if an inmate was able to bring

4   narcotics into a prison; you would agree with

5   that?

6        A.     Something happened, yes,

7   something happened in the system somewhere,

8   yes.

9        Q.     So, what's your evaluation?

10       A.     I mean, he should have been

11  properly searched before he came into our

12  jail.  Once he comes into our prison, we do

13  what we call a pat-down search, which is

14  mainly looking for weapons or anything that

15  sticks out of the ordinary, like a bulge in a

16  sock area or something hard in the waist.

17            Once that gets done, we do an

18  unclothed body search where we look more for

19  contraband; that's more of a checking his

20  privates, checking his body out, things of

21  that nature.

22       Q.     So, it seems like the answer to

23  my question of did anyone do anything wrong,

24  your answer in what you just said was the



1  officers that brought him to the prison didn't

2  properly search him.

3           Is that -- is that your answer?

4      A.    He should have been searched, if

5  they searched him.  I'm not sure if they did

6  or not, but he should have been searched and

7  then he's searched again by us.

8      Q.    Okay.  But, really, their

9  failures have nothing -- I mean, you're

10  supposed to re-search the guy when he comes

11  in, right?

12      A.    We ask him questions about

13  himself, yes.

14      Q.    Right.  And then you just gave

15  the whole description of how you search him

16  when he comes in, right?

17      A.    Yes.

18      Q.    Because your training is not to

19  rely on what the law enforcement officers do

20  before he gets to the prison, right?

21      A.    No, that's not our training, no.

22      Q.    Right.  So, you can't, you can't

23  put this on them, can you?

24      A.    No.



JULIO ATILES                              February 13, 2024
CORBIN V. BUCKS COUNTY

1        Q.    Okay.  So, therefore, once he

2    gets to the prison and he has narcotics on

3    him, in your evaluation of what happened, who

4    made a mistake here?

5        A.    I'm not sure.

6        Q.    Do you think no one at the Bucks

7    County prison made a mistake in regard to this

8    incident?

9        A.    In terms of the intake area, I

10   think we did everything that we're supposed to

11   do.

12       Q.    Okay.  When you say "we," who is

13   we?

14       A.    Me and my partners at the time,

15   my partner at the time.

16       Q.    Who were they?

17       A.    I had one partner, Officer Ulmer.

18   I think Ulmer.

19       Q.    Okay.  And was anyone else

20   working in intake at that time?

21       A.    It was just us two, but

22   occasionally a records officer would come in.

23   We had a case manager supervisor also in the

24   general area, but it was just me and Ulmer



1  were the actual officers assigned to that

2  post.

3          Q.    Okay.  If I told that you there

4  was another officer at the time named Fabiani,

5  do you know who that person is or was?

6          A.    I know who Officer Fabiani was,

7  is.

8          Q.    Okay.  And, if you know, was he

9  or she working on that same shift with you and

10  Officer Ulmer?

11          A.    I don't recall Officer Fabiani.

12          Q.    Okay.  Do you recall, did Officer

13  Fabiani have any contact with Inmate Rhoades?

14          A.    I don't -- I'm not sure, sir.

15          Q.    Okay.  Do you know, did Officer

16  Ulmer have any contact with Mr. Rhoades?

17          A.    Not sure, other than possibly

18  processing him, but other than that, no, I

19  don't think so.  Not sure.

20          Q.    Okay.  Do you know, were you

21  written up or disciplined or whatever terms

22  y'all use at the Bucks County prison in regard

23  to Mr. Rhoades bringing narcotics into the

24  prison on or about July 26th of 2022?



JULIO ATILES                                    February 13, 2024
CORBIN V. BUCKS COUNTY

1              A.      No, sir.

2              Q.      Were you interviewed by anyone in

3    regard to what you did or didn't do on

4    July 26th of 2022?

5              A.      No, sir.

6              Q.      Okay.  And so you haven't made

7    any statements, either written or recorded,

8    before today?

9              A.      No, sir, none.  I didn't even

10   know about all of this until recently.

11             Q.      Okay.  I understand.

12                     All right.  So, now let's sort of

13   go back to the beginning of this.  Okay?  So,

14   your -- the area where someone's brought into

15   intake, what's that called at the Bucks County

16   prison?

17             A.      The reception area.

18             Q.      I'm sorry, I didn't hear you.

19             A.      I'm sorry, it's called the

20   reception area.

21             Q.      Okay.  And you were assigned to

22   the reception area?

23             A.      Yes, sir.

24             Q.      Okay.  With Officer Ulmer?



JULIO ATILES                                      February 13, 2024
CORBIN V. BUCKS COUNTY

 1          A.      Yes.
 2          Q.      And as far as you know, there
 3   were no other correction officers that were
 4   assigned at that time?
 5          A.      Not that I recall, sir, no.
 6          Q.      And what were your roles and
 7   responsibilities for yourself at that time?
 8          A.      At that time, I was the officer
 9   that does the unclothed body searches.  I put
10   away the property.  If it's a male officer
11   coming into the unit -- I mean, I'm sorry, a
12   male inmate coming into the unit, I'll give
13   them a pat-down.
14               And, if needed, I would process
15   them.  If we have a couple people coming in, I
16   would assist with the processing process.
17          Q.      Okay.  What is that, what's the
18   processing process?
19          A.      When they come in, they get
20   interviewed, they're asked questions about
21   their history, their family.  They get
22   fingerprinted.  They get a picture taken of
23   them.  It sort of processes them into the
24   system.



1     Q.     And they're searched before or

2  after that?

3     A.     They're given a pat-down before

4  that, before they get put into the holding

5  cell, they're given a pat-down.  They sit in

6  the holding cell.  Once the officer is ready,

7  we'll bring them out, we'll process them.

8          Once they're finished

9  fingerprinting, photo, process is done, I take

10  them back to the shower area for the unclothed

11  body search.

12     Q.     Does everyone get an unclothed

13  body search?

14     A.     All males that came in that day

15  should have been given an unclothed body

16  search by me, yes.

17     Q.     Why is that?

18     A.     I have to search the men.  My

19  partner would search any of the females that

20  would came in.

21     Q.     Ulmer?

22     A.     Yes.  She would -- if we had any

23  females that came in at the time, she would

24  have to do them.



JULIO ATILES                                          February 13, 2024
CORBIN V. BUCKS COUNTY

```
1         Q.     I see.  But I mean to say, every

2    one gets a strip search?

3         A.     Yes, sir.  Unless we get

4    instructions by a supervisor, yes, everybody

5    gets a strip search.

6         Q.     Okay.  There's nothing about like

7    classifications, like, hey, you know, these

8    people are classified a certain way, they

9    don't get strip-searched?

10        A.     That's the only -- every once in

11   a while we'll get a notification from a

12   supervisor, like certain civil cases or

13   something, that we're told that they cannot be

14   searched.  But it's rare, it's very rare.

15        Q.     I see.  Like civil contempt?

16        A.     Something like that, sir, yes.

17   And they're telling us, they'll tell us

18   personally do not give this person an

19   unclothed body search.  Hand them their

20   clothes, tell them to get dressed.  But,

21   again, that's a rare occasion.

22        Q.     The rest of the people that come

23   in, the policy is just strip search them?

24        A.     Yes, sir.
```



JULIO ATILES                                    February 13, 2024
CORBIN V. BUCKS COUNTY

1          Q.     And what if you wanted to do a

2    cavity search?

3          A.     We're not instructed to do that.

4    That would have to go through supervisors and

5    then the medical staff.  But in my time there,

6    I've never, never heard of that in my 19 years

7    there.

8          Q.     Okay.  Is there ever a time where

9    you need a special warrant to search somebody?

10         A.     Not that I've ever gotten, sir,

11   or ever heard of.

12         Q.     Have you ever had a case where

13   you did try to obtain a warrant in order to do

14   some kind of more invasive search?

15         A.     No, sir.

16         Q.     Okay.  And so when you do the

17   cursory pat-down search, what do you actually

18   do?

19         A.     The initial pat-down search is

20   we're checking from the neck down and, again,

21   like I said, the primary search is we're

22   looking for anything out of the ordinary, like

23   a weapon, a bulge in a sock area, a bulge in

24   the waistline.



JULIO ATILES                                February 13, 2024
CORBIN V. BUCKS COUNTY

```
 1              We've had guys come in with
 2   knives on them and we usually catch that
 3   during a pat search.  So, it's more like for
 4   weapons and anything out of the ordinary.
 5          Q.    Okay.  All right.  And how long
 6   have you been assigned this post?
 7          A.    Off and on for my whole time
 8   there, for 18 years off and on.
 9          Q.    Okay.  And then after they're
10   processed and you do the unclothed search,
11   what's the process for that?
12          A.    We get down to the back of the
13   shower area, one at a time we give them
14   instructions to start handing me their
15   clothing; if it's a hat, we start with the
16   hat, we'll search the hat.  We search one
17   piece of clothing at a time.
18              Once the clothes are searched, we
19   put it inside a property bag and now we
20   instruct the inmate, give them instructions to
21   looking into their mouth, turn their heads,
22   looking behind their ears, looking at their
23   arms, lifting up their private area, lifting
24   up their feet, turn around, spreading their
```



 1   cheeks, giving us three coughs.

 2                    We have to look at all that.

 3          Q.      Okay.  Are you in there alone

 4   with the inmate or is someone else in there

 5   with you?

 6          A.      No, it's just me and the inmate

 7   in the shower area.

 8          Q.      Okay.  And there's no video

 9   cameras there obviously?

10          A.      Not facing that area, no, sir.

11          Q.      Okay.  Understood.  No problem.

12                    And so when Mr. Rhoades came in,

13   do you recall, did you do all that to him?

14          A.      I do that to everyone, so I would

15   kind of say yes.

16          Q.      Okay.  Do you have a specific

17   memory of Mr. Rhoades coming in on the day in

18   question?

19          A.      No, sir.

20          Q.      Okay.  Did you later learn there

21   was some issue about some bag he brought in?

22          A.      Yes, I did hear about that later

23   on, yes.

24          Q.      Tell me about that, please.



JULIO ATILES                                    February 13, 2024
CORBIN V. BUCKS COUNTY

1          A.      I was informed of a gentleman

2     bringing in drugs and when I inquired on who

3     was the gentleman, what date did it happened,

4     they told me the date that it happened.  I'm

5     like, wait a minute, I was in intake that day.

6     So, how could it possibly happen?

7                  And then they informed me --

8     after an unclothed body search, I usually give

9     them instructions to go to what we called

10    holding cell number 6, which is the clean

11    cell, where once they've been searched and

12    they've been processed, they go inside the

13    cell.  I gave them instructions to go to

14    holding cell 6, I normally put away their

15    property and then I come and I lock him in the

16    cell.

17                 But what he did, what little I

18    seen on the camera, is he went to I guess

19    holding cell 1, picked up something, went

20    back, shoved it into his laundry bag and then

21    started to take it back to the unit with him

22    when he was actually escorted back to the

23    unit.

24          Q.     And is that the bag that the



1   narcotics were in?

2          A.    I would assume so, sir.

3          Q.    I see.  And so he was able to go

4   back in cell 1 before cell 6 and you didn't

5   see that?

6          A.    No, sir, I was in the back

7   putting away his property.

8          Q.    Okay.  And where would Ulmer have

9   been during that time period?

10         A.    She should have been at the front

11  desk, should have been at the front area.

12         Q.    And would she have been able to

13  see into cell 1 or cell 6 or see him moving

14  back to 1 or 6?

15         A.    She would be able to catch him

16  going into 1, yes.

17         Q.    Okay.  And she failed to do that

18  that day, right?

19         A.    She wasn't there at that moment.

20  I didn't know she wasn't there until after I

21  watched the video.

22         Q.    If you know, where was she?

23         A.    I have no idea where she was.  I

24  would assume a break, but I'm just assuming.



JULIO ATILES                                        February 13, 2024
CORBIN V. BUCKS COUNTY

1   I don't know.

2           Q.      If she was on break, you would

3   have been there alone?

4           A.      Yes.

5           Q.      Officer Fabiani wouldn't have

6   come over to relieve her?

7           A.      If needed, he would have, yes.

8   If I was sitting there by myself and all of a

9   sudden, let's say, two more inmates came in, I

10  would need assistance.  Somebody would come

11  down and help me.  I would call a supervisor

12  and say, hey, I need assistance down here, I

13  have two guys that just came in, I'm by

14  myself.

15          Q.      And if you know, at that time,

16  was that Officer Fabiani's role?

17          A.      I'm not sure, sir.

18          Q.      Okay.  I understand he's no

19  longer working, right?

20          A.      Yes, correct.

21          Q.      So, I'm not going to be able to

22  depose him, I'm not going to be able to do

23  with him like I'm doing with you.

24                  Do you understand?



1          A.     Yes, sir.

2          Q.     So, do you know at that time what

3    Officer Fabiani's duties were that day?  Was

4    he working?

5          A.     I'm not even sure if he was

6    working that day, but if he was there, he

7    probably was an SA, special assignment

8    officer.

9          Q.     What does that mean?

10         A.     That's an officer that we have on

11   the floor for like escorts, emergencies.  They

12   sort of assist on the floor and, like, if we

13   needed assistance, we called for a special

14   assignment officer to assist us.

15         Q.     Okay.  And that day, do you

16   recall that day did you or Officer Ulmer, if

17   you know, call for special assistance?

18         A.     I didn't call.

19         Q.     Okay.  Very good.  I understand.

20                I'm just going to have a moment,

21   I'm going to pull a document up on the screen.

22   Okay?  I'm working from home today because of

23   the snow, it's much more difficult to do this.

24   So, please bear with me.  Thank you.



JULIO ATILES                                    February 13, 2024
CORBIN V. BUCKS COUNTY

```
1              A.      Okay.

2              Q.      Can you see this?

3              A.      I got bad vision.  I can barely

4     see it, sir.

5              Q.      I'm going to try to blow it up.

6     Okay.  Again, it's pretty tough to do from

7     home.

8                      Is that any better?

9              A.      If you give me a minute, I'll try

10    too grab some glasses.

11             Q.      Hold on, one more time.  Let me

12    see if I can -- how about now?

13             A.      It's still a little blurry.  Give

14    me a quick second, I'll get my glasses.

15             Q.      Sure.  No problem.

16             A.      One quick second, I have to get

17    reading glasses.

18             Q.      For the record, it's page 149.

19             A.      Okay.  That's a lot better.

20             Q.      Excellent.  Do you see this says

21    Bucks County Department of Corrections

22    Standard Operating Procedures and Guidelines,

23    Title: Searches, Inmates and Staff, Pat

24    Searches and Unclothed Searches," do you see
```



```
 1   that?
 2          A.     Yes.
 3          Q.     It's Section A-4.20, do you see
 4   that?
 5          A.     Yes.
 6          Q.     Do you know what this policy
 7   pertains to?
 8          A.     No, sir.
 9          Q.     Are you familiar with this
10   policy?
11          A.     No, sir.
12          Q.     Okay.  So, this policy is not
13   about intake, therefore?
14          A.     Not to my knowledge, sir.
15          Q.     Right.  So, this policy is just
16   like the general -- the general policy of
17   search, inmate and staff, pat searches and
18   unclothed searches.
19                 Is that true?
20          A.     I don't know the policy, sir,
21   offhand.
22          Q.     Okay.  How many times a year do
23   you go to training?
24          A.     We used to go -- we used to do
```



JULIO ATILES                                February 13, 2024
CORBIN V. BUCKS COUNTY

1   on-service training twice a year.  They got

2   away with that -- got away from that I should

3   say.  Now we do online training.  That's every

4   -- almost quarterly now.

5           Q.    Okay.  And this policy, do you

6   recall at any of the trainings, has it ever

7   been reviewed with you?

8           A.    Not that I can recall, sir.

9           Q.    Okay.  I'm going to scroll down a

10  little bit here.  Just give me a moment here.

11          Okay.  Can you see this one?

12          A.    Blurry, but, yes, I can see it.

13          Q.    This is page 168.  And this is

14  the standard operating procedure called

15  "Reception Unit Officer," and this is Section

16  B-3.13.

17          Do you see that?

18          A.    Yes.

19          Q.    And it's fair to say that your

20  earlier answer said that you were the

21  reception unit officer on the day in question

22  that we're here to talk about today, correct?

23          A.    Yes, I was assigned to that post

24  today.



1        Q.     Are you familiar with this

2   policy?

3        A.     I don't know what the policy is

4   exactly.  Is it just standard reception?

5        Q.     I'm going to scroll down in a

6   minute, but, generally, like, and you can read

7   it or I'll read it to you, but what I mean is,

8   when you see this policy, Reception Unit

9   Officer, B-3.13, are you instantly familiar

10  with what this is?

11       A.     No, sir.

12       Q.     And at the training you've been

13  to over the years you've been a correction

14  officer, have you been shown this document,

15  you know, multiple times during your training?

16       A.     Yes, we're shown a lot of

17  document.  I don't remember this one in

18  particular, but, yeah, yes, we are shown a lot

19  of documents.

20       Q.     But you don't have a firsthand

21  knowledge of being shown this one?

22       A.     No, sir.

23       Q.     Okay.  I'm going to scroll down.

24  Okay?  We're on the same page, it says, "The



1   reception unit officer is responsible for

2   processing new commitments, discharges,

3   institutional transfers and court returns

4   without unnecessary delay ensuring that all

5   steps of these processes are complete."

6              So, you would agree, that was

7   your role on the day of what we're talking

8   about here, correct?

9        A.    Yes, sure.

10       Q.    "Reception unit officers will,

11  one, Have a working knowledge of, comply with

12  all existing post orders, policies, procedures

13  and directives, especially all emergency

14  procedures and assist the reception unit

15  supervisor as directed."

16             Is that true?

17       A.    Yes, sir.

18       Q.    You were not the supervisor that

19  day, were you?

20       A.    No, sir.

21       Q.    "Two, Be responsible for the

22  security, safety and cleanliness of this

23  post."

24             Is that true?



JULIO ATILES                                    February 13, 2024
CORBIN V. BUCKS COUNTY

1         A.      Yes, sir.

2         Q.      Okay.  "Three, Ensure the

3    reception unit remains free of contraband."

4                 Is that true?

5         A.      Yes, sir.

6         Q.      You agree that, on this day in

7    question, you violated Number 3, right?

8         A.      I don't agree with that, no.

9         Q.      Can you explain your answer?

10        A.      You're saying that do I agree if

11   we weren't free from contraband?  We didn't

12   know he had the -- I didn't -- we didn't know

13   he had the contraband.

14        Q.      I understand, but you gave a

15   whole explanation about doing the search and

16   having them go from, you know, cell 1 to the

17   back of the bathroom or shower and then going

18   to cell 6, and you do all that to prevent

19   someone from, you know, smuggling in narcotics

20   into the prison, right?

21        A.      Yes.  That's what the unclothed

22   body search is for, yes.

23        Q.      Right.  But that day it didn't

24   happen correctly and so narcotics were



```
 1   eventually smuggled into the prison, you

 2   learned that later.  Right?

 3          A.     Yes.

 4          Q.     Okay.  And so, therefore, do you

 5   agree that Number 3, that you violated Number

 6   3 here of this policy by not having the

 7   procedure go correctly on the day you searched

 8   Mr. Rhoades?

 9          A.     I didn't --

10                 MS. GRIESER:  Objection.

11                 THE WITNESS:  I didn't --

12                 MS. GRIESER:  Objection,

13   objection.  I think you're mischaracterizing

14   the testimony here.  He never -- this witness

15   never testified that anything was not done

16   correctly.

17                 MR. ZEIGER:  Okay.

18   BY MR. ZEIGER:

19          Q.     Let me go back then.  I'll try to

20   clarify it.

21                 You testified earlier, guys come

22   in, they're in cell number 1, correct?

23          A.     Yes.

24          Q.     And you take them into the shower
```



1    area and you do a strip search of that,

2    correct?

3            A.    Yes, sir.

4            Q.    And after that's over, you have

5    them go to a different cell other than number

6    1 so they can't go back to anything that was

7    in Cell Number 1, correct?

8            A.    Correct.

9            Q.    Okay.  And on the day in

10   question, you agree that Mr. Rhoades, upon

11   further review, was able to go back to cell 1

12   and retrieve an item from cell 1 and bring it

13   with him to cell 6, correct?

14           A.    Yes.

15           Q.    Okay.  And that item he put in

16   his laundry bag you said, right?

17           A.    It shows in the video that he put

18   something in his laundry bag, correct.

19           Q.    You later learned or later

20   believed that that was narcotics, correct?

21           A.    That's what I was told.

22           Q.    So, you agree on the day in

23   question that your normal methodology of

24   properly searching the inmate and not letting



1   him go back to cell 1, it didn't follow

2   through correctly with Mr. Rhoades, correct?

3          A.     Well, we searched him.  The

4   search was good.  He didn't follow the direct

5   order when I told him to go back holding cell

6   6.

7          Q.     Right.  And there was no other

8   officer there at the time that this happened,

9   right?

10         A.     No.

11         Q.     Right.  And so because Officer

12  Ulmer wasn't there, she couldn't observe him

13  go directly to cell 6, right?

14         A.     Yes.

15         Q.     So, on this day, with Mr.

16  Rhoades, the entire procedure, when someone

17  comes into the reception, wasn't properly

18  followed, correct?

19         A.     Other than the inmate going to

20  where he wasn't supposed to go, everything

21  else was done correctly.

22         Q.     Okay.  So, that one piece where

23  the inmate goes back to cell 1, the proper

24  procedure wasn't followed that day, right?



1         A.      That moment, yes.

2         Q.      Okay.  So, and as a result of

3   that, there were narcotics that were brought

4   into the Bucks County prison, right?

5         A.      As far as I know, yes, he went to

6   holding cell 1, picked up something, and may

7   have -- the video showed that he may have put

8   something in his bag, yes.  I don't know if it

9   was narcotics, but he put something in his

10  bag.

11        Q.      Well, you don't have any reason

12  to believe that there was anything other than

13  narcotics in that bag, do you?

14        A.      Could have been his lunch.

15  Sometimes they do take their lunch back with

16  him.

17        Q.      Okay.  You have no other evidence

18  of any other way that Mr. Rhoades brought

19  narcotics into the prison, do you?

20        A.      No, sir.

21        Q.      Okay.  And so based on that

22  entire analysis, do you agree that, therefore,

23  number 3 was violated that day, which is

24  "Ensure the reception unit remains free of



```
 1   contraband"?

 2        A.     I don't understand how I'm

 3   supposed to answer that.

 4        Q.     Okay.  Well, obviously if he

 5   brings narcotics into the prison when he first

 6   gets there, that's not a violation of this,

 7   right, because he brought it in to begin with,

 8   but there's a whole procedure that you've

 9   described that you go through in order to make

10   sure that by the time someone hits the general

11   population they are free of contraband.

12             You agree were that, right?

13        A.     Yes.

14        Q.     And you agree that, on this day,

15   after he left reception, he had narcotics on

16   his person, right?

17        A.     I assume he did, yes.

18        Q.     Okay.  So, therefore, on this

19   day, this number 3 was violated, right?

20        A.     Not sure.

21        Q.     Okay.  I'm going to scroll down

22   here a little bit.  The next page, the top in

23   bold says, "Admissions and Discharges," and

24   number 4 says, "
```



1 ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████."

5          Do you agree it says that?

6          A.    That's what it says, yes.

7          Q.    Did you follow this on this

8 July 26th day when Mr. Rhoades was brought to

9 the prison?

10          A.    Yeah, I conducted a search of

11 him, yes.

12          Q.    Okay.  And ████████████████

██████████████████, did you fill that out

14 for Mr. Rhoades?

15          A.    No.  We didn't -- I don't -- we

16 don't fill out any forms ████████████████

████████████

18          Q.    Okay.  So, if this policy here

19 says ████████████████████████████████

████████████ you just have no idea what that

21 is, that form?

22          A.    No, sir.

23          Q.    And in all the years you've been

24 working at the Bucks County prison, have you



1   ever filled out that form?

2          A.     No, sir.

3          Q.     Do you think I'm misreading this

4   policy in some way?

5          A.     No.

6          Q.     Perhaps ███████████████████

███████████████████ means something else, maybe

8   I don't understand what it is.

9                 Could you tell me what it is?

10         A.     I have never heard of that form,

11  sir.

12         Q.     Okay.  I'm going to keep

13  scrolling here.  I want to stop sharing my

14  screen.

15                Are you familiar with an inmate

16  named Octavius Davis?

17         A.     No, sir.

18         Q.     Okay.  If I told you he overdosed

19  at the Bucks County prison on narcotics, would

20  that refresh your memory?

21         A.     No, sir.

22         Q.     You never heard of him?

23         A.     I know inmates by last names.  I

24  don't know them by first names.



```
1            Q.     Okay.  A lot of Davis.

2                   I understand.  Is that your

3    answer?  I'm sorry, I didn't mean to speak

4    over you, I apologize.

5            A.     No, I don't recall that

6    situation, sir.

7            Q.     Okay.  Are you familiar with

8    another inmate named Quinn that's accused

9    of -- had been accused of smuggling narcotics

10   into the prison?

11           A.     No, sir.

12           Q.     And another inmate named Sullivan

13   who's accused of smuggling narcotics into the

14   prison?

15           A.     No, sir.

16           Q.     Is there anything about this case

17   regarding Mr. Rhoades that I didn't ask you

18   about that you want to put on the record

19   today?

20           A.     No, sir.

21                  MR. ZEIGER:  Okay.  I have

22   nothing further.  Thank you very much,

23   Officer.

24                  THE WITNESS:  Thank you.
```



```
 1                   MR. ZEIGER:  Hold on.  Tyler
 2    might, I'm sorry, Mr. Burns might may have
 3    something to say.
 4                   THE WITNESS:  Yes.
 5                   MR. BURNS:  Yeah, if you can just
 6    give me one second here, Officer.
 7                   THE WITNESS:  Sure.
 8                        -  -  -
 9                   EXAMINATION
10                        -  -  -
11    BY MR. BURNS:
12         Q.    All right.  Sorry for the delay
13    there, Officer.
14              So, being a corrections officer,
15    do you have to be cleared to work in certain
16    areas of the facility, such as, you know,
17    working on the block?
18         A.    Yes, sir, there are certain areas
19    you need to be trained and cleared.
20         Q.    Okay.  Were you cleared to work
21    in reception?
22         A.    Yes.
23         Q.    Now, were you trained in
24    conducting searches?
```



```
 1           A.     Yes, sir.
 2           Q.     Were you trained in conducting a
 3   pat-down search?
 4           A.     Yes, sir.
 5           Q.     As well as an unclothed body
 6   search?
 7           A.     Yes, sir.
 8           Q.     Is it fair to say that you may
 9   not be familiar with a written policy, but you
10   are familiar with the substance of the
11   training that you received?
12           A.     The general principle, yes.
13           Q.     Now, you talked a little bit
14   earlier about the unclothed body search
15   section.
16           A.     Yes, sir.
17           Q.     Let's talk about it as it relates
18   to Rhoades.
19                  When you conducted that search,
20   did you search the clothing that he took off?
21           A.     Yes.
22           Q.     And did you find anything in his
23   clothing?
24           A.     No, sir.
```



```
 1          Q.     Do you recall at that time if
 2   there was a lunch bag with him?
 3          A.     Not when he came back to shower,
 4   I don't recall, sir.  I don't recall if he had
 5   the bag with him when he came back.
 6          Q.     If you can just give me one
 7   second, I'm going to pull something up.
 8          A.     Sure.
 9          Q.     I apologize for the delay.  I
10   just got kicked out.
11          A.     No problem.
12               MR. ZEIGER:  No problem.
13   BY MR. BURNS:
14          Q.     Officer, can you see that?
15          A.     Yes, sir.
16          Q.     Okay.  All right.  Now, is this
17   you pictured here, if you can see my cursor,
18   on the left-hand portion?
19          A.     It's hard to tell, sir.
20               MR. ZEIGER:  Tyler, I don't mean
21   to interrupt you, objection.  Can you state on
22   the record what you just shared the screen of,
23   please?
24               MR. BURNS:  Sorry.  I'm sharing
```



JULIO ATILES                                February 13, 2024
CORBIN V. BUCKS COUNTY

1   the screen, this is video number 15 that was

2   produced during discovery.

3                 MR. ZEIGER:  I'll withdraw the

4   objection at this time.

5                 MR. BURNS:  7/26.  Yes.

6                 MR. ZEIGER:  Thank you.

7   BY MR. BURNS:

8        Q.    Let me see if I can back us up

9   here to see if I can get a picture of you in

10  the frame, or it's going to not cooperate.

11  I'm trying to get a picture of your face.

12                Can you see better here at all,

13  Officer?

14       A.    A little better, yes, a little

15  better.  It's a little better.

16       Q.    All right.  Now, can you -- I'll

17  play it for you so you can see it, you can

18  watch the individual's mannerisms, although

19  not much might be happening here.  Of course,

20  there's stuff behind the glass.  Hopefully,

21  you'll see this individual walk across the

22  screen.

23                Does that look like you?

24       A.    It looks like me, yes, sir.



```
 1          Q.      All right.  Do you believe that

 2   is you?

 3          A.      I would say yes.  Yeah, it looks

 4   like my built.

 5          Q.      Now, just for the record, this

 6   individual, this individual here, the other

 7   male in the room --

 8          A.      Yes.

 9          Q.      -- do you know who that is?

10          A.      That's Officer Jude Williams,

11   he's the sanitation officer that day.

12          Q.      Okay.  So, he doesn't work in

13   reception?

14          A.      No, sir.

15          Q.      Okay.  I'll skip back here to the

16   relevant portion.

17                  So, this is the 10:50 stamp of

18   the video just for the record, so the record

19   can see it.  This appears to be Officer Ulmer

20   fingerprinting Inmate Allen Rhoades and

21   Officer Atiles over here on the left.

22          A.      Yes.

23          Q.      And so I'm just going to play

24   this.
```



JULIO ATILES                                    February 13, 2024
CORBIN V. BUCKS COUNTY

1          A.     She's actually putting his arm
2   band on now.
3          Q.     Okay.  Excellent.  Thank you for
4   clarifying that, Officer.
5                 I just want you to pay attention
6   to the next 30 seconds or so of video and to
7   just observe Inmate Patterson as he walks
8   across the screen.
9          A.     Patterson?
10         Q.     Oh, sorry, my apologies, Inmate
11  Rhoades.
12         A.     Oh, okay, okay, yes.
13         Q.     Thank you for clarifying.  I'll
14  just back it up there, start it again.
15         A.     Okay.
16                (Playing of videotape.)
17         Q.     So, at that point, Inmate Rhoades
18  is leaving with you.  Are you going to conduct
19  an unclothed body search of the inmate?
20         A.     Yes, sir.
21         Q.     Now, in that last ten seconds or
22  so of video I showed you, did Allen Rhoades
23  have a lunch bag with him at all?
24         A.     I didn't see one, sir.



JULIO ATILES                                        February 13, 2024
CORBIN V. BUCKS COUNTY

```
 1              Q.     Let me stop sharing the screen.

 2                     And so it's fair to say that he

 3    did not have the lunch bag with him when he

 4    conducted the unclothed body search?  Is that

 5    correct?

 6              A.     Yes.

 7              Q.     If the drugs were placed in his

 8    lunch bag and, as far as I believe the

 9    testimony reflected earlier, were left in

10    holding cell 1, you couldn't have found them

11    in an unclothed body search, right?

12              A.     No, sir.

13              Q.     And was your unclothed body

14    search on Inmate Rhoades thorough?

15              A.     Yes.

16              Q.     And do you believe it was

17    consistent with the policy?

18              A.     Yes.

19              Q.     And the training that you've had

20    as a reception officer?

21              A.     Yes, sir.

22              Q.     Now, if there is -- are you

23    familiar with what a code 99 is?

24              A.     Officer needs assistance, yes.
```



JULIO ATILES                                February 13, 2024
CORBIN V. BUCKS COUNTY

1          Q.     Now, if a code 99 is pulled near

2    reception, will a reception officer respond?

3          A.     Depending on how many we have.

4    We always have to have at least one officer on

5    the actual post.  If we have two, one can go

6    respond, depending on the code, yes.

7          Q.     Okay.  So, on this day in

8    question, there would be you and Officer

9    Ulmer, so you would have at least two?

10         A.     Yes.

11         Q.     All right.  So, if a code 99

12   officer needs assistance was pulled and an

13   officer responded, would it be fair to say

14   then you would be the only officer on the

15   block?

16         A.     Correct, sir.

17         Q.     Now, at this point, do you know

18   if there was a code 99 pulled at this time?

19         A.     I don't recall, sir.

20                MR. BURNS:  That's all I have.

21   Nothing further.

22                     -   -   -

23                FURTHER EXAMINATION

24                     -   -   -



JULIO ATILES                                    February 13, 2024
CORBIN V. BUCKS COUNTY

1  BY MR. ZEIGER:

2          Q.      Just a follow-up.

3                  So, the part where someone comes

4  into reception and they start in cell 1, you

5  do the strip search and then they go back to a

6  different cell, you referred to it as cell 6.

7                  Why do you do that?

8          A.      It's a clean cell.  It's -- once

9  they've been fully cleaned, we don't want to

10  put them in any other cells.  We put them in

11  the clean cell.  From there, they get seen by

12  either a case manager or nursing staff or we

13  escort them back to the unit.

14                 So, we just don't want to put

15  them back in the cell that they were

16  originally in.  We call that the clean cell.

17         Q.      And why do you not put them back

18  in the original cell?  What are potential

19  problems that could come up?

20         A.      Well, we want to keep them away

21  from the other inmates that we haven't

22  processed yet.  We don't want to get them

23  around them.  We want to keep them away from

24  the inmates that we haven't processed yet.



1        Q.    Or is it also they might have

2   brought something in with them that they left

3   in that original cell?

4        A.    It's possible.

5        Q.    Right.  In fact, in this case,

6   that's what happened?

7        A.    (Witness nodding head.)

8        Q.    Yes?  I see you nodding your

9   head, but you have to give an answer.

10       A.    Oh, yes.  That's what it looked

11  like on camera, yes.  I couldn't tell by the

12  video, it was hard to tell.

13       Q.    And is that a policy, to do this

14  sort of cell 1, strip search, clean cell?

15       A.    Yes.

16       Q.    Okay.  Is it a written-down

17  policy or it's just sort of the custom?

18       A.    I think -- I don't know if it's

19  written down, but it's definitely something

20  that we've practiced, I guess like, say, a

21  custom.

22       Q.    Okay.  But you're not really

23  familiar with the written policy anyway, so --

24  correct?



JULIO ATILES                                    February 13, 2024
CORBIN V. BUCKS COUNTY

```
1            A.    Yes.  Not word for word, no.
2                  MR. ZEIGER:  Okay.  I have
3    nothing further.  Thank you.  Be safe, please.
4                  THE WITNESS:  Thank you.
5                  MR. BURNS:  Thank you very much
6    for your time, Officer.  We really appreciate
7    it.
8                  THE WITNESS:  Thank you, sir.
9                  MS. GRIESER:  Thank you.
10                  (Videoteleconferenced Deposition
11   is concluded at 12:46 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
```



JULIO ATILES                                        February 13, 2024
CORBIN V. BUCKS COUNTY

1                    C E R T I F I C A T E

2               I hereby certify that the

3       proceedings and evidence noted are contained

4       fully and accurately in the notes taken by me

5       on the deposition of the above matter, and

6       that this is a correct transcript of the same.

7

8

9

10      _____

11                  DENISE D. BACH,
                    Registered Professional
12                  Reporter
                    Certified Court Reporter
13                  Notary Public - Expires
                    March 2026
14
                    DATE OUT:  February 23, 2024
15

16

17

18

19               (The foregoing certification of

20      this transcript does not apply to any

21      reproduction of the same by any means, unless

22      under the direct control and/or supervision of

23      the certifying reporter.)

24



800.211.DEPO (3376)
EsquireSolutions.com







JULIO ATILES
CORBIN V. BUCKS COUNTY

February 13, 2024



JULIO ATILES
CORBIN V. BUCKS COUNTY

February 13, 2024



JULIO ATILES
CORBIN V. BUCKS COUNTY

February 13, 2024



JULIO ATILES
CORBIN V. BUCKS COUNTY

February 13, 2024



JULIO ATILES
CORBIN V. BUCKS COUNTY

February 13, 2024



800.211.DEPO (3376)
EsquireSolutions.com

JULIO ATILES
CORBIN V. BUCKS COUNTY

February 13, 2024



JULIO ATILES
CORBIN V. BUCKS COUNTY

February 13, 2024



800.211.DEPO (3376)
EsquireSolutions.com

JULIO ATILES
CORBIN V. BUCKS COUNTY

February 13, 2024



## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VALERIA CORBIN, administrator of the    :
ESTATE OF JOSHUA PATTERSON,     :
                                       :        CIVIL ACTION
                 Plaintiff,    :
                                         :        Case No. 23-2784
      v.                   :
                                         :        JURY TRIAL DEMANDED
BUCKS COUNTY, et al.,      :
                                         :
               Defendants.   :

## **AFFIDAVIT OF ASHLEY DAYOUB**

Pursuant to 28 U.S.C. § 1746, I, Ashley Dayoub, hereby declare and state as follows:

1.     I serve as the Litigation Paralegal for the Law Department of the County of Bucks, as well as the Open Records Officer ("AORO") for the Bucks County Commissioners and Administration (the "Agency").

2.     I have knowledge of the facts set forth herein and, if called upon as a witness, I could testify to them competently under oath.

3.     I respectfully submit this Declaration in support of the Defendants' Motion for Summary Judgment.

4.     In the ordinary and normal course of my duties as the Litigation Paralegal and AORO, I am responsible for retrieving publicly available documents for the Law Department. This includes retrieving and providing public documents in response to requests under the Pennsylvania Right-to-Know Law that are directed to the Agency.

5.     On March 1, 2024, I accessed the "Prison Oversight Board" webpage on the County of Bucks' official website. This webpage can be accessed by anyone at the following link: https://www.buckscounty.gov/215/Prison-Oversight-Board.

6.     Under the "2022 Meetings" heading, I retrieved the "Director's Report" for July

2022.  A true and correct copy of the July 2022 Director's Report is attached hereto and can also

be accessed at the above-listed URL.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and understanding.

Dated: March 1, 2024

Ashley Dayoub
Litigation Paralegal
County of Bucks, Law Department
55 E. Court Street
Doylestown, PA 18901



## BUCKS COUNTY PRISON OVERSIGHT BOARD REPORT



**The Prison Oversight Board Report for July 2022 is submitted herein.**

<u>**Prison Oversight Board Members**</u>
**Commissioner Diane M. Ellis-Marseglia, LCSW, Chair**
**Commissioner Gene DiGirolamo, Vice Chair**
**Commissioner Robert J. Harvie, Jr.**
**Pamela A. Van Blunk, Secretary**
**Hon. Wallace H. Bateman, President Judge**
**Matthew D. Weintraub, District Attorney**
**Frederick A Harran, Sheriff**
**Christine A. Shenk, Chief, Adult Probation and Parole**
**Ann Russavage-Faust, Public Defender**
**Mel Kardos, Citizen Board Member**
**Daniel H. Grace, Citizen Board Member**
**Sara Webster, Esq., Citizen Board Member**

# PRISON OVERSIGHT BOARD REPORT INDEX

**Section 1.**          **DEPARTMENT of CORRECTIONS**                    **Page**

Inmate Census                                                      1.

Average Historical Population Trends                               2.

Average Monthly Female Population Trends                           3.

Commitments vs. Discharges Statistic and Graph                    4.

Commitment Summary Statistic and Graphs                           5.

Prisoners by Locations Serving Over 2 yrs. Sentence               6.

Drug and Alcohol Report                                           7, 8.

Correctional Mental Health Report                                 8.

Correctional Health Care Report                                   9.

Training Academy Report                                           10.

Tours, Recognitions, Official Visits, Events                      10.

Misconducts/Use of Force                                          10.

Project(s) Information                                            10.

Treatment Program Services                                        11.


**Section 2.**     **CORRECTIONAL FACILITY**

JPC Meeting Information                                            12.

Library/HUB/Reentry Usage Report                                  12.


**Section 3.**     **COMMUNITY CORRECTIONS**

Supervision Groups Graphed Monthly Trends                         13.

Community Corrections Employment                                  13.

Work Release Status Report                                        14,15.

Walk Away Report                                                  16.

Program Services                                                  16.

JPC Meeting Information                                           16.

Garden Chart                                                      17.

<u>Section #1.   DEPARTMENT OF CORRECTIONS</u>

**July 2022**
**INMATE CENSUS SNAPSHOT**

## BUCKS COUNTY CORRECTIONAL FACILITY

| | | |
|---|---|---|
| **Female Inmates** | | **122** |
| **Male Inmates** | | **559** |
| **Inmates in other Institutions/Habeas** | | **27** |
| *7x Other County or SCI* | *0* | |
| *Hospital* | *2* | |
| *Berks County* | *0* | |
| *Montgomery County* | *1* | |
| *Norristown State Hospital* | *22* | |
| *Treatment Prgm* | *0* | |
| *Furlough* | *1* | |
| *U.S. Marshal's Service* | *0* | |
| *Other* | *1* | |
| | **Total** | **708** |

### COMMUNITY CORRECTIONS CENTERS

| | | |
|---|---|---|
| Male Residents - Minimum Custody | | 71 |
| Male Residents - Medium Custody | | 46 |
| Female Residents – Minimum Custody | | 0 |
| | **Total** | **117** |

| | | |
|---|---|---|
| House Arrest | | 0 |
| Weekenders | | 1 |
| 48 Hour DUI | | 0 |
| 72 Hour DUI | | 1 |
| | **Total** | **2** |

| | | |
|---|---|---|
| | **Grand Total** | **827** |

# HISTORICAL AVERAGE
# POPULATION TRENDS
## 2019 - 2022

| MONTH | Correctional Facility | | | | | | | Community Corrections | | | | | House Arrest | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | | 2022 | | | 2019 | 2020 | 2021 | 2022 | | 2021 | 2022 |
| | | | BCCF In-House | Housed Elsewher | BCCF In-House | Housed Elsewher | | | | | | | | |
| JAN | 804/*106 | 723/72 | 632 | 37 | 658 | 36 | | 235 | 210 | 57 | 98 | | 72 | 1 |
| FEB | 789/*107 | 712/70 | 641 | 35 | 651 | 38 | | 251 | 210 | 63 | 100 | | 57 | 0 |
| MAR | 782/*98 | 699/56 | 648 | 40 | 663 | 43 | | 255 | 189 | 68 | 101 | | 35 | 0 |
| APR | 777/*89 | 540/42 | 639 | 44 | 661 | 44 | | 243 | 126 | 94 | 115 | | 13 | 0 |
| MAY | 761/*87 | 468/41 | 653 | 46 | 678 | 42 | | 236 | 80 | 95 | 108 | | 10 | 0 |
| JUN | 739/*73 | 491/41 | 693 | 45 | 673 | 42 | | 230 | 58 | 102 | 115 | | 7 | 0 |
| JUL | 732/*76 | 551/42 | 712 | 48 | 658 | 41 | | 225 | 53 | 107 | 123 | | 4 | 0 |
| AUG | 803/*75 | 613/45 | 735 | 43 | | | | 204 | 54 | 116 | | | 3 | |
| SEP | 756/*82 | 657/45 | 722 | 44 | | | | 209 | 57 | 97 | | | 3 | |
| OCT | 760/*84 | 718/47 | 664 | 40 | | | | 226 | 64 | 99 | | | 2 | |
| NOV | 753/*88 | 704/46 | 674 | 38 | | | | 218 | 65 | 113 | | | 1 | |
| DEC | 735/*77 | 646/42 | 655 | 37 | | | | 220 | 60 | 115 | | | 1 | |
| | | | | | | | | | | | | | | |
| Yrly ADP | 766/*87 | 627/*49 | 673 | 42 | 664 | 41 | | 229 | 102 | 94 | 109 | | 18 | 0 |

*Included in monthly ADP total

2



# Commitment Summary



## Committed vs. Discharged

|           | Aug'21 | Sept'21 | Oct'21 | Nov'21 | Dec'21 | Jan'22 | Feb'22 | Mar'22 | Apr'22 | May'22 | June '22 | July'22 |
|-----------|--------|---------|--------|--------|--------|--------|--------|--------|--------|--------|----------|---------|
| Committed | 407    | 329     | 344    | 357    | 321    | 373    | 413    | 463    | 394    | 406    | 408      | 429     |
| Discharged| 402    | 395     | 355    | 326    | 373    | 389    | 375    | 460    | 368    | 411    | 409      | 418     |

■Committed ■Discharged







## Prisoners by Location Serving Over 2 Yr. Sentences

| | AUG'21 | SEPT'21 | OCT'21 | NOV'21 | DEC'21 | JAN'22 | FEB'22 | MAR'22 | APR'22 | May'22 | JUNE'22 | JULY'22 | AVG 2020 | AVG 2021 | AVG 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Walk Away/Escape | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CCC | 3 | 3 | 6 | 6 | 5 | 5 | 5 | 9 | 8 | 8 | 8 | 10 | 6 | 4 | 8 |
| House Arrest | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 3 | 0 |
| BCCF | 29 | 47 | 50 | 57 | 41 | 45 | 40 | 17 | 20 | 17 | 19 | 4 | 25 | 30 | 24 |
| Total | 33 | 51 | 57 | 64 | 47 | 50 | 45 | 26 | 28 | 25 | 27 | 14 | 43 | 37 | 32 |

■ Walk Away/Escape   ■ CCC   ■ House Arrest   ■ BCCF   ■ Total

## DRUG AND ALCOHOL SERVICES

The following statistics represent the core activities of the Drug and Alcohol Treatment Section for the month of July.

| | June | June |
|---|---|---|
| Number of referrals | **215** | **218** |
| Number of offenders screened/received services | **125** | **125** |
| Number of assessments completed | **115** | **101** |
| Court-Ordered | **85** | **91** |
| Number of CRN evaluations completed by Council of SEPA | **0** | **0** |
| Number of offenders in group/Offenders on waiting list for group | **40/16** | **32/14** |
| Number of groups/1:1's facilitated | **8/0** | **12/0** |
| **Referrals/Placement** | | |
| Highway Safety Classes/Multiple Offenders Program | **0** | **0** |
| Outpatient treatment | **48** | **43** |
| Residential treatment | **25** | **21** |
| Recovery house | **18** | **18** |
| Sentenced offenders in community-based programming | **0** | **0** |
| Identified Veterans | **2** | **2** |
| COMPASS Applications | **45** | **38** |

| **Vivitrol:** | | Male | Female | Total | Male | Female | Total |
|---|---|---|---|---|---|---|---|
| Received medication: | **Total** | 7 | 2 | 9 | 9 | 2 | 11 |
| Location: | GPOP | 3 | 2 | 5 | 3 | 2 | 5 |
| | MC3 | 1 | 0 | 1 | 3 | 0 | 3 |
| | Drug Court | 0 | 0 | 0 | 0 | 0 | 0 |
| | HOPE/HEART | 3 | 0 | 3 | 3 | 0 | 3 |
| Bloodwork refused: | | 0 | 0 | 0 | 0 | 0 | 0 |
| *1 GPOP male received 2 injections; Total injections administered in July = 12 | | | | | | | |

| **Subutex**: | Male | Female | Total | Male | Female | Total |
|---|---|---|---|---|---|---|
| **Total number of inmates treated:** | **107** | **31** | **138** | **92** | **32** | **124** |
| Total number of inmates discontinued: | 45 | 20 | 65 | 35 | 15 | 50 |
| Maintained: | 62 | 19 | 81 | 65 | 19 | 84 |
| Released: | 15 | 13 | 28 | 15 | 4 | 19 |
| Tapers Only: | 30 | 7 | 37 | 20 | 11 | 31 |
| Diversion: | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | |
| **Narcan:** | | | | | | |
| Received Upon Release: | 0 | 0 | 0 | 1 | 0 | 1 |

## RECOVERY UNITS – JULY 2022

|  | HOPE | HEART |
|---|---|---|
| Total Number of Residents | 18 | 7 |
| Average Daily Number of Residents Participating | 13.5 | 6.9 |
| **Admissions:** | 4 | 0 |
| **Discharges:** | 7 | 2 |
| Parole/Maximum | 2 | 2 |
| Misconduct | 0 | 0 |
| Discharge by Staff | 1 | 0 |
| Medical | 0 | 0 |
| Habeas | 0 | 0 |
| Self-Request to General Population | 1 | 0 |
| Self-Request to MC3/WC3 | 1 | 0 |
| Bail | 0 | 0 |
| TOT State Facility | 2 | 0 |
| Discharged Graduates | 5 | 2 |
| **Paroled:** |  |  |
| Home | 0 | 1 |
| Residential Treatment | 0 | 0 |
| Recovery House | 0 | 1 |
| TOT Other County/PA or NJ | 2 | 0 |

## PRIMECARE – CORRECTIONAL MENTAL HEALTH SERVICES:

|  | June | July |
|---|---|---|
| Current Census | 445 | 469 |
| Intake Referral Received | 274 | 321 |
| Intake Assessments Completed | 216 | 223 |
| Inmate Request Form Referrals Received | 270 | 297 |
| Inmates Seen by Psychologist/Psychologist Rounds | 648 | 519 |
| Inmates Seen by LCSW | 1,089 | 864 |
| Inmates Prescribed Psychotropic Medications | 263 | 230 |
| Involuntary Medication/304 Commitment | 0 | 0 |
| Inmates Enrolled In Group Counseling – Male/Female | 0 male/0 female | 0 male/0 female |
| Inmates on SPMI | 79 | 79 |
| Community Treatment Arrangements | 2 male/1 female | 2 male/3 female |
| Psychiatric Hospitalizations-302 commitment | 0 | 0 |
| Psychiatric Hospitalizations-303 commitment | 0 | 0 |
| Psychiatric Hospitalizations-304 commitment | 0 | 0 |
| Psychiatric Hospitalizations-306 commitment | 0 | 0 |
| Psychiatric Hospitalizations-402 commitment for NSH wait list | 5 male/ 3 female | 1 male/1 female |
| Dr. McKeegan Court Ordered Evaluations | 8 | 4 |
| Dr. Markey Competency Evaluations | 7 | 5 |
| Court Ordered Mental Health Assessments | 11 | 3 |
| Referral to VA | 0 | 2 male |
| 911 Alerts | 13 | 7 |

** The 911 Suicide Hotline has experienced **seven (7)** calls in the month of July totaling **77** calls in 2022.

## PRISONER HEALTHCARE – PrimeCare:  2022

| YEAR: 2022 | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Intake Screens | 358 | 389 | 453 | 380 | 395 | 421 | 428 | | | | | |
| Nurse Sick Call | 202 | 181 | 258 | 218 | 244 | 225 | 204 | | | | | |
| Provider Physicals | 197 | 203 | 253 | 208 | 192 | 205 | 198 | | | | | |
| Provider Sick Call | 698 | 629 | 786 | 688 | 675 | 672 | 646 | | | | | |
| Provider Chronic Clinic | 128 | 166 | 210 | 173 | 153 | 147 | 172 | | | | | |
| TB Testing - PPD Planted | 486 | 472 | 626 | 519 | 496 | 429 | 471 | | | | | |
| TB Testing - Positives | 10 | 6 | 7 | 10 | 4 | 5 | 2 | | | | | |
| Chest X-Rays | 8 | 12 | 7 | 11 | 10 | 10 | 13 | | | | | |
| TB Treatment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | |
| Syphilis (RPR) Testing | 18 | 31 | 21 | 11 | 20 | 10 | 10 | | | | | |
| HIV Testing | 19 | 36 | 29 | 21 | 29 | 13 | 13 | | | | | |
| New Diagnosis HIV Positive | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | |
| Known HIV Positive Patients | 15 | 16 | 14 | 12 | 11 | 15 | 9 | | | | | |
| Chlamydia and Gonorrhea Testing | 245 | 317 | 300 | 293 | 353 | 256 | 347 | | | | | |
| Chlamydia + | 6 | 9 | 6 | 2 | 17 | 5 | 9 | | | | | |
| Gonorrhea + | 6 | 4 | 6 | 2 | 9 | 5 | 7 | | | | | |
| Total STD Treatment | 9 | 6 | 9 | 5 | 16 | 10 | 16 | | | | | |
| Total Reportable Comm. Diseases | 14 | 12 | 12 | 5 | 29 | 10 | 16 | | | | | |
| Medical Isolation | 8 | 10 | 12 | 8 | 15 | 18 | 18 | | | | | |
| Positive MRSA Infections | 4 | 5 | 4 | 2 | 6 | 1 | 3 | | | | | |
| Facility Acquired MRSA Infections | 3 | 2 | 3 | 1 | 5 | 0 | 3 | | | | | |
| Hepatitis A Vaccinations | 0 | 0 | 0 | 28 | 0 | 0 | 0 | | | | | |
| Total Vaccinations | 22 | 88 | 83 | 43 | 11 | 6 | 10 | | | | | |
| Optometrist Clinic | 7 | 0 | 0 | 6 | 0 | 6 | 0 | | | | | |
| Pregnant Patients | 7 | 9 | 10 | 9 | 7 | 3 | 5 | | | | | |
| OB/GYN - On Site | 9 | 4 | 5 | 18 | 0 | 0 | 0 | | | | | |
| OB/GYN - Off Site | 0 | 1 | 2 | 3 | 3 | 2 | 0 | | | | | |
| Dental Clinic | 134 | 136 | 122 | 154 | 116 | 117 | 128 | | | | | |
| Outside Physician Consults | 8 | 11 | 21 | 28 | 22 | 17 | 39 | | | | | |
| X-Ray/ Imaging Services | 38 | 54 | 52 | 48 | 56 | 44 | 50 | | | | | |
| ER Visits | 19 | 13 | 24 | 22 | 19 | 24 | 33 | | | | | |
| ER Visits Via Ambulance | 11 | 7 | 13 | 8 | 5 | 9 | 17 | | | | | |
| Hospital Admissions | 3 | 5 | 10 | 5 | 6 | 10 | 9 | | | | | |
| Deaths | 0 | 1 | 1 | 0 | 0 | 1 | 2 | | | | | |
| Total Number of Admissions | 373 | 413 | 463 | 383 | 389 | 391 | 418 | | | | | |
| Average Daily Population - BCCF | 694 | 688 | 706 | 704 | 719 | 716 | 699 | | | | | |
| Average Daily Population - M/WCCC | 97 | 100 | 101 | 116 | 107 | 115 | 123 | | | | | |
| Total Population | 791 | 788 | 807 | 820 | 826 | 831 | 822 | | | | | |

## CORRECTIONS TRAINING ACADEMY July 2022

| Course Type | |
|---|---:|
| Mandatory In-Service hours | 0.0 |
| Basic Training hours | 1,506.5 |
| Other | 434.0 |
| **Total** | **1,940.5** |

## TOURS, RECOGNITIONS AND OFFICIAL VISITS TO THE DEPARTMENT OF CORRECTIONS

On 7/14/22 six (6) Warrington EMS staff toured WCF with Lt. Morris.
On 7/19/22 twenty-three (23) Warrington Volunteer Firefighters toured WCF with Lt. Morris.
On 7/25/22 one (1) APPD staff member toured WCF with Captain Nottingham.

## DOC BEHIND THE WALLS HIRING EVENT AT BCCF AND MCCC

2022 DOC Behind the Walls event was scheduled to target the 1-year mark of last year's DOC Behind the Walls Job Fair (July 22, 2021). DOC in conjunction with Bucks County Workforce Development and PA CareerLink coordinated two July hiring events in our facilities. These events targeted offenders who had a projected release date withing a four-month time frame as well as them completing a special VITA education job sessions so they could have a prepared resume for the hiring events. The next steps is to continue a team effort to hold these events at the DOC Facilities every 4 months to provide soon to be released offenders more employment opportunities to have successful reentry back to the community.

- 7/26/22 Behind the Walls Hiring Event was held with 6 offenders at MCCC with 4 employers and 2 agencies.
- 7/28/22 Behind the Walls Hiring Event was held at BCCF with 12 offenders with 3 Employers and 2 agencies.

The smaller hiring event was able to provide these offenders more induvial time for each offender to discuss the employers' job openings, requirements, and to be interviewed for potential hiring upon their future release.

## ASSAULTS /USE OF FORCE

There was a total of eight (8) assaults with two (2) offender on offender and six (6) offender on staff assaults/misconducts in July 2022. There were zero (0) injuries sustained requiring attention beyond basic first aid.

There were 36 Use of Force in the month of July.  Of these Use of Force occurrences, the following were used: Handcuffs – 36, Shackles – 6, OC Spray – 3, Restraint Chair – 4.

| Use of Force Causes | Number of Occurrences – July 2022 |
|---|---|
| Non-compliance | 15 |
| Possession of Contraband | 0 |
| Assaultive | 2 |
| Fighting | 19 |
| **Total** | **36** |

## PROJECTS UPDATE July 2022
### WCF

Honeywell and CMG have corrected ongoing HVAC issues.
Floor finishing to begin this month.
CorreTrak rounds have been identified and will be installed for electronic tour and cell monitoring.
Staff training continues to prepare for opening.

# TREATMENT PROGRAM SERVICES
## Activities and Services Provided

|  | June | July |
|---|---|---|
| ABE/GED Female Class | **Awaiting a start date from VITA** | **Awaiting a start date from VITA** |
| ABE/GED Male Class | **Mathematics class has resumed with 1 male currently attending** | **This is currently paused for the summer** |
| Anger Management | **4 males are attending** | **4 males completed** |
| Child Services Visits | **Virtual visits remain available and in-person visits continue** | **Virtual visits remain available and in-person visits continue** |
| Decisions Group | **No group for this month** | **4 males began and 4 completed this month** |
| Intake Classifications | **360 completed** | **416** |
| Jobs Readiness |  | **8 males began this month** |
| Religious Services | **Chaplain remains in contact.  Faith based mentoring and bible study continues.  The Chaplain provided monthly church services.  There were two Church services held during the month** | **Chaplain remains in contact.  Faith based mentoring and bible study continues.  The Chaplain provides monthly church services as well as OLMC.** |
| School Age Youth | **This is currently paused for the summer** | **This is currently paused for the summer** |
| STOP | **There were no sessions during this month** | **There were no sessions during this month** |

## Section # 2 CORRECTIONAL FACILITY

### July JPC Meeting
JPC meeting was postponed to the beginning of August.

### LIBRARY USAGE 2022

#### General Library

|  | Jan | Feb | Mar | Apr | May | Jun | July | Aug | Sept | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Men | 333 | 525 | 281 | 0 | 0 | 0 | 0 |  |  |  |  |  | 1139 |
| Women | 48 | 65 | 62 | 0 | 0 | 0 | 0 |  |  |  |  |  | 175 |
| Inmate Workers | 15 | 18 | 20 | 0 | 0 | 0 | 0 |  |  |  |  |  | 53 |
| Total | 396 | 608 | 363 | 0 | 0 | 0 | 0 |  |  |  |  |  | 1367 |

#### Law Library

|  | Jan | Feb | Mar | Apr | May | Jun | July | Aug | Sept | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Men | 41 | 92 | 66 | 26 | 17 | 33 | 20 |  |  |  |  |  | 295 |
| Women | 3 | 6 | 7 | 1 | 0 | 1 | 1 |  |  |  |  |  | 19 |
| RHU | 7 | 5 | 5 | 3 | 10 | 9 | 6 |  |  |  |  |  | 45 |
| MHU | 5 | 0 | 0 | 1 | 0 | 0 | 0 |  |  |  |  |  | 6 |
| Total | 56 | 103 | 78 | 31 | 27 | 43 | 27 |  |  |  |  |  | 365 |

#### The HUB

| July 2022 |
|---|
| 7 |

#### Release & Reintegration Program

| July 2022 |
|---|
| 8 |

#### Job Fair Readiness Class

| July 2022 |
|---|
| 8 |

#### Credit Counseling (Group)    Credit Counseling (1 on 1)

| July 2022 | July 2022 |
|---|---|
| 10 | 0 |

#### ServSafe Food Protection Manager Certification Examination

| July 2022 |
|---|
| 3 |

## Section # 3 COMMUNITY CORRECTIONS



| | Minimum Custody | Employed | Unemployed | Weekenders | House Arrest | 48/72 Hour DUI | Medium Custody |
|---|---|---|---|---|---|---|---|
| February | 49 | 20 | 3 | 0 | 0 | 0 | 45 |
| March | 50 | 18 | 10 | 0 | 0 | 0 | 62 |
| April | 51 | 18 | 13 | 0 | 0 | 7 | 63 |
| May | 60 | 13 | 8 | 2 | 0 | 6 | 47 |
| June | 76 | 14 | 22 | 1 | 0 | 4 | 47 |
| July | 71 | 19 | 19 | 1 | 0 | 1 | 46 |

## COMMUNITY CORRECTIONS EMPLOYMENT

| | June | July |
|---|---|---|
| Resident New Job Starts | 6 | 6 |
| New Admissions – MCCC/WCCC | 70 | 53 |
| Releases/Transfers | 54 | 62 |
| Un-sentenced | 0 | 0 |
| Weekenders | 1 | 1 |
| 48 Hour DUI's | 2 | 0 |
| 72 Hour DUI's | 2 | 1 |
| Minimum Custody- Men | 76 | 71 |
| Minimum Custody- Women | 0 | 0 |
| Medium Custody- Men | 47 | 46 |
| House Arrest | 0 | 0 |
| **Last Day of the Month:** <br> **MCCC** <br> **WCCC** | <br> 123 <br> 0 | <br> 117 <br> 0 |

13

## WORK RELEASE STATUS

### WORK RELEASE

| | 2018 | 2019 | 2020 | 2021 | 2022 | |
|---|---|---|---|---|---|---|
| | | | | | July | YTD |
| Net Inmate Wages | $738,517 | $727,711 | $96,884 | $112,359 | $15,552 | $150,842 |
| Court Costs, Fines & Restitution | $145,084 | $139,742 | $16,489 | $22,779 | $2,545 | $33,905 |
| Van - shuttle to/from work | $4,950 | $5,394 | $768 | $3,207 | $0 | $1,308 |
| Board Paid to County (Revenue) | $223,907 | $223,098 | $31,138 | $34,541 | $5,015 | $46,258 |

### PER DIEM CONFINEMENT REVENUE

| | 2018 | 2019 | 2020 | 2021 | 2022 | |
|---|---|---|---|---|---|---|
| | | | | | July | YTD |
| DUI and Weekender Programs | $1,390 | $799 | $264 | $0 | $0 | $0 |
| House Arrest | $555,436 | $419,885 | $316,113 | $110,713 | $356 | $1,737 |

| July Work Release | | |
|---|---|---|
| **Employment Categories** | Male Residents | Female Residents |
| Landscaping | 3 | 0 |
| Building/Trades/Manufacturing/Labor | 4 | 0 |
| Restaurant/Retail | 11 | 0 |
| Professional | 1 | 0 |
| **TOTAL            19** | **19** | **0** |

As of July 31, 2022, there were seventy-one (71) male residents classified as minimum custody and housed at the Men's Community Corrections Center.

For the month of July, there were thirty-eight (38) male residents classified as eligible to work. Of these, nineteen (19) were gainfully employed in the community. [Note: One (1) of the work release eligible offenders was removed from work release due to issues at the work site. Four (4) of the work release offenders were paroled in the month of July.]

In the month of July, there were zero (0) female offenders from BCCF that were eligible for work release.

## INSTITUTIONAL EMPLOYMENT & COMMUNITY SERVICE PERFORMED FOR July 2022

| *INSTITUTIONAL* | | | |
|---|---|---|---|
| Site | # of Residents | | # of hours worked |
| Kitchen (MCCC) | 15 | | 1,815 |
| Garden (MCCC) | 7 | | 710 |
| Sanitation (MCCC) | 27 | | 3,923 |
| Lobby (BCCF) | 9 | | 520 |
| Aramark Crew (MCCC) | 2 | | 14 |
| Aramark Crew (CCC and Special Projects) | 7 | | 637 |
| BCCF (Special Detail) | 0 | | 0 |
| Paint Crew | 0 | | 0 |
| Library | 3 | | 248 |
| Snow Crew | 0 | | 0 |
| **TOTALS:** | **70** | | **7,867** |
| | | | |
| *COMMUNITY* | | | |
| **\*Community Service suspended as of 3/13/20\*** | | **July** | |
| | | | |
| Fairless Hills Fire Company | 0 | | 0 |
| Lenape Valley | 0 | | 0 |
| Pennsbury Manor | 0 | | 0 |
| VFW Post 6493 | 0 | | 0 |
| Washington Crossing Park | 0 | | 0 |
| Bucks County Emergency Management PPE (In-house detail @ MCCC) | 0 | | 0 |
| Bucks County EMA/Health Department | 0 | | 0 |
| **TOTALS:** | **0** | | **0** |

| Community Service Year to Date | YTD- Hours |
|---|---|
| Fairless Hills Fire Company | 0 |
| Lenape Valley Foundation | 0 |
| Pennsbury Manor | 0 |
| VFW Post 6493 | 0 |
| Washington Crossing Park | 0 |
| Bucks County Emergency Management PPE (In-house detail @ MCCC) | 0 |
| Bucks County EMA/Health Department | 0 |
| **TOTALS** | **0** |

**Walk-away activity for the month – July 2022**
**Walk-away/Escape:**          0          **Apprehensions/Returns:**          0

**Community Service**
Please note: Community Service details remained suspended during the month of July.

**Institutional Jobs**
There were 70 offenders that completed 7,867 hours in institutional jobs in July.

**Drug and Alcohol**
In-house drug and alcohol sessions for minimum custody at the Men's Center has been meeting once a week by Drug and Alcohol Staff. For the month of July, there were twelve (12) participants.

**Alcoholics Anonymous Virtual meeting**
Twelve (12) HOPE Program (medium custody) offenders attended an Alcoholics Anonymous Virtual Meeting on Wednesdays in July. Nine (9) minimum custody offenders attended an Alcoholics Anonymous Virtual Meeting on Tuesdays in July. Zero (0) medium custody offenders attended an Alcoholics Anonymous Virtual Meeting on Fridays in July.

**Life Abundant Virtual Bible Study Meeting**
Three (3) medium custody Offenders attended virtual Bible study meetings on Mondays in July.
Four (4) minimum custody Offenders attended virtual Bible study meetings on Thursdays in July.

**VITA Decision for Living**
No sessions held this month. Screening and coordinating for the next session.

**Furloughs**
There were zero (0) court ordered furloughs for the month of July.

**Community Corrections Joint Participation Council (JPC) meetings**
On July 27, 2022, a Minimum Custody JPC was held with one (1) offender attending the meeting.
On July 25, 2022, a Medium Custody JPC was held with one (1) offender attending the meeting.

**Medium Custody**
As of July 31, 2022, there were forty-six (46) male residents classified as medium custody and housed at the Men's Community Corrections Center – Secure Medium Area.

**Weekend Sentences**
There was one minimum custody offender serving a weekend sentence during the month of July.

**JA192**

# GARDEN CHART



| ITEM | JAN | FEB | MAR | APR | MAY | JUNE | JULY | AUG | SEP | OCT | NOV | DEC | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lettuce (lbs) | | | | | 22 | 177 | 108 | | | | | | 307 |
| Eggplant (lbs) | | | | | | | 75 | | | | | | 75 |
| Cucumber (lbs) | | | | | | 11 | 72 | | | | | | 83 |
| Tomatoes (lbs) | | | | | | | 226 | | | | | | 226 |
| Sweet & Hot Peppers (lbs) | | | | | | 1 | 13 | | | | | | 14 |
| Green Peppers (lbs) | | | | | | 6 | 7 | | | | | | 13 |
| Kale (lbs) | | | | | | | | | | | | | 0 |
| Swiss Chard (lbs) | | | | | | | | | | | | | 0 |
| Squash (lbs) | | | | | | 51 | 153 | | | | | | 204 |
| Melons (lbs) | | | | | | | | | | | | | 0 |
| Spinach (lbs) | | | | | | | | | | | | | 0 |
| Zucchini (lbs) | | | | | | 181 | 238 | | | | | | 419 |
| Cherry Grape Tomatoes (lbs) | | | | | | | 18 | | | | | | 18 |
| Garlic (lbs) | | | | | | 47 | | | | | | | 47 |
| Thyme (lbs) | | | | | | | | | | | | | 0 |
| Rosemary (lbs) | | | | | | | | | | | | | 0 |
| Chives (lbs) | | | | | 4 | 12 | 7 | | | | | | 23 |
| Cilantro (lbs) | | | | | | 1 | 6 | | | | | | 7 |
| Basil (lbs) | | | | | | 8 | 24 | | | | | | 32 |
| Sage (lbs) | | | | | | | | | | | | | 0 |
| Oregano (lbs) | | | | | | 3 | 8 | | | | | | 11 |
| Dill (lbs) | | | | | 2 | 8 | 2 | | | | | | 12 |
| Asparagus (lbs) | | | | | 4 | 9 | 4 | | | | | | 17 |
| Arugula (lbs) | | | | | | | | | | | | | 0 |
| Broccoli (lbs) | | | | | | | | | | | | | 0 |
| Cauliflower (lbs) | | | | | | | | | | | | | 0 |
| Raspberries (lbs) | | | | | | | | | | | | | 0 |
| Peas (lbs) | | | | | | 5 | 8 | | | | | | 13 |
| Sweet Potatoes (lbs) | | | | | | | | | | | | | 0 |
| **Total Produce** | | | | | 32 | 520 | 969 | | | | | | 1521 |
| **Total Compost (lbs)** | 1021 | 981 | 1129 | 1301 | 1346 | 1297 | 1426 | | | | | | 8501 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VALERIA CORBIN, administrator of the | : |
| ESTATE OF JOSHUA PATTERSON, | : |
| | :     CIVIL ACTION |
| Plaintiff, | : |
| | :     Case No. 23-2784 |
| v. | : |
| | :     JURY TRIAL DEMANDED |
| BUCKS COUNTY, et al., | : |
| | : |
| Defendants. | : |

### AFFIDAVIT OF LIEUTENANT ZACHARY SHERMAN

I, Lieutenant Zachary Sherman, hereby declare and state as follows pursuant to 28 U.S.C.
§ 1746:

1.     I serve as the Administrative Lieutenant for the Bucks County Correctional Facility
("BCCF").

2.     I have knowledge of the facts set forth herein and, if called upon as a witness, I
could testify to them competently under oath.

3.     In my role as Administrative Lieutenant, I am required to have knowledge of and
work within the various document and data management systems that BCCF employs.

4.     My duties also include assisting counsel with the review and collection of
documents and materials relating to lawsuits involving BCCF and its officers.

5.     In the ordinary course of business, BCCF maintains a record of each inmate's
booking and commitment information for the course of their incarceration. This includes, among
other data, an inmate's personal identifying information, physical characteristics, responses to
questions asked at intake, medical and mental health program referrals, and special alerts and

watches (such as constant watch suicide, mental health watch, and various medical watches including detoxification, medical isolation, house alone, COVI    9 status, and more).

6.      This information is logged in BCCF's "Offender Management System" ("OMS") by the booking officer, intake case manager, and intake nurse at the time of the inmate's processing and commitment to the facility, as well as by case managers who meet with each inmate every thirty days and log information and updates simultaneous with their meetings.

7.      Recording information in the OMS database is a regular practice of BCCF and is completed for all inmates committed to its custody.

8.      At the request of counsel, I conducted a thorough investigation and review of Joshua Caleb Patterson's OMS data, looking for any and all flags, notations, or information relating to: (i) any disclosed history of drug or alcohol use; (ii) any disclosed detoxification or withdrawal symptoms; or (iii) any referral to BCCF's "medically assisted treatment" ("MAT") program, which offers inmates suffering from opioid use disorder the opportunity to participate in opioid replacement therapy administered by BCCF's medical contractor – PrimeCare, Inc.

9.      In my review, I did not locate any flags, notations, or information demonstrating that Mr. Patterson had: (i) disclosed a history of drug or alcohol use to the facility; (ii) disclosed that he was ever experiencing any detoxification or withdrawal symptoms; or (iii) been referred to, evaluated for, or participated in the MAT program.

10.     If Mr. Patterson had reported any drug or alcohol use, signs of detoxification or withdrawal, or been referred to, evaluated for, or participated in the MAT program, this information would have been recorded in the OMS database in the ordinary course of business.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and understanding.

2

Dated: March 13, 2024        BY:         Zachary Sherman
                                          Administrative Lieutenant
                                          County of Bucks

| From: | Grieser, Jaclyn |
|---|---|
| To: | Brian J. Zeiger |
| Cc: | Burns, Tyler B.; Dayoub, Ashley |
| Subject: | Corbin v. Bucks County et. al. - No. 23-2784 - County"s Response to Plaintiff"s Interrogatory No. 6 |
| Date: | Monday, February 12, 2024 12:47:39 PM |
| Attachments: | 21-024-18 IM QUINN #068708 initial report_Redacted.pdf |
| | 22-225-18 IM SULLIVAN B. #109628 - Incident Report_Redacted.pdf |

Brian,

I am responding on behalf of the County as to Interrogatory No. 6, which states "[p]lease state any prior allegations, within the last ten years, of narcotics being recovered by any corrections officers at the Bucks County Prison."

**Objections**

The County sets forth and incorporates the following objections, which are incorporated by reference into each specific response below:

1. The County objects to this interrogatory as it is not a party to the above-listed litigation. The County provides this response and the attached as a courtesy to Plaintiff and disavows any continuing obligation to provide information or engage in discovery in this matter.

2. The County further objects to this interrogatory as overbroad, unduly burdensome, presenting an unreasonable annoyance, not likely to lead to discoverable information, and seeking information that is not relevant or protected from discovery insofar as it seeks a response relating to "the last ten years." The County will construe this as encompassing five years prior to the date of the alleged incident through the date of the alleged incident.

3. The County objects to this interrogatory as vague and ambiguous insofar as "narcotics" is undefined. The County shall construe this as it is commonly understood and defined in Section 201 of the Controlled Substances Act, 21 U.S.C. § 802.

4. The County objects to this interrogatory as vague, ambiguous, overbroad, unduly burdensome, presenting an unreasonable annoyance, not likely to lead to discoverable information, and seeking information that is not relevant insofar as it seeks information relating to "narcotics being recovered by any corrections officers at the Bucks County Prison." In accordance with the allegations in the Amended Complaint, the County shall construe this interrogatory as encompassing any narcotics recovered in the Facility's reception hall and in any cells on the men's correctional modules.

**Response**

Subject to the foregoing objections and in accordance with the protective order in this case, the County responds as follows:

Mr. Patterson's death was the first inmate death involving the use of narcotics inside the Facility in the last ten years. From 2017 through 2022, the Facility processed 34,463 new commitments. During this period, reception officers recovered various drugs and related paraphernalia on 67 occasions during their routine searches of inmates during intake and <u>prior</u> to the inmates entering the housing modules.  In this same period, there were two instances in which narcotics were recovered by corrections officers from the cells at the Facility – both of which involved the inmates ingesting/"tucking" the drugs prior to their arrival at the Facility.*  The reports from these incidents are attached.

> *██████████████████████████████████████) body cavity searches can only be conducted by licensed, contracted medical staff after notification and approval of the facility's Director or designee.  In these instances, a search warrant is typically required.  If Officers witness the inmate swallow something or are informed that an inmate may have ingested drugs prior to reaching the Facility, the inmate is monitored in a cell ███████████████████████████████ ██████████.

This information is designated as CONFIDENTIAL in accordance with the protective order in this case.

Regards,
Jaclyn

*Jaclyn C. Grieser*
*Deputy County Solicitor*
Law Department – County of Bucks
55 E. Court St.
Doylestown, PA 18901
jgrieser@buckscounty.org
Office: 215-348-6140



This electronic message transmission, to include any attached files or documents, may contain confidential information from Jaclyn C. Grieser, Esquire of the Bucks County Law Department which may be legally privileged.  The information is intended to be used by the individual or entity named above.  If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this information is prohibited by law.  If you receive this electronic transmission in error, please notify the sender of this communication at 215-348-6140 or by electronic mail at jgrieser@buckscounty.org. The opinions expressed herein may not necessarily represent those of the County of Bucks.

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report

| Date of Report: 01-12-2021 | Day: Tuesday | Investigator: Bochenek, Frank T. | ORI#: | Incident #: ▮ | UCR: ▮ |
|---|---|---|---|---|---|

| Source of Call: Referred | Date and Time of Incident: 01-11-2021 / 2100 hours | | Case Status: Clear / Closed | | |
|---|---|---|---|---|---|

| Crime or Incident: Contraband / Drug law violation | Location of Incident – Address/Module: BCCF / ▮ | | | | |
|---|---|---|---|---|---|

| Involved: Inmate | QUINN, T▮ | | DOB ▮ | BCP# ▮ | Telephone |
|---|---|---|---|---|---|
| Involved: Staff | BENNETT, K▮ - BCCF Corrections Officer | | DOB ▮ | BCP | Telephone |
| Involved: Staff | HARRISON, E▮ - BCCF Corrections Officer | | DOB ▮ | BCP | Telephone |
| Involved: Staff | CRUZ, N▮ - BCCF Corrections Sargeant | | DOB ▮ | BCP | Telephone |

**Summary:**
Inmate QUINN found in possession of controlled substances and observed to appear under the influence of drugs

**Assisting Staff:**
R▮ Leopardi - BCCF Corrections Officer

**Narrative:**
At about 2130 hours Monday 01-11-2021, DDO K▮ Rousset informed me of a possible overdose incident in cell ▮, on "D" Module. Inmate QUINN was observed by Prime Care Nurse R▮ Stoltzfus he observed Inmate QUINN appearing like he was under the influence of a controlled substance. CO Bennett was assisting Nurse Stoltzfus with dispensing medication when the observation was made. Inmate QUINN was seen by Prime Care Medical and a Narcan injection was administered to him. Inmate Quinn was then transported to Doylestown Hospital for evaluation and treatment.

At about 2200 hours I arrived at BCCF and spoke with officers involved in this incident. Sgt Cruz related at about 2105 hours she was informed by CO McMullin of a request from Nurse Ruben to have Inmate QUINN be given a urinalysis test due to observations made by the nurse. Sgt. Cruz continued saying at about 2110 hours "D" Module Officer, CO Bennett, informed her Inmate QUINN had just been removed from cell ▮ and Inmate QUINN had contraband in the cell on the chair in plain view. Cell ▮ was secured. Sgt. Cruz and Lt Brown went to cell ▮. They saw 9 small bags with a blue color paper inside and 1 orange pill sitting on top of the chair opposite the desk area. IM QUINN had been removed from the cell and was in a holding cell at the time. Inmate QUINN was assigned to the cell being housed alone under medication isolation. CO Bennett, CO Harrison and Sgt. Cruz continued searching he cell.

CO Bennett said at about 2100 hours he was assisting Nurse Stoltzfus with medication rounds. They made contact with Inmate QUINN cell #43. Nurse Stoltzfus said to CO Bennett that Inmate QUINN appeared to be under the influence of something as he appeared non-coherent. Inmate QUINN was then secured in the cell due to his classification as being medication isolation. CO Bennett said ▮ CO Beck and CO Dones escorted IM QUINN from his cell off the module. CO Bennett began to conduct a cell search for contraband. CO Bennett saw a towel on a chair and when he picked up the towel there were several bags of an unknown substance and an orange pill. Sgt Cruz was notified of the contraband and responded with Lt. Brown. CO Bennett said he and CO Harrison began to fully search the cell. CO Bennett said additional contraband was found under the bottom bunk mattress and a condom was found under the cell sink.

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report

Page 2, case 21-024-18

CO Harrison advised me IM QUINN was taken off the module on suspicion of being intoxicated. CO Harrison assisted CO Bennett in searching the cell. CO Harrison observed the bags of blue contents under a towel on the only chair in the cell. The bottom bunk mattress was lifted and a clear plastic bag of pills and small bag of tobacco like matter was near the pills. CO Harrison observed a condom ███████████████████████████████████████████ ███████████████████████████████

CO Harrison added when he entered the cell there was a strong odor of fecal matter in the air. In addition to the contraband a note was found with writing on it saying "IN MY ASS". CO Harrison said just prior to the incident IM QUINN was given the opportunity to take a shower. IM QUINN refused to shower and discarded trash from inside the cell. IM QUINN then returned into his cell closing his door behind him. CO Harrison said other than refusing the shower IM QUINN did not appear to be under the influence of any substance. ████████████████████████

CO Harrison also said when IM QUINN was being escorted off the module CO Harrison observed Inmate QUINN to have trouble walking, was glassy eyed and lethargic. CO Harrison was requested to provide a follow up memo describing what his observations were during his contact with Inmate QUINN and during the cell search.

████████████████████████████████████████████████████████████ ████████████

██████████████████████, I removed evidence seized from inside cell ██████ assigned to IM QUINN. ██████████ █████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████

In doing so I observed, and counted, 9 small clear plastic baggies containing what appeared to be blue color waxed paper with the marking of "LAKALAKA". These baggies are consistent with possessing and distributing packets of controlled substance Heroin, a PA schedule 1 drug.

Also present were 21 full orange color pills marked 970, and 1 broken orange color pill similar to the full pill. In researching the pill through Drugs.com the pills were identified as Buprenorphine Hydrochloride and Naloxone Hydrochloride pills Sublingual 8mg base / 2mg base. These pills are listed as PA schedule 3 drugs available by prescription only.

██████████████the contraband recovered from QUINN'S cell was transported to NMS Labs for analysis by Investigator Daniel ONISICK. On 02/11/2021 I received the laboratory results from NMS Labs which indicated that the (9) plastic zip-lock bags containing blue wax folds white powdery substance was determined to be 4-ANPP, a DEA Schedule II Substance, Fentanyl, a PA Schedule II Substance, Heroin, a Schedule I Substance, and para-Fluoroisobutrylfentanyl, a PA Schedule I Substance. The (21) and parts of orange pills stamped "970" was determined to be Buprenorphine & Naloxone, a PA Schedule II Substance.

**"CONTINUED"**

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report

**21-024-18: PAGE 3**

On 05/17/2021 I attended the preliminary hearing for Inmate T█████ QUINN at District Court 07-2-02. QUINN waived his right to a preliminary hearing and arraignment is scheduled for July 22nd 2021 at the Buck County Court of Common Pleas.

On 10/07/2021 a trial was held for the defendant, T█████ QUINN at the Bucks County Court of Common Pleas before the Honorable Judge Raymond F. MCHUGH. The defendant entered a negotiated Guilty Plea to Contraband, Possession of a Controlled Substance, and Possession of Drug Paraphernalia. And was sentenced to 18 – 36 months in a state correctional facility.

This investigation is closed. There are no active CLEAN/NCIC messages associated with this investigation and evidence will be destroyed in accordance with BCCF regulations.

*Investigator D█████ Onisick*

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report

| Date of Report:<br>04/18/2022 | Day:<br>Monday | Investigator:<br>Onisick, Daniel | | ORI#: | Incident #:<br>█████ | UCR:<br>█████ |
|---|---|---|---|---|---|---|

| Source of Call:<br>Staff Initiated | Date and Time of Incident:<br>04/15/2022 @ Approx. 0730 Hours | | | Case Status:<br>Closed / Arrest | | |

| Crime or Incident:<br>Contraband - Heroin/Fentanyl | Location of Incident – Address/Module:<br>BCCF - A Module, █████ | | | | | |

| Involved:<br>Inmate | B███ SULLIVAN | | | DOB<br>█████ | BCP#<br>█████ | Telephone |
|---|---|---|---|---|---|---|
| Involved: | | | | DOB | BCP | Telephone |
| Involved: | | | | DOB | BCP | Telephone |
| Involved: | | | | DOB | BCP | Telephone |

**Summary:**
Officers conducted a search of ████ after receiving anonymous letter about possible drugs in the cell of IM B████ SULLIVAN. Officers recovered sevral bags of suspected heroin/fentanyl from SULLIVAN'S cell.

**Assisting Staff:**
N/A

**Narrative:**

On 04/15/2022 at approximately 0730 hours, A Module Officer K████ GANDOLFO called Sgt. P███ MORENI to inform him that he had received an anonymous letter stating that there were drugs in cell ████ which was occupied by Inmate B████ SULLIVAN. Sergeants MORENI, A██████ CRUZ, and Officers S████ FURLONG, and S████ HAGG proceeded to A Module and removed Inmate SULLIVAN, who was the lone occupant of cell ████. Inmate SULLIVAN was placed in handcuffs and removed from the module by Sgt. CRUZ and Ofc. FURLONG. Sgt. MORENIN and Ofc. HAAG conducted a search of SULLIVAN'S cell. Ofc. HAAG located a clear plastic bag with white residue on SULLIVAN'S tablet which was lying on an over-turned yellow storage bin the center of the cell. There was a blue wax paper stamped "Kobe 24" lying next to the plastic bag.

While searching a jacket that was on the bottom bunk mattress, Sgt. MORENI discovered a medium sized plastic bag that contained a bundle of smaller plastic, zip locked bags containing blue wax paper also stamped "Kobe 24" in the pocket of the jacket. Sgt. MORENI photographed the evidence prior to collecting it and placing it into an evidence bag. Sgt. MORENI did not open the bag recovered from the jacket pocket prior to placing it into the evidence bag. When Sgt. MORENI asked Inmate SULLIVAN about the contraband items found in his cell, SULLIVAN stated, "Its mine, its dope. SULLIVAN further explained that during the booking process (in BCCF Reception), he concealed the contraband by "tucking" it during the unclothed body search. MORENI advised that SULLIVAN did not explain where he "tucked" the contraband. SULLIVAN advised Sgt. MORENI that he had approximately (10) unopened baggies left.

At approximately 0750 hours, Sgt A. Cruz and Ofc. FURLONG who had escorted Inmate SULLIVAN to the Dispensary, conducted an unclothed body search of SULLIVAN ████████████████████. During the search, Ofc. FURLONG instructed SULLIVAN to hold his upper up for inspection when observed a piece of folded blue paper that was tucked into SULLIVAN'S upper lip.  Officer Furlong retrieved the piece of paper from SULLIVAN'S mouth and Sgt. CRUZ took possession of the contraband.

<u>"CONTINUED"</u>

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report



**22-225-18: Page 2**

The paper matched the contraband found by Sgt. MORENI and Ofc. HAAG when the searched SULLIVAN'S cell ▮▮▮.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

At 0804 hours Sgt Moreni reported that the Dispensary staff was requesting EMS transport to Doylestown Hospital for SULLIVAN due to a suspected opiate overdose, Narcan had been administered by nursing staff.  At 1320 Inmate SULLIVAN was discharged from Doylestown Hospital and returned to BCCF. All documentation was forwarded to the Dispensary.

▮▮▮▮▮▮▮ I transported the items recovered from Inmate B▮▮▮ SULLIVAN'S cell and person to NMS Labs for analysis.

▮▮▮▮▮▮▮▮▮▮▮ Investigator R▮▮▮ MCLEOD and I conducted an interview with Inmate Bryon SULLIVAN regarding the contraband recovered from his cell. Prior to this interview, SULLIVAN was provided Miranda Warnings which he acknowledged and agreed to speak with investigators without an attorney present. SULLIVAN arrived at BCCF ▮▮▮▮▮▮ after being arrested by Bensalem Twp. PD for Retail Theft. SULLIVAN was searched at Bensalem PD and strip searched when he arrived at BCCF. SULLIVAN claimed that he was provided a jumper and placed into a holding cell in BCCF Reception. While he was providing a urine sample he observed a bag with drugs on the floor next to the toilet. SULLIVAN stated he was "ecstatic" since he believed the drugs would help him with detoxing. SULLIVAN described the packets as a "bundle" with 10-12 packets inside. The bags were stamped with Kobe24, or Kobe23. SULLIVAN claimed he did know what the individually wrapped bag of powder that was found with the suspected heroin packets in the larger zip-lock bag.

Inmate SULLIVAN stated that he did not know how long the bag was in the Reception holding cell, and did not see anyone in there prior to being placed into the cell. When I questioned SULLIVAN how he was able to get the bag back to the module, SULLIVAN advised that he hid the bag in his sock after he had been strip searched and provided a jumper. SULLIVAN did admit to using two of the bags of heroin while he was on A Module, but claimed that he did not share it with other inmates. SULLIVAN advised that he used the bags for detox, and stated, "I was lucky that I found it". On the day his cell was searched, SULLIVAN stated that he snorted a bag that morning. SULLIVAN stated that he did not recall talking with Sgt. MORENI, but did remember telling him that the dope was his.

I conducted a review of the ▮▮▮▮▮▮▮▮▮▮▮▮ cameras on 04/13/2022 when Inmate SULLIVAN was admitted to BCCF. SULLIVAN entered Reception at 0331 hours accompanied by two Bensalem PD Officers. SULLIVAN enters HC#3 with a cup for a UT. Sullivan is in civilian clothes at this time and clearly intoxicated. SULLIVAN places his right hand into his pants and appears to manipulate something by his anus. The object is not visible on the camera. SULLIVAN does not appear to urinate in the cup, and never retrieves any item from the floor before exiting the cell at 0340 hours.

SULLIVAN reruns to HC#3 in a yellow jumper with a UT cup. SULLIVAN places the cup on the sink and reaches into the jumper between his legs with his right hand and removes something not visible on camera. SULLIVAN picks up the UT cup and places it on the ground, then places something into his left sock. SULLIVAN departs the cell at 0359 hours.

*"CONTINUED"*

# Bucks County Department of Corrections
## Special Investigation Unit
## Incident Report

**22-225-18: Page 3**

Inmate SULLIVAN enters HC#6 after he is processed at 0427 hours and stands at the toilet and appears to provide a UT. At 0437 hours SULLIVAN then moves to the bench and appears to manipulate something in his crotch and anus area, them sits on the bench to eat a bag lunch. At 0443 hours SULLIVAN bends over and appears to picking something up from the floor beneath where he was just seated. Nothing visible before or after he was seated on the bench. SULLIVAN uses the cellophane wrapper from his sandwich, appearing to possibly conceal something, but it is not visible. SULLIVAN gathers items from the bench and departs the cell at 0444 hours.

On 05/13/2022 I received the lab results from NMS Labs that were submitted for analysis ▇▇▇▇▇▇▇ The submitted items recovered from Inmate SULLIVAN were determined to be 4-ANPP, a DEA Schedule II substance, Fentanyl, a PA Schedule II substance, Fluorofentanyl, a PA Schedule I substance, and Methamphetamine, a PA Schedule II substance.

On 07/18/2022 I attended a preliminary hearing for the defendant, Inmate B▇▇▇ SULLIVAN at District Court 07-2-02. SULLIVAN waived his right to a preliminary hearing and will be applying for veteran's court. Arraignment tentatively scheduled at the Buicks County Court of Common Pleas on 08/19/2022.

*Investigator D▇▇▇ Onisick*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VALERIA CORBIN, administrator of the | : | |
| ESTATE OF JOSHUA PATTERSON, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | Case No. 23-2784 |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| BUCKS COUNTY, et al., | : | |
| | : | |
| Defendants. | : | |

## **OFFICER DEFENDANTS' RESPONSES TO PLAINTIFF'S INTERROGATORIES**

Pursuant to the Federal Rules of Civil Procedure and any applicable Local Rule of Civil Procedure, Defendants Julio Atiles, Stephanie Ulmer, Thomas Fabiani, Tony Dowdy, Joshua Manning, Louis Ventureira, Kaitlyn McGinley, and Connor Wilcox (the "Officer Defendants") respond and object to Plaintiff's Interrogatories as follows:

## **GENERAL OBJECTIONS**

The Officer Defendants set forth the following general objections to the Requests, which are incorporated by reference into each specific response below.

1.      The Officer Defendants object to the Interrogatories to the extent they seek to impose discovery obligations that are greater than those imposed by the Federal Rules of Civil Procedure and any applicable Local Rule of Civil Procedure.

2.      The Officer Defendants object to the Interrogatories to the extent they do not include definitions or instructions.

3.      The Officer Defendants object to the Interrogatories insofar as they are not directed to any particular defendants.

4.      The Officer Defendants object to the Interrogatories to the extent they seek information that is not relevant to any party's claims or defenses and is not reasonably calculated to lead to the discovery of admissible evidence.

5.      The Officer Defendants object to the Interrogatories to the extent they seek information that (i) is protected from discovery by the attorney-client privilege or the work-product doctrine; (ii) constitutes or discloses the mental impressions, conclusions, opinions, or legal theories of an attorney in this or any other litigation; or (iii) is protected from disclosure by any other privilege, immunity, or protection.  Any production of privileged or protected material is inadvertent and shall not constitute a waiver of such privilege or protection.

6.      The Officer Defendants object to the Interrogatories to the extent they are vague, ambiguous, overbroad, harassing, unduly burdensome, or not proportional to the needs of the case.

7.      The Officer Defendants object to the Interrogatories to the extent they seek information that is not in the Officer Defendants' possession, custody, or control, is already in Plaintiff's possession, or is publicly available.

8.      The Officer Defendants object to the Interrogatories to the extent they seek information that is private, personal, or confidential about the Officer Defendants, individual employees, or former employees of the Officer Defendants, the disclosure of which would result in an undue invasion of privacy with respect to those individuals.

9.      The Officer Defendants object to the Interrogatories as overbroad to the extent they fail to specify an applicable or reasonable time period.

10.      The Officer Defendants reserve the right to object to the competency, relevancy, materiality, and admissibility of the information or documents disclosed in response to each Request.

11.     The Officer Defendants' use of any term defined in Plaintiff's Interrogatories does not constitute acceptance of Plaintiff's definitions.

12.     The Officer Defendants reserve the right to modify, amend, or supplement their responses as necessary.

## RESPONSES TO INTERROGATORIES

1.     What is your name?

**RESPONSE:  Louis Ventureira, Stephanie Ulmer, Joshua Manning, Tony Dowdy, Julio Atiles, Kaitlyn McGinley, Connor Wilcox, and Thomas Fabiani.**

2.     From July 25, 2022 through July 28, 2022, where you a correctional officer at the Bucks County Prison. If so what days and times were you are on duty. If so, what was your specific assignment(s) during those days? Please include dates and times. What were your duties during those times.

**RESPONSE:**

**Officer Ventureira – For the specified dates, my assignment was the 2 p.m. – 10 p.m. shift as a Module Officer on Alpha module.  In accordance with Federal Rule of Civil Procedure 33(d), the relevant policy describing a Module Officer's duties was produced on October 30, 2023.  Plaintiff is respectfully referred to this document for additional information.**

**Officer Ulmer – I worked in reception on July 25 and July 26, 2022.  I do not recall where I was working on July 27, 2022.  I was off on July 28, 2022.  In accordance with Federal Rule of Civil Procedure 33(d), the relevant policy describing a Reception Officer's duties was produced on October 30, 2023.  Plaintiff is respectfully referred to this document for additional information.**

**Officer Manning** – For the specified dates, my assignment was the 10 p.m. – 6 a.m. shift as a Special Assignment Officer.  As a Special Assignment Officer, my duties vary from day-to-day as I go anywhere that the facility has a need.  For example, I facilitate officer breaks, respond to interactions, and cover modules as needed.  I also worked forced overtime from 6 a.m. to 2 p.m. on July 26, 2023.  I do not recall working on Alpha module.  If I was on Alpha it was to break a Module Officer. In accordance with Federal Rule of Civil Procedure 33(d), the relevant policy describing a Module Officer's duties was produced on October 30, 2023.  Furthermore, in accordance with Federal Rule of Civil Procedure 33(d) and the protective order entered in this matter, the relevant policy describing a Special Assignment Officer's duties is attached hereto. Plaintiff is respectfully referred to these documents for additional information.

**Officer Dowdy** – For the specified dates, I believe my assignment was the 6 a.m. – 2 p.m. shift as a Module Officer on Alpha Module. I was off on July 25, but worked my scheduled shift on July 26, July 27, and July 28. In accordance with Federal Rule of Civil Procedure 33(d), the relevant policy describing a Module Officer's duties was produced on October 30, 2023.  Plaintiff is respectfully referred to this document for additional information.

**Officer Atiles** – For the specified dates, my assignment was a Special Assignment Officer.  As a Special Assignment Officer, I can be anywhere in the facility depending on the need.  I do not recall specifically, but I believe I was working in reception on the specified dates.  In accordance with Federal Rule of Civil Procedure 33(d), the relevant policy describing a Reception Officer's duties was produced on October 30, 2023.  Furthermore, in accordance with Federal Rule of Civil Procedure 33(d) and the protective order entered in

this matter, the relevant policy describing a Special Assignment Officer's duties is attached hereto.   Plaintiff is respectfully referred to these documents for additional information.

**Officer McGinley** – For the specified dates, my assignment was the 2 p.m. – 10 p.m. shift as a Module Officer on Alpha module. I do not specifically recall whether I was working for the relevant time period but I do know that I worked the shift before Mr. Patterson passed away.  In accordance with Federal Rule of Civil Procedure 33(d), the relevant policy describing a Module Officer's duties was produced on October 30, 2023.  Plaintiff is respectfully referred to this document for additional information.

**Officer Wilcox** – For the specified dates, my assignment was the 2 p.m. to 10 p.m. shift as a Module Officer.  As a recent hire, my assigned Module varied from shift-to-shift depending on the Facility's need.  I also worked a forced overtime shift from 10 p.m. to 6 a.m. on July 27, 2022 on Alpha Module.  In accordance with Federal Rule of Civil Procedure 33(d), the relevant policy describing a Module Officer's duties was produced on October 30, 2023.  Plaintiff is respectfully referred to this document for additional information.

**Officer Fabiani** – I cannot remember.  By way of further response from counsel, since the alleged incident, Officer Fabiani suffered a subarachnoid hemorrhage, resulting in memory, cognitive, and mobility impairment. While Officer Fabiani was asked these Interrogatories, he has no memory of the alleged incident or the days in question.  Officer Fabiani is still undergoing treatment for his injuries.  Medical documentation from Officer Fabiani's treating physician was produced to Plaintiff on February 2, 2024.

3.      Please state what if any contact you had with the decedent inmate Joshua Patterson during July 25, 2022 through July 28, 2022. Please describe the contact you had with the inmate.

**RESPONSE:**

**Officer Ventureira** – Aside from conversation during regular tours, none.

**Officer Ulmer** - None.

**Officer Manning** - None.  I do not remember this inmate.

**Officer Dowdy** - Aside from general duties, none.

**Officer Atiles** - None.

**Officer McGinley** - Aside from conversations in passing, none.

**Officer Wilcox** –  From July 25, 2022, through July 27, 2022, prior to the alleged incident, I do not recall any contact outside of my general duties.  On the night/morning of the alleged incident, I had routine contact with Mr. Patterson throughout the evening on my scheduled rounds.  Mr. Patterson was singing and dancing in his cell, playing music through his tablet.  On one round, I recall Mr. Patterson making finger guns at me.  At approximately 1:30 a.m. or 2 a.m., I took my scheduled break with Officer Clarke providing coverage.  Upon my return, I continued completing my scheduled rounds.  After a couple rounds, I noticed Mr. Patterson lying on the ground.  After receiving no verbal response from Mr. Patterson, I immediately activated my body alarm, moved Mr. Patterson to the upper-tier balcony, and began administering CPR.  I continued to administer CPR until I was relieved.  I did not have any contact with Mr. Patterson on July 28.

**Officer Fabiani** – I cannot remember. Plaintiff is referred to the response to Interrogatory No. 1 for additional details.

6

4.     Please state what if any contact you had with inmates J. Torres #133115, M. Clark #110759, J. Dobrowski #091463, A. Rhoades, #128546, and J. Massino #133188, during July 25, 2022 through July 28, 2022. Please describe the contact you had with the inmate.

**RESPONSE:**

**Officer Ventureira -** ███████████████████████████████████████████

████████████████████████████ **As to A. Rhodes, I performed the search of his cell and ultimately found paraphernalia.  I had no interaction other than day-to-day business with M. Clark, J. Massino, or J. Dobrowski.**

**Officer Ulmer - I was the female officer working in reception when A. Rhodes was booked.  I asked A. Rhoades questions, which he answered and that was it.  I had no contact with J. Torres, M. Clark, or J. Massino.**

**Officer Manning – None.**

**Officer Dowdy - None. M. Clark was a block runner on Alpha Module, but I do not recall any interactions with him.**

**Officer Atiles – In reception, I gave A. Rhoades a pat down search and an unclothed body search.  After the unclothed body search, I directed A. Rhoades to go to Holding Cell No. 6.  I had no contact with J. Torres, M. Clark, J. Dobrowski, or J. Massino.**

**Officer McGinley – I was involved with the extraction of A. Rhodes when he was searched by my partner, Officer Ventureira, and drugs were found in his cell.  I had no contact with J. Torres, M. Clark, J. Dobrowski, or J. Massino.**

**Officer Wilcox – None. I recall M. Clark working as block runner and hearing that he was a good worker, but I do not recall any contact with him.**

**Officer Fabiani – I cannot remember.  Plaintiff is referred to the response to**

Interrogatory No. 1 for additional details.

5.      During the time period of July 25, 2022 through July 28, 2022, what was the policy at the Bucks County Prison in regard to:

     a.      Searching inmates at intake.

     b.      Searching inmates' cells.

     c.      Monitoring inmates activities on the block, pod or unit, where they were housed.

     d.      Inmates in restrictive or protective custody.

     e.      Inmates not in restrictive or protective custody interacting with inmates in restrictive or protective custody.

**RESPONSE: Subject to the foregoing objections, following the entry of an appropriate protective order, and in accordance with Federal Rule of Civil Procedure 33(d), all policies responsive to the foregoing Interrogatory were produced on October 30, 2023. Plaintiff is respectfully referred to those documents.**

6.      Please state any prior allegations, within the last ten years, of narcotics being recovered by any corrections officers at the Bucks County Prison. Please include any reference to and produce copies of, any and all case/incident reports, internal affairs records, investigation records, medical records, cell block records, etc.

**RESPONSE:  The Officer Defendants object to the foregoing Interrogatory as it is beyond the scope of their knowledge and, as Plaintiff's counsel explained on January 9, 2024, is directed to the County of Bucks.  The Officer Defendants will not respond to this interrogatory.  Counsel for the County will confer with Plaintiff's counsel separately regarding the response to this Request.**

7.      Please state any and all prior founded internal affairs or internal disciplinary reports to which you have been subject while employed as a bucks county corrections officer.

**RESPONSE:   Subject to the foregoing objections, following the entry of an appropriate protective order, and in accordance with Federal Rule of Civil Procedure 33(d), the Officer Defendants will produce relevant, non-privileged documents responsive to this Interrogatory.  Plaintiff is respectfully referred to the attached documents.**

Dated:    February 8, 2024              **BUCKS COUNTY LAW DEPARTMENT**

                                        */s/ Jaclyn C. Grieser*
                                        Jaclyn C. Grieser, (No. 93385)
                                        Deputy County Solicitor

                                        */s/ Tyler B. Burns*
                                        Tyler B. Burns (No. 325660)
                                        Assistant County Solicitor

**V E R I F I C A T I O N**

I, _____ verify that the responses to Plaintiff's Interrogatories are true

and correct to the best of my knowledge, information, and belief. This verification is made subject to

the penalties of 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury.

_____
**Dated:**

_____
**Signature**

# V E R I F I C A T I O N

I, _Tony Lee Doozle_ verify that the responses to Plaintiff's Interrogatories are true and correct to the best of my knowledge, information, and belief. This verification is made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury.

Dated: 2   24

Signature

# **V E R I F I C A T I O N**

I, _____Connor Wilcox_____ verify that the responses to Plaintiff's Interrogatories are true

and correct to the best of my knowledge, information, and belief.  This verification is made subject to

the penalties of 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury.

**Dated: January 30, 2024**
                                                              Connor Wilcox
                                        _____
                                        **Signature**

## <u>V E R I F I C A T I O N</u>

I, <u>Joshua J Manning</u> verify that the responses to Plaintiff's Interrogatories are true and correct to the best of my knowledge, information, and belief. This verification is made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury.

**Dated:** 2 - 7 - 24

Signature

**V E R I F I C A T I O N**

I, Stefanie Ulmer verify that the responses to Plaintiff's Interrogatories are true and correct to the best of my knowledge, information, and belief. This verification is made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury.

Dated: 2/01/24

_____

**Signature**

# V E R I F I C A T I O N

I, _____ verify that the responses to Plaintiff's Interrogatories are true
and correct to the best of my knowledge, information, and belief. This verification is made subject to
the penalties of 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury.

Dated:  02 - 01 - 24

_____
**Signature**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VALERIA CORBIN, Administrator of the | : | CIVIL ACTION |
| ESTATE OF JOSHUA PATTERSON | : | |
| | : | |
| Plaintiff, | : | No. 23-2784 |
| | : | |
| v. | : | |
| | : | |
| BUCKS COUNTY, et al. | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S ANSWERS TO INTERROGATORIES OF OFFICER DEFENDANTS

1. Someone from the prison called me to tell me that Joshua was at the hospital.  Other than that, I did not have any communications with anyone from the prison or any other party to the case that I can recall.

2. Plaintiff intends to call the parties to the action to testify at trial as to their knowledge, information and involvement pertaining to the incident.  See all documents attached, which will be relied upon or introduced into evidence.

3. I am the mother to the decedent.  Other than that, I have no relationship to any other party.

4. The Decedent died intestate.

5. The Decedent's heirs are his children: Elijah Reyes, Jamari Reyes and Loyalty London Patterson.

6. The decedent graduated high school with his high school diploma and completed some college but did not graduate.

7. Within the five years prior to his death, decedent was employed with a trash company, whose business name I cannot recall and at a McDonald's in Pennsylvania, whose address I do not know.

8. Plaintiff is in the process of obtaining medical records for the decedent and will amend this response to supplement those records upon receipt of same.

9. The decedent suffered from drug addiction for about 1 year prior to this incident.

10. The decedent did not have any physical disabilities, limitations or handicaps.

11. The decedent was an alcohol, drug, and tobacco user.  He used painkillers, mainly Percocet and smoked Black & Mild cigars.

12. The decedent was rehabilitating while in prison and was using suboxone to combat his addiction issues.

13. Plaintiff reserves the right to supplement this response upon determination of economic damages.

14. Plaintiff claims damages in this action based on loss of services, care, guidance, counsel, training, society, comfort or companionship suffered by each of the decedent's three children.  Plaintiff reserves the right to amend this response upon determination of the calculations.

15. Plaintiff claims damages based on mental anguish, grief or sorrow suffered by each of the decedent's three children.  Plaintiff reserves the right to amend this response upon determination of the calculations.

16.  The Decedent did not pay child support for his children but he was an active, involved father.

17.  Objection.  Plaintiff's Complaint is a legal pleading that speaks for itself.

18. Plaintiff reserves the right to amend this response to supplement this response to include income documents upon receipt of same.

19. Plaintiff has not yet determined which expert witnesses will be called at the time of trial. Plaintiff reserves the right to supplement this response upon determination of same.

20. Plaintiff reserves the right to amend this response upon determination of same.

21. Plaintiff reserves the right to amend this response upon determination of same.


                                              **LEVIN & ZEIGER, LLP**

Date:   2/6/24                    BY:   _/s/ Brian J. Zeiger, Esquire_____
                                        BRIAN J. ZEIGER, ESQUIRE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VALERIA CORBIN, administrator of the : 
ESTATE OF JOSHUA PATTERSON, :

                              :       CIVIL ACTION

             Plaintiff, :

                              :       Case No. 23-2784

     v. :

                              :       JURY TRIAL DEMANDED

BUCKS COUNTY, et al., :

                              :

           Defendants. :

---

## OFFICER DEFENDANTS' REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF VALERIA CORBIN

Pursuant to Federal Rule of Civil Procedure 34, Defendants Julio Atiles, Stephanie Ulmer, Thomas Fabiani, Tony Dowdy, Joshua Manning, Louis Ventureira, Kaitlyn McGinley, and Connor Wilcox (the "Officer Defendants") hereby requests that Plaintiff produce for inspection and copying, the documents in her possession, custody, or control as set forth below.  The production should be made to: Jaclyn C. Grieser & Tyler B. Burns, Bucks County Law Department, 55 E. Court Street, Doylestown, PA 18901 (E-mail: Jgrieser@buckscounty.org & Tbburns@buckscounty.org).

## INSTRUCTIONS

1.      In responding to this request, you are required to obtain and produce all documents and/or things requested which are in the possession of, available to, or under the control of you and/or any of your representatives, employees, agents, contractors, consultants, servants, or attorneys.

2.     Where a specific document and/or thing is requested, such request shall be interpreted to include any other documents and/or things which are known to contain information relevant to the request.

3.     If a document and/or thing described by the request was, but no longer is, in existence or in your possession or control, your response should indicate:

    a.   the last known location of that document and/or thing;

    b.   the names and addresses of all persons with knowledge of the contents of the document and/or thing;

    c.   why the document and/or thing is no longer in existence or in your possession or control.

4.     This request represents a continuing request for production. Therefore, if a document and/or thing described by this request is not in existence, or is not in your possession or control, at the time of this request, but that document and/or thing later comes into existence or comes into your possession or control, you must immediately produce that document.

5.     Any request propounded in the disjunctive shall also be read and propounded in the conjunctive and vice versa, any request propounded in the singular shall also be read as propounded in the plural and vice versa, and any request propounded in the present tense shall also be read as propounded in the past tense and vice versa.

6.     If any form of privilege, or other protection from disclosure, is claimed as a ground for withholding any document or thing requested to be produced, you are instructed to set forth:

    a.   the number and particular part of this request for production to which the claimed privileged information is responsive;

b.  a description of the document or thing which would be responsive (including the date, title, author/creator, and subject matter of the document and/or thing);

c.  the basis upon which the privilege is claimed, and

d.  the identity of each person (other than the attorneys representing you in this action) to whom the contents of the document or thing have been disclosed, either orally or in writing.

7.     If you object to any document request in whole or in part on the ground that the request is unreasonably burdensome, identify the approximate number and the nature of the documents needed to be searched, the location of the documents, and the number of person-hours and costs required to conduct the search.

8.     No document request should be left unanswered. If the answer to a request or subparagraph of a request is "none" or "unknown," the word "none" or "unknown" must be written in the answer. If the request is inapplicable, "n/a" and the reason why the request is inapplicable must be written in the response.

## **DEFINITIONS**

A.     "And" and "or" shall be construed as either in the disjunctive or in the conjunctive, as required to bring within the scope of these requests documents and/or things which might otherwise be considered to be beyond their scope.

B.     "Any" and "all" shall be construed as required to bring within the scope of these requests documents and/or things which might otherwise be considered to be beyond their scope.

C.     "Communication" means any transmittal of information (in the form of facts, ideas, inquiries, or otherwise), including but not limited to mail correspondence, email, facsimiles, telephone calls, text messages or instant messages set to or received by any stationary or mobile

communications device (including wireless and cellular telephones, personal digital assistants, and laptop or desktop computers, and oral conversations).

D.      "Concerning" means relating to, referring to, describing, evidencing, or constituting.

E.      "Decedent" means Joshua Patterson.

F.      "Documents" and "things" means the materials listed in Rule 34(a) of the Federal Rules of Civil Procedure (including, but not limited to, written, typewritten, printed, recorded, charged, taped, graphic, magnetic, photographed, filmed, and computer-based) and any drafts or non-identical copies thereof in the possession, custody, or control of Plaintiff or his attorneys, or known by Plaintiff or his attorneys to exist.

G.      "Person" means any natural person and any corporation, association, other business enterprise or legal entity, or government body or agency, and means both the singular and plural.

H.      "You," "your," and "Plaintiff" refers to Valeria Corbin, along with any of his heirs, beneficiaries, principals, representatives, or agents.

## DOCUMENTS REQUESTED

1.      All statements, signed statements, transcripts of recorded statements or interviews of any person or witness concerning or describing any of the events described in the Complaint.

2.      All expert opinions, reports, summaries, or other writings in your custody or control or in the custody or control of your attorney, which relate to the subject matter of this litigation.

3.      All documents, correspondence or other drawings, sketches, diagrams, or writings in your custody or control of in the custody or control of your attorney or insurers, which relate to the subject matter of this litigation.

4.      All photographs and videotapes of any item or thing involved in this litigation.

5.      All documents and communications prepared by you, your representative, agent, or anyone acting on your behalf, except your attorneys, during the investigation of the incident in question or any of the events or allegations described in the Complaint.  Such documents shall include any documents made or prepared up through the present time, with the exclusion of the mental impressions, conclusions, or the opinions respecting the value or merit of the claim or defense or respecting strategy or tactics.

6.      All financial records concerning Decedent including, but not limited to, any and all tax returns, W-2s and other filings, employment records, and wage or salary information for a period of five (5) years prior to the date of this incident and up to the present.

7.      All documents that refer or identify any Department of Public Welfare Medical Assistance liens, Medicare/Medicaid liens, liens from any public source or any other applicable liens in connection with any treatment or injuries that Decedent received as a result of the accident forming the basis for this lawsuit.

8.      Decedent's medical records from his incarceration at Bucks County Correctional Facility, including but not limited to those from PrimeCare Medical, Inc.

9.      All grievances, sick call slips and/or requests submitted by or on behalf of Decedent to Bucks County Correctional Facility, and/or PrimeCare Medical, Inc., including but not limited to, those indicating that he needed medical evaluation and treatment in relation to his narcotics usage.

10.      All responses to the grievances, sick call slips and/or requests submitted by or on behalf of Decedent from Bucks County Correctional Facility and/or PrimeCare Medical, Inc., including but not limited to, those indicating that he needed medical evaluation and treatment in relation to his narcotics usage.

5

11.     All documents related to any grievance, grievance response, appeal or appeal response submitted by or on behalf of Decedent to Bucks County Correctional Facility and/or PrimeCare Medical, Inc., including but not limited to, those indicating that he needed medical evaluation and treatment in relation to his narcotics usage.

12.     All documents and communications supporting your contention that "Defendants knew [D]ecdent was vulnerable to overdose or injury due to his previous narcotics usage."

13.     All documents and communications supporting your contention that "Defendants knew there was a pervasive drug smuggling problem at the Bucks County Prison."

14.     All documents and communications supporting your contention that "Defendants ignored their knowledge of illegal narcotics entering the Bucks County Prison and did not do anything to curb the introduction, spread, and usage of dangerous drugs in prison, despite their direct and prior knowledge from prisoners regarding drugs in the prison."

15.     All documents and communications concerning the creation or raising of the Estate of Joshua Patterson.

16.     All documents and communications concerning or showing that Valeria Corbin is the "Administrator of the Estate of Joshua Patterson."

17.     All documents and communications concerning your contention Elijah Reyes, Jamari Reyes, and Loyalty Patterson are "beneficiaries under the Wrongful Death Act."

18.     All documents and communications concerning your contention that you "claim[] all expenses recoverable under the Wrongful Death Act, including but not limited to damages for medical, funeral and burial expenses and expenses of administration necessitated by reason of the injuries causing Joshua Patterson's death."

19.     All documents and communications identifying the "Co-Administrators" of the Estate of Joshua Patterson.

20.     All documents and communications concerning your contention that the "Co-Administrators claims damages for monetary support that the decedent would have provided to the beneficiaries during his lifetime, including but not limited to, the support provided, or which could have been expected to have been provided to the beneficiaries."

21.     All documents and communications concerning your contention that "the Co-Administrators claim damages for all pecuniary loss suffered by the beneficiaries."

22.     All documents and communications concerning your contention that "the Co-Administrators claim damages for all loss of consortium, comfort, society, guidance, and tutelage that the beneficiaries may have received from the decedent by the beneficiaries as a result of decedent's untimely death."

23.     All documents and communications concerning your contention that Joshua Patterson's "his Estate has been deprived of the economic value of his life expectancy, and Plaintiff's claim under the Survival Act, damages for all pecuniary losses suffered by the Estate as a result of his decedent's death, including all loss of income, earnings, retirement income, benefits and Social Security income."

24.     All documents and communications concerning your contention that "The administrator further claims, under the Survival act, the total amount that the decedent would have earned in the future, minus the costs of personal maintenance."

25.     All documents and communications concerning your contention that "the Co-Administrators claim damages for services provided of which could have been expected to have been performed in the future."

7

26.     All documents and communications identified in and relied upon by you in answering the Officer Defendants' Interrogatories.

27.     All documents that you intend to rely upon or introduce at trial of this litigation.

28.     The name, address, and telephone number of any expert witness consulted and the nature of their expertise.

29.     The Curriculum Vitae of any expert witnesses.

30.     Copies of any rule or principal relied upon by any expert witness in rendering their opinion(s).

31.     Copies of any codes, regulations, or standards, governmental or otherwise, relied upon by any expert witness in setting forth the facts and opinions of that expert witness.

32.     Copies of the text from any scientific or engineering textbook or other publication relied upon by any expert witness in setting forth the facts and opinions of said expert witness.

Dated: January 3, 2024                          BUCKS COUNTY LAW DEPARTMENT

                                                */s/ Jaclyn C. Grieser*
                                                Jaclyn C. Grieser, (No. 93385)
                                                Deputy County Solicitor

                                                */s/ Tyler B. Burns*
                                                Tyler B. Burns (No. 325660)
                                                Assistant County Solicitor

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VALERIA CORBIN, Administrator of the :    CIVIL ACTION
ESTATE OF JOSHUA PATTERSON    :
                               :
                Plaintiff,    :    No. 23-2784
                               :
     v.                              :
                               :
BUCKS COUNTY, et al.          :    JURY TRIAL DEMANDED
                               :
               Defendants.    :

## **PLAINTIFF'S ANSWERS TO DEFENDANTS' REQUESTS FOR PRODUCTION OF DOCUMENTS**

1.    Plaintiff is not in possession of any documents in response to this request except for deposition transcripts and documents previously provided by the Defendants.

2.    Plaintiff will provide an expert report from Will Adams by March 5, 2024, by agreement. The plaintiff previously identified and provided a CV for Will Adams to the defense counsel.

3.    Plaintiff is not in possession of any documents in response to this request except documents previously provided by the Defendants.

4.    Plaintiff is not in possession of any documents in response to this request except documents previously provided by the Defendants.

5.    Plaintiff is not in possession or aware of any documents in response to this request.

6.    Plaintiff is awaiting receipt of decedent's tax returns, which will be produced upon receipt. If requested, Plaintiff will provide signed Authorizations permitting the release of this information to defendants. Plaintiff is unaware of or possesses any other documents in response to this request.

7.    Plaintiff has requested DPW and Medicare/Medicaid liens. Plaintiff is awaiting confirmation regarding the existence of a DPW lien. The decedent was not the recipient of Medicare/Medicaid.

8.    Plaintiff is not in possession of the decedent's medical records from Bucks County Corrections Facility/Prime Care. The plaintiff will provide the defendants with a signed Authorization permitting the release of these records to them, if requested. Further, Plaintiff believes these documents are in custody

of the Defendant. Further, Plaintiff is not in possession of the decedent's medical records from Doylestown Hospital, and she will sign a release for Doylestown Hospital upon request of Defendant. Further, Plaintiff believes these documents are in the custody of the Defendant.

9.   Plaintiff is not in possession of decedent's grievances, sick call slips, and/or requests submitted by or on behalf of decedent from Bucks County Correctional Facility and/or PrimeCare Medical, Inc. Plaintiff believes these documents are in the custody of the Defendant.

10.  Plaintiff is not in possession of any responses to the grievances, sick call slips and/or requests submitted by or on behalf of Decedent from Bucks County Correctional Facility and/or PrimeCare Medical, Inc. Plaintiff believes these documents are in the custody of the Defendant.

11.  Plaintiff is not in possession of any documents related to any grievance, grievance response, appeal or appeal response submitted by or on behalf of Decedent from Bucks County Correctional Facility and/or PrimeCare Medical, Inc. Plaintiff believes these documents are in the custody of the Defendant.

12.  Plaintiff is not in possession of any documents in response to this request for documents.

13.  Plaintiff is not in possession of any documents in response to this request for documents. See cases cited in Plaintiff's complaint and narcotics smuggling documents given to Plaintiff by Defendants in response to her requests for documents.

14.  Plaintiff is not in possession of any documents in response to this request for documents. See cases cited in Plaintiff's complaint and narcotics smuggling documents given to Plaintiff by Defendants in response to her requests for documents.

15.  Any and all documents related to the Estate were previously provided to the Defendant by Plaintiff.

16.  Any and all documents related to the Estate were previously provided to the Defendant by Plaintiff.

17.  Any and all documents related to the Estate were previously provided to the Defendant by Plaintiff.

18.  Plaintiff will produce these documents to Defendant once received.

19.  Any and all documents related to the Estate were previously provided to the Defendant by Plaintiff.

20.  Any and all documents related to the Estate were previously provided to the Defendant by Plaintiff.

21. Elijah Reyes, Jamari Reyes and Loyalty Patterson were decedent's biological children. Any and all documents related to the Estate were previously provided to the Defendant by Plaintiff.

22. Elijah Reyes, Jamari Reyes and Loyalty Patterson were decedent's biological children. Any and all documents related to the Estate were previously provided to the Defendant by Plaintiff.

23. Elijah Reyes, Jamari Reyes and Loyalty Patterson were decedent's biological children. Any and all documents related to the Estate were previously provided to the Defendant by Plaintiff.

24. The plaintiff does not intend to call an economics expert at trial and, therefore, is not in possession of any documents in response to this request.

25. The plaintiff does not intend to call an economics expert at trial and, therefore, is not in possession of any documents in response to this request.

26. Plaintiff will provide documents to the Defendants as stated within this reply once in her possession.

27. All documents have been provided to the defendants. Or, in the alternative, all documents have been supplied by the defendant to the plaintiff and are therefore in the defendant's possession.

28. Plaintiff previously provided information regarding expert witness testimony to Defendants.

29. Plaintiff previously provided information regarding expert witness testimony to Defendants.

30. Plaintiff previously provided information regarding expert witness testimony to Defendants.

31. Plaintiff previously provided information regarding expert witness testimony to Defendants.

32. Plaintiff previously provided information regarding expert witness testimony to Defendants.

**LEVIN & ZEIGER, LLP**

Date:   2/6/24                            BY:   */s/ Brian J. Zeiger, Esquire*
                                                BRIAN J. ZEIGER, ESQUIRE

## VERIFICATION

I, Valleria Patterson Corbin, hereby verify that I am the Plaintiff in this action and the statements made in the foregoing Answers to Defendants' Requests for Production of Documents are true and correct to the best of my knowledge, information and belief.  I understand that statements made in said Verification are made subject to the penalties of the Federal Rules of Civil Procedure.

**VALLERIA PATTERSON CORBIN**

EXPERT TESTIMONY AND/OR OPINION OF WILLIAM ADAMS
Correctional Counselor II, (Ret.)
California Department of Corrections and Rehabilitation


Regarding:


VALERIA CORBIN, Administrator of the ESTATE OF JOSHUA PATTERSON,
Plaintiff(s), vs. BUCKS COUNTY, et al., Defendant(s).

In the United States District Court for the Eastern District of Pennsylvania
Civil Action Number 23-0027


**CURRICULUM VITAE:**

1.   I am the owner and lead consultant of Correctional Litigation Solutions (CLS). CLS is a consulting firm that provides expert testimony and consulting services regarding policies, procedures, and general prison information regarding accepted standards, policies, and procedures related to correctional system, prison, and jail best practices and industry standards. The firm also provides services regarding general law enforcement use of force issues. My business address, contact information and fee schedule is as follows:

WILL ADAMS
Correctional Litigation Solutions
16692 Hallmark Trail
Monument, CO 81032
will.adams@corrlitsolutions.com


**FEE SCHEDULE**


| | |
|---|---|
| Records Review/Consult/Report | $350 per hour |
| Deposition Testimony (4-hour Minimum) | $350 per hour |
| Travel (Excluding Trial Days) | $225.00 per hour |
| Mileage (Current Federal Rate) | 67¢ per mile |
| Trial Testimony | $2800.00 per day |

Corbin vs. Bates County, et al.
March 4, 2024
Page 2

## PROFESSIONAL HISTORY

2.     I began my employment with the California Department of Corrections (CDCR) on January 4, 1988. I attended the Basic Correctional Officer Academy shortly thereafter. On June 1, 1993, I was promoted to Correctional Sergeant. As a sergeant, I supervised Prison Facilities, Prison Yards, Prison Kitchen, Watch Office, Central Control, Receiving and Release, Inmate Transportation, Mental Health Unit, Outside Patrol Sergeant, and served two years as an In-Service Training Sergeant. During that period, I was one of the institution sergeants that assisted in the design and development of the current direct impact munitions and riot control procedures for which CDCR is now respected in the law enforcement community.

3.     On January 1, 2001, I was promoted to Correctional Lieutenant. As a lieutenant, I served as the second-line supervisor for all Correctional Officers and first-line supervisor for all sergeants. I routinely supervised facilities housing an average daily population of 1200 inmates, 20 correctional officers, and two sergeants, often cross covering a second facility. I served as watch Commander where I was in charge of the entire prison after business hours. I served as the escape commander and interim emergency commander as needed. While in that position, I was responsible for 4700 inmates and all staff members on institutional grounds. I served as Visiting Lieutenant and was a trainee member of the Special Emergency Response Team. I commanded the R. J. Donovan Correctional Facility Honor Guard as well.

4.     On November 26, 2006, I was promoted to Correctional Counselor II Specialist, Appeals Coordinator, at Kern Valley State Prison. I served in that position until accepting an assignment as Facility Captain in 2007. I served out of class as a captain for six months, and then accepted the position of Litigation Coordinator (returning to CCII Specialist as a lateral transfer) in late 2007.

5.     During my time as a Litigation Coordinator, I was utilized by the California Department of Corrections and Rehabilitation's Office of Legal Affairs, and the California Department of Justice, Office of the Attorney General, as a prison expert including prison administration, prison gangs, use of force, inmate politics and behaviors, inmate cultural norms, contraband and smuggling, and various other matters. I served as an expert in several trials and provided consulting services to the California DOJ and CDCR on multiple matters requiring my intimate knowledge of, and long-time experience with, matters of prison administration.

6.     On September 1, 2014, I retired from service with the CDCR, having served almost 27

Corbin vs. Bates County, et al.
March 4, 2024
Page 3

years in peace officer positions at three institutions of the department and having served in several special details away from the institution. The minority of my career was spent in administration, giving me a breadth of operational experience and constant inmate and staff contact over the years. Even during my time in administrative positions, I continued to remain qualified as a peace officer, and to train correctional officers, sergeants, lieutenants, and other prison staff as needed.

7.    Throughout my career, and continuing through this day, I have served as an expert witness in California state courts regarding general prison matters, prison and jail administration, interpretation of CDCR documents, CDCR policies and procedures, use of force, narcotic distribution and smuggling in the prison setting, prison gangs, prison disruptive (street gang) activities, and protection of confidential informants, documents, and information under the control of CDCR. Such testimony has taken place in the counties of San Diego, Los Angeles, Kern, Riverside, Kings, Tulare, Santa Cruz, Del Norte, and Monterey, among others.

8.    I have provided expert testimony and reports in Federal Court regarding prison and jail administration, confidential informant protection, confidential record protection, prison disciplinary process, general prison culture, inmate cultural norms, prison rules and policies, prison gang culture, emergency response, less lethal and deadly force with firearms and launchers, and use of force policy, procedure, applications, and options.

9.    Most often my expertise in use of force policy and procedure is provided in Federal Courts. I have testified in the U.S. Eastern, Central, and Southern District Courts of California. I have provided expert report and consulting services in the Northern District of California, District of New Mexico, District of Mississippi, District of Arizona, Western District of New York, Eastern District of Pennsylvania, and District of Michigan. My services have been provided for plaintiff and defense cases.

**TRAINING/ EXPERIENCE**

10.    I served as a master trainer in the following:
Use of Force Policy and Procedures
Tactical Alarm Response
Def. Tech. / Federal Arms Factory Certified Impact Munitions Instructor
Blood borne Pathogens
Electrified Fence Master Trainer
Electrified Fence Trainer for Master Trainers
Emergency Response Procedures

Corbin vs. Bates County, et al.
March 4, 2024
Page 4


Escape Procedures
Inmate   Staff   Relations
Litigation        Procedures
Range Safety Officer
I have been certified by CDCR in the following:
FEMA Emergency Response, National Incident
Management System (NIMS)
CDCR    Internal    Affairs    Investigation
(Investigator 40-hour Course)
Cardiopulmonary Resuscitation
Rules Violation Report Hearing Officer
Rules Violation Report Senior Hearing Officer
Basic   First   Aid
Basic Supervision
Advanced         Supervision
Sergeant's            Academy
Lieutenant's          Academy
Classroom Presentation Skills
CDCR Emergency Operations- Conflict Management

**CURRENT AND PRIOR PROFESSIONAL MEMBERSHIPS INCLUDE**

11.
- California Narcotic Officer's Association
- Fraternal Order of Police, San Diego Lodge# 10
- Former   Chapter   President,   California Correctional Supervisor's Organization
- California Correctional Peace Officers Association
- Former Chief Job Steward, California Correctional Peace Officers Association
- California Correctional Peace Officers Association, Retired Chapter
- Correctional Peace Officer's Foundation
- Lifetime Member, American Legion, Post #26, Bakersfield, CA
- Lifetime Member American Legion Post #109, Colorado Springs, CO
- Meudell Oildale Lodge #695, Free and Accepted Masons, Bakersfield, CA
- Centurian   Lodge   #  195,   Ancient   Free   and   Accepted   Masons,   Monument Colorado
- Kiwanis International, Golden Empire Club, Bakersfield, CA
- American Correctional Association
- Aircraft Owners and Pilots Association
- American Radio Relay League
- Committee Member, Citizens Bond Oversight Committee, Bakersfield City School

Corbin vs. Bates County, et al.
March 4, 2024
Page 5

       District, Bakersfield, CA
- Board Member, Jackson Creek Homeowner's Association, Monument, CO

12.    My presentations and list of cases in which I have provided consulting services or expert testimony are set forth in Exhibit "A" attached hereto.

**Valeria Corbin, Administrator of the Estate of Joshua Patterson, vs. Bucks County, et al. In the United States District Court for the Eastern District of Pennsylvania, Civil Action Number 23-2784**

13.    I have been asked to review the above titled case to provide an opinion as to whether the actions of, and the procedures used by the defendant(s), related to this lawsuit, were appropriate and consistent with the industry standards for correctional facilities, and how the actions of persons who had contact with Allen Rhoades, Bucks County Jail Number 128546[1] were appropriate or not based upon my training and experience in the correctional field.

14.    I have been asked to assess whether Defendant Bucks County Correctional Facility, through its employees, established, knew of, and acquiesced to policies, procedures, and customs that Defendants knew or should have known would lead to violations of citizens' constitutional rights. Related to the plaintiff, I have been asked to assess whether the defendants knew, or should have known that ineffective policies, rules, and procedures contributed to the incident described in the operative complaint in this case, and if the lack of training and supervision within the Bucks County Correctional Facility (BCCF) may have facilitated the introduction of narcotics into the jail which allowed Allen Rhoades to provide Fentanyl, to Joshua Patterson, which led to his death. I have been asked to assess whether the employees named in the operative complaint in this case failed in their duty to protect Mr. Patterson from harm.

15.    I have been asked to review BCCF policies in effect when Mr. Patterson was provided Fentanyl by Allen Rhoades while in the custody of the BCCF, located at 1730 Easton Road, Doylestown, PA 18901.

16.    I have been asked to determine if the procedures in effect at the time of the incident, or a lack of policies and procedures, met a generally recognized industry standard at the time Mr. Patterson was provided the Fentanyl that resulted in his death, while detained at the BCCF, as the events were described in the operative complaint.

---

[1] Bates # COB 000356

Corbin vs. Bates County, et al.
March 4, 2024
Page 6

17.    In forming my opinion, I have relied on my training and experience, as well as the policies and/or procedures of the BCCF.[2]

18.    My opinions are also based upon, and supported by, my review of various documents relative to this case including but not limited to:

- The Complaint with attachments filed by Plaintiff Estate of Jushua Patterson, Civil Action No. 23-2784.
- Defendant BCCF Policies as produced in discovery Bates COB 000149 through COB 000184.
- Documents provided to Plaintiffs' Counsel identified as Bates numbers COB 000001 through COB 000399.
- Deposition of Correctional Officer Julio Atiles taken remotely vis Zoom on February 13, 2024.
- Deposition of Correctional Officer Stefanie Ulmer taken remotely vis Zoom on February 13, 2024.

### OPINIONS

19.    In this report, I am not opining about the defendants' intent or providing testimony as a fact witness. However, I have analyzed the facts, and have drawn the types of inferences that I typically made during my career based on my 26+ years of experience, education, and training, and information and research conducted during my time as the owner of Correctional Litigation Solutions since September 2014.

20.    This report is based on information currently available to me. I reserve the right to expand or modify my opinions as my analysis continues, as I received further discovery including documents and things, and to supplement my opinions in response to any additional information that becomes available to me, including any matters that Defendants raise in this case, opinions or testimony provided by Plaintiff's or Defendant's expert(s), and/or in light of any relevant orders from the Court.

21.    I also understand that I may be asked to give rebuttal testimony or provide a rebuttal expert report on any issues not covered in this report. I further reserve the right to respond in a rebuttal report to opinions put forth by any expert that Defendant(s) offers on prison policy and procedural issues and prison/jail administration. In addition, I may participate in creating materials (*e.g.*, animations, demonstratives, enlargements of

---

[2] BCCF Procedures reviewed are found in COB 000149 through COB 000183.

Corbin vs. Bates County, et al.
March 4, 2024
Page 7

exhibits, and other devices to illustrate my opinions) to aid the Court's and/or the jury's understanding of any of the subjects identified in this report.

22. This case involves allegations of improper, inappropriate, and negligent search procedures, and failure to protect the health and welfare of Joshua Patterson by the BCCF and its employees, failure to provide a safe housing area free from dangerous contraband for Mr. Patterson, as well as exercising prudence and reasonable care when conducting searches during the intake of arrestees at the BCCF, and indifference to Mr. Patterson's 4th, 8th, and 14th Amendment rights under the United States Constitution.

23. I am not a medical or mental health expert and give no medical or mental health opinions in this report. Likewise, I will offer no legal conclusions, as I am not an attorney. Remarks in this report referring to legal issues are based upon written reports of professionals in the legal field. I have not been asked to opine on medical procedures or response procedures at the BCCF. I may utilize common knowledge known to the lay person; however, such references are not intended to be taken as expert opinion on my part with regard to legal conclusions.

24. The plaintiff generally alleges that the BCCF, as well as the individual defendants in this case, acted in ways that contributed to the death of Joshua Patterson and violated his rights under the 4th, 8th, and 14th Amendments to the United States Constitution due to their ineffective training, ineffective application of written policies and procedures, failure to practice sound correctional facility practices, and disregard for Mr. Patterson's physical wellbeing.

25. It is alleged that the defendants showed deliberate indifference to the fact that the conditions in the BCCF were unsafe for inmates confined there, and that they knew, or should have known that their policies, procedures, training, and supervision of employees in the BCCF was substandard. It is alleged that those substandard policies and actions or inactions by employees of the BCCF led to the death of Joshua Patterson by Fentanyl overdose. Due to ineffective search of Allen Rhoades during his intake into the facility, he was allowed to bring a "baseball sized"[3] amount of Fentanyl and Methamphetamine into the BCCF by correctional officers assigned to the intake area of the BCCF on July 25, 2022.[4]

---

[3] COB 000372

[4] See: original Complaint for Deliberate Indifference, Civil Rights Violations, Negligent Hiring, Training, Supervision, and other claims, filed in the USDC, Eastern Dist. Of Pennsylvania, Civil Action No. 23-2784.

Corbin vs. Bates County, et al.
March 4, 2024
Page 8

26. The allegations in the operative complaint include a failure by the BCCF to protect from illicit drugs, municipal liability, wrongful death of Joshua Patterson, and survival action under Pennsylvania law.[5]

**DEFENDANTS**

27. In this report, I will refer to officers, policies, and procedures and may identify shortcomings of the same or point out deficiencies of officers. I may use activities to support my opinion that the risks from fentanyl in the facility were both well known, even to members of the public, but that Mr. Patterson was especially at risk due to his condition as a detainee.

28. I have been asked only to opine regarding the officers involved in the initial failure to stop the fentanyl that killed Mr. Patterson from entering the BCCF. It is my understanding that this case is proceeding only against Officers Ulmer and Atiles. Given that I will mention other officers or their supervisors, and generally the BCCF and its administration and administrative activities, these references are only intended to give context to issues raised in this report and are intended to be demonstrative that there were conditions at the BCCF that posed an unreasonable risk to Mr. Patterson's life.

29. References to officials, and activities other than Officers Atiles and Ulmer, are meant to be demonstrative that Mr. Patterson, as well as all inmates there suffered an unreasonable risk from the introduction of dangerous contraband and that a culture existed in the BCCF that presented an obvious risk to detainees. These risks were, or should have been, obvious to Officers Ulmer and Atiles.

30. The jail officers in general and Officers Atiles and Ulmer specifically were aware that preventive action was necessary but made no concerted or focused effort to do so, as a matter of course over a period of time before and after Mr. Patterson was killed by an accidental overdose of fentanyl that should have been prevented.

31. In mentioning officers and events other than Atiles and Ulmer, I am demonstrating that the lack of regard to the obvious risk of drugs, including dangers posed by fentanyl in the facility was pervasive throughout the facility and that officers throughout the facility lacked care for the vulnerability of Mr. Patterson and others as a matter of general practice and employee culture at the BCCF.

---

[5] Operative Complaint.

Corbin vs. Bates County, et al.
March 4, 2024
Page 9

## INITIAL OPINION

32. It is my initial opinion that the failure of officers Ulmer and Atiles to detect fentanyl and methamphetamine in the possession of Allen Rhoades, during the in-processing of Mr. Rhoades into the Buicks County Correctional Facility, allow for a series of events that permitted Mr. Rhoades to smuggle the fentanyl that killed Joshua Patterson into the Alpha Module of the BCCF. Mr. Rhoades distributed the fentanyl to Mr. Patterson, who became a victim of an accidental overdose and died. Mr. Patterson would not have been provided with the fentanyl by Mr. Rhoades, had officers Ulmer and Atiles performed their duties in accordance with BCCF standard operating procedures and according to sound and commonly accepted correctional best practices.

## INCIDENT INVOLVING MR. JOSHUA PATTERSON

33. On July 27, 2023, at approximately 0344am, a correctional officer assigned to the housing unit named "Alpha Module" at BCCF found Mr. Patterson unresponsive in his assigned cell, cell thirty-nine, on the upper tier of Alpha Module.[6] The officer removed Mr. Patterson from the cell and started life-saving measures. Mr. Patterson was transported by EMS to Doylestown Hospital.[7] Mr. Patterson passed away at Doylestown Hospital from a death ruled as "accidental death" and a cause of death listed by the Buck's County Coroner's Office as "Complications of Fentanyl Intoxication."[8]

34. At or near the time Mr. Patterson was found unresponsive in cell 39, officers conducted a search of the cell and found a powdery substance consistent with fentanyl. The substance, a plastic bag found in the cell, and a rolled piece of white paper containing white residue, also found in the cell, were tested by NMS Labs. All three items of evidence were found to be positive for presence of fentanyl.[9] Through investigation, the BCCF found that Inmate Allen Rhoades, an inmate housed in Alpha Module, cell 2, provided the fentanyl to Mr. Patterson. The Bucks County Detectives, after completing an investigation at the BCCF concluded that Mr. Rhoades was responsible for violation of "A Drug Delivery Resulting in Death."[10]

## EVENTS REGARDING ALLEN RHOADES SMUGGLING FENTANYL INTO BCCF AND DELIVERING TO JOSHUA PATTERSON

35. On July 25, 2022, a Pennsylvania State Trooper arrested Mr. Rhoades for a warrant. During the arrest, the trooper found 19 bags of fentanyl in the car where Mr. Rhoades was stopped. The fentanyl was individually packaged in baggies marked "Ric Flair,"

---

[6] Report of Correctional Officer Wilcox, COB000026.

[7] Report of Sergeant Cruz, COB 000022.

[8] Coroner's Report, COB 000057.

[9] NMS Labs Report COB 000015 and 000016.

[10] Arrest Warrant of Allen Rhoades, COB 000255

Corbin vs. Bates County, et al.
March 4, 2024
Page 10

"Game Over," and "Avengers."[11] This packaging was consistent with fentanyl smuggled into the BCCF that day by Mr. Rhoades. According to the affidavit Mr. Rhoades was initially patted down (pat search) by correctional officers and placed into BCCF holding cell one.[12]

36. During the intake of Mr. Rhoades, correctional officers failed to find the baseball sized amount of fentanyl, which Mr. Rhoades eventually smuggled into Alpha Module.[13]

37. Reported reviews of the surveillance cameras in Alpha Module revealed that Mr. Rhoades immediately started distributing the contraband narcotics throughout the module, "within five minutes"[14] and continued to do so for several hours before an informant alerted a correctional officer of the criminal activity. The inmate advised an officer (Luis Venturiera) "that afternoon" that he should, "probably take a look at [cell] A1."[15] Cell A1 was occupied by Allen Rhoades. While it is unclear exactly when Officer Venturiera received this information, it is clear that he did not advise the lieutenant (shift supervisor) until 7:20pm.[16]

38. The BCCF Standard Operating Procedures and Guidelines (SOPs) indicate ███████

███████████████████████████████████████████████

█████████████████████████████ ██[17] Officer Venturiera did not immediately report the suspected contraband to his shift supervisor and instead waited until 7:20pm to do so.

39. Mr. Rhoades admitted to investigators that he was handed "a large amount of fentanyl and methamphetamines during the traffic stop which he placed in his pants and later smuggled into the BCCF Alpha Module."[18] Joshua Patterson was among the several inmates provided fentanyl that day. There is no evidence correctional officers were monitoring the module sufficiently to detect the many transactions made by Mr. Rhoades and other inmates helping him distribute the dangerous contraband until a confidential informant informed a correctional officer of the activity.

40. There is no dispute among the parties that Mr. Rhoades distributed the narcotic that killed Mr. Patterson, or that Mr. Rhoades smuggled the narcotics into the module.

---

[11] Bucks CountyDistrict Attorney, Affidavit of Probable Cause, Case 99-22-0692, COB 000269.

[12] COB 000270

[13] A photograph of the baseball sized amount of contraband can be found in the affidavit. COB 000279.

[14] COB 000271.

[15] COB000379.

[16] BCCF Lieutenant's Shift Report dated 07/26/2022, COB000372.

[17] BCCF SOP Section B-3.11, "Module Officer" Emphasis added.

[18] COB000270.

Corbin vs. Bates County, et al.
March 4, 2024
Page 11

41. The affidavit of probable cause reports several transactions of suspected contraband narcotics including a screen capture of a video time stamped as early as 3:03pm.[19] The information received by the officer was relayed to the shift lieutenant on duty at 7:20pm.[20] Based upon this information, Mr. Rhoades was distributing narcotics unobserved by officers in the Alpha Module for a period in excess of four hours. In the deposition of Officer Julio Atiles, Officer Ulmer is seen on a video played by defense counsel placing an armband on Mr. Rhoades at 10:50am.[21] The BCCF investigative Unit placed Mr. Rhoades in the Alpha Module at 11:21am.

42. By his own admission, Mr. Rhoades was in possession or control of the baseball sized amount of narcotics upon arrival at the BCCF, throughout in-processing in the BCCF reception unit, smuggled the narcotic into, and then distributed fentanyl and methamphetamines in the module.

43. Based upon this information, Mr. Rhoades may have started distributing narcotics in the Alpha Module several hours before the 3:03 pm timestamp noted above. Mr. Rhoades admits that the fentanyl he brought into the module was delivered to Mr. Patterson, although he denies directly distributing the contraband to Mr. Patterson personally. In fact, the BCCF Special Investigation Unit report indicates that Mr. Rhoades is in the module at 11:21am, according to their documented review of surveillance cameras.[22] This means that Mr. Rhoades and others were distributing the narcotics for about eight hours unobserved and unhindered by BCCF officers.

44. Officers Ulmer and Atiles both indicated they knew inmates should be stopped from bringing narcotics into prison indicating they knew that drugs in prison are dangerous.

45. Officer Atiles indicated that preventing dangerous narcotics from entering the BCCF was why officers performed unclothed searches of inmates, but he made no mention of thorough and effective pat searches at intake.[23] Throughout his deposition, Officer Atiles repeatedly disregarded or downplayed the crucial value of the initial pat down search at initial reception of a detainee.

46. Officer Ulmer indicated an understanding that inmates should be searched upon entry to the jail but mentions the order of search operations as that the constables do it (pat search), then questions are asked of the incoming detainee, then an unclothed search is performed. She omits the obligation of BCCF to perform a pat search once receiving custody from the constable.[24]

---

[19] COB 000273.

[20] BCCF Lieutenant's Shift Report dated 07/26/2022, COB000372.

[21] Officer Atiles Depo., P41: L15-22.

[22] COB000379

[23] Atiles Dep.: P28, L14 – 22.

[24] Ulmer Dep.: P9, L2 - 11

Case 2:23-cv-02784-WB Document 57-1 Filed 06/28/24 Page 248 of 265 JA245

Corbin vs. Bates County, et al.
March 4, 2024
Page 12

47. Officers Ulmer and Atiles, throughout this incident, exhibit an attitude that removes personal responsibility for the safety of Mr. Patterson and others, and places it on others. This shows that the attitude of expecting others to have effectively performed a function is a pervasive attitude in the BCCF that catastrophically decreases the safety and security of inmates like Mr. Patterson.

48. Officer Ulmer indicated she had been a correctional officer for three years, and Officer Atiles 19 years at the time they failed to prevent Mr. Rhoades from smuggling the fentanyl into the BCCF that killed Mr. Patterson.[25] Officer Atiles indicated that he had been working in the reception unit of the BCCF for "18 years off and on."[26]

49. Officer Atiles ignores all possible actions that could be made once a pat search fails, and places responsibility for the pat search on the constable.[27] It is only after being challenged by the deposing officer that Officer Atiles admits that the constable can't be blamed for the introduction of the fentanyl. Interestingly, even though challenged, Officer Atiles does not mention that it is an initial pat search that should have been performed. In fact, when he is asked if BCCF staff, in this case *he* should re-search incoming detainees, he makes no mention of a pat search and instead says, "we ask him questions about himself, yes."[28]

**ILLEGAL NARCOTICS TRANSACTIONS NOTED AND ALLEGED IN PROBABLE CAUSE AFFIDAVIT[29]**

50. Several inmates were interviewed by the detectives investigating the death of Mr. Patterson as it related to Mr. Rhoades having distributed narcotics in the Alpha Module at BCCF. In reviewing the affidavit of probable cause, I counted the number of times the detectives noted Mr. Rhoades or other inmates in the module apparently distributing the narcotics smuggled in by Mr. Rhoades. It is noted that several suspects later admitted to their involvement and more than one confidential informant described that there were narcotic distribution activities taking place in the module.

60. By my count there were at least eight different inmates who received the narcotics smuggled into the Alpha Module by Mr. Rhoades. None of these transactions were seen nor were any suspicious activities noted by correctional officers.

61. The distribution of fentanyl took place for around eight hours on Alpha Module, and although Officer Venturiera (Alpha Module Officer) indicated he noted Mr. Rhoades sniffing and "acting off," so he was suspicious of Mr. Rhoades, he took no action to investigate. It was not until later that afternoon that an inmate informed him that he might

[25] Atiles Dep.: P 16, L3-7, Ulmer Dep.: P 10, L16-17.
[26] Atiles Dep.: P17, L5-8.
[27] Atiles Dep. P9, L3 – 24.
[28] Ibid.
[29] COB 000268 through COB 000279

Corbin vs. Bates County, et al.
March 4, 2024
Page 13

want to search cell 1.[30] The officer indicated his suspicions were confirmed by an inmate. Still, he did not immediately act. He did not tell the shift commander until "sometime later in his shift" about his suspicions and the information he received from the inmate.[31]

62. Officer Venturiera's lack of action left Mr. Rhoades and others to distribute fentanyl throughout the module unfettered for several hours. His lack of taking immediate action is yet another example of a pervasive culture in the BCCF that "someone else should do it." In this specific case, Officer Venturiera left taking action to investigate and stop contraband activities in his assigned duty station to the lieutenant. The fact that he waited several hours to inform the lieutenant further illuminates the culture in the BCCF that while officers are aware that narcotics are extremely dangerous, someone else should, or should have, dealt with it.

**JOSHUA PATTERSON WAS ON RESTRICTIVE HOUSING STATUS BUT WAS APPROACHED SEVERAL TIMES BY INMATES INCLUDING MR. RHOADES.**

63. According to the BCCF Commitment Summary regarding Mr. Patterson, he had two "active alerts" listed including, "Keep Separate" (this was listed twice) and "ADM Lock."[32]

64. The Bucks County Special Investigation Unit Report indicates Mr. Patterson was "PATTERSON was on Administrative Lock for Fighting. As a result of this fight PATTERSON was sanctioned to 30 days in RHU (Restricted Housing)."[33] "He was the only detainee in Alpha Module housed in A-39 and was on administrative lock status."[34]

65. The Special Confinement Cases procedure at BCCF states, "

"[35]

66. Evidence of a culture of lack of concern or indifference to the wellbeing of inmates in the BCCF is found in the records of security checks made. It is my opinion that one officer being assigned to a housing unit must observe for the safety and security of the unit and act to interdict contraband and other rules violations in the unit. It is ca commonly understood correctional best practice that housing officers assume a duty post for which they must remain, stay alert, and take primary responsibility. At BCCF, a culture of expecting others to perform security functions based upon a shared duty led to multiple drug distributions in the Alpha Module without officers noticing. This shows a culture of indifference at the facility.

---

[30] COB 000378, COB 000379.
[31] Ibid.
[32] Commitment Summary, Joshua Patterson, COB 000020
[33] COB 000180
[34] COB 000377
[35] BCCF SOP B-4.48, "Special Confinement Cases," COB000180

Corbin vs. Bates County, et al.
March 4, 2024
Page 14

67. There were 39 recorded checks of the upper tier (where Mr. Patterson received the fentanyl) between 7am and midnight on July 26, 2022.

68. The 39 recorded checks were performed by 12 different officers.[36]

69. Of those 39 checks, the 12 different officers reported no unusual activity.[37]

70. During the time period of the 39 checks, Mr. Rhoades brought a baseball sized amount of fentanyl and methamphetamine into the Alpha Module and distributed it to several inmates, an officer was suspicious of him but took no action, several visits were made to Mr. Patterson by other inmates even though he was on RHU status, and Mr. Patterson was provided fentanyl, leading to his death.

71. Although officers were to check into Mr. Patterson ████████████████████ of the 39 checks, 9 were late, representing about 1/3 of the total checks. Among the missed checks, 8 were more than 10 minutes past due. Of the 9 missed checks, 3 were around an hour between checks and 1 was 1.5 hours between checks. The late checks also represent missed checks due to the space between hours.

72. There were 5 missed checks, even though 12 officers conducted checks during the time that fentanyl was distributed in the BCCF Module.

**AN OFFICER SHOULD HAVE BEEN ASSIGNED ON THE UPPER TIER BUT WAS NOT**

73. There is no dispute between the parties that inmates were allowed to approach, communicate with, and trade items with Mr. Patterson at his cell front on July 26, 2022, unobserved and unhindered by correctional officers in the module. Even though he was supposed to have been kept separate from other inmates.

74. There were several officers making tours in the Alpha Module on July 26, 2022, even though Officer Venturiera was assigned to the unit. The officers touring there between 6:50 am and midnight, and ostensibly providing security coverage of Mr. Patterson, were not noting anything out of the ordinary, including Officer Venturiera who had suspicions about Mr. Rhoades.

75. According to the Restricted Housing Unit SOP section, ████████████████████
██████████████████████████████████████.[38] The second officer is primarily responsible

---

[36] COB000045 - 000049
[37] Ibid.
[38] SOP Section B-3.11 COB 000163.

Corbin vs. Bates County, et al.
March 4, 2024
Page 15

▬▬▬ .39

76. The ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ .40

77. The ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ .41

78. Even though there should have been a second officer assigned in the unit, there is no indication that a second officer was assigned. The assignment of a second officer to the upper tier in Alpha Module, if it took place, did not result in Mr. Patterson remaining separated from other inmates in the population, nor did it prevent him from receiving inmate visitors at his cell front, or being distributed fentanyl.

79. It is my opinion that the assignment of a second officer could have prevented the distribution of narcotics around the module by Mr. Rhoades and prevented Mr. Patterson from receiving any, thereby preventing his death.

80. It is my opinion that even though a primary concern in correctional facilities is enforcement of laws and rules pertaining to the unit, including interdicting, controlling, locating, and removing fentanyl and other dangerous drugs, the culture in the BCCF allowed for officers to ignore a duty to protect inmates from a substantial risk posed by drugs in the housing unit, by first sharing the duty among 12 officers to patrol, observe, and act upon violations, but then exhibiting a mutual expectation that one of 12 different officers would gather sufficient information based upon proactive observation and policing to do so.

**ALLEN RHOADES WAS ABLE TO SMUGGLE A LARGE AMOUNT OF NARCOTICS INTO THE BCCF DUE TO FAILURES BY OFFICERS TO PERFORM PROPER CELL DOOR SECURITY, PAT DOWN PROCEDURES, ENGAGE IN CONSISTENT OBSERVATION OF MR. RHOADES, COMMUNICATE EFFECTIVELY, AND TAKE PERSONAL RESPONSIBILITY FOR THE SAFETY AND SECURITY OF INMATES IN THE RECEPTION UNIT**

81. It is my opinion that Mr. Patterson would not have been the recipient of fentanyl on July 26, 2022, had officers in the Reception Unit of BCCF followed written BCCF procedures and exercised reasonable prudence regarding detection of contraband in their duty area, and prevention of introduction of the same into the facility.

82. Allen Rhoades, as stated earlier in this report, was arrested, and brought to the BCCF by Pennsylvania State Troopers on July 26, 2022.

---

[39] Emphasis added.
[40] BCCF Activity Log, COB 000010.
[41] Ibid.

Corbin vs. Bates County, et al.
March 4, 2024
Page 16

83. According to the SOP for the Reception Unit, ██████████████████████████

████████████████████████████ "[42]

84. Officers Julio Atiles and Stefanie Ulmer were assigned to the Reception Unit when Mr. Rhoades arrived.

85. According to Officer Ulmer, she booked Mr. Rhoades into the facility but did not immediately pat search Mr. Rhoades because she is a female officer and therefore not allowed to pat search male inmates. In her deposition, she stated regarding Mr. Rhoades, "He gets pat searched when he comes into the jail with the constables."[43]

86. According to Officer Atiles, he conducted the pat search of Mr. Rhoades.[44] When asked if he took responsibility for not properly searching Mr. Rhoades, Officer Atiles stated, "No"[45]

87. Officer Atiles indicated that, "They're [detainees] given a pat down before they are placed in a holding cell, they're given a pat down."[46]

88. The SOP regarding pat down searches indicates the following procedure is to be followed:

89. "Pat search procedures will be executed in the following manner:



---

[42] BCCF SOP Section B-4.40, "Reception Unit – Admissions and Discharge Procedures, Revised 9/16/2020, Section 2a. COB 0000172

[43] Ulmer Dep.: P9, L2-7.

[44] Atiles Dep.: P8, L24-6.

[45] Atiles Dep.: P8, L19 through P9, L6.

[46] Atiles Dep.: P14, L3 – 5.

Corbin vs. Bates County, et al.
March 4, 2024
Page 17



90. Items in bold and italicized are due to my emphasis and do not appear like that in the policy. I emphasize these sections because it is my opinion that they highlight the failures on the part of Officer Atiles to properly pat search Mr. Rhoades.

91. The existence of the search procedures and Reception Unit SOP indicate that the BCCF was aware of the risks posed by allowing fentanyl and other dangerous contraband into the facility. This was not sufficient to ensure proper training of the officers or monitoring of the reception unit.

92. As noted earlier in this report, Mr. Rhoades indicated he received a large amount of methamphetamine and fentanyl at the scene of his arrest from another person. He admits having the drugs in his pants upon arrival at the BCCF.

93. According to the BCCF Special Investigation Unit (SIU), Mr. Rhoades is seen on surveillance video in the holding cell, after being pat searched by Officer Atiles, producing something from inside his pants, "At 0646 hours, RHOADES is provided a lunch bag by an officer. At 0648 hours, RHOADES turns his back to the camera and appears to remove the plastic wrap from a sandwich. RHOADES places his right hand down the front of his pants and appears to remove something. RHOADES is observed clearly manipulating something in the front of his pants that he eventually hides inside the lunch bag."[48]

94. Mr. Rhoades corroborates the observations of the SIU Officer. "During an interview with Allen RHOADES, he provided details that during the traffic stop he was handed a large amount of Fentanyl and methamphetamine by another occupant in the vehicle that he secreted in his pants. Once he was arrested, he kept the Fentanyl and methamphetamine in his pants until arriving to the Bucks County Correctional Facility.

95. While inside of holding cell 1 in the intake area of the Bucks County Correctional Facility, Allen RHOADES stated, he had ingested bags Fentanyl and was feeling high from the effects. Allen RHOADES admitted that he smuggled the Fentanyl and

---

[47] BCCF SOP A-4.20, "Searches – Inmate and Staff – Pat Searches and Unclothed Searches. COB 000150 – COB 000151.

[48] SIU Incident Report COB 000376

Corbin vs. Bates County, et al.
March 4, 2024
Page 18

96. methamphetamine (contraband) into the correctional facility by removing it from his pants and wrapping the Fentanyl and methamphetaminc (sic.) in the sandwich wrapper, then placed the drugs inside of the brown food bag. Allen RHOADES stated that he had smuggled those drugs from the intake holding cell into A Module housing cell 1."[49]

97. Based upon the admission of Mr. Rhoades and the observations of the Bucks County SIU investigator, it is clear that Mr. Rhoades was placed in the holding cell after he had been pat searched by Officer Atiles. Officer Atiles failed to conduct a pat search thorough enough to detect a "large amount" of narcotics in his pants. The amount was described and photographed later as being the size of a baseball.

98. The BCCF search procedure indicates ███████████████████████████████████

99. Officer Atiles did not properly check this area during the pat search, because he should have easily found the baseball sized amount of narcotics had he performed the pat search of the waistline and legs properly.

100. The procedure ██████████████████████. Had Officer Atiles ██████████████ ███████████, he would have easily found a large amount of narcotics hidden there.

101. The procedure instructs officers about pat searching inside the waistline of the detainee's pants, abdomen, and crotch area. It reads, ██████████████████████

102. Given that Mr. Rhoades admitted hiding the drugs in his pants and the SIU Officer reported observing him reaching into his pants while in the holding cell and removing something he placed in a bag, it is my opinion that Officer Atiles failed to properly search the waist, leg, and crotch area of Mr. Rhoades, thereby allowing Mr. Rhoades to introduce the contraband into the BCCF.

103. It is my opinion that the failure of properly pat searching Mr. Rhoades upon his arrival at the BCCF was a catastrophic failure, in that it provided an opportunity for Mr. Rhoades to introduce the fentanyl into the jail that ended the life of Mr. Patterson. Had officer Atiles properly pat searched Mr. Rhoades, it is my opinion that Mr. Patterson would not have received the fentanyl that killed him.

---

[49] Probable Cause Affidavit, COB 000270.

Corbin vs. Bates County, et al.
March 4, 2024
Page 19

104. It is my opinion that the procedure of having an initial pat search of incoming inmates, followed by an unclothed search is a sound procedure; however, if officers involved in the in-processing of detainees perform complacent and ineffective pat searches assuming that anything they miss will be found in the unclothed search, the two search procedure fails, and contraband is likely to be introduced into the facility.

**OFFICER ATILES DID NOT RECEIVE EFFECTIVE TRAINING IN SEARCH PROCEDURES AND WAS NOT AWARE OF WRITTEN BCCF SOPS REGARDING SEARCHES**

105. In his deposition, Officer Atiles indicated, as noted above, that he did not believe he bore any responsibility for failing to pat search Mr. Rhoades properly. Even so, Officer Atiles admitted being unfamiliar with the policies of BCCF regarding search procedures. He described the pat search procedure as, "The initial pat-down search is we're checking from the neck down and, again, like I said, the primary search is we're looking for anything out of the ordinary, like a weapon, a bulge in a sock area, a bulge in the waistline."[50]

106. It is noted that Officer Atiles did not describe checking an area which my 26+ years of training and experience in the correctional field informs me is a primary place inmates, arrestees, and detainees hide contraband. That place is in the crotch area, between the legs, in the area of the penis and testicles. Inmates often hide contraband in that area because officers are often too embarrassed to search them there or are intimidated by the protestations of the person being searched in that area of the body. It is clear, however, that ███████████████████████████████████████.

107. During his deposition, Officer Atiles was shown SOP Section A-4.20 regarding search procedures as noted above. Officer Atiles repeatedly stated he was not familiar with the policy. At one point he stated, "I don't know the policy, sir, offhand."[51]

108. Officer Atiles indicated in his deposition that he cannot recall the search procedures being a part of his quarterly online training.[52]

109. Officer Atiles was shown, during his deposition, BCCF SOP B-3.13, "Reception Unit Officer." He indicated he was not familiar with the policy.[53]

110. It is my opinion that the BCCF had a responsibility to ensure that officers in the reception area were properly trained in how to search inmates, beginning with a proper and effective pat search of newly arriving commitments, such as Mr. Rhoades. Proper searches were

---

[50] Atiles Dep.: P16, L19 – 24.

[51] Atiles Dep.: P24, L3 – 21.

[52] Atiles Dep.: P25, L1 – 8.

[53] Atiles Dep.: P25, L13 trough P26, L 22.

Corbin vs. Bates County, et al.
March 4, 2024
Page 20

crucial in preventing dangerous contraband from being introduced into the jail. The officer regularly assigned in the reception unit, Officer Atiles, by his own testimony, was not aware of the BCCF SOPS regarding search procedures or Reception Unit procedures. Officer Atiles did not recall having received training in pat searches, unclothed body searches, or Reception Unit standard operating procedures/policies.

111. Because the BCCF was responsible for the training of their officers, and provided training quarterly as testified to by Officer Atiles, they reasonably should have known that officers were not receiving training in search procedures.

112. It is my experience and opinion that a failure to provide meaningful training to officers results in substandard performance by the officers. In this case, the failure of BCCF to provide training in the SOPs regarding search procedures and Reception Unit procedures contributed to the catastrophic failure of BCCF officers to prevent the introduction fentanyl into the facility. This failure resulted in the death of Mr. Patterson.

**FAILURE TO PROPERLY SECURE AN EMPTY CELL GAVE MR. RHOADES AN OPPORTUNITY TO GAIN ACCESS TO THE NARCOTICS HE SMUGGLED INTO ALPHA MODULE**

113. After Officer Atiles failed to find the narcotics Mr. Rhoades had hidden in his pants during the initial pat search, Mr. Rhoades was placed in holding cell 1. While there, he was provided a lunch. He took the plastic wrap form the sandwich and used it to package the large amount of fentanyl and methamphetamine he removed from his pants. He placed the drugs into the lunch bag and at one point placed the drugs near the officer's station.

114. When Officer Ulmer removed Mr. Rhoades from the holding cell 1 for processing, she left the door to the cell "slightly ajar."[54] Mr. Rhoades did not have the lunch bag with him when he left holding cell 1.[55] It is apparent Mr. Rhoades left the lunch bag containing the drugs in holding cell 1, which should have been locked once empty of detainees.

115. After Mr. Rhoads had been processed by Officer Ulmer, Officer Atiles took him directly to have the unclothed search. It is verified during his deposition that Mr. Rhoades did not have the lunch sack when he went with Officer Atiles for the unclothed search.[56]

116. When Officer Ulmer failed to close and lock the holding cell after removing Mr. Rhoades for further processing, she created an opportunity for Mr. Rhoades to re-enter the cell.

117. It is my experience and training, and a common correctional safety and security practice, to never leave an empty cell open. There are several reasons for this. Among them, open

---

[54] COB 000376.

[55] Ibid.

[56] Atiles Dep.: P42, L17 – 24.

Corbin vs. Bates County, et al.
March 4, 2024
Page 21

cells can be used for detainees to hide while conducting illegal activities, stage attacks on staff or inmates, force staff members into the cell then lock them in for the purpose of assault (either sexual or physical), force staff members of visitors into the cell for the purpose of hostage taking, and several other purposes that threaten the safety of staff and inmates. Specific to this case, the cell was considered a "dirty cell" because an inmate had left items of clothing and things there that may have contained contraband, and the inmate should not be allowed back in. The concept of dirty and clean cells was a "custom" at the BCCF.[57]

118. In this specific case, Officer Ulmer would have stopped Mr. Rhoades from re-entering the cell to retrieve the narcotics had she simply closed and secured (locked) the empty holding cell door. Had she done so, it is my opinion that Mr. Rhoades would not have been able to re-enter the cell and retrieve the fentanyl that was eventually distributed to Mr. Patterson, resulting in Mr. Patterson's death.

119. It was the account of Officer Ulmer, during her deposition, that while Officer Atiles was performing the strip search of Mr. Rhoades, she was required to respond to a Code 99, which she described as an emergency incident in an area away from the Reception Unit.[58] This called her away from her post. She indicated that she called out to her partners to inform them she was leaving, and then ran out of the Reception Unit.[59]

120. When Officer Ulmer left the unit, it was unclear to Officer Atiles she was gone.[60] In the deposition of Officer Atiles, he indicated that he was in the back of the reception unit and was not aware of Ulmer's absence from the front of the unit until reviewing the surveillance video.

121. Regardless of the location of Officer Ulmer, Officer Atiles had custodial control of Mr. Rhoades, and bore the responsibility of maintaining direct observation of him until properly relieved of that duty by another officer who affirmatively assumed custodial control. Officer Atiles had the responsibility to maintain direct observation and control of Mr. Rhoades by escorting him to the "clean cell" after performing an unclothed search of the detainee.

122. Officer Atiles admitted he did not escort Mr. Rhoades from the area where he was given an unclothed search to holding cell 6, which afforded Mr. Rhoades the opportunity to go instead from the shower area to the unsecured holding cell 1, retrieve the contraband he left there, and then go to holding cell 6 once again in possession of the dangerous contraband.

---

[57] Atiles Dep.: P46, L13 – 21.
[58] Ulmer Dep.: P10, L7 – 14.
[59] Ibid, and P19, L11 – 19.
[60] Atiles Dep.: P20, L8-24.

Corbin vs. Bates County, et al.
March 4, 2024
Page 22

123. Instead of escorting Mr. Rhoades, Officer Atiles ordered Mr. Rhoades to go from the unclothed search area to holding cell 6, but gave no indication that he informed Officer Ulmer, or ensured that at a minimum Mr. Rhoades was under visual surveillance at all times between locations.[61]

124. Officer Atiles simply gave a detainee an order to go somewhere and believed the inmate would feel obliged to follow it. Instead of identifying the failure to escort or ensure safe and secure movement of a detainee, Officer Atiles instead identified the failure in following BCCF policies and ineffective performance of accepted correctional practices as the fault of Mr. Rhoades alone, because Mr. Rhoades did not follow orders. Officer Atiles testified, "Well, we searched him. The search was good. He didn't follow the direct order when I told him to go back holding cell 6."[62]

125. Officer Atiles indicated that it was not his habit to escort inmates to the "clean cell" after the search, but in fact he only ordered them to go there. He stated, "...after an unclothed body search, I usually give them instructions to go to what we called holding cell number 6, which is the clean cell, where once they've been searched and they've been processed, they go inside the cell. I gave them instructions to go to holding cell 6, I normally put away their property and then I come and I lock him in the cell.[63]

126. This statement indicates to me that Officer Atiles was in the habit of trusting people recently arrested and booked into a correctional facility to comply at all times with his instructions. Based upon my training and experience in officer safety tactics and correctional awareness, as well as safety and security measures in the correctional environment, this is naïve on the part of Officer Atiles to expect arrestees undergoing in-processing to always follow instructions or orders. Such an expectation on the part of Officer Atiles shows a lack of regard for the safety and security of inmates and staff members, and a lack of understanding that maintaining proper custody and control of inmates whose intentions are unknown to the officer is essential to his own safety, the safety of the in-processing detainee, and others in the correctional environment.

127. In the deposition of Officer Atiles, defense counsel asked if it was possible for Officer Atiles to find the contraband in the lunch bag during the unclothed search given the fact that Mr. Rhoades did not have it with him during that search. Officer Atiles said it would not be possible.[64]

126. It is my opinion that Officer Atiles was correct that it was not possible to find the fentanyl and methamphetamines Mr. Rhoades smuggled into the BCCF during the unclothed body

---

[61] Atiles Dep.: P19, L 7 – 23.

[62] Atiles Dep.: P31, L1 – 6.

[63] Atiles Dep.: P19, L8-16.

[64] Atiles Dep.: P43, L7-12.

Corbin vs. Bates County, et al.
March 4, 2024
Page 23

search because the contraband was not in his possession at that time, it was in holding cell 1, which should have been locked.

128. It is my opinion that the contraband narcotics should have been found during the initial pat search officer Atiles performed at intake. Had the pat search been performed properly, the drugs could not have been smuggled into the Alpha Module and distributed for over eight hours before being reported to officers. The same drugs could not have resulted in the death of Mr. Patterson.

129. It is my opinion that there was a section of the Reception Unit SOP that called for video surveillance in the Reception Unit. The video surveillance was not monitored when Mr. Rhoades entered the area of cell1 after having been given an unclothed body search but not under escort or direct visual observation.

130. SOP Section B-4.40 § <u>Remaining Holding Cells</u>, (c.), reads, "

[65] The evidence I have reviewed thus far does not include any report from Main Center staff regarding their visual supervision, if any, of the reception unit via video.

131. It is my opinion that if a reception unit officer must respond to a Code 99, the Main Center staff should begin monitoring the video closely to ensure the security of the remaining holding cell that may be left unattended. Had this taken place, it is possible the Main Center staff would have seen Mr. Rhoades re-enter the unsecured holding cell 1, retrieve something, and then enter the "clean cell" holding cell 6.

**SUMMARY OF EXPERT OPINIONS**

132. It is my opinion that the death of Joshua Patterson could have been prevented. Had Officer Atiles performed an effective search in accordance with BCCF SOP regarding searches, Mr. Patterson's death would have been prevented.

133. Likewise, if Officer Ulmer locked holding cell 1 after taking Mr. Rhoades out prior to the unclothed search, the death would have been prevented.

134. If Officer Atiles had escorted Mr. Rhoades directly to holding cell 6 after the unclothed search and locked him in instead of trusting him to go there on his own, Mr. Patterson's death would have been prevented.

---

[65] Emphasis added.

Corbin vs. Bates County, et al.
March 4, 2024
Page 24

135. If officers in the Alpha Module proactively monitored the module and kept inmates away from Mr. Patterson's door (he was on RHU "keep separate" status), the death would have been prevented.

136. If a second officer was assigned to the upper tier in Alpha Module due to the high population in the unit, the death would have been less likely to happen as the officer would stop contraband from being passed into the cell or take immediate action if it happened.

137. If Officer Venturiera had informed the shift supervisor of suspected contraband in the afternoon when he received the tip from an informant about Cell 1, instead of waiting until after 7pm to make the report, search operations could have started immediately and either stopped inmates from distributing the fentanyl to Mr. Patterson, or they might have found Mr. Patterson in possession of the fentanyl and prevented his death.

138. It is my opinion that the BCCF had policy and training responsibility for the officers staffing the facility and should have reasonably known that training was lacking, and officers were unaware of the policies governing their activities and duty assignments. Had officers been effectively trained and aware of BCCF's written SOPs, errors leading to the death of Mr. Patterson would have been less likely to occur.

139. The failures of the defendants in this case were related to, and causative of, the death of Mr. Patterson. This assessment applies to the actions and decisions related to the correctional environment alone and does not extend to any other issue involved in this case such as medical care.

140. In the hours leading to the time Mr. Patterson died, the officers of the BCCF exhibited a "someone else will do it, someone else should have done it" culture repeatedly. The officers showed a repeated pattern of disregard to stopping contraband, by their shared institutional culture. For instance:

141. Officer Atiles expected the constable to have performed a pat down on Mr. Rhoades but did not perform an effective pat down himself.

142. Officer Ulmer expected the constable to have conducted an effective pat down of Mr. Rhoades and assumed Officer Atiles did one too.

143. Officer Atiles assumed Officer Ulmer secured the door to Cell 1 in the reception Unit after removing Mr. Rhoades.

144. Officer Ulmer assumed there was no reason to ensure the security of the reception unit when she failed to secure the cell 1 door.

Corbin vs. Bates County, et al.
March 4, 2024
Page 25

145. Officer Atiles assumed that Mr. Rhoades would go directly to cell 6 after the unclothed search. But did not take affirmative steps to ensure he did.

146. Officer Atiles did not ensure Mr. Rhoades could not obtain fentanyl from the "dirty cell" but assumed Officer Ulmer would do so. Because he assumed Officer Ulmer would do it, he assumed Officer Ulmer was in her post even though she was not.

147. Officer Ulmer left her post for a legitimate reason (responding to a code 99 in the female section of the facility) but assumed Officer Atiles was aware she was gone.

148. Officer Ulmer took no affirmative steps to ensure Officer Atiles knew she was absent from her post and assumed he knew she was gone.

149. Officer Venturiera was assigned to the housing unit where Mr. Rhoades distributed the contraband and extremely dangerous fentanyl but shared the duty of touring the unit with several other officers.

150. Officer Venturiera suspected Mr. Rhoades, but instead of taking affirmative steps to investigate, assumed another officer would.

151. Officer Venturiera failed to immediately notify the lieutenant about his suspicions, even after a detainee in the unit warned him about Mr. Rhoades and confirmed his suspicions. Instead, he waited until the lieutenant arrived for a shift tour to share his confirmed suspicions.

152. Officer Venturiera apparently assumed his suspicions about Mr. Rhoades and possible narcotics in the unit could wait until someone else decided to act.

153. Lieutenant Sherman, the shift commander, did act and the contraband in Mr. Rhoades' possession and cell were confiscated. He wrote in his shift log that based upon the incident, "**In lieu of this finding; Cell searches will be conducted on Alpha module as precautionary measures taken.**"[66] Even so, he apparently assumed someone else would do it because there is no indication in the log after that entry (at 7:45pm) that any searches took place.

154. It is my opinion that most persons in the United States are aware of a fentanyl epidemic. Most people are aware that fentanyl is extremely dangerous and poses a severe danger to anyone who comes in contact with it. Officers Ulmer and Atiles were aware of the

---

[66] COB 000372.

Corbin vs. Bates County, et al.
March 4, 2024
Page 26

dangers yet did not take personal responsibility for maintaining security in their duty area, each acting upon the "someone else" culture in the BCCF.

155. It is my opinion that dangers of fentanyl overdose are greatly magnified in correctional facilities because inmates are left out of the view of others and are therefore subject to more infrequent observation of their health and welfare. Inmates are wholly dependent upon correctional officers and staff members to observe them and their health, safety, and wellbeing.

156. Because a culture existed at the BCCF and Officers Ulmer and Atiles failed in their duties to stop the introduction of fentanyl and other dangerous contraband into the facility, Mr. Patterson was detained under conditions that posed a substantial risk of serious harm.

157. This risk was extended to the Alpha module when 12 officers performed ineffective checks and failed to notice or stop the distribution of fentanyl in the Alpha Module. It is clear that these officers failures would not have been at issue had Officers Atiles and Ulmer performed their duty to protect the inmate population from the introduction of fentanyl.

158. It is also my opinion in this case that lesser amounts of contraband, including fentanyl and methamphetamine can be missed during in-processing of detainees. This is common and I believe that an amount of fentanyl, sufficiently small, could be hidden in a body cavity and be easily missed by officers during both pat and unclothed searches. This is not; however, the case here. In this case, a baseball sized amount of fentanyl and methamphetamines was in Mr. Rhoades' pants when Officer Atiles alleges, he performed a pat search.

159. The failures and indifference to adherence with BCCF SOPs exhibited by Officers Ulmer and Atiles posed a substantial risk of harm to Mr. Patterson and to the inmates in the facility in general. The risk was so great that it violated the contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the "someone else culture" and specific and identifiable catastrophic failures of Officers Ulmer and Atiles were not a "one off," but were failures borne of habit, of a long history of indifference to safety that the officers admitted to as noted above.

160. Officers Ulmer and Atiles testified that they knew of the particular vulnerability of danger narcotics introduced into the BCCF imposed upon the inmates of the facility, even so, their catastrophic failures to act upon that knowledge by performing their duties in accordance with written (and available) SOPs showed a reckless indifference to that vulnerability.

161. The risk of failing to prevent the introduction of fentanyl into the BCCF was so obvious that even a lay person would recognize the necessity of conducting effective searches

Corbin vs. Bates County, et al.
March 4, 2024
Page 27

and exercising security procedures in a manner effective to prevent fentanyl from entering the facility.

162. Fentanyl poses a severe danger to anyone who comes in contact with it. As noted by the Bucks County District Attorney Affidavit of Probable Cause in the case against Allen Rhoades, No. 99-22-0692, *"Fentanyl: a scheduled II substance is a synthetic opioid that is 50-100 times stronger than morphine. Because of its powerful opioid properties, Fentanyl is also diverted for abuse. Fentanyl is often labeled as highly potent heroin. Many users believe that they are purchasing heroin and actually don't know that they are purchasing fentanyl - which often results in overdose deaths."*[67]

163. It is my opinion that the risk of overdose from fentanyl in correctional facilities is greater than the general public because the drug is highly dangerous, and inmates are not under consistent observation. Mr. Patterson, as noted above, was in his cell by himself, and was subjected to periods of nearly an hour, on one instance an hour and a half, without any observation from officers. During such periods, inmates may easily overdose from fentanyl and not be observed after the overdose for prolonged periods of time. Therefore, the risk of death by fentanyl overdose to Mr. Patterson was magnified by his status as an incarcerated person.

164. It is my opinion that drugs were prevalent inside the BCCF as noted by the SIU Incident Report. Inmates were noted as testing positive for:

- BZO (Benzodiazepine) based upon my training and experience found in urine after cocaine usage.

- THC (Tetrahydrocannabinol) based upon my training and experience is found in the urine and blood stream after use of cannabis.

- BUP (Buprenorphine) Used to relieve symptoms of heroin withdrawal. According to the Drug Enforcement Administration (DEA), "Like other opioids commonly abused, buprenorphine is capable of producing significant euphoria. Data from the United States and other countries indicate that buprenorphine has been abused by various routes of administration (sublingual, intranasal, and injection) and has gained popularity as a heroin substitute and as a primary drug of abuse."[68]

- COC (Cocaine)

---

[67] COB000198

[68] https://www.deadiversion.usdoj.gov/drug_chem_info/buprenorphine.pdf

Corbin vs. Bates County, et al.
March 4, 2024
Page 28

- AMP (Amphetamines)

165. As per the evidence in this case, Mr. Rhoades only introduced Methamphetamine and fentanyl into the BCCF on 7/26/22. Even so, inmates tested after the incident had illegal narcotics in their systems not smuggled in by Mr. Rhoades. For instance, an inmate with positive urinalysis test results for amphetamines, buprenorphine, and methamphetamine was booked into the BCCF on 6/7/22, around 6 weeks prior to Mr. Rhoades.[69]

166. Such information supports the conclusion, and my opinion, that narcotics were prevalent in the BCCF and unfettered access to those drugs existed prior to Mr. Rhoades being allowed to introduce the fentanyl that killed Mr. Patterson by the failures of officers Atiles and Ulmer. The prevalence and unfettered access to dangerous drugs did not stop when Mr. Patterson died, as evidenced by the death of detainee Octavious Davis at BCCF on January 16, 2023, from a drug overdose suffered in custody there.[70]

167. I have relied on my professional experience while preparing my report. Based on my 26 years of experience at the CDCR, and 9 years as a prison expert and consultant, I have direct knowledge and administrative experience in the development of corrections policies and procedures, including correctional awareness, safety and security protocols, search and escort procedures, as well as supervising correctional officers, sergeants, and lieutenants conducting prison operations in maximum and medium custody facilities such as level four and three (maximum and medium security) prisons, facilities, housing units, administrative segregation units, and specialized units to include supervision of correctional officers in psychiatric services units and administrative segregation.

168. I have served in officer, supervisory, management, and administrative levels in medium and maximum-security institutions, and am aware of the policies and procedures essential to maintaining and enhancing safety and security in the correctional facility setting, as well as, assisting in the delivery of medical care in the correctional setting, supervising correctional staff, and assisting with security and inmate protection in the prison environment.

169. I have performed and supervised the reception, intake, and release of inmates in the correctional environment with a primary focus on preventing the introduction of controlled substances and dangerous contraband. I have engaged during my career in the CDCR in the training of employees regarding inmate intake and release procedures,

---

[69] COB00378
[70] Complaint, Pages 11 – 12.

Corbin vs. Bates County, et al.
March 4, 2024
Page 29

search and escort procedures, housing unit and cell security,  officer safety tactics, and
responsibility of staff members to exercise situational awareness, also known as
correctional awareness, in the custodial environment.

170.  This opinion is based solely upon the facts available at the time of this writing. I am
competent and willing to testify regarding the above, if asked to do so. All opinions
expressed here are my own, having been based upon my extensive training and
experience from the beginning of my career with the CDCR until the present. I reserve
the right to amend this opinion should additional facts become available that are not
available at the time of this writing.

171.  I reserve the right to submit supplemental opinions as requested by the parties or court,
or as additional information or discovery is received.

Respectfully,

William Adams
Correctional Counselor II, CDCR (Ret.)
Owner/Consultant
Correctional Litigation Solutions